## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

PSW, INC., d/b/a PSW BILLING,
                    **Plaintiff,**

v.                                                    **C.A. No. 04-**

VISA U.S.A., INC., MASTERCARD
INTERNATIONAL INCORPORATED, FIRST
FINANCIAL BANK, and FIRST DATA
MERCHANT SERVICES CORPORATION,
                    **Defendants**

**CA 04 347 T**

## COMPLAINT

### I.    Introduction

1.    Plaintiff has brought this action seeking declaratory relief and compensatory, punitive, and treble damages, as well as attorneys' fees, against the Defendants for violation of the Sherman Act, Clayton Act, the Rhode Anti-Trust Law, and for breach of the covenant of good faith and fair dealing, interference with contractual relations, interference with prospective economic advantage, conversion, embezzlement, and breach of contract, arising out of the use of market power by the Defendants to act arbitrarily, commercially unreasonably, and unlawfully, and thereby deprive Plaintiff of the value and fruits of its business.

### II.    Parties

2.    Plaintiff PSW, Inc., d/b/a PSW Billing ("PSW") is a corporation duly organized and incorporated under the laws of the State of Rhode Island, with a principal place of business located in the City of Cranston, County of Providence, State of Rhode Island.

3.    Defendant Visa U.S.A., Inc. ("Visa") is a Delaware corporation with a principal place of business located in San Francisco, California. Visa is a national bank card association whose members include more than 14,000 banks. Visa is doing business and transacts business in this judicial district.

4.    Defendant MasterCard International Incorporated ("MasterCard") is a Delaware corporation with a principal place of business located in Purchase, New York. MasterCard is a national

**Page 1 of 38**



bank card association whose members include more than 20,000 banks. MasterCard is doing business and transacts business in this judicial district.

5.      Defendant First Financial Bank ("FFB"), is a corporation duly organized and incorporated under the laws of the State of Colorado, with a principal place of business located at 6200 South Quebec Street, Greenwood Village, Colorado. FFB is doing business and transacts business in this judicial district.

6.      Defendant First Data Merchant Services Corporation ("FDMS") is a corporation duly organized and incorporated under the laws of the State of Florida, with a principal place of business located at 6200 South Quebec Street, Suite 240, Greenwood Village, Colorado. FDMS is doing business and transacts business in this judicial district and is registered to do business in the State of Rhode Island.

7.      On information and belief, both Defendants FFB and FDMS are wholly owned subsidiaries of First Financial Management Corporation, which in turn is a wholly owned subsidiary of First Data Corporation ("FDC"), a corporation duly organized and incorporated under the laws of the State of Delaware, with a principal place of business located at 6200 South Quebec Street, Suite 240, Greenwood Village, Colorado. FDC is a worldwide leader in electronic commerce and payment services, and it provides credit, debit, smart card and stored-value card issuing and merchant transaction processing services; Internet commerce solutions; and cheque processing and verification services to financial institutions in more than 70 countries on six continents. With more than 30,000 employees worldwide, FDC has offices throughout Europe, Asia Pacific, Africa, Latin America and North America. FDC is doing business and transacts business in this judicial district and is registered to do business in the State of Rhode Island.

8.      Each of the Defendants herein are liable for the relevant acts and/or omissions of the other, including by not limited to those alleged herein, either as a principal, agent, and/or co-venturer.

### III.    Jurisdiction

9.      This Court has jurisdiction under 28 U.S.C. §§1331 (federal question), 1367 (supplemental jurisdiction), 1332 (diversity), insofar as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00, and 2201 (Declaratory Judgment Act), as well as 15 U.S.C. §15 (Clayton Act).

### IV.    Venue

10.     Insofar as Defendants transact business and/or may be found in this judicial district, and the interstate trade and commerce involved and affected by the Defendants' wrongful acts and/or omissions complained of herein have had and will continue to have anti-competitive effects in this district, venue in this judicial district is proper under 28 U.S.C. §1391 and 15 U.S.C. §22.

### V.    Material Facts

#### A.    The MasterCard and Visa Networks

11.     MasterCard and Visa are two of the United States' four major network systems in the payment card industry, the other two being American Express and Discover. *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 234 (2nd Cir. 2003) [hereinafter referred to as *"Visa, (2nd Cir."*)].

12.     MasterCard and Visa are organized as open joint ventures, owned by the numerous banking institutions that are members of the respective MasterCard and Visa networks (also referred to herein as "associations"). Accordingly, MasterCard is owned by its approximately 20,000 member banks, while Visa is owned by its approximately 14,000 member banks. *Id.* at 235.

13.     The networks' operations are conducted primarily by their member banks. While the member banks engage in the card business for profit, MasterCard and Visa themselves operate as non-profit organizations and are largely funded through service and transaction fees paid by their members. Both make a "profit" on these fees, but their business model is not one that strives to maximize earnings at the "network" level. Rather, the two organizations' capital surpluses are held basically as security accounts, to pay merchants in the event a member bank defaults on a payment obligation. *Id.*

14.    The member banks of the MasterCard and Visa card networks may function either as "issuers" (also referred to herein as "Issuing Bank") or "acquirers" (also referred to herein as "Acquiring Bank") or both.  A member bank serving as an "issuer" issues cards to cardholders; it serves as the liaison between the network and the individual cardholder.  A member bank serving as an "acquirer" acquires the card-paid transactions of a merchant; it acts as liaison between the network and those merchants accepting the network's payment cards with which it has contracted.  *Id.*

15.    When a consumer uses a MasterCard or Visa card to pay for goods or services, the accepting merchant relays the transaction information to the Acquiring Bank with which it has contracted.  The Acquiring Bank processes and packages that information and transmits it to the network (the applicable MasterCard or Visa association).  The network then relays the transaction information to the cardholder's Issuing Bank, which approves the transaction if the cardholder has a sufficient credit line.  Approval is sent by the issuer to the Acquiring Bank which relays it to the merchant.  *Id.*

16.    Both MasterCard and Visa are *open* joint ventures, meaning that there is no limit to the number of banks that may become members, either as issuers or as acquirers.  Member banks agree to abide by their association's by-laws and other regulations.  *Id.*

17.    A member of either the MasterCard or Visa network may also be a member of the other network.  Thus a bank that is a member of Visa's network and issues Visa cards may also be a member of the MasterCard network and issue MasterCard cards.  *On the other hand, both MasterCard and Visa have promulgated rules that prohibit their members from issuing American Express or Discover cards.*  *Id.* at 236.

## B.    PSW

18.    PSW was a business which operated exclusively on the Internet.  PSW's business involved processing payment card sales to consumers on-line for purchases of goods and services delivered by the operators of various World Wide Websites and other card-not-present merchants ("website clients").

19.     At its inception, PSW's role was essentially to provide credit card billing services to website clients, many of which comprised the largest companies in the adult entertainment industry. Website clients hired PSW to process customer credit and debit card purchases of their on-line entertainment services.  PSW played the role of what is called an "aggregator" or middleman, between website clients and the eventual Acquiring Bank.

20.     As a billing processor for website clients, PSW (through its contracts with the website clients) was authorized to facilitate and process sales on behalf of such website clients, and PSW accepted MasterCard and Visa cards as payment for such sales.  PSW then submited the card transactions for settlement under PSW' s own Merchant Account (i.e. an account into which MasterCard and Visa transactions are deposited and through which such transactions are "settled" and the merchant is paid) at its Acquiring Bank and paid the website clients for such sales out of the proceeds of such settled transactions.  PSW provided this service to its website clients, which, for one reason or another, did not have their own Merchant Account with a MasterCard or Visa member bank.

21.     A substantial percentage of the website clients for which PSW processed credit card transactions involved the delivery of digital content for the "Adult Entertainment Internet industry." PSW did not produce, own, review, or manage such digital content, but rather provided a gateway that permitted such websites to accept credit card transactions from consumers and allowed consumers to view such content on the websites of PSW's clients.  In essence, PSW's role was much like that of a ticket agent (e.g. TicketMaster) in providing access to a number of different "venues" (or, in PSW's case, websites).  Account ID's and passwords ordinarily were available as part of a recurring monthly subscription, for which a monthly subscription fee was charged each month to permit the consumer access to a website of a PSW client.

22.     Although PSW's website clients were, in fact, the parties supplying the goods and services to which PSW provided access, PSW was technically the "merchant" that made the sale to the consumer through the MasterCard and Visa networks.

23. PSW's business, although modeled after TicketMaster, is a somewhat unique business on the Internet. In essence, PSW's business provided the value-added services of facilitating payment to its website clients for the goods and services delivered by the website clients to consumers. Whereas the majority of PSW's website clients possessed the technical know-how to establish and distribute account ID's and passwords to consumers desiring access to the client's websites, very few possessed the technical expertise to process the transaction and manage the risks of fraud that would be present in the absence of appropriate fraud screening employed by PSW.

24. Unlike a traditional "brick and mortar" business, such as a book store, restaurant or other such retail market, PSW (and other merchants operating on the Internet) cannot, as a practical matter, accept cash or bank checks from consumers as a means of payment for the goods and services purchased on-line from PSW client websites. Rather, PSW was limited to accepting payment cards in order to be able to make sales to consumers, meaning that PSW was much more reliant than the average merchant in the United States on the ability to accept MasterCard and Visa cards. Operating on the Internet, PSW originally also did business with consumers around the world, for whom MasterCard and Visa cards were the primary means of payment. Without the ability to accept these cards, PSW could not have operated its business. Nearly 100% of the transactions processed by PSW involved either a MasterCard or Visa card.

### C. The Payment Card Processing System

#### 1. The Merchant Agreement

25. While neither PSW nor any other "merchant" contracts directly with MasterCard or Visa in order to process credit card transactions, merchants such as PSW do so indirectly by entering into a "Merchant Services Agreement" ("Merchant Agreement") with a "member bank," which is a member of the MasterCard and/or Visa bankcard associations (i.e. networks).

26. As described previously above, a member bank may be either an "Issuing Bank," that issues payment cards to consumers and set the cardholders' interest rates and fees, or an "Acquiring

Bank," that contracts with and on behalf of MasterCard and Visa and with merchants to accept their payment card transactions from cardholders for settlement, or both. Acquiring Banks often contract with payment card processing banks or institutions which, as agents of and in conjunction with the Acquiring Bank, process payment card transactions pursuant to Merchant Agreements.

27.  A Merchant Agreement is an agreement with MasterCard and/or Visa, through their member banks, pursuant to which merchants such as PSW agree, *inter alia*, to honor payment card transactions with MasterCard and/or Visa cardholders, and MasterCard and/or Visa, and their member banks agree, *inter alia*, to accept all sales drafts generated in compliance with the Merchant Agreement and deposited by the merchant into its Merchant's Account[1] with the Acquiring Bank.

28.  Each Merchant Agreement is expressly subject to and incorporates the bylaws, rules and regulations promulgated by MasterCard and Visa, as presently existing, or as the same may be amended from time to time. Nevertheless, merchants such as PSW are not provided with a copy of or allowed access to these rules, which, on information and belief, are hundreds of pages long. MasterCard and Visa each promulgate their own rules, although, on information and belief, they are extremely similar.

29.  Payment requests are sent by the merchant to the Acquiring Bank, which in turn forwards the request to the Issuing Bank, which bills and receives payment from the cardholder. When a cardholder makes a purchase with his or her MasterCard or Visa card from a merchant, the Acquiring Bank reimburses the merchant the purchase price less a "Discount Fee" (e.g. 2.5%), from which the Acquiring Bank pays the Issuing Bank an "Interchange Fee," which the Issuing Bank withholds from the payment received from the cardholder. Visa and MasterCard set the Interchange Fee, and the Discount Fee is based largely on the Interchange Fee. On information and belief, the Issuing Bank and Acquiring

---

[1] In general, a Merchant Account is a bank account in which funds are collected by a bank from credit card purchasers and disbursed to the merchant. Banks consider Merchant Accounts to be a "loan" and underwrite the issuance of a Merchant Account much like a loan, requiring an application, supporting documentation (such as tax returns), and good credit. Merchant Agreements allow for consumer payment card transactions to take place.

Bank are each, in turn, required to pay a portion of the foregoing fees they receive to MasterCard or Visa.

30.     On information and belief, Issuing Banks and Acquiring Banks are required to become a "member bank" by entering into one or more agreements with MasterCard and Visa in order to be authorized to act as agents of MasterCard and Visa with respect to the processing of payment card transactions in the foregoing manner.

### 2.     Market Power of MasterCard and Visa

31.     Credit and charge cards[2] issued under the MasterCard and Visa brand names are known as general purpose cards, because they are accepted by numerous, unrelated merchants, unlike those issued by department stores like Sears and Macy's and accepted only at those locations. *United States v. Visa, U.S.A., Inc.*, 163 F. Supp.2d 322, 331 (S.D.N.Y. 2001), *affirmed*, 344 F.3d 229 (2nd Cir. 2003)[hereinafter referred to as "*Visa*"].

32.     MasterCard and Visa, through their approximately 20,000 member banks, issue a wide variety of payment cards, including credit and debit cards. In 2002, Visa reported that it had more than 1 billion cards in circulation worldwide, and MasterCard reported that it had more than 590 million cards in circulation worldwide. Also in 2002, Visa reported that more than 1.8 trillion products and services were purchased using its cards, and MasterCard reported more than 13.6 billion transactions involving the use of its cards. Today, Visa's share of the general purpose credit and debit card market is nearly 60%, while MasterCard's share of the general purpose credit and debit card market is 33% to 36%.

33.     In 1999, Visa members accounted for approximately 47% of the dollar volume of credit and charge card transactions and MasterCard members for approximately 26%. Their only competitors in the network services market for general purpose cards, American Express and Discover, accounted for approximately 20% and 6% of dollar volume respectively in 1999. Visa and MasterCard together

---

[2]  A charge card requires the cardholder to pay his or her full balance upon receipt of a billing statement from the issuer of the card. A credit card permits cardholders to pay only a portion of the balance due on the account after receipt of a billing statement. *Visa* at 31.

control over 73% of the volume of transactions on general purpose cards in the United States. In terms of cards issued, they control about 85% of the market. *Id*. at 341.

34.    Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both these Defendants have market power in the general purpose card market and the network services for general purpose cards (hereinafter referred to as "network services") market, whether measured jointly or separately. *Id*. at 342.

35.    The ability of MasterCard and Visa to price discriminate also illustrates their market power. Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than "brick and mortar" merchants. *Id*. at 341.

36.    Defendants MasterCard and Visa rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not MasterCard and/or Visa or their member banks, bears virtually all the risk of loss from fraudulent transactions. *Id*.

37.    PSW relied almost completely on MasterCard and Visa credit cards. As established above, MasterCard and Visa charge a higher Interchange Fee to PSW and other Internet merchants than they do to "brick and mortar" merchants. Such fees are typically two to five percent (2% -5%) higher than "brick and mortar" merchants.

38.    PSW (and other merchants operating on the Internet) paid such higher Interchange Rates in the form of higher Discount Rates paid to its Acquiring Bank. MasterCard and Visa cannot justify such higher Interchange Rates on the basis of increased fraud for Internet transactions because, as described above, all Internet merchants (including PSW) bear virtually all risk of loss from fraudulent transactions.

39.     MasterCard and Visa are able to charge substantially different prices to PSW and other Internet merchants because such merchants must accept MasterCard and Visa general purpose cards at any price, because their customers insist on using those cards, insofar as it is the only practical form of payment. *Id.*

40.     These realities of the Internet marketplace only serve to strengthen MasterCard and Visa's market power in the general purpose card market, rendering PSW and other Internet merchants completely subservient to their demands, no matter how unreasonable those demands might be.

41.     MasterCard and Visa can and do base their pricing structure, including the fine and "recovery fee" programs for "chargebacks" described below, upon the degree to which a particular merchant category needs to accept its cards. *Id.*

42.     As the foregoing demonstrates, MasterCard and Visa have overwhelming market power in the general purpose card market on the Internet, for which there are no commercially reasonable alternatives available to PSW or other similarly situated Internet merchants, allowing MasterCard and Visa to effectively dominate the marketplace.  In particular, because card associations such as American Express have chosen not to accept transactions related to the "Adult Entertainment Internet industry," PSW *must* accept MasterCard and Visa branded cards (or, in the terms of the district court in *Visa*, at 341, PSW's "need" is especially high).

### 3.      Chargebacks

43.     When a cardholder disputes a transaction billed by PSW through the chardholder's Issuing Bank, typically because "I didn't do it" or it was otherwise purportedly not authorized by the cardholder, MasterCard and Visa, through PSW's Acquiring Bank, would reverse the transaction and charge the amount of the transaction back to PSW.

44.     Transactions which are reversed in this way are known as "chargebacks."  In practice, the amount taken from a merchant such as PSW for a chargeback is the full amount of the original transaction, even though the merchant had only been paid the transaction amount less the Discount Rate

in the first place. MasterCard and Visa thus compel the merchant to pay the amount of the Discount Rate (i.e. a percentage of the original transaction amount), even though the cardholder's account has been fully refunded and the merchant has in the end received nothing for the sale. The merchant is also charged a fee by the Acquiring Bank (which fee is specified in the Merchant Agreement with the Acquiring Bank and typically ranges from $5-$15) for each chargeback.

45.     On information and belief, the typical chargeback fee of $5.00 to $15.00 per transaction imposed is more than sufficient to reimburse MasterCard and Visa, and their member banks, for any administrative costs associated with the chargeback process.

46.     Ordinarily, in a "brick and mortar" operation, whenever a customer makes a purchase using a general purpose card, they sign and return to the merchant a paper receipt which indicates, "I agree to pay the above total according to my card issuer agreement" or words to similar effect. If a cardholder disputes a charge by calling his or her Issuing Bank, ordinarily the Issuing Bank will send a request to the Acquiring Bank (which is passed on to the merchant) for a signed copy of the paper receipt for that charge. If the merchant is able to produce such a signed copy, the Acquiring Bank will re-present the transaction for clearance and ordinarily the re-presentment will be honored.

47.     When a customer makes a purchase over the Internet using a general purpose card, however, it is obviously not possible to obtain their physical signature on a receipt, which could then be presented in response to a chargeback. It is a well-known fact in the general purpose card processing industry that, in the absence of a signed sales receipt, there is "no sure way for a merchant to dispute a cardholder claim that a purchase wasn't made."

48.     This is true even though PSW, through the screening process, obtains a significant amount of information from the customer, including the customer's e-mail address, and can often establish with reasonable certainty, as a result of the information obtained as well as, *inter alia*, on some occasions, from multiple monthly billings to the customer, that the customer visited the client website for which the charge was made.

49.     In addition, in order to encourage cardholders to make more purchases using their cards, MasterCard and Visa publicly promote the "security" of their cards through various programs. As a result of these programs, ordinarily, if a customer complains to his or her Issuing Bank about a transaction charge reflected on his or her card statement and claims that the purchase was not made, there is little a merchant can do to prevent that transaction from becoming a chargeback for which the merchant is held liable—both for the amount of the original transaction and any per-chargeback fees assessed by the Acquiring Bank, as well as potential fines and penalties imposed by MasterCard and Visa in the event the number of a merchant's chargebacks as a percentage of total transactions exceed a specified number under programs established by MasterCard and Visa to purportedly reduce "Excessive Chargebacks."

### 4.     Friendly Fraud

50.     MasterCard and Visa are acutely aware of the fact that Internet merchants such as PSW are and have been powerless to prevent chargebacks from cardholders claiming "I didn't do it," in an effort to avoid paying for purchases made over the Internet (so-called "friendly fraud"). According to MasterCard's own publications, "I didn't do it" and "cardholder non-authorization" chargebacks represented more than 80% of the chargeback expenses associated with e-commerce transactions in the Fourth Quarter of 2000.

51.     MasterCard and Visa also concede that, "This poses a serious dilemma for merchants interested in tapping into today's new business channels." The recognized prevalence of such "friendly fraud" in transactions over the Internet is exacerbated by the availability of stolen card numbers through various sources.

52.     Even when MasterCard and Visa are aware of large banks of card numbers which have been compromised, MasterCard and Visa often deliberately do nothing to block the use of those cards because to do so would require Issuing Banks to incur the expense of re-issuing new cards to replace the cards which have been compromised.

53.     MasterCard and Visa are willing to allow such fraud to exist since, because of their market power, as established by the district court in *Visa* and as outlined herein, MasterCard and Visa can and do force Internet merchants such as PSW to bear *all* of the risks and costs of such fraud.

## 5.     Internet Fraud Prevention Technologies

54.     The technology systems which have been put into place to date to reduce fraud from stolen card numbers and non-authorized use including AVS (which compares the address and zip code listed by the purchaser with the information on file for the cardholder) and CVC2 (a three digit code written at the end of the card number on top of the card's signature strip) often do not work because many Issuing Banks have failed to implement the technologies required on their end to allow merchants to take advantage of such systems. On information and belief, MasterCard and Visa are aware of the foregoing; however, they have refused to compel their Issuing Banks to fully implement such technological innovations.

55.     Nevertheless, regardless of whether the merchant obtained an authorization code at the time the transaction was first initiated, and regardless of whether the merchant used available technologies to verify that the purchaser was the cardholder, MasterCard and Visa allow cardholders the nearly absolute right to deny that they have made the purchase and to refuse to pay for it—in the absence of a signed receipt.

56.     MasterCard and Visa, by and through their member banks, ultimately have the sole power to eliminate fraud by terminating existing general purpose cards which have been compromised, lost, stolen, or used without authorization, refusing to pay any charges on such accounts, listing the credit card as stolen or compromised, transferring all existing, valid charges to a new account, and sending the cardholder a new card bearing his or her new account number.

57.     Due to the failure or refusal of Master Card and Visa to combat fraud on the Internet, PSW, along with other internet merchants, have been forced to retain, at considerable expense, outside firms approved or acceptable to MasterCard and Visa, which specialize in fraudulent or high risk

transaction screening. These firms add an additional layer of protection by screening all Internet transactions in order to reduce the likelihood of fraud.

58.     As outlined above and as established by the district court in *Visa*, despite the known risks of Internet fraud using MasterCard and Visa cards, risks which are ultimately beyond the control of PSW or other Internet merchants to completely control, MasterCard and Visa compel PSW and other Internet merchants to bear the full risk of any and all fraud (whether actual fraud from stolen cards or "friendly fraud" from consumers seeking to avoid payment obligations) in connection with the use of MasterCard and Visa cards.

### 6.     Chargeback Fines and Penalties or "Recovery Fees"

59.     MasterCard and Visa each view the incidences of chargebacks emanating from on-line merchants as an indicator of the level of fraudulent transactions being processed through such merchants. MasterCard and Visa each evaluate such fraud levels on the basis of the ratio of chargebacks received by a particular merchant in a given month as compared to the total number of sales transactions made by that merchant in the same month (called the merchant's "Chargeback Ratio").

60.     Although, as outlined above, all on-line merchants experience the same risk of fraud because of the inability to dispute a cardholder's claim that a purchase was not made, MasterCard and Visa view merchants delivering audiotext or videotext services (such as, but not limited to, the adult entertainment digital content provided by many of PSW's customers) as "High Risk."

61.     MasterCard and Visa have implemented a variety of monitoring and enforcement procedures directed at coercing such merchants to take steps to reduce the level of purported "fraud" occurring in transactions processed through such merchants.

62.     MasterCard and Visa have instituted parallel programs that set Chargeback Ratio target thresholds ("Chargeback Thresholds"), which they want such "High Risk" merchant to stay below, and have established departments within their respective organizations to track and report to their member

Acquiring Banks any merchants whose Chargeback Ratios in any given month exceed those prescribed thresholds.

63. These parallel programs allow MasterCard and Visa, in their sole discretion, to impose substantial fines and additional fees (denominated "penalties" or "recovery fees") on Acquiring Banks and/or merchants when Chargeback Ratios for "High Risk" transactions exceed the proscribed Chargeback Thresholds. When such fines and additional fees are assessed to an Acquiring Bank, the Acquiring Bank in turn passes such fines and additional fees on to the merchant which MasterCard or Visa determines to be responsible for such fines and additional fees. On information and belief, MasterCard and Visa each know that the merchant ultimately bears the financial burden of such fines and additional fees, and intend that to be the case.

64. Moreover, MasterCard and Visa reserve the power to order an Acquiring Bank to terminate the Merchant Account of a particular offending merchant and to prohibit that merchant from participating in the MasterCard or Visa general purpose card processing system network.

65. Under the current parallel programs of MasterCard and Visa, they have the right, in their sole and absolute discretion, to declare a merchant to be an Excessive Chargeback Merchant, if the merchant experiences more than a specifed number of chargebacks and exceeds the specified Chargeback Threshold in a specified (e.g. two month) trigger period. As soon as MasterCard and Visa declare a merchant to be an Excessive Chargeback Merchant, their Issuing Banks are entitled to collect substantial "recovery fees," from that merchant for every chargeback incurred over a given period, *retroactively* (e.g. up to one full year prior), regardless of the merchant's subsequent Chargeback Threshold, based on a progressive scale.

66. These recovery fees include a per chargeback fee and a monthly fine, which progressively increases from $25.00 per chargeback and a $25,000.00 per month fine for the first three months following the trigger period (wherein a merchant has exceeded the Chargeback Threshold), all the way up to a maximum of $100.00 per chargeback and a $100,000.00 per month fine for any period

in excess of seven months after the trigger period (wherein a merchant continues to exceed the Chargeback Threshold).

67.     Under the parallel Excessive Chargeback Programs established by MasterCard and Visa, fines and penalties are progressive over succeeding months for at least one full year regardless of whether the merchant's Chargeback Ratio exceeds the Chargeback Threshold ever again during that year. MasterCard and Visa also claim the absolute discretion to extend the fine period for longer than the specified period if they so desire until, again, MasterCard and Visa either terminate the merchant or convince the Acquiring Bank to terminate the merchant. Such a continuing and progressive assessment of fines and recovery fees regardless of whether the merchant's Chargeback Ratio exceeds the Chargeback Threshold cannot be justified as a necessary measure to progressively encourage merchants to take further steps to limit chargebacks. Nor can such a scheme be justified on any other commercially reasonable basis.

68.     There are, however, numerous reasons (as outlined herein) why an Internet merchant might experience chargebacks, which are unrelated to whether the merchant practices or allows fraud to occur.

69.     Moreover, it is a well-known fact in the general purpose card industry that chargebacks lag between 30 and 180 days, or more, behind sales to which they are related. In other words, it can take a cardholder 30 to 180 days, or more, to dispute a charge and seek a chargeback. Once a sale is made, particularly in the case of transactions over the Internet, there is little if anything a merchant can do to prevent incurring "I didn't do it" or "cardholder non-authorization" related chargebacks. Therefore, since a merchant's Chargeback Ratio is completely irrelevant under the current Excessive Chargeback Programs once MasterCard or Visa declare the merchant an Excessive Chargeback Merchant, the progressive nature of the fines and fees charged by MasterCard and Visa for chargebacks incurred in successive months is completely unwarranted and cannot be supported by any rationale, other than

allowing MasterCard and Visa and their member Issuing Banks to earn monopolistic profits on the backs of merchants who have no other commercially reasonable option.

70.     A merchant's Chargeback Ratio is also artificially inflated (as a purported indicia of the current degree of fraud in a merchant's general purpose card transactions) where, for whatever reason, a merchant's volume of business decreases in any given month as compared to the preceeding month, since the Chargeback Ratio will be based on chargebacks from higher volume months, as applied against a month with a decreased volume of transactions.  The arbitrariness of this policy is exacerbated and rises to the level of irrational, when a merchant, for whatever reason, winds down and stops doing business—yet continues to be assessed fines and penalties based on chargebacks applied against no or negligible transactions in a given month.

71.     MasterCard also purports to reserve the right to decide, in its sole discretion, to treat *credits* issued by a particular merchant as if they were chargebacks for purposes of determining whether the merchant's Chargeback Ratio exceeds the Chargeback Threshold and to charge such merchants an additional fine for each credit processed.

72.     Unlike chargebacks, which require interaction between the cardholder and the Issuing Bank, processing credits involves little or no additional expense whatsoever to MasterCard or its Issuing Banks.  There is, therefore, no commercially reasonable justification for MasterCard to decide to treat credits issued in the ordinary course of business as if they were chargebacks, or to fine PSW for issuing credits that are mandated by the system which MasterCard itself has established and maintained.

73.     Accordingly, a merchant's Chargeback Ratio is also artificially inflated where, MasterCard, in its discretion, for whatever reason, designates credits issued by a particular merchant as if they were chargebacks for purposes of determining the merchant's Chargeback Ratio.  The arbitrariness of this policy is exacerbated and rises to the level of irrational, where a merchant, in the exercise of reasonable business judgment, has a "money back" guarantee policy to facilitate customer satisfaction.

74.     In addition, MasterCard and Visa rules and regulations *direct* merchants to attempt to reconcile any complaints or requests for refunds from cardholders and, where appropriate, to issue a credit at the cardholder's request.  Moreover, as described above and as admitted by MasterCard and Visa, there has historically existed "no sure way [for an Internet merchant such as PSW] to dispute a cardholder claim that a purchase wasn't made."  PSW is thus compelled under the system established and maintained by MasterCard and Visa to issue a credit when a cardholder insists that "I didn't do it," or else the cardholder will almost certainly call its Issuing Bank and charge back the transaction (which would naturally inflate PSW's Chargeback Ratio ).

75.     Thus, on the one hand, cardholders are told by MasterCard and Visa that they will not bear the loss and merchants are directed by MasterCard and Visa to issue credits to satisfy cardholder requests, and on the other hand, MasterCard and Visa retain the right to punish merchants for complying with its directives and keeping MasterCard's and Visa's promises to their cardholders.

### 7.     The Reserve Account

76.     On information and belief, MasterCard and Visa, by and through their member Acquiring Banks, require a merchant pursuant to the Merchant Agreement to maintain sufficient funds on deposit, without interest, in a Reserve Account in an amount established by and in the sole discretion of the Acquiring Bank as sufficient to cover any and all anticipated risk of loss of the Acquiring Bank, including the potential imposition of fines and/or recovery fees by MasterCard or Visa under their respective Excessive Chargeback programs.

77.     Because of the retroactive and substantially progressive nature of the MasterCard and Visa Excessive Chargeback programs, the Reserve Account required by an Acquiring Bank may reach a substantial sum, which may be many multiples of the value of a merchant's average monthly transactions, thereby impairing or preventing the merchant from continuing in business, while, in the meantime, MasterCard and Visa, by and through their member Acquiring Banks, benefit from holding the merchant's funds interest free.

### 8.      Net Effect of Excessive Charegeback Programs

78.      In an "I didn't do it" friendly fraud transaction, *someone* did it. As alleged above, MasterCard and Visa rules essentially permit a chargeback without contest in "card not present" transactions. If the cardholder did not do it and did not authorize it, *the card should be terminated and re-issued to prevent any further fraud in the exercise of common sense and commercially reasonable diligence*. However, MasterCard and Visa rules do not mandate this, in part because of the cost to Issuing Banks to re-issue cards, and also because of the profits made from "card not present" chargebacks through their respective Excessive Chargeback Programs.

79.      By not mandating cancellation, MasterCard and Visa rules encourage this activity, thereby further fueling the profits of the foregoing cash cow programs, and the transformation of the card not present processing industry, particularly as it relates to Aggregators such as PSW. Moreover, consistent with the foregoing policy—or lack thereof—MasterCard and Visa, through their Acquiring Banks, have databases of cardholders who are notorious for claiming chargebacks, yet they continue to honor the cards of and/or re-issue cards to these people. The bottom line is that MasterCard and Visa are not concerned about merchants, but about increasing the number of cards in circulation, and to do this they want to keep their cardholders happy by permitting chargebacks on demand in "card not present" situations, with Internet and telemarketing merchants such as PSW and other Aggregators paying the cost.

80.      The net effect of the Excessive Chargeback Programs is to create a downward spiral, as in PSW's case discussed below, which inevitably leads to the Aggregator/merchant being driven out of business. First, for whatever reason, a merchant experiences a chargeback ratio in excess of the threshhold for the requisite period. Next, its reserves are substantially increased because of the potential fines and recovery fees, which *could be imposed* by MasterCard and Visa. The merchant then is unable to pay its customers. Its customers leave. The merchant's volume of transactions go down. Inexorably, the number of chargebacks, which lag behind between thirty (30) to one hundred

eighty (180) days, as a ratio with respect to the now decreased volume of the merchant, continues to exceed the threshhold. The merchant's reserve account level is further increased, more customers are lost, and the process continues until the merchant is driven out of business.

**D.     Anti-Competitive Effects of MasterCard and Visa Parallel Programs and Practices**

81.     Of all the potential measures that could have been taken to achieve the same result of reducing purported fraud, MasterCard and Visa selected a scheme involving excessive, retroactive, and progressive *penalties*.  This permitted MasterCard and Visa, along with their Acquiring banks, to make an unearned profit from assessments imposed upon and interest not paid on excessive Reserve Accounts of PSW and other similarly situated internet merchants, which had no practical alternative. Perhaps even more troubling, this also had the inevitable and intended effect of *eliminating all small Aggregators processing for Adult Entertainment Websites and consolidating that business with one or a handful of Aggregators large enough to spread unavoidable "friendly fraud" chargebacks against a sufficiently large volume, or with those MasterCard and Visa member Acquiring Banks willing to process such transactions directly with such large website clients as are also able to spread chargebacks against a sufficiently large volume* .

82.     The significant magnitude of the assessments, which have no relation to the actual economic costs of chargebacks, combined with the retroactive and progressive nature of the penalties, insure that they would impact small merchants most heavily.  Using ratios based on volume assured that the penalties would impact Aggregator/merchants most heavily, which as they reduced their chargebacks by eliminating clients causing the same, would actually be incurring progressively higher penalties.  They impact Adult Entertainment Websites most heavily, because almost all such websites in the market, which consists largely of literally hundreds of thousands of small business entrepreneurs that have jumped into an industry which has easy entry and large profits, do not have the sophistication and/or means to process or qualify to process as a merchant for MasterCard or Visa.  They must process through an Aggregator or not at all.

83.     In addition to the Excessive Chargeback Programs, there were and are other, parallel programs and practices of MasterCard and Visa which have substantially and adversely affected competition in the Adult Entertainment Website processing industry:

a.      ***Registration Programs***.  The Visa Internet Payment Service Providers ("IPSP") program required all Aggregator/merchants such as PSW to provide Visa with the name, address, financial information, and URL for each website client and pay and/or collect a $750.00 registration fee for each website.  Visa also required that the password be provided for each such website, which were inspected for content by Visa.  Processing approval was denied by Acquiring banks with respect to sites with certain sexual content or gambling links.  The related MasterCard Member Service Providers program, which mandated, among other things, a change in display format, $1,000.00 registration fee, and $2,500.00 per day fine for noncompliance with the Internet Merchants Qualifications Mandate ("IMQM"), sought to essentially eliminate Aggregators from the industry.

b.      ***Boycott List Programs***.  MasterCard's MATCH file program and Visa's Terminated Merchant's File ('TMF") program list for member banks the names of merchants who have been terminated or declared to be an Excessive Chargeback Merchant.  On information and belief, once a merchant is identified on the MATCH file or TMF, all member Acquiring Banks refuse to deal with the merchant, or any new entity involving that merchant, its officers, and/or its principals.

c.      ***Geographic Market Divisions***.   MasterCard and Visa established and enforced rules prohibiting the processing of domestic transactions by offshore acquiring banks and/or processors, or the reverse, processing of foreign transactions by a domestic acquirer/processor, which have had and continue to have a substantial anti-competitive impact in the Adult Entertainment Website processing industry, without any countervailing pro-competitive purpose.

d.      ***Exclusivity Rules***.  MasterCard and Visa adopted yet another parallel program whereby member banks in their respective networks were authorized to issue the general purpose card of the other network, but prohibited them from issuing general purpose cards of the competing networks, Amex and Discover, thereby unreasonably excluding competition and restraining trade in the general purpose card market and the network services market.

e.      ***Price Discrimination.***  MasterCard and Visa have adopted parallel pricing schemes in conjunction with their member banks, whereby a higher interchange rate is charged to internet and telemarketing merchants, which have no practical alternative, thereby permitting MasterCard and Visa and their member banks to earn above normal profits at the expense of PSW and other similarly situated merchants.

84.     Each of the foregoing programs is and/or was commercially unreasonable or otherwise tortious, anti-competitive, and/or a violation of applicable state and/or federal antitrust laws, and directly

and/or indirectly caused or contributed to PSW's demise. Each of the parallel, disputed programs of MasterCard and Visa described above worked hand and glove to achieve their obviously joint goal of the consolidation and eventual elimination of Aggregators processing for Adult Entertainment Websites on the Internet.

85.     The Excessive Chargeback Programs was a revenue generating measure designed to usurp the profits of Aggregators, while eventually causing their demise. The fact that both MasterCard and Visa adopted extremely similar policies, with the same perverse effects, ensured that Aggregators would not switch to the other bankcard network.

86.     The exclusivity rules ensured that there would be no competing card network to turn to.

87.     The no cross border acquiring policy limited the ability to seek more flexible Acquiring Banks offshore and otherwise further limited competition in the general purpose card market.

88.     The MATCH file and TMF lists insured that any Aggregator whose Merchant Agreement was terminated could not secure a new Acquiring Bank in either network.

89.     The Registration Programs were an attempt to squeeze additional fees out of Aggregators, while obtaining detailed information about their client websites, for reasons, which, on information and belief, were wrongful, in whole or in part. In particular, MasterCard's MSP policy was a blatant attempt to eliminate the competition of Aggregators such as PSW by requiring website clients to contract directly with MasterCard's Acquiring Banks as a form of vertical integration to compliment the geographic restrictions imposed by MasterCard's "non cross border processing" policy.

90.     The anti-competitive effects of the Defendants' conduct complained of herein, include, among other things, an unreasonable restraint on competition and trade in the domestic Adult Entertainment Website general purpose card processing industry, which consists of those few Acquiring Banks—perhaps five in the United States—willing to acquire and/or provide general payment card processing services to Adult Entertainment Websites, plus a limited number of Aggregator/merchants

like PSW—once over a dozen and now only three—that provide credit processing services to these businesses.

91.     The foregoing conduct of the Defendants herein includes agreements which have been held on a *per se* and/or rule of reason basis to constitute violations of federal anti-trust law, including but not limited to horizontal concerted refusals to deal, price-fixing, geographic market divisions, and price discrimination.

### E.     PSW Processing through Defendants FFB and FDMS

#### 1.     Entering the System—the Agreement

92.     On or about January 17, 2002, PSW entered into a Merchant's Agreement ("Agreement") with its Acquiring Bank, FFB, which, at that time, was a special purpose (credit card) state bank headquartered in Atlanta, Georgia, and FDMS, which, on information and belief is a credit card processing institution which assists Acquiring Banks with the processing of general purpose card transactions.

93.     At all relevant times, FFB was a member bank of MasterCard and Visa and FDMS was duly authorized by MasterCard and Visa to act as an agent of and in conjunction with FFB in performing authorization, processing and credit card settlement services for merchants such as PSW pursuant to Merchant Agreements.

94.     At all relevant times, FFB, as a member bank of MasterCard and Visa, was therefore both a principal and agent of those bankcard networks.

95.     The Agreement expressly incorporated and was subject to MasterCard and Visa "Association Rules."

96.     In particular, ¶26.9 of the Agreement expressly provided that MasterCard and Visa retained the right to require termination or modification of the Agreement with respect to transactions involving MasterCard and Visa cards.

97.     The agreement provided for a Discount Fee of 5.6% and was based on, among other things, an average sales transaction of $34.00 and an annual transaction volume of 8.4 million dollars. Attachment 1 purporting to establish all Interchange Fees, assessments and qualifying criteria, which was supposed to appear as an attachment to the Agreement, was not affixed thereto or ever provided to PSW.

98.     The Agreement further provided that an Excessive Chargeback handling fee would be charged in addition to any fee or fine imposed by Visa or MasterCard.  Specifically, in the event PSW's Chargeback Ratio exceeded 2.5% annually, PSW would be billed a chargeback processing fee of $7.50 for each chargeback in excess of the foregoing level, as well as a fee of $7.50 per chargeback.

99.     Based on the foregoing annual dollar volume of business, or an average of $700,000.00 per month, PSW was required to maintain a reserve account of $300,000.00.  FFB reserved the right, in its sole discretion, to increase the reserve account based upon PSW's processing history and any anticipated risk of loss, including the potential imposition of fines, penalties, and/or fees by MasterCard or Visa.

100.    The Agreement further expressly provided that PSW would reimburse FFB on demand for any fees, charges or expenses required or imposed by MasterCard or Visa in connection with or related to the Agreement or any of the services provided thereunder.

101.    As a condition to receiving the services provided pursuant to the Agreement, PSW was required to enter into and maintain appropriate arrangements to receive risk control services, which, on information and belief were mandated by MasterCard and Visa (since PSW was considered a "High Risk" merchant), also known as chargeback reduction services, from an entity that met minimum specifications set forth in the Agreement.

102.    Accordingly, in order to fulfill the foregoing requirement, PSW entered into a remote processing service agreement with Shared Global Systems ("SGS") to provide certain remote

computerized intermediate transaction processing services, including a) use of profiling techniques and procedures that are designed to aid in the protection against chargebacks and fraud; b) computerized and computer aided modeling techniques; c) transmission of credit and debit card transactions to an Acquiring Bank for settlement purposes; d) pay-per-call transaction verification; e) consumer telephone number billing; f) private label card authorization and billing; and, g) analytical reporting services related to transaction and sales value, chargebacks and other data.

103.    On information and belief, SGS is a subsidiary, agent or otherwise closely associated with FFB and/or FDMS.

104.    The SGS agreement provided for a discount rate of 5.6% per transaction, a flat fee per transaction of $0.32, a minimum monthly fee of $7,500.00, and a $15.00 fee per chargeback processed.

### 2.    Navigating the System—the MasterCard and Visa Minefield

105.    On or about December 2002, Visa suddenly began enforcing its "no cross-border" processing rule. As a consequence, PSW lost 60% of its Visa transactions processed through FFB. Also, PSW was required to cease processing for certain high chargeback sponsored client websites. As a consequence of the foregoing as well as the unavoidable incidents of "friendly fraud" described previously above, PSW's chargeback ratios rose substantially in the ensuing three months.

106.    In a letter dated February 3, 2003 from Visa, PSW was informed that for January, 2003, it had exceeded Visa's Risk Identification Service High Fraud parameters and was designated High Risk.

107.    On or about February, 2003, FDMS informed PSW that due to increased business, PSW was required to maintain $750,000.00 in its reserve account against potential fines, penalties and/or fees imposed by MasterCard or Visa.

108.    FDMS also advised PSW that it would withhold settlement on thirty-three percent (33%) of daily deposits until the reserve account balance was $750,000.00.

109.    On or about April 29, 2003, PSW entered into a contractual agreement with a non-Adult Entertainment Website client, SoftSell, to provide billing processing services for healthcare oriented products sold over the Internet or on the phone by SoftSell.

110.    SoftSell was referred and approved by SGS.  Accordingly, PSW understood that SoftSell had been approved by FFB.

111.    As a consequence of the SoftSell account, PSW's Visa processing volume increased dramatically, which was the only appropriate business strategy to overcome the perverse effect of the Excessive Chargeback Program due to the loss of processing volume described above.

112.    Prior to contracting with SoftSell, PSW maintained a merchant account with FFB for non-adult oriented transactions.

113.    To assist cardholder consumers in identifying transactions from SoftSell, PSW used the merchant descriptor PSWHEALTH.COM as well as the merchant identification number (23599860012).

114.    All transactions PSW processed for SoftSell were transmitted through the PSWHEALTH.COM merchant account.  Additionally, all SoftSell transactions came with a thirty (30) day money back guarantee.

115.    After one (1) week of providing billing services to SoftSell, and without any notice to PSW, FFB ceased wiring disbursements to PSW.

116.    In May, 2003, as a result of an increase in volume in billings provided by PSW due to the SoftSell contract, FDMS's First Financial Risk Team commenced an investigation regarding PSW's increased processing.

117.    At FDMS's request, SGS contacted PSW for financial information concerning SoftSell.

118.    It was then determined that SoftSell had previously processed billing through SGS while doing business as "Commonwealth Benefits" and had ceased processing to address high chargeback volumes.

119.    Based on Commonwealth Benefits' purported history of having high chargeback volumes, after PSW had been processing for SoftSell for less then two (2) weeks, FDMS determined that the funds in PSW's reserve account were inadequate.

120.    FFB then ceased wiring disbursements to PSW.  SGS was informed by FFB that FFB was withholding settlement on one hundred percent (100%) of PSW's daily deposits and depositing these funds into PSW's reserve account until the account balance reached $1.2 million.

121.    FFB subsequently withheld settlement on fifty percent (50%) of PSW's daily deposits and deposited these funds into PSW's reserve account until the account balance reached $1.2 million.

122.    FFB then notified PSW that effective on or about May 13, 2003, PSW was barred from processing for SoftSell.

123.    At the time, PSW was told that the reason it was directed to cease processing for SoftSell was due to a previous history of high chargeback volumes when SoftSell processed directly through SGS as "Commonwealth Benefits."

124.    Nevertheless, pursuant to a September 16, 2003 letter from FFB, FFB contended that its directive that PSW cease processing for SoftSell *was required under Visa rules*.  Visa and FFB claim that as an IPSP (Aggregator), PSW was forbidden from processing for "Buyers' Clubs, Membership Clubs, Outbound Telemarketers and other related merchants."

125.    SoftSell falls in none of the above specified categories of merchants.  It had a health product related website, from which it received phone and Internet orders for such products. Moreover, if SoftSell did fall in the "prohibited merchant" category, *there was no way PSW could have know this since it was neither familiar with nor did it have access to the Visa rules, SGS was*

*also apparently unaware of the rule, and it took FFB over a week to make that purported determination.*

126. As of July 15, 2003, of the 41,157 transactions processed by PSW for SoftSell, SGS received 38 chargebacks in May, 136 in June and 77 in July for a chargeback rate of .61 %, *a rate well below the chargeback threshold.* At that time, PSW had a reasonable expectation of continuing and substantially increasing the volume of business from similar, card not present merchants.

127. On information and belief, on or about June 1, 2003, Visa instituted a new provision of its rules, without notice to PSW, that permitted Visa to shift a merchant that meets certain criteria to the High Risk Chargeback Monitoring Program. Visa then identified PSW's catalog account, a non-adult oriented account, as "High Risk," and combined the chargebacks in the catalog account with the chargebacks in PSW's adult-oriented account. At the time, Visa's Chargeback Threshold was 2.5%.

128. The foregoing combination of the chargebacks from both PSW's adult and non-adult accounts ensured that PSW's chargebacks would exceed the threshold and thus would subject PSW to fines, penalties, and/or recovery fees imposed by Visa for exceeding the chargeback threshold of 2.5%. On information and belief, Visa required the combination of the foregoing accounts with the intent and purpose of causing PSW to exceed the threshold.

129. *Moreover, as a result of the Defendants' directive that PSW cease processing for SoftSell, PSW's volume dropped tremendously, and its chargeback ratios skyrocketed accordingly.*

130. In June 2003, PSW processed 9,942 Visa transactions in the combined accounts, of which there were 429 chargebacks. Visa imposed on PSW chargeback fines, penalties, and/or recovery fees in the amount of $42,900.00, because PSW purportedly exceeded the chargeback threshold of 2.5%.

131. In a letter dated July 24, 2003, FDMS informed PSW that due to its increased exposure to fines and chargebacks, FDMS and FFB were requiring PSW to increase the reserve

account to $1.7 million.  FDMS also advised PSW that it would withhold settlement on twenty-five percent (25%) of daily deposits until the reserve reached $1.7 million.

132.    The substantial and progressively increased amounts PSW was required to maintain in its reserve account was mandated by the Defendants, due to alleged potential exposure to fines, fees, and penalties under the MasterCard and Visa Excessive Chargeback Programs.

133.    The foregoing substantial increases in funds, which PSW was required to maintain in its reserve account, created a substantial cash flow problem that prevented PSW, which operated on a margin of about 5%, from forwarding payments to its website clients in a timely fashion.

134.    The Defendants were well aware that PSW would be forced out of business if the Defendants continued to insist on withholding payments and maintaining a substantial and excessive reserve account, as evidenced by an e-mail dated August 18, 2003 from Terry L. Crane at SGS to Daniel Papas at FDMS, which provided in pertinent part as follows:

> *PSW has been doing everything we ask of them from the first day they started with SGS.  Their business has grown considerably and their reputation has been very good.  PSW has continually sent out directives to its merchants about adhering to all the regulations required by VISA, MC and FDMS.*  They have built a model to be compliant with MasterCard aggregator rules, at a cost of many thousands of dollars, even though the MC model will absolutely cause many more chargeback problems for our merchants then they currently have.. . .

> The next few months [PSW] will have very high chargeback ratios because we have essentially gutted PSW sales.  We have stopped all foreign sales for MC and PSW has shut down every site that had over 3% cb rates.. . .

> Having said all this, the bottom line is, I do not believe PSW can survive with a 25 or 33% hold back.. . .

135.    The foregoing e-mail is instructive for several reasons.  First, Mr. Crane, who is not on PSW's payroll or beholden to it in any way, *opined that PSW had grown considerably and had an excellent reputation in the industry.*  Second, that PSW at all times acted diligently and in good faith to comply with the myriad and ever changing rules of the game imposed by the various MasterCard and Visa programs and policies in dispute.  Third, that the combination of, *inter alia,*

**Page 29 of 38**

MasterCard and Visa's no cross border acquiring policy and excessive chargeback programs had substantially reduced PSW's sales volume. Fourth, that the perverse effect of PSW diligently complying with MasterCard and Visa directives was that PSW was going to experience high chargeback ratios. Fifth, the result of the foregoing being that PSW's reserves would be increased yet further (to account for potential excessive, progressive, and commercially unreasonable fines, fees and/or penalties under MasterCard and Visa excessive chargeback programs). Sixth, that the current level of reserves, let alone any prospective increase, would eventually be fatal to PSW.

136. Notwithstanding the foregoing e-mail, in a letter dated August 19, 2003, FDMS informed PSW that due to its increased exposure to fines and chargebacks, FDMS and FFB were requiring PSW to increase the reserve account to $2 million. FDMS also advised PSW that it would withhold settlement on thirty-three percent (33%) of daily deposits until the reserve reached $2 million.

137. Because of the inability to pay its clients because its revenues were tied up in the FFB reserve account, by September of 2003, PSW had lost approximately 85% of its accounts to its competitors and was impaired in its ability to attract new clients, insofar as businesses are generally not inclined to do business with an entity which cannot or does not pay its obligations.

138. In September, 2003, Visa imposed a $81,000.00 fine on PSW for exceeding the Chargeback Threshold.

139. In September, 2003, PSW advised MasterCard and Visa in writing that, *inter alia*, individually and in concert with others, they were using their market power to assess and continue to assess illegal fines and penalties on PSW for chargebacks in order to shift the risk of such transactions in a commercially unreasonable manner, which was not financially justified, with the intent and/or effect of driving PSW, and similar entities from the market for payment card processing of internet transactions. PSW further advised MasterCard and Visa of its belief that the foregoing conduct constituted violations of federal and state law and of its intention to file suit.

140.    *In a letter from FDMS to PSW dated September 16, 2003, FDMS notified PSW that it was terminating its relationship with PSW effective September 26, 2003, <u>due primarily to the "very significant financial exposure" for fines, penalties, and/or recovery fees under the MasterCard and Visa Excessive Chargeback Programs</u>. In that letter, FDMS also cited PSW's threat of litigation against MasterCard and Visa and a "decrease in overall transaction volume," as purported additional grounds for termination.*

141.    In a September 16, 2003 e-mail, FDMS claimed that in light of potential fines, penalties, and/or recovery fees under the MasterCard and Visa Excessive Chargeback programs, PSW's reserves should be $3,000,000.00, rather than the approximately $1.6 million being held at that time.

### 3.    <u>Conduct Post-Termination of the Agreement</u>

142.    In a letter dated October 3, 2003, FDMS expressly refused to reduce PSW's reserve account level, even though PSW was no longer processing with FFB and FDMS, claiming that it was purportedly undercollateralized as compared to its potential exposure for potential fines, penalties, and/or recovery fees under the MasterCard and Visa Excessive Chargeback programs. FDMS claimed its potential exposure at that time was approximately $2,200,000.00, of which approximately $2,050,000.00 was to MasterCard and $150,000.00 was to Visa, *assuming Visa was waiving potential fines and penalties from January through March. The potential MasterCard fines and penalties were retroactive to January of 2003.*

143.    According to the foregoing letter, $372,500.00 of the potential MasterCard fines, penalties, and/or recovery fees was aggregator noncompliance fines of $2,500.00 a day, which purportedly accrued between April 30 to September 26, 2003, notwithstanding the fact that PSW, at considerable expense, had in fact satisfied the requirements imposed by the MasterCard IMQM program, as evidenced by the above quoted e-mail dated August 18, 2003 from Terry L. Crane at SGS to Daniel Papas at FDMS.

144.     Since at least as early as November of 2003, MasterCard and Visa were well aware that approximately $1.6 million was being held in PSW's reserve account by FFB and FDMS, due to potential MasterCard and Visa fines, penalties, and/or recovery fees, yet as of the date of this Complaint, more than 10 months later, neither MasterCard nor Visa have assessed fines, penalties, and/or recovery fees against or authorized the release of these funds to PSW.

145.     Despite diligent efforts, due to the operation of the Match File and TMF programs, neither PSW nor any of its officers or principals were able to secure another Acquiring Bank through which to process its business.

### F.     Harm to Competition and Damages Sustained by PSW

146.     The MasterCard and Visa Excessive Chargeback Programs described herein had the inevitable and intended effect of driving PSW out of business.  The fact that both MasterCard and Visa adopted extremely similar policies, with the same perverse effects, prohibited PSW from avoiding its demise by switching from one of these networks to the other.  The exclusivity rules ensured that there would be no competing card network to turn to.  The no cross border acquiring policy prohibited PSW from entering into a Merchant Agreement with a more flexible Acquiring Bank offshore.  Revenue generated from MasterCard and Visa's parallel discriminatory pricing policies and Excessive Chargeback Programs' penalties and recovery fees ensured that, while PSW was in operation, the Defendants would earn above-normal profits at PSW's expense.  MATCH file and TMF list programs insured that neither PSW nor any of its officers or principals could secure a new Acquiring Bank in either network.

147.     The actual and intended affect of the Defendants' conduct, including but not limited to the acts and/or omissions alleged herein, was to utilize their market power in the general purpose card market and the network services market to shift all the risk of fraud to Internet merchants such as PSW, in a commercially unreasonable manner, which is not financially justified, in order to usurp their profits and eventually drive PSW and other Aggregator/merchants from the Internet card

processing market, and thereby consolidate that business with one or more large Aggregators and/or indirectly secure such business for Defendants or other member banks of the MasterCard and Visa networks willing to process such transactions underlined directly with larger website clients, which are the only entities large enough to maintain Chargeback Ratios below the steadily decreasing level arbitrarily established by Defendants.

148.    Defendants' have used market power to unreasonably exclude competition and restrain trade in the general purpose card market and the network services market, that was not outweighed by any countervailing pro-competitive effects, in violation of the Sherman Act §1, which they are collaterally estopped from denying under 15 U.S.C. §16 in light of the decision in *Visa, affirmed, Visa* (2nd Cir.); as a result of which PSW was forced to pay higher prices for network services, Excessive Chargeback fees, fines, and/or recovery fees, comply with unknown, continuously changing, and/or commercially unreasonable rules and directives of the Defendants at significant expense, both because of the Defendants' parallel actions and the lack of any practical alternative to the Defendants' network services, and thereby usurped PSW's profits and good will and forced it out of business.

149.    As a proximate result of Defendants' acts and/or omissions, including but not limited to those alleged herein, PSW has suffered injury to its trade or business, including but not limited to the economic losses from the fees, fines, and/or penalties imposed by Defendants, lost profits and revenues from being unable to pay and, therefore, retain and/or obtain clients, and the diminution in goodwill which PSW would otherwise have enjoyed in the absence of Defendants' wrongful conduct.

150.    Defendants' acts and/or omissions, including but not limited to those alleged herein, were taken in conscious disregard of PSW's statutory and common law rights, and/or constitute oppression, bad faith, fraud, and/or were taken negligently, with gross negligence, intentionally, and/or with reckless indifference to the rights of the Plaintiff, and were motivated by malice, wantonness or willfulness of such an extreme nature as to amount to criminality.

## VI.     <u>Claims For Relief</u>

151.     Plaintiff incorporates the allegations in ¶¶1 through 150 above in each of the counts alleged below.

### COUNT ONE
### (Violation of Sherman Act § 1--Contract or Conspiracy in Restraint of Trade)

152.     Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, contracted, combined, conspired and/or otherwise acted to unreasonably restrain competition and/or trade in interstate commerce in violation of the Sherman Act §1, actionable pursuant to 15 U.S.C. §15, thereby causing Plaintiff to sustain damages as aforesaid.

### COUNT TWO
### (Violation of Sherman Act § 2--Monopolization)

153.     Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, monopolized, attempted to monopolize, and/or combined, conspired and/or otherwise acted to monopolize and unreasonably restrain competition and/or trade in interstate commerce, in violation of the Sherman Act §2, actionable pursuant to 15 U.S.C. §15, thereby causing Plaintiff to sustain damages as aforesaid.

### COUNT THREE
### (Violation of Robinson-Patman Act)

154.     Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, in particular, the requirement that Plaintiff pay fines, fees and/or recovery fees under their Excessive Chargeback Programs as a condition of allowing Plaintiff to accept and process their general purpose cards, employed a device by which large merchants and Aggregator/merchants gain discriminatory preference over smaller Aggregator/merchants such as the Plaintiff, in violation of the Robinson-Patman Act, 15 U.S.C. §13, actionable pursuant to 15 U.S.C. §15, thereby causing Plaintiff to sustain damages as aforesaid.

## COUNT FOUR
### (Violation of the Rhode Island Anti-Trust Law)

155.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, established, maintained, or used a monopoly, or attempted to establish a monopoly of trade or commerce, for the purpose of excluding competition or controlling, fixing and/or maintaining prices, in violation of R.I.G.L. §6-36-5, which is actionable pursuant to R.I.G.L. §6-36-11, thereby causing Plaintiff to sustain damages as aforesaid.

## COUNT FIVE
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

156.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, acted in bad faith and/or otherwise used discretion conferred by contract to act dishonestly, arbitrarily, capriciously and/or commercially unreasonably in order to deprive Plaintiff of the benefit of the Agreement, in violation of the implied covenant of good faith and fair dealing, thereby causing Plaintiff to sustain damages as aforesaid.

## COUNT SIX
### (Tortious Interference With Contractual Relations—Website Clients)

157.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, wrongfully interfered with Plaintiff's contracts with its website clients, thereby causing Plaintiff to sustain damages as aforesaid.

## COUNT SEVEN
### (Tortious Interference With Contractual Relations—the Agreement)

158.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, wrongfully interfered with performance by the parties under the Agreement, thereby causing Plaintiff to sustain damages as aforesaid.

## COUNT EIGHT
### (Tortious Interference With Prospective Economic Advantage—Website Clients)

159.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, wrongfully interfered with Plaintiff's prospective economic advantage as it relates to acquiring and continuing contracts with website clients, thereby causing Plaintiff to sustain damages as aforesaid.

## COUNT NINE
### (Tortious Interference With Prospective Economic Advantage—Merchant Agreement)

160.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, wrongfully interfered with Plaintiff's prospective economic advantage as it relates to entering into a Merchant Agreement with another Acquiring Bank, thereby causing Plaintiff to sustain damages as aforesaid.

## COUNT TEN
### (Conversion)

161.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, interfered with Plaintiff's ownership interest in and exercised dominion over Plaintiff's funds in the Reserve Account, and thus converted the same to their own use, thereby causing Plaintiff to sustain damages as aforesaid.

## COUNT ELEVEN
### (Embezzlement)

162.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, appropriated and converted to their own use Plaintiff's funds in the Reserve Account, which were entrusted to Defendants' for a specific use, and thus embezzled the same, thereby causing Plaintiff to sustain damages as aforesaid

## COUNT TWELVE
### (Breach of Contract)

163.    Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, breached the Agreement by, *inter alia*, failing or refusing to indemnify and hold harmless Plaintiff in accordance with ¶24.2 of the Agreement, thereby causing Plaintiff to sustain damages as aforesaid.

## VII.    Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.    A declaratory judgment declaring that the Defendants, by their individual and concerted acts and/or omissions, including by not limited to those alleged herein, have violated the Sherman Act §1 and §2, the Robinson-Patman Act, 15 U.S.C. §13, and the Rhode Island Anti-Trust Law, R.I.G.L. §6-36-5, and have breached the covenant of good faith and fair dealing, tortiously interfered with contracts and prospective economic advantage of Plaintiff, converted or embezzled property of Plaintiff, and/or breached their contract with Plaintiff.

2.    An award of compensatory damages in the amount of sixty ($60,000,000.00) million dollars;

3.    An award of punitive damages in the amount of one-hundred eighty ($180,000,000.00) million dollars;

4.    An award of treble damages pursuant to 15 U.S.C. §15 and/or R.I.G.L. §6-36-11;

5.    An award of reasonable attorney's fees and costs of suit pursuant to 15 U.S.C. §15 and/or R.I.G.L. §6-36-11; and,

6.    Such other and further relief as this Court deems just and proper.

VIII.   **Demand for Jury Trial**

Plaintiff hereby demands a trial by jury on all counts so triable.

IX.   **Designation of Trial Counsel**

Plaintiff hereby designates Richard A. Sinapi, Esquire, and V. Edward Formisano as trial counsel.

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO &COMPANY, LTD.**

Richard A. Sinapi, Esq. (R.I. Bar No. 2977)

V. Edward Formisano, Esq. (R.I. Bar No 5512)
100 Midway Place, Suite 1
Cranston, RI 02920
(401) 944-9690
(401) 943-9040 (Fax)

**Dated:  August 16, 2004**

Associated Counsel:
David Paul Steiner, Esq.
California Bar No. 064638
David Steiner & Associates
A Professional Law Corporation
1925 Century Park East, Suite 2350
Los Angeles, CA 90067
(310) 557-8422
(310) 556-0336 [Fax]
[pending admission *pro hac vice*]

F:\USERS\SINAPI\PSW\FIRST.REVISED.COMPLAINT.2