UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| PSW, INC., d/b/a/ PSW BILLING,<br><br>Plaintiff,<br>v.<br><br>VISA U.S.A., INC., MASTERCARD INTERNATIONAL, INC., FIRST FINANCIAL BANK AND FIRST DATA MERCHANT SERVICES CORP.,<br><br>Defendants. | C.A. No. 04-347-T |

**VISA U.S.A. INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant Visa U.S.A. Inc. ("Visa") respectfully moves the Court for an order dismissing plaintiff's complaint against Visa. As explained in the accompanying memorandum, even assuming all of the allegations in the complaint to be true, plaintiff does not state any claim against Visa upon which relief may be granted under federal or state law. Accordingly, all counts of the complaint against Visa should be dismissed on the merits.

Respectfully submitted,

Patricia A. Sullivan #2120
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Telephone: (401) 274-9200
Facsimile: (888) 325-9067

*Attorney for Defendant Visa U.S.A., Inc.*

OF COUNSEL:

Daniel H. Bookin
Randall W. Edwards
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Richard G. Parker
Jonathan D. Hacker
Matthew R. Cosgrove
Nikhil M. Shanbhag
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendant Visa U.S.A., Inc.*

DATED: November 24, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2004, a true and correct copy of *Visa U.S.A., Inc.'s Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted* was sent via facsimile and first-class mail, postage prepaid to the following parties:

Richard A. Sinapi, Esq.
V. Edward Formisano, Esq.
Sinapi Formisano & Company, Ltd.
100 Midway Place, Suite 1
Cranston, RI 02920-5707

David Paul Steiner, Esq.
David Steiner & Associates
1925 Century Park East, Suite 2350
Los Angeles, CA 90067

Jay Fastow, Esq.
Bruce Colbath, Esq.
Denise Plunkett, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Brian Wallach, Esq.
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Joseph V. Cavanagh, Esq.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903-1765

John A. Tarantino, Esq.
Patricia K. Rocha, Esq.
Adler Pollock & Sheehan, P.C.
2300 Financial Plaza
Providence, RI 02903

Patricia A. Sullivan #2120
*Attorney for Defendant Visa U.S.A., Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

PSW, INC., d/b/a/ PSW BILLING,

Plaintiff,

v.

VISA U.S.A., INC., MASTERCARD INTERNATIONAL, INC., FIRST FINANCIAL BANK AND FIRST DATA MERCHANT SERVICES CORP.,

Defendants.

Case No. 04-0347-T

**MEMORANDUM IN SUPPORT OF VISA U.S.A. INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Patricia A. Sullivan (#2120)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Telephone: (401) 274-9200
Facsimile: (888) 325-9067

OF COUNSEL:
Daniel H. Bookin
Randall W. Edwards
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Richard G. Parker
Jonathan D. Hacker
Matthew R. Cosgrove
Nikhil M. Shanbhag
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendant Visa U.S.A. Inc.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1
PLEADINGS ..... 2
DESCRIPTION OF MOTION ..... 2
FACTS ..... 3
1. The Visa Network System ..... 3
2. A Typical Visa Transaction ..... 5
3. Internet Transaction Fraud And "Chargebacks." ..... 6
ISSUES ..... 8
POINTS AND AUTHORITIES ..... 9
I. PSW FAILS TO STATE A FEDERAL ANTITRUST CLAIM ..... 9
A. PSW Does Not Allege Harm To Marketwide Competition ..... 10
B. PSW Lacks "Antitrust Standing" ..... 14
II. PSW FAILS TO STATE ANY CLAIM UNDER RHODE ISLAND LAW ..... 17
A. Rhode Island Antitrust Claim ..... 17
B. Contract Claims ..... 17
C. Tortious Interference Claims ..... 18
1. Tortious Interference With Website Client Relations ..... 18
2. Tortious Interference With Merchant Agreements ..... 19
D. Conversion Claim ..... 20
E. Embezzlement Claim ..... 20
CONCLUSION ..... 20

# TABLE OF AUTHORITIES

Page

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ........ 10

*Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ........ 14

*Augusta News Co. v. Hudson News Co.*,
269 F.3d 41 (1st Cir. 2001) ........ 10

*Belliveau Bldg. Corp. v. O'Coin*,
763 A.2d 622 (R.I. 2000) ........ 18, 19

*Centerville Builders v. Wynne*,
683 A.2d 1340 (R.I. 1996) ........ 17

*DeChristofaro v. Machala*,
685 A.2d 258 (R.I. 1996) ........ 20

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ........ 16

*DM Research, Inc. v. College of Am. Pathologists*,
2 F. Supp. 2d 226 (D.R.I. 1998) ........ 9, 17

*Dovenmuehle Mortgage, Inc. v. Antonelli*,
790 A.2d 1113 (R.I. 2002) ........ 18

*Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*,
357 F.3d 1 (1st Cir. 2004) ........ 10

*ERI Max Entm't v. Streisand*,
690 A.2d 1351 (R.I. 1997) ........ 17

*Ford Motor Co. v. Lane*,
86 F. Supp. 2d 711 (E.D. Mich. 2000) ........ 16

*H&H Internet, N.V. v. P.S.W., Inc.*,
C.A. No. 04-324-L (D.R.I. July 28, 2003) ........ 17

*Hairston v. Pac. 10 Conf.*,
101 F.3d 1315 (9th Cir. 1996) ........ 14

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968) ........ 16

*Hawaii v. Standard Oil Co.*,
405 U.S. 251 (1972) ........ 14

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........ 17

**TABLE OF AUTHORITIES**

**Page**

*In reBrand-Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997) ..... 16

*In re Citicorp Credit Servs., Inc.*, 116 F.T.C. 87 (1993) ..... 8

*In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702 (D. Md. 2001) ..... 16

*In re Visa Check/Mastermoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. 2003) ..... 12

*Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000) ..... 15

*Interface Group v. Massachusetts Port Auth.*, 816 F.2d 9 (1st Cir. 1987) ..... 9

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990) ..... 16

*Larson v. Dawson*, 53 A. 93 (R.I. 1902) ..... 20

*Menasha Corp. v. News Am. Mtg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ..... 12

*Mesolella v. Providence*, 508 A.2d 661 (R.I. 1986) ..... 18, 19

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir. 1989) ..... 13

*Moran v. Norrell Health Care, Inc.*, 1993 R.I. Super. LEXIS 56 (1993) ..... 19

*Nat'l Bancard Corp. v. Visa U.S.A. Inc.*, 779 F.2d 592 (11th Cir. 1986) ..... 3, 4, 5, 6

*Nat'l Bancard Corp. v. Visa U.S.A. Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984) ..... 4, 5

*Norte Car Corp. v. Firstbank Corp.*, 25 F. Supp. 2d 9 (D.P.R. 1998) ..... 10

*Polk Bros., Inc. v. Forest City Enterps., Inc.*, 776 F.2d 185 (7th Cir. 1985) ..... 10

*Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992 (N.D. Cal. 2003) ..... 3, 12

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) ..... 10, 11

**TABLE OF AUTHORITIES**

**Page**

*SCFC ILC, Inc. v. Visa U.S.A. Inc.*, 36 F.3d 958 (10th Cir. 1994) ........ 10, 12

*Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) ........ 14

*State Dep't of Corr. v. ADP Marshall, Inc.*, 2004 R.I. Super. LEXIS 66 (2004) ........ 17

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 239 F. Supp. 2d 180 (D.R.I. 2003) ........ 10, 11, 19

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57 (1st Cir. 2004) ........ 1, 10

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994) ........ 11

*Sullivan v. Tagliabue*, 25 F.3d 43 (1st Cir. 1994) ........ 14, 15

*Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ........ 12

*Tower Venture II, LLC v. Global Telcoms, LLC*, 2004 R.I. Super. LEXIS 86 (2004) ........ 18

*United States v. Visa U.S.A. Inc.*, 344 F.3d 229 (2d Cir. 2003) ........ 10, 17

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001) ........ *passim*

*Uno Restaurants v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957 (Mass. 2004) ........ 18

*Worthen Bank & Trust Co. v. Nat'l BankAmericard, Inc.*, 485 F.2d 119 (8th Cir. 1973) ........ 16

**Statutes**

15 U.S.C. § 1 ........ 2

15 U.S.C. § 2 ........ 2

15 U.S.C. § 13 ........ 2, 10

R.I. Gen. Laws § 6-36-2 ........ 17

R.I. Gen. Laws § 6-36-5 ........ 2, 17

**Other Authorities**

Fed. R. Civ. P. 12 ........ 2

P. Areeda & H. Hovenkamp, *Antitrust Law* (2d ed. 2000) ........ *passim*

# TABLE OF AUTHORITIES

Page

Restatement (Second) of Torts ........................................................................................... 20

*Taxpayer Beware: Schemes, Scams and Cons: Hearing Before the Committee on Finance of the United States Senate*, 107th Cong. (2001) ........................................................ 7

## PRELIMINARY STATEMENT

"Some antitrust cases are intrinsically hopeless because . . . they merely dress up in antitrust garb what is, at best, a business tort or contract violation." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 69 (1st Cir. 2004). This is such a case – except that the complaint no more alleges a proper business tort or contract violation than it does a viable federal antitrust claim.

Plaintiff PSW Inc. ("PSW") processed electronic credit and charge card (collectively "payment card") purchases, primarily for Internet pornography website operators. As the complaint acknowledges, Internet payment card purchases present a unique risk of consumer disputes, including asserted fraud, because there typically is no consumer signature that can be used to verify the consumer purchase. According to PSW, while banks that provide merchants with payment card accounts impose fees on *all* merchants who experience high levels of disputed consumer transactions, *PSW's* consumers had such a high incidence of disputes that PSW was ultimately unable to afford to pay the assessed under its contract with the bank that provided payment card services to PSW.

PSW's allegations do not describe a violation of any law, federal or state. The most fundamental element of a federal antitrust claim is harm *to competition* – i.e., an allegation that the challenged conduct increased *overall* prices or reduced *total* output in a relevant market. But PSW alleges nothing more than injury *to itself* from the fees it was required to pay as a result of the comparatively high levels of consumer disputes arising out of PSW's charges to cardholder accounts. Because PSW does not and cannot allege that the fees imposed on it generally increased prices or reduced output in the market for payment-card services, the complaint does not state a federal antitrust claim. And because those fees were part and parcel of valid

contractual agreements PSW had with its merchant bank, their imposition was neither a breach of any contract-based duty nor a cognizable business tort of any kind.

That market forces – not market constraints – caused PSW's demise is clear from the face of the complaint. PSW's inability to obtain payment-card services on its desired terms resulted directly from the uncontested facts that (a) the two major "closed" payment-card networks (Amex and Discover) altogether declined to do business with PSW, Compl. ¶ 42 (b) thousands of individual bank members of the two "open" networks (defendants MasterCard International Incorporated ("MasterCard") and Visa U.S.A. Inc. ("Visa")) also declined to do business with PSW, *id.* ¶ 90, and (c) the five banks (*id.*) apparently willing to do business with PSW declined to do so on terms to PSW's liking, *e.g.*, *id.* ¶¶ 78-80. PSW's attempt to cast the blame – and the cost – for PSW's business failure on Visa should be rejected, and its complaint dismissed.

## PLEADINGS

PSW alleges that certain Visa rules relating to contested payment-card charges violate § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2; the Robinson-Patman Act, 15 U.S.C. §§ 13 *et seq.*; and the Rhode Island Antitrust Law, R.I. Gen. Laws § 6-36-5. PSW also alleges that Visa's enforcement of those rules constituted breach of contract and of the implied covenant of fair dealing, tortious interference with existing and prospective business relations, conversion, and embezzlement. Visa submits that the facts alleged in the complaint fail to state any cognizable federal or state claim.

## DESCRIPTION OF MOTION

This is a motion by defendant Visa for an order dismissing the complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

## FACTS

1. *The Visa Network System*[1]

Visa is a joint venture established by financial institutions (mostly banks) to develop and promote an internationally recognized credit or "payment" card. Visa itself neither issues payment cards to consumers nor contracts with merchants to "accept" Visa cards. Both ends of the transaction are handled by individual Visa members. The Visa network facilitates such transactions, however, by providing its members with two critical services that the individual banks could not successfully perform on their own: (1) the promotion and marketing of a universally recognized mark; and (2) a system for approving and processing charges involving millions of merchants and cardholders and thousands of banks every day. Visa has approximately 14,000 members in the United States. Individual banks may issue cards to consumers, or they may "acquire" merchants to accept Visa cards, or they may do both. Compl. ¶ 14; *Visa*, 163 F. Supp. 2d at 333.

There are two other major general payment card networks: American Express and Discover. In contrast to Visa and MasterCard, American Express and Discover are wholly integrated for-profit enterprises, referred to as "closed loop" systems. 163 F. Supp. 2d at 333. Discover and American Express issue their own cards to consumers and process merchant transactions themselves. *Id.*

The courts uniformly have recognized that the Visa system embodies a classic pro-competitive joint venture: a group of banks have joined together in a limited fashion to offer an innovative product that none could offer on its own – bank-issued credit cards that can be used in

[1] Although PSW's complaint includes many inaccurate statements and characterizations of Visa's system, for purposes of this motion, we treat the alleged facts as true. The basis operation of Visa's system is also elaborated in numerous published judicial opinions. *See, e.g., Nat'l Bancard Corp. v. Visa U.S.A. Inc.* ["*NaBanco*"], 779 F.2d 592, 594-96 (11th Cir. 1986); *Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992, 996-97 (N.D. Cal. 2003); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 331-34 (S.D.N.Y. 2001).

virtually every consumer transaction in virtually every corner of the world. *See*, *e.g.*, *id.* at 333-34. At the same time, individual member banks continue to compete with each other in terms of issuing credit cards to consumers, signing up merchants to process payment card transactions, and, of course, in other aspects of their businesses. *Id.* at 332-33. In short, the members of the Visa venture "work together . . . to achieve benefits for themselves they could not provide independently, including globally recognized brands and sophisticated computer networks for processing transactions." *Id.* at 332. That cooperation, in turn, facilitates vigorous competition: "The members of Visa and MasterCard compete with each other on practically every other dimension that directly impacts consumers, including pricing, fees and finance charges, product features and other services for cardholders and merchants." *Id.* at 332-33; *see* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 2103d, at 38 (2d ed. 2000) ("*Antitrust Law*") (Visa is an "elaborate network-style venture" in which there is "robust competition" among the individual members). The ability of Visa's members to compete with each other, and with Amex, Discover, and members of the MasterCard network, in the provision of payment card services is made possible by the "plethora of ancillary regulations" that govern membership in the Visa joint venture. *Nat'l Bancard Corp. v. Visa U.S.A. Inc.*, 596 F. Supp. 1231, 1253 (S.D. Fla. 1984); *see NaBanco*, 779 F.2d at 602.

Visa operates on a not-for-profit basis. It does not charge merchants or cardholders fees, but receives funds from members as fees for its network services; any funds it receives in excess of the costs of those services are held for the benefit of merchants such as PSW, in the form of security accounts to pay merchants in the event of a bank default on a payment card transaction. Compl. ¶ 13; *Visa*, 163 F. Supp. 2d at 332.

2. *A Typical Visa Transaction*

The typical payment-card transaction within the Visa network involves at least five entities: (1) a cardholder, who uses a payment card to purchase goods or services; (2) a merchant, which accepts the card as payment for the goods or services; (3) an "acquiring" member bank, which has contracted with the merchant to acquire payment card charges; (4) an "issuing" member bank, which issued the card to the cardholder; and (5) Visa. Compl. ¶ 29; *NaBanco*, 779 F. 2d at 594. To be clear: as PSW acknowledges, the merchant does not contract with Visa, but with the Visa member bank, Compl. ¶ 25, which competes with other Visa and MasterCard banks, and with Amex and Discover, for the business of acquiring the merchant's payment-card transactions. As any payment-card user knows from experience, some merchants contract for payment card services with Visa banks, MasterCard banks, Amex and Discover, while others contract with only one or two payment-card service providers and thus only "accept" certain payment cards for purchases.

A typical Visa payment card transaction begins with a purchase of goods or services by a consumer who holds a payment card issued by a member bank (the "issuing" bank). Compl. ¶ 29. The merchant will accept the Visa card for payment if the merchant has already contracted with a Visa bank for the bank to "acquire" the merchant's payment card transactions. The merchant submits a request for payment of the Visa card charge to its "acquiring bank." *Id.* The acquiring bank reimburses the merchant the face amount of the charge, minus a small discount (the "merchant discount fee") as part of the price for providing payment card services. *Id.*[2] The acquiring bank then submits, through the Visa system, a request for payment on the card charge

[2] In general, merchants are willing to pay a price for payment card services because such cards allow them to make sales to customers on credit without bearing the risk that the customer will default on the payment; if a cardholder defaults, the issuing bank remains responsible for the cardholder's purchases. *National Bancard*, 596 F. Supp. at 1260.

to the cardholder's issuing bank. The issuing bank reimburses the acquiring bank the face amount of the charge, minus a fee (the "interchange fee") slightly smaller than the merchant discount fee. *Visa*, 163 F. Supp. 2d at 332; *Nabanco*, 779 F.2d at 594. The issuing bank, finally, bills the cardholder and receives payment for the face amount of the charge. Compl. ¶ 29.

As part of its contract with the acquiring bank, a merchant must establish a "Merchant Account" with the bank. *Id.* ¶ 27 & n.1. The merchant deposits card charges to its Merchant Account, and receives reimbursements from the acquiring bank for such charges through that account. But because the acquiring bank itself does not actually receive the funds until it is paid by the issuing bank, the funds provided in the merchant account are treated as a form of loan to the merchant, requiring an application, credit check, and supporting documentation. *Id.* Those requirements, as well as the comparatively high levels of consumer disputes and fraud in the adult entertainment industry (*see infra* at 6-7), make smaller website operators in that industry generally less attractive customers to banks offering payment-card services. *Id.* ¶¶ 27 & n.1, 81-82. Accordingly, to obtain such services, many adult entertainment website handle payment-card transactions through an "aggregator" such as PSW, which essentially combines the charges of numerous Internet merchants and presents a potential acquiring bank with a sufficiently large number of transactions to make the business commercially attractive to the bank. *Id.* ¶¶ 81-82. The aggregator serves as the merchant from the acquiring bank's perspective. *Id.* ¶ 22. PSW's acquiring bank was defendant First Financial Bank ("FFB").

3. *Internet Transaction Fraud And "Chargebacks."*

As the complaint explains, Internet payment-card transactions involve a comparatively high rate of disputed consumer transactions, in part because of the "known risk of . . . fraud" associated with such transactions. *Id.* ¶ 58; *see id.* ¶ 51. Fraud of many types – by merchant, by

cardholder, by third party – is a special problem on the Internet because there is no face-to-face transaction and no customer signature. PSW asserts that the most prevalent form of fraud on the Internet is "friendly fraud," which occurs when the cardholder simply denies that he made a charge that appears on his bill. *Id.* ¶ 50. In a traditional "brick and mortar" business, disputes can be resolved by reviewing a signed receipt. *Id.* ¶ 46. Not so for "card not present" transactions, including many Internet transactions. If such a merchant chooses to offer its customers the option of paying on credit, and the customer later denies the charge, the Internet merchant may have difficulty proving that the customer did, in fact, make the transaction. *Id.* ¶¶ 47, 50. Payment-card transactions conducted by Internet merchants and other "card not present" merchants pose a significantly higher risk of fraud than do transactions conducted by "brick and mortar" merchants. *Id.* ¶¶ 51, 58; *Taxpayer Beware: Schemes, Scams and Cons: Hearing Before the Committee on Finance of the United States Senate*, 107th Cong. 31-33, 109, 112 (2001) (statement of Hugh Stevenson, Assoc. Director, Div. of Planning and Information, F.T.C. Bureau of Consumer Protection) (describing high incidence of fraud in Internet adult entertainment industry). PSW acknowledges that disputed transactions impose costs on the Visa system, and that Visa can and should take measures to prevent such costs by reducing the number of disputed transactions. Compl. ¶ 78.

"Chargebacks" are part of the process Visa has adopted to address disputed transactions. When a cardholder denies a charge and the merchant cannot verify the transaction with a customer signature, the issuing bank may "reverse" the transaction. *Id.* ¶ 43. In accordance with Visa's rules, the acquiring bank reimburses the issuing bank the amount of the transaction (less the interchange fee). The acquiring bank typically compels the merchant to reimburse the bank the amount of the transaction (it is a reimbursement since the acquiring bank already paid the

merchant the transaction amount minus discount fee upon approval of the transaction) plus a fixed "fee" for the chargeback, under whatever terms and procedures are set forth in the Merchant Agreement between acquiring bank and merchant. *Id.* ¶ 44. Both the reimbursement and the fee are drawn directly from the merchant account. Because both Visa (*id.* ¶ 59) and the U.S. Government (*e.g.*, *In re Citicorp Credit Servs., Inc.*, 116 F.T.C. 87, 92 (1993)) consider the rate of chargebacks a reasonable proxy for the amount of fraud occurring in a given merchant's transactions, Visa's efforts to mitigate and deter the costs of such fraud step up when a given merchant's chargeback rate increases. When chargebacks reach a specified level, Visa imposes certain fees on the member bank that serves as the merchant's acquirer. Compl. ¶ 63. The levels are set to identify only the most extreme problematic merchants: in a given month, only approximately 30-50 merchants out of the 5 million merchants in the Visa system – less than one-hundredth of one percent – experience chargeback problems severe enough to satisfy the excessive chargeback thresholds. Acquiring banks subjected to the fees triggered by such high chargeback levels often pass them on to the merchants involved in accordance with their Merchant Agreements. *Id.* ¶¶ 65-67. As the complaint explains, Visa's chargeback rules have the effect of encouraging merchants to take steps to "reduce the likelihood of fraud," *id.* ¶ 57; *see id.* ¶ 102, reducing the costs such fraud imposes on the system.

## ISSUES

1. Whether the complaint properly alleges harm to competition – i.e., increase in overall prices or decrease in total output – in the market in which PSW purchases payment-card services.

2. Whether PSW has standing to bring an antitrust claim.

3. Whether the complaint alleges facts sufficient to state claims for breach of contract and the duty of good faith and fair dealing, tortious interference with business relations, embezzlement and conversion.

**POINTS AND AUTHORITIES**

The basic standard governing a motion to dismiss under Rule 12(b)(6) is familiar: whether the plaintiff has stated a claim upon which relief could be granted, taking as true all the complaint's well-pled allegations and drawing all reasonable inferences in the plaintiff's favor. *See DM Research, Inc. v. College of Am. Pathologists*, 2 F. Supp. 2d 226, 228 (D.R.I. 1998) (Torres, J.). The plaintiff carries an important burden under that standard, especially in antitrust cases, as this Court has explained:

> [T]he complaint must allege *facts* that establish all of the elements of the claim[s] asserted. . . . Bald assertions, subjective characterizations and legal conclusions are insufficient. . . . Moreover, the factual allegations must be specific enough to justify dragging a defendant past the pleading threshold. . . . These principles are especially applicable in antitrust cases where further litigation is likely to be protracted and expensive and, therefore, the impact of unfounded claims is severe. . . . While antitrust complaints are not subjected to any heightened pleading requirements, courts must be vigilant to insure that the underlying facts are pled with sufficient specificity to state a claim.

*Id.* (citations omitted).

## I. PSW FAILS TO STATE A FEDERAL ANTITRUST CLAIM

The gravamen of PSW's complaint is Visa's "chargeback" system for deterring fraudulent transactions. PSW's federal antitrust attack on that system fails for at least two independent reasons.[3] *First*, PSW fails to allege harm *to overall competition* in a relevant market, i.e., a reduction in total output or increase in general prices. *Second*, even assuming the

[3] In addition to the arguments set forth below, Visa adopts by reference the arguments set forth in the briefs of co-defendants MasterCard and FFB.

complaint described a violation of the Sherman Act, PSW is not *directly* injured by the asserted violation and thus lacks "antitrust standing" to pursue a claim under the statute.[4]

### A. PSW Does Not Allege Harm To Marketwide Competition

Rules designed to reduce disputed consumer transactions are a necessary and integral part of any payment-card joint venture. Because Visa's chargeback rules are "part of a larger, legitimate economic [joint] venture," they are not per se unlawful, but must be analyzed under the "rule of reason." *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001); *see Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 4 n.1 (1st Cir. 2004) (per se treatment essentially applies only to "naked" restraints, i.e., restraints "unconnected with any redeeming larger enterprise"); *accord Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986); *Polk Bros., Inc. v. Forest City Enterps., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985). Antitrust courts have uniformly applied rule of reason analysis to Visa's rules. *See, e.g., U.S. v. Visa U.S.A. Inc.*, 344 F.3d 229, 238 (2d Cir. 2003); *SCFC ILC, Inc. v. Visa U.S.A. Inc.*, 36 F.3d 958, 963-65 (10th Cir. 1994).[5]

To articulate a rule of reason challenge to a particular restraint of trade, a plaintiff must allege, inter alia, that the challenged restraint harms "competition" in a relevant market. *See Stop*

---

[4] The analysis set forth below applies equally to PSW's claims under § 1 (agreements in restraint of trade) and § 2 (monopolization) of the Sherman Act: both provisions require allegation and proof of harm to marketwide competition (*see Interface Group v. Massachusetts Port Auth.*, 816 F.2d 9, 10 (1st Cir. 1987)) and antitrust standing (*see Antitrust Law* § 335, at 286). Further, PSW does not a state a § 2 claim because it fails to allege that Visa has engaged in "exclusionary conduct," i.e., conduct tending to impair the competitive opportunities of rivals (without pro-competitive justification). *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 & n.32 (1985). PSW cites the exclusivity rule invalidated in *Visa*, 163 F. Supp. 2d at 379, but that rule only barred Visa member banks from *issuing* Amex and Discover cards, *id.* (quoting rule); it did not bar them from *acquiring* merchant transactions for Amex and Discover, and thus did not exclude any rival from the market for acquiring merchant transactions.

PSW's Robinson-Patman Act claim fails because that statute applies only to price discrimination in the purchase of "commodities" and "goods." 15 U.S.C. §§ 13(a)-(e). It does not apply to the sale of *services*, including financial services. *See, e.g., Norte Car Corp. v. Firstbank Corp.*, 25 F. Supp. 2d 9, 18 (D.P.R. 1998).

[5] It is appropriate for the court to determine at the pleading stage whether the facts alleged in an antitrust complaint implicate a *per se* or rule of reason challenge. *See Stop & Shop*, 373 F.3d at 61.

*& Shop Supermarket Co. v. Blue Cross & Blue Shield*, 239 F. Supp. 2d 180, 191 (D.R.I. 2003) (Torres, J.). It is not enough to allege harm to a single purchaser or competitor. Antitrust law is "concerned not with wrongs directed against the private interest of an individual business," *Eastern Food*, 357 F.3d at 4, but with "activities that interfere with competitive markets and their ability to provide adequate supplies of quality goods at reasonable prices," *Stop & Shop*, 239 F. Supp. 2d at 186. Accordingly, an antitrust plaintiff challenging an ancillary restraint as unreasonable must allege harm to competition "marketwide." *Id.* at 192; *see Antitrust Law* ¶ 1912f, at 330 ("An anti-competitive restraint on trade is one that tends to reduce *marketwide* output." (emphasis added)). To establish such "marketwide" harm, the plaintiff must allege that "the challenged restraint is reasonably likely to effect an output reduction" – and thus an increase in prices – "in the relevant market considered *as a whole*." *Antitrust Law* ¶ 1912e, at 330 (emphasis added); *see Sullivan v. NFL*, 34 F.3d 1091, 1097 (1st Cir. 1994) (harm to competition is "usually measured by a *reduction in output* and an *increase in* prices in the relevant market"); *Rothery*, 792 F.2d at 211. Determining "whether the plaintiff has plausibly alleged that the challenged restraint can yield lower market output or higher market prices" is a key "early screening device[]" for antitrust cases. *Antitrust Law* ¶ 2103a, at 27. On a motion to dismiss, the court should ask "[w]hether the restraint considered on its face makes any plausible threat to reduce marketwide output and thus increase prices; if not, the complaint can be dismissed." *Id.* ¶ 2100g2, at 17; *see id.* ¶ 1912j, at 340.

PSW's complaint must be dismissed because it does not allege and could not plausibly allege that Visa's chargeback rules have caused a marketwide output reduction or marketwide price increase. PSW is not even clear as what market it believes to be at issue – whether it is the

overall "network services market for general purpose cards," Compl. ¶¶ 33 & 34,[6] or something PSW calls "domestic Adult Entertainment Website general purpose card processing industry," *id.* ¶ 90; *see id.* ¶ 83. PSW's failure to define the relevant market with any clarity or explanation is itself sufficient grounds for dismissal:

> To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand ... and it must be plausible. Cases in which dismissal on the pleadings is appropriate frequently involve ... failure even to attempt a plausible explanation as to why a market should be limited in a particular way.

*Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (internal quotation marks and citations omitted). In any event, regardless how the relevant market is defined, PSW has not alleged harm to *competition* – i.e., a general price increase or output reduction – in *any* market.

If, for purposes of this motion, the relevant market is assumed to be the market for merchant payment-card services,[7] PSW's complaint most certainly falls short. PSW alleges that Visa imposes certain fees on those member banks whose merchants experience high chargeback

[6] "Network services" are the services Visa offers to its bank members in accordance with its network rules, including its chargeback rules. *Visa*, 163 F. Supp. 2d at 338-39.

[7] Every other antitrust challenge to a Visa rule has analyzed a general payment-card market, not a segment of the market defined solely by the characteristics of particular purchasers (such as Internet pornographers or their aggregators). *See, e.g., SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994); *Reyn's Pasta Bella*, 259 F. Supp. 2d at 1000; *In re Visa Check/Mastermoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. 2003); *Visa*, 163 F. Supp. 2d at 338. There is no basis for analyzing the market more narrowly here; as explained in the text, the question whether Visa's chargeback rules caused "harm" to a market must be asked with respect to the market in which they operate "as a whole." That market is certainly no narrower than the overall payment-card services market: Visa's rules apply to all member banks that sell services in the payment-card market, and they govern any and all merchant transactions that result in chargebacks, regardless of the merchant's identity. To be sure, the rules do effectively impose higher costs on those merchants with higher chargeback rates, but that does not justify treating those particular merchants as a distinct market unto themselves. The characteristics of the product or service define the market, not the characteristics of a few purchasers. *See Menasha Corp. v. News Am. Mtg. In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir. 2004) ("Attributes of shoppers do not identify markets."). To the extent PSW would define the relevant market as the "Adult Entertainment Website card processing industry," the definition is almost perfectly circular: it effectively defines the market as "purchasers who claim to be injured by the rules" to assess whether the "market" was harmed by the rules. That tautological definition is not "plausible" and thus not acceptable, even at the pleading stage. *Todd*, 275 F.3d at 200; *see Menasha*, 354 F.3d at 665-66. It is especially preposterous given PSW's own representation that the Internet pornography card processing "market" is comprised of a grand total of three purchasers (Compl. ¶ 90) out of the millions of merchants who purchase payment card services, and also given the fact – which PSW cannot in good faith dispute – that in a typical month less than .001% of the 5 million merchants in the Visa system trigger the excessive chargeback fees, *see supra* at 8.

rates. When such fees are passed on to those particular merchants, PSW alleges, those merchants (obviously) experience higher costs than other merchants. The fees thus at most "harm" *those particular merchants*. PSW does not and cannot allege that the fees increase prices *marketwide*. The market "price" all merchants pay to banks or to Amex and Discover for payment-card services is the merchant discount each individual bank (or Amex or Discover) negotiates with each individual merchant. *See supra* at 5.[8] And PSW simply does not allege that Visa's chargeback rules have driven up prices for merchants seeking to purchase payment-card services in the intensely competitive market for the sale of such services.[9]

Even if the market is arbitrarily defined as the market for the sale of payment-card services to adult entertainment website operators and their aggregators, PSW still fails to allege that Visa's chargeback rules caused a general price increase or output reduction in such a market. PSW alleges only that the chargeback rules have caused the number of smaller purchasers in that market to decline, leaving only "a handful of large Aggregators" and large websites available to negotiate Merchant Agreements with payment-card service providers. Compl. ¶ 81. But PSW does not allege, as it must, that such consolidation on the demand side in the supposed Internet pornography card processing market has been accompanied by any general increase in the price of payment-card services charged in that market. To the contrary, such market effects are almost certain to force *down* the prices Visa members can negotiate with the purchasers in that market,

[8] PSW does not and could not in good faith allege any "agreement" under § 1 between Visa and MasterCard, or between Visa and Amex, or between Visa and Discover, to fix the chargeback rules applied to all merchant transactions in the market.

[9] To the contrary, PSW actually alleges that Visa *should* have imposed chargeback-related fees on – or taken other measures against – issuing bank members and card-using consumers, rather than against high-chargeback merchants such as PSW. Compl. ¶¶ 78-79. If Visa had shifted such fees toward issuing banks, they likely would have passed such costs on to consumer cardholders in the same way that FFB passed fees on to PSW. PSW cannot state an antitrust claim against Visa's chargeback rules on the ground that Visa should have adopted different rules more likely to increase consumer prices. *See Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 527 (1st Cir. 1989) ("The Sherman Act's very purpose is to help consumers, in part by bringing about low, nonpredatory prices.").

since "[l]arge buyers are frequently able to obtain price concessions unavailable to smaller buyers." *Antitrust Law* § 517c5, at 136.

Accordingly, while PSW's complaint can be dismissed for failure to allege an adequately defined market, its truly fundamental defect is its failure to allege overall harm to any market, no matter how it might be defined.

**B. PSW Lacks "Antitrust Standing"**

PSW's action is also barred because PSW lacks "antitrust standing." A prudential doctrine more restrictive than constitutional standing, *see Sullivan v. Tagliabue*, 25 F.3d 43, 45 n.5 (1st Cir. 1994), "antitrust standing" principles are founded upon the recognition that "Congress did not intend the antitrust laws to provide a remedy . . . for all injuries that might conceivably be traced to an antitrust violation," *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264 (1972); *see Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999). "[A]lthough theoretically possible to allow all affected persons to sue . . . the Supreme Court and the lower courts have never doubted the need for some cutoff." *Antitrust Law* ¶ 339d, at 331. That "cutoff" is provided by the "antitrust standing" doctrine, which narrows the class of assertedly injured persons who may bring suit under the federal antitrust statutes. *See Serpa*, 199 F.3d at 10; *Sullivan*, 25 F.3d at 45.

The plaintiff has the burden to allege and prove all of the numerous factors that must be satisfied to establish antitrust standing. *See Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1321 (9th Cir. 1996); *Antitrust Law* ¶ 335a, at 286. At least three are pertinent here: the directness of the injury; the speculative nature of damages; and the risk of duplicative recovery or complex apportionment of damages. *See Serpa*, 199 F.3d at 10 (listing factors). In particular, when the plaintiff's alleged injury is not direct, but derives from the injury of a more immediate victim of

the alleged anti-competitive conduct, the plaintiff "is routinely denied standing." *Antitrust Law* ¶ 339c, at 327; *see id.* ¶ 339d, at 329; *see Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 541 (1983) (no antitrust standing where "any injuries were only an indirect result of whatever harm may have been suffered by" more proximate parties); *Sullivan*, 25 F.3d at 51 (rejecting antitrust standing where injury is "indirect, and a consequence of the direct injury inflicted on the [more immediate victim]"). Similarly, recovery is barred when "the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000).

PSW lacks standing because the injury it asserts from chargeback-related costs does not result directly from Visa's conduct, but that of the acquiring bank – FFB – with which PSW contracted for card services. Chargeback-related fees are assessed by Visa *on the acquiring banks*, who then allegedly choose to pass the fees on to merchants such as PSW. Compl. ¶¶ 63, 100. PSW does not and could not allege that FFB is contractually required by any agreement with Visa to pass on chargeback-related fees to merchants. To the contrary, PSW alleges that the amount required in the reserve account to provide for chargeback fees and penalties is "established by and in *the sole discretion of the Acquiring Bank*," *id.* ¶¶ 76, 99 (emphasis added), and every allegation concerning increases in the amount of the reserve account specifies FFB or FDMS – not Visa – as the source of the demand, *id.* ¶¶ 107, 108, 120, 121, 131, 134, 136, 140-142. Neither does PSW allege the existence of any agreement between FFB and other Visa member banks to pass through chargeback fees to merchants. Rather, chargeback fees and other chargeback-related requirements (such as reserve accounts) are imposed on merchants by individual banks under the terms of their independent Merchant Agreements. *Id.* ¶¶ 93, 97-101.

In short, the pass-through from which PSW claims "injury" derives from the terms of a freely negotiated contractual agreement between FFB and PSW – an agreement *to which Visa is not a party*. Visa's chargeback rules govern only the relationship between Visa and acquiring banks such as FFB, and if those rules are anti-competitive, the party immediately "injured" by such rules is the acquiring bank that is required to pay the fees. If merchants such as PSW suffer any injury, it is only because the acquiring banks elect to pass the fees on to them in accordance with the terms of each individual bank's independent Merchant Agreement.

PSW's alleged injury is thus indirect, derivative of an "injury" ostensibly suffered by the acquiring bank in the first instance. Likewise, the existence of any damage to PSW depends on whether FFB decided to pass on the assertedly anti-competitive chargeback fees and penalties, thus rendering any damage to PSW a speculative consequence of FFB's own decisions.[10] Finally, allowing PSW to recover for its indirect, derivative injury would risk duplicative recovery, because if there is any anti-competitive conduct at all, then the more immediate "victim" of that conduct – FFB – could also sue and seek recovery of its own damages, i.e., the fees it was required to pay under the supposedly anti-competitive chargeback rules adopted by the Visa joint venture.[11] Since Visa could not avoid paying damages in such an action on the

[10] Although the complaint alleges that FFB *did* pass on the chargeback fees, that is irrelevant for antitrust standing purposes. PSW is at best an "indirect purchaser" of Visa's payment-card-processing network services, which are "sold" in the first instance to Visa's member banks, subject to Visa's network rules. *See Visa*, 163 F. Supp. 2d at 338-39. It is settled that an indirect purchaser cannot pursue an antitrust claim against the ultimate supplier of a good or service, even when the direct purchaser – here, FFB – has indisputably passed the allegedly unlawful cost through to the plaintiff. *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213-14 (4th Cir. 2002); *Ford Motor Co. v. Lane*, 86 F. Supp. 2d 711, 716-17 (E.D. Mich. 2000). The "very purpose" of the rule "is to prevent indirect purchasers . . . from recovering any portion of a passed through overcharge." *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 712 (D. Md. 2001).

[11] The fact that FFB is a member of the Visa joint venture would not preclude FFB from bringing an action challenging the rules. *See Antitrust Law* ¶ 357c, at 458; *see, e.g., Worthen Bank & Trust Co. v. Nat'l BankAmericard, Inc.*, 485 F.2d 119 (8th Cir. 1973) (antitrust challenge by member bank against card network). Although some courts have held that standing may be granted to an indirect purchaser when the direct purchaser is actively controlled by the defendant, *see, e.g., In re Brand-Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605-06 (7th Cir. 1997), that exception does not apply here: Visa does not control its member banks in general, nor does Visa compel its member banks to pass chargeback fees through to merchants. The fact that Visa member

ground that FFB passed on such charges to its merchants, *see Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) (barring defendant from discounting plaintiff's damages claim by the amount passed on to the customer), Visa could be forced to pay essentially the same damages twice. Avoiding that result – or, at a minimum, avoiding the difficulty of sorting out the various damage claims under such circumstances[12] – is one of the main reasons the antitrust standing doctrine limits the right to sue to the first injured party. *See, e.g., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 738-39 (1977).[13]

## II. PSW FAILS TO STATE ANY CLAIM UNDER RHODE ISLAND LAW

### A. Rhode Island Antitrust Claim

PSW asserts a monopolization claim under R.I. Gen. Laws § 6-36-5. Compl. ¶ 155. Because that statute is construed *in pari materia* with Sherman Act § 2, *see* R.I. Gen. Laws § 6-36-2(b); *ERI Max Entm't v. Streisand*, 690 A.2d 1351, 1353 n.1 (R.I. 1997), PSW's state antitrust claim fails for the same reasons its Sherman Act claims fail.

### B. Contract Claims

PSW's claims for breach of contract (Count Twelve) and breach of the implied covenant of good faith and fair dealing (Count Ten) must be dismissed for two distinct reasons. *First*, each claim depends on the existence of a contract between Visa and PSW. *See State Dep't of Corr. v. ADP Marshall, Inc.*, 2004 R.I. Super. LEXIS 66 at *22-23 (2004); *Centerville Builders*

---

banks have not themselves challenged the chargeback rules merely indicates that the banks recognize the rules as pro-competitive restraints that enhance the ability of each bank to compete to acquire merchant services and issue cards. *See Antitrust Law* ¶ 335c, at 291 ("If the superior plaintiff has not sued, one may doubt the existence of any antitrust violation at all.").

[12] It bears emphasis that PSW itself appears to have passed on chargeback-related fees and penalties to its own merchant customers, further complicating any apportionment of damages. *See H&H Internet, N.V. v. P.S.W., Inc.*, C.A. No. 04-324-L (D.R.I. July 28, 2003) (action by merchant against PSW alleging that PSW withheld 10% of all receipts to cover the cost of chargebacks and related expenses).

[13] Beyond the chargeback rules, PSW's complaint passingly refers to other Visa rules as potential unlawful restraints. Compl. ¶ 83. The factual allegations concerning those rules are nowhere near "pled with sufficient specificity to state a claim." *DM Research*, 2 F. Supp. 2d at 228. Visa adopts the discussion of those allegations contained in MasterCard's motion to dismiss.

*v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996). But PSW admits that no direct contract existed between itself and Visa. Compl. ¶¶ 27, 92; *see Visa*, 344 F.3d at 235 (merchant contracts with acquiring bank, not with Visa). PSW's contract claims thus fail as a matter of law.

*Second*, even if there were privity of contract between PSW and Visa, PSW does not allege a breach of any contractual terms. To the contrary, PSW itself alleges that the chargeback-related costs imposed on PSW were authorized by the PSW-FFB Merchant Agreement. Compl. ¶¶ 44, 83, 97-101. Obviously a breach of contract claim will not lie absent an alleged breach of a contract. A good faith and fair dealing claim likewise fails when the conduct at issue is authorized by the contract. *See Dovenmuehle Mortgage, Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I. 2002); *Tower Venture II, LLC v. Global Telcoms, LLC*, 2004 R.I. Super. LEXIS 86, at *11-12 (2004); *Uno Restaurants v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004).

### C. Tortious Interference Claims

PSW alleges that Visa tortiously interfered with PSW's existing and prospective business relationships with its website clients (Counts Six and Eight) and with FFB or other potential acquiring banks (Counts Seven and Nine). Compl. ¶¶ 157-160. To state a claim of tortious interference with business relationships under Rhode Island law, PSW must allege that Visa intended to interfere with the PSW's contracts or business expectancies through "improper" means, without the benefit of legally recognized privilege or justification. *See Stop & Shop*, 239 F. Supp. 2d at 194; *Belliveau Bldg. Corp. v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000); *Mesolella v. Providence*, 508 A.2d 661, 669-70 (R.I. 1986).

1. *Tortious Interference With Website Client Relations*. PSW alleges that Visa interfered with PSW's business relations with its website clients by raising the reserve account requirement

when PSW continually showed chargeback rates over the allowed ratio, which caused PSW a serious cash flow problem that prevented it from meeting its obligations to its website clients. Compl. ¶¶ 133, 137. But the reserve account was raised by FFB, not by Visa. *Id.* ¶¶ 131, 141. And because the reserve account is established pursuant to the PSW-FFB Merchant Agreement, which gives FFB's the "sole discretion" to determine the reserve amount, *id.* ¶ 76, the raising of the reserve amount was contractually sanctioned and thus not an "improper" means of acting. *Belliveau*, 763 A.2d at 628.

2. *Tortious Interference With Merchant Agreements.* Count Seven alleges that Visa tortiously interfered with the PSW's performance under the FFB-PSW Merchant Agreement, Compl. ¶ 158, and Count Nine alleges that Visa tortiously interfered with PSW's prospective relations with other acquiring banks, *id.* ¶ 160. Again, PSW fails to allege a legally improper purpose or means: the chargeback-related costs and reserve account requirements were all sanctioned by PSW's Merchant Agreement and thus were not "improper" under state tort law. *See supra* at 18. In addition, as explained above, Visa's chargeback rules are an ancillary restraint imposed as part of a larger economic enterprise, designed to reduce loss-causing fraud and thus enhance the efficiency of the enterprise. The enforcement of a pro-competitive ancillary restraint, lawful (indeed, encouraged) under the federal antitrust laws cannot be an "improper" means of competing in the market. *See Stop & Shop*, 239 F. Supp. 2d at 195 (defendant should not be held liable in tort for competing lawfully in market). PSW also fails to allege that it had any expectancy of a Merchant Agreement relationship with another acquiring bank. *See Mesolella*, 508 A.2d at 671 (requiring proof "either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the

relationship would have been established"); *Moran v. Norrell Health Care, Inc.*, 1993 R.I. Super. LEXIS 56, at *9 (1993).

**D. Conversion Claim**

Count Ten alleges a conversion claim, *viz.*, that Visa interfered with PSW's ownership interest in and exercised dominion over PSW's funds in the reserve account, and thus converted those funds to Visa's own use. Compl. ¶ 161. The tort of conversion requires "an intentional exercise of dominion or control over a *chattel* which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A; *see Larson v. Dawson*, 53 A. 93 (R.I. 1902). Money can be the subject of conversion only where the defendant is under an obligation to deliver a specifically identifiable body of money to the plaintiff. *See DeChristofaro v. Machala*, 685 A.2d 258, 263 (R.I. 1996). Because PSW has not alleged the conversion of any chattel or that Visa is under an obligation to return any specific bills or coins to PSW (rather than simply a general sum of money not specifically identifiable), the conversion claim must be dismissed.

**E. Embezzlement Claim**

PSW alleges that Visa appropriated and converted to its own use PSW's funds in the reserve account, which were entrusted to Visa for a specific use, and thus embezzled the same. Compl. ¶ 162. But PSW did not maintain any account with or otherwise entrust funds to Visa. PSW's acquiring bank at all times held any funds at issue. *Id.* ¶ 76. Accordingly, Visa "embezzled" nothing from PSW.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss should be granted.

Respectfully submitted,

Patricia A. Sullivan #2120
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Telephone: (401) 274-9200
Facsimile: (888) 325-9067

DATED: November 24, 2004

OF COUNSEL:

Daniel H. Bookin
Randall W. Edwards
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Richard G. Parker
Jonathan D. Hacker
Matthew R. Cosgrove
Nikhil M. Shanbhag
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendant Visa U.S.A., Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2004, a true and correct copy of *Visa U.S.A., Inc.'s Memorandum of Law in Support of its Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted* was sent via facsimile and first-class mail, postage prepaid to the following parties:

Richard A. Sinapi, Esq.
V. Edward Formisano, Esq.
Sinapi Formisano & Company, Ltd.
100 Midway Place, Suite 1
Cranston, RI 02920-5707

David Paul Steiner, Esq.
David Steiner & Associates
1925 Century Park East, Suite 2350
Los Angeles, CA 90067

Jay Fastow, Esq.
Bruce Colbath, Esq.
Denise Plunkett, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Brian Wallach, Esq.
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Joseph V. Cavanagh, Esq.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903-1765

John A. Tarantino, Esq.
Patricia K. Rocha, Esq.
Adler Pollock & Sheehan, P.C.
2300 Financial Plaza
Providence, RI 02903

Patricia A. Sullivan #2120
*Attorney for Defendant Visa U.S.A., Inc.*