UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| PSW, INC., d/b/a PSW BILLING | : | |
| | : | |
| v. | : | C.A. No. 04-347T |
| | : | |
| VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION | : | |

**DEFENDANTS FIRST FINANCIAL BANK'S AND FIRST DATA MERCHANT SERVICES CORPORATION'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendants, First Financial Bank and First Data Merchant Services Corporation, pursuant to Rule 12(b)(6) of the Rules of Civil Procedure, hereby move to dismiss Plaintiff's Complaint on the ground that it fails to state a claim upon which relief can be granted. In support thereof, Defendants rely on their Memorandum of Law filed contemporaneously herewith.

Dated: November 24, 2004

**Request for Oral Argument**

Defendants request oral argument pursuant to Local Rule 12(b) on the ground that the motion involves important issues of law. Defendants request one hour for the parties to be heard.

DEFENDANTS, FIRST FINANCIAL BANK AND FIRST DATA MERCHANT SERVICES CORPORATION
By their Attorneys,

JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
2300 Financial Plaza
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607

14

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of November, 2004, a true copy of the within was served via first class mail, postage prepaid, on the following counsel of record:

*Counsel for Plaintiff:*
Richard A. Sinapi, Esq.
Sinapi, Formisano & Company, Ltd.
100 Midway Place, Suite 1
Cranston, RI 02920

*Counsel for MasterCard International:*
Joseph V. Cavanagh, Esq.
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

Jay N. Fastow, Esq.
Bruce A. Colbath, Esq.
Denise L. Plunkett, Esq.
Weil, Gotshall & Manges, LLP
767 Fifth Avenue
New York, NY 10153

*Counsel for VISA, U.S.A., Inc.:*
Patricia A. Sullivan, Esq.
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903

Daniel Brookin, Esq.
Randall W. Edwards, Esq.
O'Melveny & Myers
275 Battery Street
San Francisco, CA 94111

*Co-Counsel for First Financial:*
Brian Wallach, Esq.
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402

*316894_1.doc*

DebraHumm ______________________

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| PSW, INC., d/b/a PSW BILLING,<br><br>Plaintiff,<br><br>v.<br><br>VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION<br><br>Defendants. | Case No. 04-347T |

**MEMORANDUM IN SUPPORT OF DEFENDANTS FIRST FINANCIAL BANK'S AND FIRST DATA MERCHANT SERVICES CORPORATION'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION....1

PLEADINGS ....2

DESCRIPTION OF MOTION....2

FACTS ....2

ISSUES ....4

POINTS AND AUTHORITIES....4

I. PLAINTIFF HAS NOT ADEQUATELY ALLEGED CLAIMS FOR BREACH OF CONTRACT OR FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ....5

II. PLAINTIFF HAS NOT ADEQUATELY ALLEGED ANY TORTIOUS INTERFERENCE CLAIMS ....7

A. Neither FFB nor FDMS Can Tortiously Interfere with its Own Contract....8

B. Plaintiff's Other Tortious Interference Claims Are Also Insufficient ....8

III. FFB AND FDMS HAVE NOT CONVERTED OR EMBEZZLED PLAINTIFF'S PROPERTY....10

IV. PLAINTIFF FAILS TO ADEQUATELY ALLEGE A SHERMAN ACT CLAIM....11

A. Plaintiff Has Not Alleged and Cannot Show Antitrust Injury ....11

B. Plaintiff Has Not Adequately Alleged Any Involvement By FFB and FDMS in an Antitrust Conspiracy....12

C. PSW Has Not Adequately Alleged a Section 2 Claim Against FFB and FDMS....14

V. PLAINTIFF'S RHODE ISLAND ANTITRUST CLAIMS FAIL FOR THE SAME REASONS AS ITS FEDERAL ANTITRUST CLAIMS ....14

VI. THE ROBINSON-PATMAN ACT DOES NOT APPLY TO SERVICES....14

## TABLE OF AUTHORITIES

### CASES

*AD/SAT v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)....13

*Alternative Energy, Inc. v. St. Paul Fire & Marine Insurance Co.*,
267 F.3d 30 (1st Cir. 2001)....5

*Arbitron Co. v. Tropicana Product Sales, Inc.*,
No. 91 Civ. 3697,1993 U.S. Dist. LEXIS 5587 (S.D.N.Y. Apr. 28, 1993)....14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)....11

*CJA Enterprises, Inc. v. Harbridge Merchant Services, Inc.*,
No. 91 C 6681, 1992 U.S. Dist. LEXIS 8706 (N.D. Ill. June 17, 1992)....9

*Cogan v. Phoenix Life Insurance Co.*,
310 F.3d 238 (1st Cir. 2002)....5

*Concord v. Boston Edison Co.*,
676 F. Supp. 396 (D. Mass. 1988)....14

*DM Research, Inc. v. College of American Pathologists*,
2 F. Supp. 2d 226 (D.R.I. 1998), *aff'd*, 170 F.3d 53 (1st Cir. 1999)....4, 12

*ERI Max Entertainment, Inc. v. Streasand*,
690 A.2d 1351 (R.I. 1997)....14

*Fuscellaro v. Industrial National Corp.*,
368 A.2d 1227 (R.I. 1977)....10

*Hord Corp. v. Polymer Research Corp. of America*,
275 F. Supp. 2d 229 (D.R.I. 2003)....6, 7

*Hugo Boss Fashions Inc. v. Federal Insurance Co.*,
252 F.3d 608 (2d Cir. 2001)....5

*Jolicoeur Furniture Co., Inc. v. Baldelli*,
653 A.2d 740 (R.I. 1995)....8

*L & J Crew Station, LLC v. Banco Popular de Puerto Rico*,
278 F. Supp. 2d 547 (D.V.I. 2003)....15

*Lang's Bowlarama, Inc. v. AMF, Inc.*,
377 F. Supp. 405 (D.R.I. 1974)....15

*Lee v. Life Insurance Co of North America*,
829 F. Supp. 529 (D.R.I. 1993), *aff'd*, 23 F.3d 14 (1st Cir. 1994)....12, 14

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................13

*May Department Store v. Graphic Process Co.*,
637 F.2d 1211 (9th Cir. 1980)....................14

*Mesolella v. City of Providence*,
508 A.2d 661 (R.I. 1986)....................7

*Monsanto Co. v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984)....................12

*Montecalvo v. Mandarelli*,
682 A.2d 918 (R.I. 1996)....................10

*Moran v. Norrell Health Care, Inc.*,
No. PC 89-4262, 1993 R.I. Super. LEXIS 56 (R.I. Super. Ct. Sept. 15, 1993)............9

*Mortgage Guarantee & Title Co. v. Commonwealth Mortgage Co.*,
730 F. Supp. 469 (D.R.I.), *aff'd mem.*, 915 F.2d 1557 (1st Cir. 1990)....................8

*Narragansett Indian Tribe v. Narragansett Electric Co.*,
No. 93-667T (D.R.I. Jan. 12, 1995)....................9

*New England Multi-Unit Housing Laundry Ass'n v. Rhode Island Housing & Mortgage Finance Corp.*, 893 F. Supp. 1180 (D.R.I. 1995)....................8, 10

*Pride Hyundai, Inc. v. Chrysler Financial Co.*,
263 F. Supp. 2d 374 (D.R.I. 2003), *aff'd*, 369 F.3d 603 (1st Cir. 2004)....................7

*Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Cos.*,
682 F.2d 660 (7th Cir. 1982)....................12

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
66 F. Supp. 2d 317 (D.R.I. 1999), *aff'd*, 217 F.3d 8 (1st Cir. 2000)....................6, 7

*Solar Travel Corp. v. Nachtomi*,
No. 00 Civ. 3564, 2001 U.S. Dist. LEXIS 7549 (S.D.N.Y. June 8, 2001)....................7

*State v. Oliveira*,
432 A.2d 664 (R.I. 1981)....................10

*Stop & Shop Supermarket Co., v. Blue Cross & Blue Shield*,
239 F. Supp. 2d 180 (D.R.I. 2003), *aff'd*, 373 F.3d 57 (1st Cir. 2004)....................14

*Sullivan v. National Football League*,
34 F.3d 1091 (1st Cir. 1994)....................11

*Suzuki of Western Massachusetts, Inc. v. Outdoor Sports Expo, Inc.*,
126 F. Supp. 2d 40 (D. Mass 2001)....................13

*Town of Norwood v. New England Power Co.*,
202 F.3d 408 (1st Cir. 2000) ........................................ 6

*Traffix, Inc. v. Herold*,
269 F. Supp. 2d 223 (S.D.N.Y. 2003) ........................................ 10, 11

*URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education*,
915 F. Supp. 1267 (D.R.I. 1996) ........................................ 8

*Venture Technology, Inc. v. National Fuel Gas Co.*,
685 F.2d 41 (2d Cir. 1982) ........................................ 13

**RULES**

Fed. R. Civ. P. 12(b)(6) ........................................ 2, 4

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This action arises out of the termination of plaintiff PSW, Inc.'s ("PSW") contract with defendants First Financial Bank ("FFB") and First Data Merchant Services Corporation ("FDMS") to process credit card transactions on the networks of defendants Visa U.S.A. ("Visa") and MasterCard International ("MasterCard"). FFB and FDMS terminated this contract due to the excessive level of consumer "chargebacks" (*i.e.*, consumer complaints of unauthorized credit card charges) stemming from PSW's activities as a billing "aggregator" for the "adult entertainment internet industry."

PSW's lengthy Complaint contains a litany of perceived grievances concerning Visa and MasterCard operating rules that are alleged to adversely impact PSW's business model. PSW leaves it to the defendants and the Court to sort through this jumble of accusations in order to determine whether any claims have been sufficiently pled. Ultimately, however, the Complaint fails to adequately state a cause of action against FFB and FDMS for any of the twelve counts pled. In fact, the Complaint repeatedly makes clear that the actions of FFB and FDMS were undertaken pursuant to the express terms of the contract between the parties.

FFB's and FDMS's exercise of their rights pursuant to the clear and unambiguous terms of a contract cannot give rise to express or implied contractual claims or claims for conversion or embezzlement. Nor do such actions give rise to claims for tortious interference in the absence of more specific allegations of intentional interference, malice, or identifiable third parties with whom the defendants interfered. PSW's antitrust claims should also be dismissed. Among other defects, the Sherman Act claims do not properly allege the essential element of antitrust injury. Nor can a Robinson-Patman Act claim be brought in a case that does not involve the sale of tangible goods.

## PLEADINGS

The sole pleading is PSW's Complaint, which generally alleges that all four defendants: (i) violated Sections 1 and 2 of the Sherman Act, as well as Rhode Island's Antitrust Act, *see* Complaint ¶¶ 152, 153, 155; (ii) violated the Robinson-Patman Act, *see* Complaint ¶ 154; (iii) breached the contract with PSW and the implied covenant of good faith and fair dealing, *see* Complaint ¶¶ 156, 163; (iv) tortiously interfered with various unidentified business relationships of PSW, *see* Complaint ¶¶ 157-60; and (v) converted and embezzled PSW's property, *see* Complaint ¶¶ 161, 162.

## DESCRIPTION OF MOTION

Defendants FFB and FDMS file this Motion to Dismiss PSW's entire Complaint. The Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because it does not present any claim for which relief can be granted.

## FACTS

Plaintiff PSW is a billing aggregator for internet website clients, primarily purveyors of on-line adult entertainment. Complaint ¶¶ 19-21. Defendant FFB is a depository institution that acts as an Acquiring Bank for merchants wishing to participate in credit card networks. *Id.* ¶¶ 92, 93. An Acquiring Bank serves as the liaison between the credit card network and the merchant, accepting the merchant's payment card transactions for settlement over the network. *Id.* ¶¶ 14, 26. Defendant FDMS assists acquiring banks with the processing of those credit card transactions. *Id.* ¶ 92.

On January 17, 2002, PSW entered into a Merchant Services Agreement (the "Agreement," relevant portions attached as Exhibit A) with FFB and FDMS. *Id.* ¶ 92. Pursuant to the Agreement, FFB and FDMS agreed to perform authorization, processing, and credit card settlement services for PSW on the MasterCard and Visa networks. *Id.* ¶ 93. The Agreement expressly incorporates the operating rules adopted by MasterCard and Visa. *Id.* ¶ 28.

MasterCard and Visa each view the incidences of chargebacks emanating from on-line merchants as an indication of the level of fraudulent transactions being processed through such merchants. *Id.* ¶ 59. To monitor the level of fraudulent transactions on their networks, MasterCard and Visa compare the number of chargebacks received by a particular merchant in a given month to that merchant's total number of sales transactions for the month to calculate a "chargeback ratio." *Id.* If a merchant's chargeback ratio exceeds prescribed limits, MasterCard and/or Visa have the right to impose fines on the merchant's Acquiring Bank. *Id.* ¶ 63 ("such fines and additional fees are assessed to an Acquiring Bank"). Therefore, as an Acquiring Bank, FFB is responsible for fines payable to MasterCard and/or Visa based on the excessive chargeback activity of merchants, such as PSW, for which it provides credit card services.

Not surprisingly, as part of the Agreement, PSW agreed to reimburse FFB and FDMS for any fines that MasterCard and/or Visa imposed on them for chargebacks arising from PSW's transactions. *Id.* ¶ 100. Toward this end, the Agreement specifically authorized FFB and FDMS to establish a Reserve Account to cover potential liability for such chargebacks. *Id.* ¶ 76. The amount in this account was set by FFB and FDMS based upon PSW's processing history and any anticipated risk of loss. *Id.* ¶¶ 76, 99. PSW agreed to permit FFB and FDMS to fund the Reserve Account through deductions from amounts otherwise payable to PSW. Ex. A ¶ 22.2.

In the event of excessive chargebacks, FFB and FDMS had the right to immediately terminate the Agreement with PSW. *Id.* ¶ 21.3. FFB had the right to hold any funds in the Reserve Account for at least ten months following termination, or for a longer period if necessary to protect FFB from potential liability arising from PSW's transactions. *Id.* ¶ 22.2.

During the first three quarters of 2003, PSW's chargeback ratio often exceeded thresholds set by MasterCard and Visa. Complaint ¶¶ 105, 106, 128-31. For example, in June 2003 PSW's chargeback ratio was approximately 4.3%, well above Visa's prescribed maximum level of 2.5%. *Id.* ¶ 130. At various times from February through September 2003, FDMS required PSW to increase the Reserve Account's funds because of FDMS's and FFB's increased exposure to fines

arising from PSW's activities. *Id.* ¶¶ 107-36, 141. On September 16, 2003, FDMS terminated the Agreement with PSW due primarily to the "very significant financial exposure" arising from PSW's excessive chargebacks. *Id.* ¶ 140. According to the Complaint, at the time of termination FFB held $1.6 million in the Reserve Account, which it continued to hold post-termination. *Id.* ¶ 141. The potential liability faced by FFB and FDMS, however, arising from PSW's activities, was at least $2.2 million. *Id.* ¶ 142.

**ISSUES**

Whether the Complaint should be dismissed because it does not: (i) adequately allege that FFB and FDMS breached their contract with PSW or breached the implied covenant of good faith and fair dealing; (ii) adequately allege that FFB and FDMS tortiously interfered with PSW's actual or prospective business relationships; (iii) state claims for conversion or embezzlement; (iv) adequately allege violations of the Sherman Act and the Rhode Island Antitrust Act; or (v) state a claim for relief under the Robinson-Patman Act.

**POINTS AND AUTHORITIES**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be granted if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *DM Research, Inc. v. College of Am. Pathologists*, 2 F. Supp. 2d 226, 228 (D.R.I. 1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)), *aff'd*, 170 F.3d 53 (1st Cir. 1999). While the Court must accept the Complaint's factual averments as true, "the complaint must allege facts that establish all of the elements of the claim[s] asserted." *Id.* "Bald assertions, subjective characterizations and legal conclusions are insufficient" to satisfy this burden. *Id.* These considerations are especially pertinent for antitrust claims and "courts must be vigilant to insure that the underlying facts in an antitrust complaint are pled with sufficient specificity to state a claim." *Id.*

It is well settled that the Court may consider a document that is "integral to or explicitly relied upon in the complaint" without converting a motion to dismiss into one for summary

judgment. *Cogan v. Phoenix Life Ins. Co.*, 310 F.3d 238, 241 (1st Cir. 2002) (citations omitted); *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) ("When the complaint relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss.") (citation omitted). In this case, the Agreement among PSW, FFB and FDMS is integral to the Complaint and can properly be considered by the Court in ruling upon the motion to dismiss.

## I. PLAINTIFF HAS NOT ADEQUATELY ALLEGED CLAIMS FOR BREACH OF CONTRACT OR FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The Complaint fails to show how FFB and FDMS breached the Agreement with PSW (Count Twelve) or breached the implied covenant of good faith and fair dealing (Count Five). PSW's breach of contract count is limited to a ***single sentence*** asserting that defendants "breached the Agreement by, *inter alia*, failing or refusing to indemnify and hold harmless Plaintiff in accordance with ¶ 24.2 of the Agreement." Complaint ¶ 163. However, under ¶ 24.2 of the Agreement the duty to "hold harmless" ***only*** arises if FFB or FDMS commit "any breach of any warranty, covenant or agreement or any misrepresentation . . . or . . . gross negligence or willful misconduct." PSW's Complaint does not allege any underlying breach for which it seeks indemnification.

PSW does not allege that FDMS's termination of the Agreement or the events preceding the termination constitute a breach of contract. On the contrary, the Complaint conclusively demonstrates that the actions of FFB and FDMS were specifically authorized by the very contract upon which this action is based.[1] Under the clear and unambiguous language of the Agreement, FFB and FDMS had the right to:

[1] The Agreement provides that it shall be governed and construed in accordance with New York law. For purposes of this motion, New York's law on contract interpretation does not appear to materially differ from Rhode Island law. *See, e.g., Hugo Boss Fashions Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001) ("[U]nder New York law,

- hold PSW responsible for all chargebacks relating to MasterCard and Visa transactions (Ex. A ¶ 14);
- establish a Reserve Account and increase its amount to cover exposure for chargebacks from MasterCard and Visa (*id.* ¶ 22);
- deduct monies from payments to PSW to fund the Reserve Account (*id.* ¶ 22.2);
- terminate the Agreement based on PSW's high chargeback ratio (*id.* ¶ 21.3); and
- maintain PSW's Reserve Account post-termination (*id.* ¶ 22.2).

In short, the Complaint establishes that FFB and FDMS enforced the Agreement's unambiguous terms. Dismissal of the breach of contract count is appropriate on those grounds. *See Town of Norwood v. New England Power Co.*, 202 F.3d 408, 417 (1st Cir. 2000) (dismissal appropriate if the alleged conduct does not violate the contract's unambiguous language). Where a contract's language is clear and unambiguous, a court should enforce it in light of its "plain, ordinary and usual meaning." *Hord Corp. v. Polymer Research Corp. of Am.*, 275 F. Supp. 2d 229, 235 (D.R.I. 2003).

Nor can PSW assert a claim for breach of the implied covenant of good faith and fair dealing. Under Rhode Island law "[t]he applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp. 2d 317, 329 (D.R.I. 1999), *aff'd*, 217 F.3d 8 (1st Cir. 1990). FFB and FDMS cannot breach the implied covenant of good faith and fair dealing by simply enforcing their unambiguous contract rights and acting within the scope of their discretion as defined in the Agreement. *See Hord*, 275 F. Supp. 2d at 238 (implied covenant claim cannot render meaningless "unambiguous contractual clause[s], agreed upon by both parties . . . because one party does not like [their] strict application") (citations omitted).

---

*footnote 1 (cont.)*

ambiguity does not exist simply because the parties urge different interpretations. Rather, the question of whether [a contract] is ambiguous is a matter of law to be determined by the court.") (citations omitted).

FFB and FDMS acted pursuant to the contract to protect their interests from the considerable liability created by PSW's activities, and hence did not act arbitrarily or unreasonably. *See Ross-Simons*, 66 F. Supp. 2d at 329 (no breach of the implied covenant when a party's actions "were based on legitimate business considerations"). Indeed, because FFB and FDMS "acted within the confines of the parties' contractual objectives," their conduct is "by definition in good faith," and cannot violate the implied covenant of good faith and fair dealing. *Hord,* 275 F. Supp. 2d at 238 (citing *Ide Farm & Stable Inc. v. Cardi*, 297 A.2d 643, 644-45 (R.I. 1972)); *see also Pride Hyundai, Inc. v. Chrysler Fin. Co.*, 263 F. Supp. 2d 374, 394-95 (D.R.I. 2003) (defendant did not violate the implied covenant of good faith and fair dealing by increasing the amount required in plaintiff's reserve account because the parties' contract expressly authorized the increase), *aff'd,* 369 F.3d 603 (1st Cir. 2004).

## II. PLAINTIFF HAS NOT ADEQUATELY ALLEGED ANY TORTIOUS INTERFERENCE CLAIMS

PSW has brought two claims for tortious interference with contractual relations (Counts Six and Seven) and two claims for tortious interference with prospective economic advantage (Counts Eight and Nine). The elements of a claim for tortious interference with contract are: (1) the existence of a contract; (2) knowledge by the defendant of the contractual relationship; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; and (5) damages to the plaintiff. *Mesolella v. City of Providence*, 508 A.2d 661, 669 (R.I. 1986). While interference with prospective economic advantage does not require the existence of a contract, a plaintiff must show an ***identifiable third party*** with whom prospective relations were contemplated. *See, e.g., Solar Travel Corp. v. Nachtomi*, No. 00 Civ. 3564, 2001 U.S. Dist. LEXIS 7549, at *37 (S.D.N.Y. June 8, 2001) (dismissing tortious interference claim on a 12(b)(6) motion when plaintiff merely alleged that it lost prospective business from new customers). For either tort, the "intentional act of interference" requires that the defendant act with "legal malice," or an "intent to do harm without justification." *Mortgage Guarantee & Title*

*Co. v. Commonwealth Mortgage Co.*, 730 F. Supp. 469, 471 (D.R.I.), *aff'd mem.*, 915 F.2d 1557 (1st Cir. 1990).

### A. Neither FFB nor FDMS Can Tortiously Interfere with its Own Contract

Count Seven alleges tortious interference with the Agreement. Complaint ¶ 158. As a matter of black-letter law, FFB and FDMS cannot tortiously interfere with a contract to which they are parties. "[S]uits brought under the Rhode Island law for tortious interference . . . can only be maintained against ***non-contractual third parties***." *URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ.*, 915 F. Supp. 1267, 1289 (D.R.I. 1996) (emphasis added); *see also Jolicoeur Furniture Co., Inc. v. Baldelli*, 653 A.2d 740, 752 (R.I. 1995) (liability only imposed on defendant that interferes with "plaintiff's rights under a contract with another person") (citations omitted). Accordingly, Count Seven of the Complaint should be dismissed.

### B. Plaintiff's Other Tortious Interference Claims Are Also Insufficient

The allegations that the defendants somehow tortiously interfered with PSW's relationships with unidentified current website clients (Count Six, Complaint ¶ 157), unidentified prospective website clients (Count Eight, *id.* ¶ 159), and some other unidentified Acquiring Bank (Count Nine, *id.* ¶ 160) should all be dismissed for three separate and independent reasons.

First, PSW does not sufficiently allege an "intentional act of interference." There is no allegation that FFB or FDMS contacted actual or prospective website clients to induce them to breach their contracts with PSW or to dissuade them from entering into future contracts with PSW. *Cf. New England Multi-Unit Hous. Laundry Ass'n v. Rhode Island Hous. & Mortgage Fin. Corp.*, 893 F. Supp. 1180, 1192-93 (D.R.I. 1995) (while exerting economic pressure on third parties to renegotiate contracts with plaintiffs did not constitute tortious interference, instructing third parties to breach contracts would have). Even PSW's allegation that it was placed on a list of excessive chargeback merchants does not constitute the requisite intent. *See CJA Enters., Inc.*

*v. Harbridge Merchant Servs., Inc.*, No. 91 C 6681, 1992 U.S. Dist. LEXIS 8706, at *11 (N.D. Ill. June 17, 1992) (stating in an antitrust context that "[d]efendants' placing plaintiff on a terminated merchant list does not coerce other credit card issuers and banks to not do business with plaintiff; it only allows them to choose to follow the suggestion").

Second, the Complaint itself establishes that neither FFB nor FDMS acted with the requisite legal malice. "When the defendant engages in otherwise lawful conduct for the purpose of advancing his own legitimate interests, such conduct does not constitute tortious interference even though it may have an incidentally adverse effect on a plaintiff's contractual relations." *Narragansett Indian Tribe v. Narragansett Elec. Co.*, No. 93-667T, Memorandum and Order at 3 (D.R.I. Jan. 12, 1995). Here, PSW alleges that the chargeback fines and fees are "assessed to an Acquiring Bank" who, in turn, "passes such fines and additional fees on to the merchant." Complaint ¶ 63. Similarly, PSW alleges that FDMS terminated the contract due in part to its "very significant financial exposure" for PSW's chargebacks. *Id.* ¶ 140. Because FFB and FDMS acted to protect their own interests from the risks created by PSW's activities, there can be no legal malice. In *Narragansett Indian Tribe*, this Court dismissed a tortious interference claim on a Rule 12(b)(6) motion where the complaint itself established "a legitimate business interest in avoiding litigation . . . and potential liability for violating State and local law" as the justifications for defendant's actions. Memorandum and Order at 3. A similar result is warranted here.

Third, PSW does not identify any specific prospective business relationships that were lost as the result of defendants' actions. Certainly, no prospective web site clients are identified. The general allegation that PSW's ability to "attract new clients" was impaired "insofar as businesses are generally not inclined to do business with an entity which cannot or does not pay its obligations," (Complaint ¶ 137) is insufficient to state a claim for relief. "[P]laintiff needs more than a hope at some prospective contract to state such a claim." *Moran v. Norrell Health Care, Inc.*, No. PC 89-4262, 1993 R.I. Super. LEXIS 56, at *7 (R.I. Super. Ct. Sept. 15, 1993);

*see New England Multi-Unit Housing Laundry Ass'n*, 893 F. Supp. at 1193 (dismissing allegations of interference with prospective contractual relationships as "speculative"). Nor does PSW identify another Acquiring Bank with which it had "more than a hope" of establishing a relationship. Indeed, given the fact that PSW is complaining about a variety of Visa and MasterCard operating rules, it is difficult to see how it could contract with another Acquiring Bank in either network (and, therefore, still be subject to the same rules) without encountering the same difficulty that precipitated the filing of this Complaint.[2]

## III. FFB AND FDMS HAVE NOT CONVERTED OR EMBEZZLED PLAINTIFF'S PROPERTY

PSW's claims for conversion (Count Ten) and embezzlement (Count Eleven) fail as a matter of law. Under Rhode Island law, both claims are subject to a similar analysis because conversion is an essential element of embezzlement. *See State v. Oliveira*, 432 A.2d 664, 666 (R.I. 1981) (embezzlement requires "(1) that defendant was entrusted with the property for a specific use, (2) that he came into possession of the property in a lawful manner . . . and (3) that defendant intended to appropriate and ***convert*** the property to his own use and permanently deprive that person of the use") (emphasis added). The "gravamen of an action for conversion lies in the defendant's taking the plaintiff's personalty without consent and exercising dominion over it inconsistent with the plaintiff's right to possession." *Fuscellaro v. Indus. Nat'l Corp.*, 368 A.2d 1227, 1230 (R.I. 1977). The plaintiff must be entitled to possession of the property at the time of conversion. *See Montecalvo v. Mandarelli*, 682 A.2d 918, 928 (R.I. 1996).

In this case, PSW consented to the actions of FFB and FDMS by signing the Agreement that expressly authorized these defendants to set up a Reserve Account and fund it from monies otherwise payable to PSW. Such monies held in a reserve account expressly provided for in a contract cannot, as a matter of law, be converted. *See Traffix, Inc. v. Herold*, 269 F. Supp. 2d

---

[2] Any suggestion that PSW's claim relates to American Express cards is impossible to reconcile with PSW's admission that American Express will not accept transactions relating to the "Adult Entertainment Internet Industry." *See* Complaint ¶ 42.

223 (S.D.N.Y. 2003). The court in *Traffix* dismissed plaintiff's conversion claim on defendant's 12(b)(6) motion because the contract between the parties expressly permitted the defendant to withhold monies otherwise payable to the plaintiff in a reserve account to provide security against future chargebacks. *See id.* at 225. Because this agreement authorized the defendant to withhold these monies, the plaintiff did not have "ownership, possession or control" of them, warranting dismissal of its conversion claim. *Id.* at 228.

As in *Traffix*, PSW has no ownership, possession or control of the funds the Agreement expressly authorizes FFB and FDMS to hold in the Reserve Account and maintain post-termination. Accordingly, Counts Ten and Eleven of the Complaint should be dismissed.

## IV. PLAINTIFF FAILS TO ADEQUATELY ALLEGE A SHERMAN ACT CLAIM

### A. Plaintiff Has Not Alleged and Cannot Show Antitrust Injury

The antitrust laws protect competition, not individual competitors. *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To have standing to seek relief under the antitrust laws, PSW must plead facts sufficient to show an injury to competition, *i.e.*, one that "obstructs the achievement of competition's basic goals – lower prices, better products, and more efficient production methods." *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1097 (1st Cir. 1994) (citation omitted).

While PSW alleges that defendants' conduct has reduced its sales volume and cash flow, it fails to allege how that resulted in an injury to ***competition***. As a matter of law, PSW's lost sales or profits are insufficient to constitute an antitrust injury. *See, e.g., Brunswick*, 429 U.S. at 489. The Complaint itself establishes that the market for adult entertainment websites provides "easy entry and large profits," *see* Complaint ¶ 82; that there are numerous parties other than PSW that can provide aggregation services, *see id.* ¶ 90; and that PSW's larger competitors are more efficient because they are capable of spreading the financial risks associated with chargebacks over a larger transaction volume. *See id.* ¶¶ 81, 147. By contrast, PSW has not

alleged how its services provide consumers unique benefits in terms of lower prices, better service, or increased output. At bottom, PSW is essentially complaining that it is being deprived of an opportunity to continue to reap "large profits," and that the defendants should bear the risk of loss when consumers dispute PSW's billing practices. *See* Complaint ¶ 147 ("The actual and intended affect of the Defendants' conduct . . . was to . . . shift all the risk of fraud to Internet merchants such as PSW . . . ."). Certainly, the fact that PSW should bear the risk of loss from its own activities does not provide the basis for a claim under the Sherman Act.

Even PSW's concern about its continued viability is irrelevant. As this Court has recognized in dismissing antitrust claims, the "removal of one or a few competitors need not equate with injury to competition." *Lee v. Life Ins. Co. of N. Am.*, 829 F. Supp. 529, 536 (D.R.I. 1993) (citation omitted), *aff'd*, 23 F.3d 14 (1st Cir. 1994); *see also Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 664 (7th Cir. 1982) ("The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him [of] a competitive price and quality."). Because the Complaint establishes that numerous additional (and more efficient) sources of supply would remain even if PSW ceases to provide aggregation services, PSW cannot establish any antitrust injury.

### B. Plaintiff Has Not Adequately Alleged any Involvement by FFB and FDMS in an Antitrust Conspiracy

To state a claim under the Sherman Act, PSW must plead facts showing that the defendants shared "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Bald statements and unsupported allegations that the defendants "contracted," "combined," and "conspired" are insufficient as a matter of law. *DM Research,* 2 F. Supp. 2d at 228.

The Complaint alleges no involvement or participation by FFB and FDMS in the operative decisions of MasterCard and/or Visa. According to the Complaint, MasterCard and Visa each promulgate their own rules, *see* Complaint ¶¶ 28, 65-69, and "in their sole discretion"

fine Acquiring Banks based on violations of the chargeback thresholds. *Id.* ¶ 63. It would be economically irrational for FFB and FDMS to conspire in a scheme that would cause them to incur substantial fines. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986) (antitrust conspirators must have a rational economic motive to conspire); *Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41, 47 (2d Cir. 1982) ("Any claim of unity of purpose, common design and understanding, or meeting of the minds based on [one alleged co-conspirator's] policy cannot be credited given . . . evidence that the policy substantially harmed [the other alleged co-conspirator.]").[3] Indeed, beyond unsupported conclusions, PSW does not offer any facts that explain why any of the defendants has a reason to pursue a goal of the "elimination of Aggregators processing for Adult Entertainment Websites on the Internet," (Complaint ¶ 84) or that defendants even compete in that market.

The actions of FFB and FDMS identified in the Complaint – increasing funds in the Reserve Account, terminating the Agreement with PSW, and maintaining the Reserve Account post-termination – simply do not support the inference of an antitrust conspiracy. FFB and FDMS were permitted to take these actions under the Agreement with PSW in order to mitigate the risk they faced with MasterCard and Visa from PSW's activities. Since these actions are wholly consistent with the independent interests of FFB and FDMS, they cannot support the inference of a conspiracy with MasterCard and/or Visa. *See Matsushita*, 475 U.S. at 596-97.

---

[3] The mere fact that FFB and FDMS acted pursuant to rules established by MasterCard and Visa does not establish an antitrust conspiracy. *See Suzuki of W. Mass., Inc. v. Outdoor Sports Expo, Inc.*, 126 F. Supp. 2d 40, 47 (D. Mass. 2001) (refusing to infer a conspiracy between defendants based on one defendant's decision to follow a policy unilaterally adopted by the other defendant four years earlier). Nor is FFB's membership in the MasterCard or Visa networks sufficient, standing alone, to satisfy this requirement. *See AD/SAT v. AP*, 181 F.3d 216, 234 (2d Cir. 1999) ("[M]embership in [an] association will not automatically involve all members in the [antitrust conspiracy]. There must, instead, be some evidence of actual knowledge of, and participation in, the illegal scheme in order to establish a violation of the antitrust laws by a particular association member.") (citations omitted).

### C. PSW Has Not Adequately Alleged a Section 2 Claim Against FFB and FDMS

Neither FFB nor FDMS compete in the alleged relevant markets of general purpose credit and debit cards. *See* Complaint ¶¶ 32-42. As a matter of law, FFB and FDMS cannot monopolize or attempt to monopolize a market in which they do not compete. *See Arbitron Co. v. Tropicana Product Sales, Inc.*, No. 91 Civ. 3697, 1993 U.S. Dist. LEXIS 5587, at *24-*28 (S.D.N.Y. Apr. 28, 1993). Moreover, a conspiracy to monopolize claim fails for the reasons stated in Section IV.B and for PSW's failure to allege a specific intent to monopolize the purported relevant markets on behalf of FFB and FDMS. *See Lee*, 829 F. Supp. at 540 (conspiracy to monopolize requires specific intent).

## V. PLAINTIFF'S RHODE ISLAND ANTITRUST CLAIMS FAIL FOR THE SAME REASONS AS ITS FEDERAL ANTITRUST CLAIMS

For the same reasons set forth in Section IV, PSW's claim for relief under the Rhode Island Antitrust Act (Count Four) also must fail. "The provisions of the Rhode Island Antitrust Act mirror those of §§ 1-2 of the Sherman Act . . . and are construed in the same manner as the federal statutes." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 239 F. Supp. 2d 180, 186-87 (D.R.I. 2003), *aff'd*, 373 F.3d 57 (1st Cir. 2004); *see also ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351, 1353 n.1 (R.I. 1997) (relying on federal authority to affirm dismissal of state law antitrust claims because Rhode Island's antitrust laws are "construed in harmony with judicial interpretations of comparable federal antitrust statutes") (citation omitted).

## VI. THE ROBINSON-PATMAN ACT DOES NOT APPLY TO SERVICES

PSW's claim under the Robinson-Patman Act (Count Three) fails as a matter of law because the Act applies only to the purchase of commodities, which has been defined to encompass ***"tangible goods and not services."*** *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980) (emphasis added); *see Concord v. Boston Edison Co.*, 676 F. Supp. 396, 397 (D. Mass. 1988) ("The term 'commodity' . . . does not include services . . . [n]or

does the term encompass intangibles such as contract rights"). The transactions at issue do not involve the sale of tangible goods, but rather concern financial services. "It is without question that banking services are of a different nature and quality than the sale of a tangible good." *L & J Crew Station, LLC v. Banco Popular de P.R.*, 278 F. Supp. 2d 547, 554 (D.V.I. 2003) (dismissing Robinson-Patman Act claim on defendants' 12(b)(6) motion); *see Lang's Bowlarama, Inc. v. AMF, Inc.*, 377 F. Supp. 405, 408 (D.R.I. 1974) (different credit terms not subject to the Robinson-Patman Act). As a result, Count Three should be dismissed.[4]

**CONCLUSION**

For all the foregoing reasons defendants FFB and FDMS respectfully request this Court to enter an order dismissing all counts of PSW's Complaint, and further requests such other relief as is deemed appropriate in the circumstances.

Date: November 24, 2004

DEFENDANTS, FIRST FINANCIAL BANK AND FIRST DATA MERCHANT SERVICES CORPORATION
By their attorneys,

John A. Tarantino (Bar. No. 2586 )
Patricia K. Rocha (Bar No. 2793)
Adler Pollock & Sheehan P.C.
2300 Financial Plaza
Providence, RI 02903
Tel: 401-274-7200
Fax: 401-351-4607

[4] FFB and FDMS understand that Visa and MasterCard also are moving to dismiss all or some of the Complaint's counts. To the extent MasterCard and Visa present additional grounds for dismissal, particularly with respect to PSW's antitrust claims, FFB and FDMS reserve the right to join in those arguments.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of November, 2004, a true copy of the within was served via first class mail, postage prepaid, on the following counsel of record:

*Counsel for Plaintiff:*
Richard A. Sinapi, Esq.
Sinapi, Formisano & Company, Ltd.
100 Midway Place, Suite 1
Cranston, RI 02920

*Counsel for MasterCard International:*
Joseph V. Cavanagh, Esq.
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

Jay N. Fastow, Esq.
Bruce A. Colbath, Esq.
Denise L. Plunkett, Esq.
Weil, Gotshall & Manges, LLP
767 Fifth Avenue
New York, NY 10153

*Counsel for VISA, U.S.A., Inc.:*
Patricia A. Sullivan, Esq.
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903

Daniel Brookin, Esq.
Randall W. Edwards, Esq.
O'Melveny & Myers
275 Battery Street
San Francisco, CA 94111

*Co-Counsel for First Financial:*
Brian Wallach, Esq.
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402

Debra Hunn
______________________

# EXHIBIT A*

MERCHANT SERVICES BANKCARD AGREEMENT

| | |
|---|---|
| PSW, INC. | PSW BILLING |
| Customer's Legal Name | Doing Business As |

| | | | |
|---|---|---|---|
| 806 RESERVOIR AVE | CRANSTON | RI | 02910 |
| Street Address | City | State | Zip Code |

| | |
|---|---|
| | 05-0509097 |
| Specify Whether Customer is (circle one) a Corporation, Partnership, Sole Proprietorship, Non-Profit or Other Type of Entity | Taxpayer Identification Number |
| JOHN LOMBARDI | 401-943-1480 |
| Recipient For Notices Under Paragraph 26.5 | Facsimile Number |

This Merchant Services Bankcard Agreement ("Agreement") is among the CUSTOMER identified above, FIRST FINANCIAL BANK, a special purpose (credit card) state bank headquartered in Atlanta, Georgia ("BANK") and FIRST DATA MERCHANT SERVICES CORPORATION, ("FDMS") (BANK and FDMS are collectively referred to as "SERVICERS").

BANK, as a member of Visa U.S.A., Inc. ("VISA") and MasterCard International Incorporated ("MasterCard"), is responsible for its VISA and MasterCard bankcard programs and has authorized FDMS or its members pursuant to a separate agreement (the "Agency Agreement") to act as an agent of and in conjunction with BANK in performing authorization, processing and settlement services for merchants participating in BANK's MasterCard and VISA bankcard programs, in performing the additional services with respect to other cards as specified on the schedules to this Agreement and in taking related actions. FDMS is acting in such capacity by executing and performing this Agreement. As between themselves, the respective rights and obligations of FDMS and BANK shall be governed by the Agency Agreement and Association Rules.

In consideration of the mutual covenants and agreements set forth herein and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, SERVICERS and CUSTOMER agree as follows:

4. **Operating Guide; Association Rules.**
CUSTOMER acknowledges that it has received, (or will receive promptly upon execution of this Agreement) the Operating Guide, the terms of which are incorporated into this Agreement. CUSTOMER agrees to follow the procedures in the Operating Guide in connection with each Card transaction and to comply with all applicable Association Rules. From time to time, SERVICERS may change the Operating Guide, in whole or in part, and other operating procedures, by providing CUSTOMER with at least 30 days' prior written notice of the change. However, in the event of changes in the Association Rules or due to security reasons, certain changes in Card procedures may become effective on shorter notice. If there is any conflict between the terms of this Agreement and the Operating Guide, the terms of this Agreement will govern, unless the conflict is directly related to a change in the Operating Guide which specifically addresses a procedure or requirement detailed in this Agreement. If CUSTOMER loses or otherwise misplaces the Operating Guide or notices of changes thereto, CUSTOMER shall be responsible for contacting SERVICERS to obtain replacement copies.

11. **Settlement of Card Transactions.**

11.2 All settlements to CUSTOMER for VISA and MasterCard Card transactions will be based upon gross sales, less credits/refunds, adjustments, applicable discount fees when due, Chargebacks, and any other amounts then due from CUSTOMER to SERVICERS.

11.3 All credits to CUSTOMER's Settlement Account or other payments to CUSTOMER are provisional and are subject to, among other things, SERVICERS' final audit, Chargebacks (including SERVICERS' related losses), fees and fines imposed by the Associations. CUSTOMER agrees that SERVICERS may debit or credit CUSTOMER's Settlement Account for any deficiencies, overages, fees and pending Chargebacks, or may deduct such amounts from settlement funds due to CUSTOMER. Alternatively, SERVICERS may elect to invoice CUSTOMER for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified.

*To comply with page limitation for exhibits contained in this Court's Amended General Order #2002-01, defendants FFB and FDMS have excerpted the relevant provisions of the Merchant Services Agreement in this Exhibit. These defendants would be pleased to provide a complete copy of this Agreement upon the Court's request.

12. **Financial Accommodation.**

CUSTOMER acknowledges and agrees that the Services constitute the extension of financial accommodations to or for the benefit of CUSTOMER within the meaning of Section 365(c) of the Bankruptcy Code and entail the assumption by SERVICERS of significant credit risks. By reason of the assumption of such credit risks, CUSTOMER has granted to and conferred upon SERVICERS certain security, authorization to take reserves and other assurances of payment, all of which are material to SERVICERS' willingness to continue to provide services under this Agreement. The parties acknowledge that this Agreement creates a contract for the extension of financial accommodations to CUSTOMER within the meaning of Section 365(c) of the Bankruptcy Code.

13. **Fees; Adjustments; Collection of Amounts Due.**

13.5 In addition to the regular Chargeback fees, as set forth on the Schedules, CUSTOMER agrees to pay SERVICERS any fines imposed on SERVICERS by any Association, resulting from Chargebacks and any other fees or fines imposed by an Association with respect to acts or omissions of CUSTOMER.

13.6 If CUSTOMER's Chargeback Percentage for any line of business exceeds the estimated industry chargeback percentage, CUSTOMER shall, in addition to the regular Chargeback fees due to SERVICERS and any applicable Chargeback handling fees or fines imposed by the applicable Association, pay SERVICERS the excessive Chargeback fee shown on the Schedules for all Chargebacks occurring in such month in such line(s) of business. Each estimated industry chargeback percentage is subject to change from time to time by SERVICERS in order to reflect changes in the industry chargeback percentage reported by VISA or MasterCard. Each then-current industry chargeback percentage for CUSTOMER's applicable line(s) of business will be reflected in the monthly loss prevention report furnished to CUSTOMER.

14. **Chargebacks.**

14.1 CUSTOMER shall be responsible for all Chargeback amounts relating to Card transactions settled by SERVICERS where:

(i) merchandise is returned and a proper credit for Cardholder is not received by SERVICERS for processing;

(ii) the Sales Draft is, or is alleged to have been, executed, accepted, endorsed, completed or assigned improperly without authority or not in accordance with the Authorization requirements or provisions of this Agreement;

(iii) regardless of any Authorization obtained (including without limitation, telephone and mail order transactions), CUSTOMER completed a transaction when the Cardholder did not sign the Sales Draft;

(iv) the signature on the draft was unauthorized as compared to the signature appearing on the Card, the signature panel on the Card was blank, or a limited purpose business purchasing card was accepted without appropriate authorization of the nature of the goods or services purchased (in addition to Authorization of the transaction amount);

(v) the Sales Draft is incorrectly completed, incomplete or illegible;

(vi) the Cardholder disputes the sale, quality or delivery (or availability for pre-arranged pick-up) of merchandise or the performance or quality of service covered by the Sales Draft or agreement accepted by such Cardholder;

(vii) the circumstances in which the Sales Draft was created or submitted by, or credit was received by, CUSTOMER constitute or otherwise involved a breach of any term, condition, representation, warranty or duty of CUSTOMER hereunder;

(viii) multiple Sales Drafts were executed to avoid the need to obtain authorization necessary to complete the transaction;

(ix) the extension of credit for merchandise sold or rented or services performed was in violation of law or the rules or regulations of any governmental agency, whether federal, state, local or otherwise;

(x) a legible copy of the Sales Draft or Credit Voucher cannot be produced by CUSTOMER within ten days of SERVICERS' request (except to the extent SERVICERS are responsible pursuant to Paragraph 16.1);

(xi) the Cardholder asserts any claim or defense which the Cardholder has as a consumer of goods or services;

(xii) the Cardholder disputes the validity of a telephone or mail order Card transaction;

(xiii) the Card transaction is otherwise subject to Chargeback by the Card issuing bank or Cardholder in accordance with the Association Rules or applicable law; or

(xiv) the Card transaction is subject to Chargeback in accordance with the procedures set forth in the Operating Guide.

14.2 CUSTOMER shall reimburse SERVICERS for any Chargebacks, return items, or other losses resulting from CUSTOMER's failure to produce a Card transaction record requested by SERVICERS within the applicable time limits.

21. Term; Events of Default.

21.1 This Agreement and the applicable Schedules shall become effective upon the date this Agreement and the applicable Schedules are signed by BANK, which shall in all instances be on or after the date(s) CUSTOMER and FDMS sign this Agreement and the applicable Schedules and CUSTOMER will be advised of the effective date by SERVICERS.

21.2 The initial term of this Agreement shall commence and shall continue in force for three (3) years after it becomes effective. This Agreement shall renew for successive one-year periods unless any party terminates this Agreement by notice to the others, in writing, at least 60 days prior to the expiration of the term or renewal term, as the case may be.

21.3 If any of the following events shall occur (each an "Event of Default"):

(i) a material adverse change in the business, financial condition, business procedures, products or services of CUSTOMER; or

(ii) any assignment or transfer of voting control of CUSTOMER or its parent; or

(iii) a sale of all or a substantial portion of CUSTOMER's assets; or

(iv) irregular Card sales by CUSTOMER, excessive Chargebacks or any other circumstances which, in SERVICERS' sole discretion, may increase SERVICERS' exposure for CUSTOMER's chargebacks or otherwise present a financial or security risk to SERVICERS; or

(v) any representation or warranty of CUSTOMER in this Agreement is breached in any material respect or was or is incorrect in any material respect when made or deemed to be made; or

(vi) CUSTOMER shall default in any material respect in the performance or observance of any term, covenant, condition or agreement contained in this Agreement, including, without limitation, the establishment or maintenance of funds in a Reserve Account, as detailed in Paragraph 22;

(vii) CUSTOMER shall default in any material respect in the performance or observance of any term, covenant or condition contained in any agreement with any affiliate of SERVICERS, including, but not limited to, any agreement governing check guarantee or check verification services; or

(viii) CUSTOMER shall default in the payment when due, whether upon maturity or otherwise, of any material indebtedness for borrowed money or any material trade payable (other than any trade payable subject to a good faith dispute by CUSTOMER so long as CUSTOMER is actively pursuing resolution of such dispute); or

(ix) CUSTOMER shall: commence a voluntary case under the Bankruptcy Code; file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or entry into a composition agreement or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; generally become unable to pay its debts or trade obligations as they become due; make a general assignment for the benefit of creditors; or take any corporate action for the purpose of authorizing any of the foregoing; or

(x) a case or other proceeding shall be commenced against CUSTOMER, in any court of competent jurisdiction seeking relief under the Bankruptcy Code or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts, the appointment of a trustee, receiver, custodian, liquidator or the like of CUSTOMER, or of all or any substantial part of the assets, domestic or foreign, of CUSTOMER, and such case or proceeding shall continue undismissed or unstayed for a period of 60 consecutive days, or an order granting the relief requested in such case or proceeding against CUSTOMER (including, but not limited to, an order for relief under the Bankruptcy Code) shall be entered; or

(xi) the independent certified accountants retained by CUSTOMER shall refuse to deliver an unqualified opinion with respect to the annual financial statements of CUSTOMER and its consolidated subsidiaries;

then, upon the occurrence of (1) an Event of Default specified in subparagraphs (iv), (ix) or (x) above, SERVICERS may consider this Agreement to be terminated immediately, without notice, and all amounts payable hereunder by CUSTOMER to SERVICERS shall be immediately due and payable in full without demand or other notice of any kind, all of which are expressly waived by CUSTOMER, and (2) any other Event of Default, this Agreement may be terminated by SERVICERS by giving not less than 10 days' notice to CUSTOMER, and upon such notice all amounts payable hereunder by CUSTOMER to SERVICERS shall be due and payable on demand.

21.4 Neither the expiration nor termination of this Agreement shall terminate the obligations and rights of the parties pursuant to provisions of this Agreement which by their terms are intended to survive or be perpetual or irrevocable and such provisions shall survive the expiration or termination of this Agreement.

21.5 If any Event of Default shall have occurred and be continuing, SERVICERS may, in their sole discretion, exercise all of their rights and remedies under applicable law, including, without limitation, exercising their rights under Section 22.

21.6 This Agreement also may be terminated by SERVICERS prior to the then-current expiration date upon at least 90 days' advance written notice, if CUSTOMER's Card transactions fail to conform to the volume or average transaction size representations as set forth in the Schedules.

21.7 If this Agreement is terminated for cause, CUSTOMER acknowledges that SERVICERS may be required to report CUSTOMER's business name and the names and other identification of its principals to the Combined Terminated Merchant File maintained by VISA and MasterCard. CUSTOMER expressly agrees and consents to such reporting in the event CUSTOMER is terminated as a result of the occurrence of an Event of Default or for any reason specified as cause by VISA or MasterCard. Furthermore, CUSTOMER agrees to waive and hold SERVICERS harmless from and against, any and all claims which CUSTOMER may have as a result of such reporting.

21.8 The provisions governing processing and settlement of Card transactions, all related adjustments, fees and other amounts due from CUSTOMER and the resolution of any related chargebacks, disputes or other issues involving Card transactions will continue to apply even after termination of this Agreement, until all Card transactions made prior to such termination are settled or resolved. In addition, the provisions of Sections 13 through 18, inclusive, 20, 22, 24 and 25, and Subsections 21.7, 21.9, 26.2 and 26.3, all in this Agreement shall survive any termination. Upon termination of this Agreement, CUSTOMER agrees to immediately send SERVICERS all the data relating to Card transactions made up to the date of termination.

21.9 After termination of this Agreement for any reason whatsoever, CUSTOMER shall continue to bear total responsibility for all Chargebacks, fees, credits and adjustments resulting from Card transactions processed pursuant to this Agreement and all other amounts then due or which thereafter may become due to SERVICERS under this Agreement or which may be due to SERVICERS before or after such termination to either SERVICERS or any of SERVICERS' affiliates for any related equipment or related services.

22. Reserve Account; Security Interest.

22.1 CUSTOMER expressly authorizes SERVICERS to establish a Reserve Account pursuant to the terms and conditions set forth in this Section 22. The initial amount of such Reserve Account shall be set by SERVICERS, in their sole discretion, based upon CUSTOMER processing history and the anticipated risk of loss to SERVICERS.

22.2 The Reserve Account shall be fully funded upon three days notice to CUSTOMER, or in instances of fraud or an Event of Default, reserve account funding may be immediate. Such Reserve Account may be funded by all or any combination of the following: (i) one or more debits to CUSTOMER's Settlement Account or any other accounts held by BANK or any of its affiliates; (ii) one or more deductions or off sets to any payments otherwise due to CUSTOMER; (iii) CUSTOMER's delivery to SERVICERS of a letter of credit; or (iv) if SERVICERS so agree, CUSTOMER's pledge to SERVICERS of a freely transferable and negotiable certificate of deposit. Any such letter of credit or certificate of deposit shall be issued or established by a financial institution acceptable to SERVICERS and shall be in a form satisfactory to SERVICERS. In the event of termination of this Agreement by either CUSTOMER or SERVICERS, an immediate Reserve Account may be established without notice in the manner provided above. Any Reserve Account will be held by BANK for the greater of ten months after termination of this Agreement or for such longer period of time as is consistent with BANK's liability for Card transactions in accordance with Association Rules. CUSTOMER's funds held in a reserve account may be held in a commingled Reserve Account for the reserve funds of BANK's customers, without involvement by an independent escrow agent.

22.3 If CUSTOMER's funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges due from CUSTOMER, or if the funds in the Reserve Account have been released, CUSTOMER agrees to promptly pay SERVICERS such sums upon request. In the event of a failure by CUSTOMER to fund the Reserve Account, SERVICERS may fund such Reserve Account in the manner set forth in subsection 22.2, above.

22.4 To secure CUSTOMER's obligations to SERVICERS and their affiliates under this Agreement and any other agreement for the provision of related equipment or related services, CUSTOMER grants to SERVICERS a lien and security interest in and to any of CUSTOMER's funds pertaining to the Card transactions contemplated by this Agreement now or hereafter in the possession of SERVICERS, whether now or hereafter due or to become due to CUSTOMER from SERVICERS. Any such funds, money or amounts may be commingled with other funds of SERVICERS, or, in the case of any funds held pursuant to the foregoing paragraphs, with any other funds of other customers of SERVICERS. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, SERVICERS are hereby authorized by CUSTOMER at any time and from time to time, without notice or demand to CUSTOMER or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to apply any and all such funds against and on account of CUSTOMER's obligations to SERVICERS and their affiliates under this Agreement and any other agreement with SERVICERS or any of SERVICERS' affiliates for any related equipment or related services (including any check guarantee and check verification services), whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. CUSTOMER agrees to duly execute and deliver to SERVICERS such instruments and documents as SERVICERS may reasonably request to perfect and confirm the lien, security interest, right of set off, recoupment and subordination set forth in this Agreement.

24. Indemnification.

24.1 CUSTOMER agrees to indemnify and hold harmless SERVICERS from and against all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) resulting from any breach of any warranty, covenant or agreement or any misrepresentation by CUSTOMER under this Agreement, or arising out of any gross negligence or willful misconduct of CUSTOMER or its employees, in connection with CUSTOMER's Card transactions or otherwise arising from CUSTOMER's provision of goods and services to Cardholders.

24.2 SERVICERS agree to indemnify and hold harmless CUSTOMER from and against all losses, liabilities, damages and expenses resulting from any breach of any warranty, covenant or agreement or any misrepresentation by SERVICERS under this Agreement or arising out of the gross negligence or willful misconduct of SERVICERS or their employees in connection with this Agreement.

26. Miscellaneous.

26.8 This Agreement, along with any Schedules and the Operating Guide, constitutes the entire agreement between the parties with respect to the subject matter, supersedes any previous agreements and understandings and, except as provided in other Sections of this Agreement, the Schedules or the Operating Guide, can be changed only by a written agreement signed by all parties. A party's waiver of a breach of any term or condition of this Agreement shall not be deemed a waiver of any subsequent breach of the same or another term or condition.

The parties hereto have caused this Agreement to be executed by their duly authorized officers. THIS AGREEMENT IS NOT BINDING UPON SERVICERS UNTIL SIGNED BY SERVICERS OR UPON THE OCCURRENCE OF ONE OF THE EVENTS SET FORTH IN SUBSECTION 21.1.

PSW INC.
("CUSTOMER")

By: [signature]

Name: John R. Lombardi
(Please Print or Type)

Title: OFFICER

First Financial Bank
("BANK")

By: [signature] PHILIP LEVINE

Name: VICE PRESIDENT
(Please Print or Type)
FIRST FINANCIAL BANK

Title:

1/17/02

First Data Merchant Services Corporation
("FDMS")

By: [signature]

Name: PHILIP LEVINE
(Please Print or Type)
VICE PRESIDENT

Title: FIRST DATA MERCHANT SERVICES

Date: 1/17/02