**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PSW, INC., d/b/a PSW BILLING,** **Plaintiff,** | : | |
| **v.** | : | **C.A. No. 04-347-T** |
| **VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION,** **Defendants** | : | |

**PLAINTIFF'S OBJECTION TO FIRST FINANCIAL BANK'S AND FIRST DATA MERCHANT SERVICES CORPORATION'S MOTION TO DISMISS**

Now comes the Plaintiff, PSW, Inc. in the above-cited matter and does hereby object to Defendants First Financial Bank's and First Data Merchant Services Corporation's Motion to Dismiss and as grounds therefore and in support thereof relies on its Memorandum of Law filed simultaneously herewith.

**WHEREFORE,** Plaintiff prays that Defendants First Financial Bank's and First Data Merchant Services Corporation's Motion to Dismiss be denied.

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO &COMPANY, LTD.**

**Dated: January 28, 2005**

**Richard A. Sinapi, Esq. (R.I. Bar No. 2977)**
**V. Edward Formisano, Esq. (R.I. Bar No. 5512)**
**100 Midway Place, Suite 1**
**Cranston, RI 02920**
**Telephone: (401) 944-9690**
**Fax: (401) 943-9040**



38

# CERTIFICATION

Patricia A. Sullivan, Esq.
Edwards & Angell LLP
2800 Financial Plaza
Providence, RI 02903

John A. Tarantino, Esq.
Adler Pollack and Sheehan P.C.
2300 Financial Plaza
Providence, RI 02903

Joseph V. Cavanagh, Jr., Esq.
Blish & Cavanaugh LLP
30 Exchange Terrace
Providence, RI 02903

I hereby certify that I mailed a copy of the within Objection to the above attorneys of records via regular mail, postage pre-paid on the 28th day of January, 2005.

________________________

F:\USERS\SINAPI\CLIENTS\PSW\Objection.First.Data.doc

FILED

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PSW, INC., d/b/a PSW BILLING,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A. No. 04-347-T** |
| | : | |
| **VISA U.S.A., INC., MASTERCARD** | : | |
| **INTERNATIONAL INCORPORATED, FIRST** | : | |
| **FINANCIAL BANK, and FIRST DATA** | : | |
| **MERCHANT SERVICES CORPORATION,** | : | |
| **Defendants** | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSTION TO FIRST FINANCIAL BANK'S AND FIRST DATA MERCHANT SERVICES CORPORATION'S MOTION TO DISMISS**

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO &COMPANY, LTD.**

**Dated: January 28, 2005**

**Richard A. Sinapi, Esq. (R.I. Bar No. 2977)**
**V. Edward Formisano, Esq. (R.I. Bar No. 5512)**
**100 Midway Place, Suite 1**
**Cranston, RI 02920**
**Telephone: (401) 944-9690**
**Fax: (401) 943-9040**

## I. INTRODUCTION

Plaintiff PSW, Inc. ("PSW") has brought this action seeking declaratory relief and compensatory, punitive, and treble damages, as well as attorneys' fees, against each of the above-named Defendants for violation of the Sherman Act, Clayton Act, the Rhode Island Antitrust Law, and for breach of the covenant of good faith and fair dealing, interference with contractual relations, interference with prospective economic advantage, conversion, embezzlement, and breach of contract, arising out of the use of market power by the Defendants to act arbitrarily, commercially unreasonably, and unlawfully, and thereby deprive Plaintiff of the value and fruits of its business.

PSW has filed a 163 paragraph, 38 page detailed Complaint, which far exceeds the minimum notice pleading requirements under Fed.R.Civ.P. 8, setting forth the factual background, nature, and basis of PSW's claims. Notwithstanding the foregoing, each of the Defendants, Visa, U.S.A., Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), First Financial ("FFB"), and First Data Merchants Services Corporation ("FDMS") have filed Motions to Dismiss under Fed.R.Civ.P. 12(b)(6) with respect to *all* 12 counts alleged. Under the guise of Motions to Dismiss, the Defendants seek Summary Judgment, insofar as they are asking the Court to consider facts not in the record. Moreover, the Defendants are urging the Court to apply the applicable standard of review in reverse, insofar as they are asking the Court to consider and weigh all facts and inferences in the "record" in favor of the Defendants, while ignoring well-pled facts in the Complaint. Since, for the reasons set forth below, it does not appear beyond doubt that PSW can prove no set of facts in support of its claim entitling it to relief, Defendants' Motions to Dismiss should be denied.

## II. MATERIAL ALLEGATIONS

### A. Plaintiff PSW

PSW's business operated exclusively on the Internet and involved processing payment card sales to consumers on-line for purchases of goods and services delivered by the operators of various World Wide Websites and other card-not-present merchants ("website clients"). Complaint ("Comp.") at ¶18. At its inception, PSW's role was essentially to provide credit card billing services to website clients,

many of which comprised the largest companies in the adult entertainment industry. *Id.* at ¶19. Website clients hired PSW to process customer credit and debit card purchases of their services or products. *Id.* at ¶19. PSW played the role of what is called an "aggregator" or middle processor between website clients and the eventual Acquiring Bank, which accepted the payment card transaction for settlement. *Id.* at ¶19. As a billing processor for website clients, PSW (through its contracts with the website clients) was authorized to facilitate and process sales on behalf of such website clients, and PSW accepted MasterCard and Visa cards as payment for such sales. *Id.* at ¶20. PSW then submited the card transactions for settlement under PSW' s own Merchant Account (i.e. an account into which MasterCard and Visa transactions are deposited and through which such transactions are "settled" and the merchant is paid) at its Acquiring Bank, Defendant FFB (the bank with which PSW entered into a Merchant's Agreement)--and paid the website clients for such sales out of the proceeds of such settled transactions. *Id.* at ¶20. PSW provided this service to its website clients, which, for one reason or another, did not have their own Merchant Account with a MasterCard or Visa member bank. *Id.* at ¶20. Although PSW's website clients were, in fact, the parties supplying the goods and services to which PSW provided access, PSW was technically the "merchant" that made the sale to the consumer through the MasterCard and Visa networks. *Id.* at ¶22. Unlike a traditional "brick and mortar" business, PSW was limited to accepting payment cards in order to make sales to consumers, meaning that PSW was much more reliant than the average merchant in the United States on the ability to accept MasterCard and Visa cards. *Id.* at ¶24. Without the ability to accept these cards, PSW could not have operated its business. *Id.* at ¶24.

**B. Defendants Visa and MasterCard**

The MasterCard and Visa associations are two of the United States' four major network systems in the payment card industry, the other two being American Express and Discover. *Id.* at ¶12. MasterCard and Visa are organized as open joint ventures, owned by the numerous banking institutions that are members of the respective MasterCard and Visa networks (also referred to herein as "associations"). *Id.* at ¶12. Accordingly, MasterCard is owned by its approximately 20,000 member banks, while Visa is owned by its approximately 14,000 member banks. *Id.* at ¶12. The networks'

operations are conducted primarily by their member banks. *Id.* at ¶13. The member banks of the MasterCard and Visa card networks may function either as "issuers" (also referred to herein as "Issuing Bank") or "acquirers" (also referred to herein as "Acquiring Bank") or both. *Id.* at ¶14. A member bank serving as an "issuer" issues cards to cardholders; it serves as the liaison between the network and the individual cardholder. *Id.* at ¶14. A member bank serving as an "acquirer" acquires the card-paid transactions of a merchant; it acts as liaison between the network and those merchants accepting the network's payment cards with which it has contracted. *Id.* When a consumer uses a MasterCard or Visa card to pay for goods or services, the accepting merchant relays the transaction information to the Acquiring Bank with which it has contracted. *Id.* at ¶15. The Acquiring Bank processes and packages that information and transmits it to the network (the applicable MasterCard or Visa association). *Id.* at ¶15. The network then relays the transaction information to the cardholder's Issuing Bank, which approves the transaction if the cardholder has a sufficient credit line. *Id.* Approval is sent by the issuer to the Acquiring Bank which relays it to the merchant. *Id.*

Both MasterCard and Visa member banks agree to abide by their association's by-laws and other regulations. *Id.* at ¶16. A member of either the MasterCard or Visa network may also be a member of the other network. *Id.* at ¶17. *On the other hand, both MasterCard and Visa promulgated rules that prohibited their members from issuing American Express or Discover cards.* *Id.* at ¶17. These parallel rules were subsequently found to violate §1 of the Sherman Act and where struck down in *United States v. Visa, U.S.A., Inc.*, 163 F. Supp.2d 322, 331 (S.D.N.Y. 2001).

**C. Defendants FFB and FDMS**

Defendants FFB and FDMS are wholly owned subsidiaries of First Financial Management Corporation, which in turn is a wholly owned subsidiary of First Data Corporation. *Id.* at ¶7. FFB is a special purpose (credit card) state bank and FDMS is a credit card processing institution, which assists Acquiring Banks with the processing of general purpose card transactions. *Id.* at ¶92. FFB was and is a member bank of MasterCard and Visa and FDMS was duly authorized by MasterCard and Visa to act as an agent of and in conjunction with FFB in performing authorization, processing and credit card

settlement services for merchants such as PSW pursuant to Merchant Agreements. *Id.* at ¶93. FFB was a member bank of MasterCard and Visa and was therefore both a principal and agent of those bankcard networks. *Id.* at ¶94. As a member bank and agent thereof respectively, FFB and FDMS expressly agreed with Visa and MasterCard to abide by the association by-laws and other regulations of those bankcard networks. *Id.* at ¶16. In January of 2002, PSW entered into a Merchant's Agreement with FFB and FDMS, which established FFB as PSW's Acquiring Bank ("Merchant Agreement"). *Id.* at ¶92. The Merchant Agreement expressly incorporated and was subject to MasterCard and Visa "Association Rules." *Id.* at ¶95. In particular, ¶26.9 of the Merchant Agreement expressly provided that MasterCard and Visa retained the right to require termination or modification of the Agreement with respect to transactions involving MasterCard and Visa cards. *Id.* at ¶95. PSW alleges that each of the Defendants are liable for the relevant acts and/or omissions of the other, in particular, those alleged in the Complaint, either as a principal, agent, and/or co-venturer or co-conspirator. *Id.* at ¶¶8, 152-163.

**D. Market Power**

Credit and charge cards issued under the MasterCard and Visa brand names are known as general purpose cards, because they are accepted by numerous, unrelated merchants. *Id.* at ¶31. MasterCard and Visa, through their approximately 20,000 member banks, issue a wide variety of payment cards, including credit and debit cards. *Id.* at ¶32. Visa's share of the general purpose credit and debit card market is nearly 60%, while MasterCard's share of the general purpose credit and debit card market is 33% to 36%. *Id.* at ¶32. In 1999, Visa members accounted for approximately 47% of the dollar volume of credit and charge card transactions and MasterCard members for approximately 26%. *Id.* at ¶33. Their only competitors in the network services market for general purpose cards, American Express and Discover, accounted for approximately 20% and 6% of dollar volume respectively in 1999. *Id.* at ¶33. Visa and MasterCard together control over 73% of the volume of transactions on general purpose cards in the United States. *Id.* at ¶33. In terms of cards issued, they control about 85% of the market. *Id.* Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both of these Defendants have market power in the general purpose card

market and the network services for general purpose cards (hereinafter referred to as "network services") market, whether measured jointly or separately. *Id.* at ¶34. The ability of MasterCard and Visa to price discriminate also illustrates their market power. *Id.* at ¶35. Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. *Id.* at ¶35. Transactions with Internet and other card-not-present merchants, which rely almost completely on general purpose cards, have higher interchange fees than "brick and mortar" merchants. *Id.* at ¶35.

MasterCard and Visa can and do base their pricing structure, including the fine and "recovery fee" programs for "chargebacks"—credit card payments to merchants like PSW which are reversed and credited back to the consumer due to purported fraud or non-authorization, upon the degree to which a particular merchant category needs to accept its cards. *Id.* at ¶¶41, 43-49. MasterCard and Visa charge a higher Interchange Fee to PSW and other Internet and telemarketing merchants than they do to "brick and mortar" merchants. *Id.* at ¶37. MasterCard and Visa have overwhelming market power in the general purpose card market on the Internet, for which there are no commercially reasonable alternatives available to PSW or other similarly situated Internet merchants, allowing MasterCard and Visa to effectively dominate the marketplace. *Id.* at ¶42.

**E. Anti-Competitive Conduct**

The Complaint describes numerous, parallel programs and practices of MasterCard and Visa which have substantially and adversely affected competition in the identified relevant markets. *Id.* at ¶¶81-91. The Exclusivity Rules, whereby member banks in their respective networks were authorized to issue the general purpose card of the other network, but prohibited them from issuing general purpose cards of the competing networks, unreasonably restrained competition and ensured that merchants such as PSW would have no competing card network to turn to. *Id.* at ¶¶83, 86. The Excessive Chargeback Programs were revenue generating measures designed to usurp the profits of merchants such as PSW, while eventually causing their demise. *Id.* at ¶¶59-80, 85. These programs had the perverse, arbitrary, and commercially unreasonable effect of actually penalizing those merchants who took appropriate steps

to combat purported internet fraud. *Id.* They imposed excessive, retroactive, and progressive penalties or "recovery fees" which progressively increased from $25.00 per chargeback and a $25,000.00 per month fine all the way up to a maximum of $100.00 per chargeback and a $100,000.00 per month fine. *Id.* The fact that both MasterCard and Visa adopted extremely similar policies, with the same perverse effects, ensured that merchants such as PSW would not switch to the other bankcard network. *Id.* The Non-cross Border Processing Rules prohibited the processing of domestic payment card transactions by offshore acquiring banks and/or Aggregators, or the reverse, processing of foreign transactions by a domestic acquirer/Aggregator. This is form of a horizontal, geographic market division, which has had and continues to have a substantial anti-competitive effects in the relevant markets. *Id.* at ¶¶83, 87. The Registration Programs were an attempt to squeeze additional fees out of Aggregators such as PSW, while obtaining detailed information about their client websites, for reasons, which, on information and belief, were wrongful, in whole or in part. *Id.* at ¶¶83, 89. In particular, MasterCard's MSP policy was a blatant attempt to eliminate the competition of Aggregators such as PSW by requiring website clients to contract directly with MasterCard's Acquiring Banks as a form of vertical integration to compliment the geographic restrictions imposed by MasterCard's "non cross border processing" policy. *Id.* The Boycott List Programs ensured that any merchant whose Merchant Agreement was terminated could not secure a new Acquiring Bank in either network. *Id.* at ¶¶83, 88.

The Complaint alleges that the effects of the foregoing parallel policies and programs of Visa and MasterCard was to increase prices, in the form of higher interchange, and therefore discount rates paid by merchants such as PSW, as well as in the form of various registration fees, fines, "recovery fees," and penalties, *id.* at ¶¶34-42, 63, 65, 81-82, and to restrain trade in the relevant markets, *id.* at ¶148.

**F. The Demise of PSW**

On or about December 2002, Visa suddenly began enforcing its "no cross-border" processing rule. *Id.* at ¶105. As a consequence, PSW lost 60% of its Visa transactions processed through FFB. Also, PSW was required to cease processing for certain high chargeback sponsored client websites.

*Id.* at ¶105. As a consequence of the foregoing as well as the unavoidable incidents of "friendly fraud" tolerated and perpetuated by policies and practices of the Defendants, *id.* at ¶50-53, PSW's chargeback ratios (i.e. the ratio between the number of chargebacks and the number of transactions in a given monthly period) rose substantially in the ensuing three months. *Id.* at ¶105. In order to cover "potential" fines and penalties which MasterCard or Visa may have imposed for purported excessive chargebacks, Defendants FFB and FDMS continued to holdback ever increasing sums from payments due PSW, eventually holding back over $1.6 million in what is known in the trade as a "reserve account." *Id.* at ¶144. In addition during the foregoing period, MasterCard and Visa continued to unilaterally reduce PSW's chargeback ratio: the allowable percentage of chargebacks which could be incurred without additional penalties. *Id.* at ¶147. As a consequence, PSW was unable to pay and began to lose its website clients and was also consequently unable to attract new clients. *Id.* at ¶137. When PSW complained to the Defendants, FFB and FDMS terminated their processing arrangement with PSW, effectively putting it out of business. *Id.* at ¶¶139-140.

Nevertheless, PSW's demise was not as simple as the accurate, but sterile summary described above—if it was, perhaps Defendants' contention that it was the result of a failed business plan would have some substance. PSW had grown considerably since its inception and had an excellent reputation in the industry until its untimely demise. *Id.* at ¶¶143-135. PSW at all times acted diligently and in good faith to comply with the myriad and ever changing rules of the game imposed by the various MasterCard and Visa programs and policies in dispute. *Id.* at ¶135. Nevertheless, the combination of, *inter alia*, MasterCard and Visa's no cross border acquiring policy and excessive chargeback programs had substantially reduced PSW's sales volume. *Id.* at ¶¶134-135. As a consequence, in February of 2003, FFB and FDMS more than doubled PSW's initial reserve account requirement to $750,000.00 to cover potential fines, fees, and penalties under the Visa and MasterCard excessive chargeback programs. *Id.* at ¶107.

In late April of 2003, in an effort to increase its volume of transactions and thereby both increase profits and reduce its chargeback ratio below permissible limits, PSW acquired a new client,

SoftSell, which marketed healthcare oriented products over the Internet or on the phone. *Id.* at ¶109. As a consequence of the SoftSell account, PSW's Visa processing volume increased dramatically, which was the only appropriate business strategy to overcome the perverse effect of the Excessive Chargeback Program due to the loss of processing volume described above. *Id.* at ¶111. After one (1) week of providing billing services to SoftSell, and without any notice to PSW, FFB ceased wiring disbursements to PSW. *Id.* at ¶115. FFB began withholding settlement on one hundred percent (100%) of PSW's daily deposits and depositing these funds into PSW's reserve account until the account balance reached $1.2 million. *Id.* at ¶120. Subsequently, FFB notified PSW that, effective on or about May 13, 2003, PSW was barred from processing for SoftSell. *Id.* at ¶122.

At the time, PSW was told that the reason it was directed to cease processing for SoftSell was due to a previous history of high chargeback volumes when SoftSell processed directly as a merchant under the name "Commonwealth Benefits." *Id.* at ¶123. Nevertheless, FFB subsequently contended in writing that its directive that PSW cease processing for SoftSell *was required under Visa rules*, specifically that, as an Aggregator, PSW was forbidden from processing for "Buyers' Clubs, Membership Clubs, Outbound Telemarketers and other related merchants." *Id.* at ¶124. SoftSell falls in none of the above specified categories of merchants. *Id.* at ¶124. It was subsequently determined that the actual chargeback ratio for SoftSell transactions processed by PSW was only *.61%, a rate well below the chargeback threshold. Id.* at ¶126. On or after June 1, 2003, without notice to PSW, the Defendants's combined PSW's catalog account, through which it previously processed SoftSell transactions, with PSW's adult account, thereby ensuring that PSW's chargebacks would exceed the threshold and therefore subject PSW to fines, penalties, and/or recovery fees imposed by Visa for exceeding the allowable chargeback ratio. *Id.* at ¶¶127, 128.

*Moreover, as a result of the Defendants' directive that PSW cease processing for SoftSell, PSW's volume dropped tremendously, and its chargeback ratios skyrocketed. Id.* at ¶129. The Defendants were well aware that PSW would be forced out of business if the Defendants continued to insist on withholding payments and maintaining a substantial and excessive reserve account. *Id.* at

¶134. Indeed, the Defendants were expressly advised that maintaining the current level of reserves, let alone any prospective increase, would eventually be fatal to PSW; nevertheless FFB subsequently *increased* the reserve account to $2 million, and advised it would withhold settlement on thirty-three percent (33%) of daily deposits until the reserve reached $2 million. *Id.* at ¶¶134-136. 136.

Due to the inability to pay its clients because its revenues were tied up in the FFB reserve account, by September of 2003, PSW had lost approximately 85% of its accounts to its competitors and was impaired in its ability to attract new clients, insofar as businesses are generally not inclined to do business with an entity which cannot or does not pay its obligations. *Id.* at ¶137. In September, 2003, Visa imposed a $81,000.00 fine on PSW for exceeding the Chargeback Threshold. *Id.* at ¶138. In September, 2003, PSW advised MasterCard and Visa in writing that, *inter alia*, individually and in concert with others, they were using their market power to assess and continue to assess illegal fines and penalties on PSW for chargebacks in order to shift the risk of such transactions in a commercially unreasonable manner, which was not financially justified, with the intent and/or effect of driving PSW, and similar entities from the market for payment card processing of internet transactions. *Id.* at ¶139. *On September 16, 2003, FFB notified PSW that it was terminating its relationship with PSW effective September 26, 2003, due primarily to the "very significant financial exposure" for fines, penalties, and/or recovery fees under the MasterCard and Visa Excessive Chargeback Programs, as well as a "decrease in overall transaction volume."* *Id.* at ¶140.

Since at least as early as November of 2003, MasterCard and Visa were well aware that approximately $1.6 million was being held in PSW's reserve account by FFB and FDMS, due to potential MasterCard and Visa fines, penalties, and/or recovery fees. Nevertheless, more than 16 months later, neither MasterCard nor Visa have assessed fines, penalties, and/or recovery fees against PSW or authorized the release of these funds to PSW. *Id.* at ¶144. Despite diligent efforts, due to the operation of the Boycott List Programs, neither PSW nor any of its officers or principals were able to secure another Acquiring Bank through which to process its business. *Id.* at ¶145.

**III. ISSUE**

Whether or not it appears beyond doubt that PSW can prove no set of facts in support of each of its claims entitling it to relief, taking as true all the Complaint's well-pled allegations and drawing all reasonable inferences in favor of PSW.

## IV. POINTS AND AUTHORITIES[1]

### A. Standard of Review

For sake of brevity and to avoid duplication, PSW incorporates herein its arguments and discussion of the proper standard of review set forth in Plaintiff's Memorandum of Law in Opposition to Visa U.S.A., Inc.'s and MasterCard International Incorporated's Motions to Dismiss.

### B. Collateral Estoppel

For sake of brevity and to avoid duplication, PSW incorporates herein its arguments and discussion of the application of collateral estoppel under 15 U.S.C. §16(a) set forth in Plaintiff's Memorandum of Law in Opposition to Visa U.S.A., Inc.'s and MasterCard International Incorporated's Motions to Dismiss. PSW would emphasis that, in light of the identity of interest of the parties discussed below, FFB and FDMS stand in the same shoes as Defendants Visa and MasterCard for purposes of collateral estoppel based on the findings and determination issued by the court in *United States v. Visa, U.S.A., Inc.*, 163 F. Supp.2d 322, 331 (S.D.N.Y. 2001), *affirmed*, 344 F.3d 229 (2nd Cir. 2003), *cert. den.*, 125 S.Ct. 45 (2004), wherein the court ruled that Visa and Master Card have used market power to unreasonably exclude competition and restrain trade in the relevant markets alleged in the Complaint, that was not outweighed by any countervailing pro-competitive effects, in violation of §1 of the Sherman Act.

---

[1] In responding herein to the Defendants' various challenges to PSW's claims alleged in the Complaint, PSW would emphasis that, despite the length and detail of the Complaint, ***it <u>has not alleged all the facts</u> supporting its claims for relief*** and is under no obligation to do so under the notice pleading standard. A plaintiff is not required to plead evidence. In addition, by describing to the Court the legal and/or factual basis by which it has properly pled its various claims, PSW is not thereafter restricted in these proceedings from establishing facts or asserting theories of relief in addition to or different than those identified and discussed herein, based only on the face of the Complaint. **Discovery and further pleadings and proceedings will identify the full and proper scope and focus of the adjudication of PSW's claims.**

### C. Identity of Interest between Visa and MasterCard and FFB and FDMS

As stated previously, MasterCard and Visa are bankcard associations organized as open joint ventures, owned by the numerous banking institutions that are members of the respective MasterCard and Visa associations. Comp. at ¶12; *Visa*, 344 F.3d at 235. Accordingly, MasterCard is owned by its approximately 20,000 member banks, while Visa is owned by its approximately 14,000 member banks. *Id.* The associations' operations are conducted primarily by their member banks. *Id.* at ¶13; *Visa*, 344 F.3d at 235. The Complaint alleges that FFB was and is a member bank of MasterCard and Visa and that FDMS[2] was duly authorized by MasterCard and Visa to act as an agent of and in conjunction with FFB in performing authorization, processing, and credit card settlement services for merchants, such as PSW, pursuant to Merchant Agreements. *Id.* at ¶93. FFB was a member bank of MasterCard and Visa and was therefore both a principal and agent of those bankcard networks. *Id.* at ¶94. As a member bank and agent thereof respectively, FFB and FDMS expressly agreed with Visa and MasterCard to abide by the association by-laws and other regulations of those bankcard associations. *Id.* at ¶16. The Merchant Agreement expressly incorporated and was subject to MasterCard and Visa "Association Rules." *Id.* at ¶95. In particular, ¶26.9 of the Merchant Agreement expressly provided that MasterCard and Visa retained the right to require termination or modification of the Agreement with respect to transactions involving MasterCard and Visa cards. *Id.* at ¶95. Indeed, other courts have expressly found that in entering into Merchant Agreements with merchants such as PSW, Acquiring Banks such as FFB are actually "contract[ing] with retailers *on behalf* of Visa or MasterCard to purchase payment card transactions." *Reyn's Pasta Bella, LLC v. Visa*, 259 F.Supp.2d 992, 996 (N.D. Cal. 2003)(emphasis added); *accord In re Visa/Mastermoney Antitrust Litigation*, 280 F.3d 124, 130 (2nd Cir. 2001). Moreover, with respect to the various concerted activities and conduct alleged in the Complaint and discussed below, it must be kept in mind that FFB's culpability does not only arise merely out of its membership in the Visa and MasterCard association joint ventures, but also by virtue of the fact that, in

---

[2] Insofar as and to the extent the liability of FDMS alleged in the Complaint is as an agent of FFB, the within memorandum of law shall reference only FFB.

135, 146-147; and, 7) failing or refusing to release to PSW or otherwise account for the $1.6 million in PSW's reserve account some 16 months after the contract was terminated and PSW ceased processing for the Defendants, *id.* at ¶¶144. In addition, the Complaint expressly alleges the Defendants breached §24.2 of the Merchant Agreement, which is the failure to indemnify and hold harmless PSW for, *inter alia*, breach of any warranty, covenant or agreement or any misrepresentation . . . or gross negligence or willful misconduct." *Id.* at ¶152. Fairly construed, "breach of covenant" would include breach of the covenant of good faith and fair dealing discussed below, and "willful misconduct" would include breach of federal and state antitrust laws discussed above.

Finally, both with respect to PSW's breach of contract claim and breach of the covenant of good faith and fair dealing claim discussed below, it must be kept in mind that the purported basis of the termination of the Merchant Agreement was 1) potential fines and penalties under the Excessive Chargeback Programs, and 2) a decrease in transaction volume. Comp. at ¶140. Aside from the fact that, as discussed below, PSW alleges that the Excessive Chargeback Programs were commercially unreasonable and imposed unenforceable penalties, *the only reason its chargeback ratio increased and exposed it to significant fines and penalties was a loss of transaction volume due largely to the Defendants' directive that PSW cease processing for SoftSell (not to mention the impact of the non-cross border restrictions).* Accordingly, the Defendants *created* the circumstances, which formed the purported basis for PSW's termination.

**2. Breach of the covenant of good faith and fair dealing.**

To the extent the Merchant Agreement is authoritatively construed at some point in this litigation to permit the Defendants the *discretion* to take any or all of the acts described in the previous section, the Complaint, at a minimum alleges that the Defendants thereby breached the implied covenant of good faith and fair dealing by taking those actions.[4] The essence of a claim for

[4] *See, e.g., Cherick Distributors, Inc. v. Polar Corp.* 41 Mass.App.Ct. 125, 127, 669 N.E.2d 218, 220 (1996)(jury justified in determining abrupt termination of terminable at will distributorship contract on four days notice immediately following discovery that distributor wrote letter urging other distributors to form association to negotiate with defendant was calculated to put plaintiff out of business and discourage other distributors from

almost every case, *it was FFB which implemented or enforced the challenged practices which visited the harm on PSW*--**hence, evidence of FFB's agreement and intent to participate in the challenged conduct.** Accordingly, courts have previously ruled that member banks such as FFB could be held liable along with their Visa and MasterCard networks for claimed antitrust violations, arising out of, *inter alia*, the application and enforcement of Visa and MasterCard association rules. *See, e.g., Reyn's Pasta Bella, LLC v. Visa,* 259 F.Supp.2d 992, 996 (N.D. Cal. 2003). In light of the nature of the relationship between the Defendants, along with the facts alleged in the Complaint generally, PSW contends that each of the Defendants herein were at all relevant times acting as either a principal, agent, and/or co-venturer or co-conspirator. *Id.* at ¶¶8, 152-163. Ultimately, the foregoing is a mixed question of law and fact to be determined by the trier of fact. At this stage of the proceedings, construing the facts in the Complaint and drawing all reasonable inferences therefrom in a light most favorable to PSW, this Court must find that each of the Defendants, along with and as part of the Visa and MasterCard association joint ventures, took the challenged conduct and imposed the various challenged parallel programs on PSW.

**D. PSW's Complaint States Claims for Relief under the Sherman Act**

For sake of brevity and to avoid duplication, PSW incorporates herein its arguments and discussion of the sufficiency of the Complaint to state claims for relief under §§1 and 2 of the Sherman Act against all of the Defendants set forth in Plaintiff's Memorandum of Law in Opposition to Visa U.S.A., Inc.'s and MasterCard International Incorporated's Motions to Dismiss.

**E. Rhode Island Antitrust Claims**

For all the reasons discussed in §IV.C.-D. above, and in accordance with the broader scope of the plain language of the statute, the Complaint states a claim for relief under the Rhode Island antitrust statute, R.I.G.L. §6-36-5, as to all the Defendants.

**F. Rhode Island State Law Claims**

### 1. Breach of contract.[3]

In the first instance, fairly construed in a light most favorable to PSW, the Complaint alleges more than sufficient facts to raise a reasonable inference that Visa and MasterCard are also a party to the Merchant Agreement, or a least in privity of contract with PSW relative thereto. *See, supra*, discussion in §IV.C. The terms of the Merchant Agreement expressly incorporate and is subject to any and all Visa and MasterCard association rules, Comp. at ¶95, including the interchange fee and each of the six (6) challenged parallel programs, including the Excessive Chargeback Programs, *id.* at ¶83, ***and Visa and MasterCard retained the right to terminate or modify the Merchant Agreement at any time***, *id.* at ¶96. Indeed, as stated previously, courts have expressly found that in entering into Merchant Agreements with merchants such as PSW, Acquiring Banks such as FFB are actually "contract[ing] with retailers *on behalf* of Visa or MasterCard . . .." *Reyn's,* 259 F.Supp.2d at 996 (emphasis added); *see also In re Visa/Mastermoney Antitrust Litigation*, 280 F.3d at 130 (same).

Secondly, fairly construed, at a minimum, the Complaint alleges a breach of the Merchant Agreement by the Defendants due to the following: 1) permitting and perpetuating "friendly fraud," and thereby improperly charging back to PSW legitimate consumer credit purchases for which PSW was entitled to payment, Comp. at ¶¶50-53; 74-79; 2) directing PSW to terminate processing for SoftSell, even though it did not fall into any of the purported prohibited categories under Visa association rules, *id.* at ¶¶124-125; 3) combining the SoftSell non-adult account with PSW's adult account and thereby causing PSW to exceed the permissible charegback ratio, *id.* at ¶¶127-128; 4) assessing an $81,000 penalty, *id.* at ¶138; 5) holding funds in the reserve account in amounts grossly in excess of that which was reasonably necessary for the contractual purpose for which it was established (i.e. provide Defendants reasonable security against *actual* losses), *id.* at ¶¶76-77, 134-135, 144, 147; 6) wrongfully terminating the Merchant Agreement after PSW complained about the excessive reserves and that the Defendants were using market power to assess illegal fines and penalties on PSW, *id.* at ¶¶124-128, 134-

[3] The elements of a breach of contract claim under Rhode Island law are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; and 3) the defendant wrongfully breached the contract. *See Del Farno v. Aetna Casualty & Surety Co.*, 673 A.2d 71, 72 (R.I. 1996).

breach of the implied covenant of good faith and fair dealing is *using discretion conferred by contract*[5] to act in a commercially unreasonable manner so as to deprive another contracting party of the benefits thereof or to destroy the object of the contract.[6] The covenant of good faith and fair dealing is based on common sense.[7] It is premised on the implied assumption that, despite any ambiguity in or discretion conferred by contract, no contracting party is thereby legally immunized from liability for any and all actions taken pursuant thereto, no matter how unfair, oppressive, or egregious they may be. In other words, merely because Defendants may have had discretion to increase the amount of the reserve account in light of purported perceived losses, the implied covenant of good faith and fair dealing requires that the Defendants not set a reserve which is commercially unreasonable and/or designed or intended to punish PSW or drive it out of business, and thereby deprive PSW of the benefits of and destroy the object of the contract. Comp. at ¶¶76-83. It must be kept in mind that the primary basis for which the Defendants' are claiming they had established and are withholding $1.6 million of PSW's funds in the Reserve Account was the potential fines, fees, and assessment under the Excessive Chargeback Programs, which PSW has

---

pursuing recommendation to form association and was unreasonable and therefore constituted a breach of the covenant of good faith and fair dealing).

[5] An act need not constitute a breach of contract to constitute a breach of the covenant of good faith and fair dealing; otherwise the cause of action would be redundant and unnecessary. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp.2d 313, 330 (D.R.I. 1999)(breach of implied covenant of good faith and fair dealing may give rise to breach of contract, but not every breach of contract is a violation of the implied covenant).

[6] *Rhode Island Charities Trust v. Engelhard Corp.*, 109 F.Supp.2d 66, 74 (D.R.I. 2000)(*citing Travellers Int'l v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994)(holding that where contract confers discretion on one party, such discretion is limited by obligation that it be exercised in good faith)); *State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2nd Cir. 2004)(where contract contemplates exercise of discretion, covenant of good faith and fair dealing requires promise not to act arbitrarily or irrationally in exercising that discretion.*); Thompson Trading, Ltd. v. Allied Breweries Overseas, Trading, Ltd.*, 748 F.Supp. 936, 942 (D.R.I.1990) (implied covenant of good faith and fair dealing prohibits contracting parties from acting in arbitrary or unreasonable manner); *Psaty & Fuhrman, Inc. v. Housing Authority of Providence,* 76 R.I. 87, 92, 68 A.2d 32 (1949)(same); *Ide Farm & Stable, Inc. v. Cardi,* 110 R.I. 735, 739, 297 A.2d 643 (1972)(purpose of implied covenant is to ensure contractual objectives are achieved). The elements to establish a breach of the implied covenant of good faith and fair dealing are as follows: the failure of a party to a contract, by such party's acts and/or omissions; to observe reasonable commercial standards of fair dealing in the trade and comply with the standard of honesty in fact in order to achieve contractual objectives; and instead, using discretion conferred by contract to act dishonestly, arbitrarily, capriciously, unreasonably, and/or outside of accepted commercial practice; and, thereby deprive the other party of the benefit of the contract. *See id.*

[7] *Tagare v. NYNEX Network Systems Co.*, 921 F.Supp. 1146, 1150 (S.D.N.Y. 1996)("[T]he concept [of implied covenant of good faith and fair dealing] is rooted in notions of *common sense* and *fairness*.")(emphasis added).

alleged in detail was commercially unreasonable and, as discussed below, was designed to impose an unenforceable penalty or forfeiture.[8] *Id.* at ¶¶59-80, 140-143. The justification for the balance of the funds held in the reserve account were fines for purported non-compliance with the MasterCard IMQM program, with which PSW alleges it had already complied. *Id.* at ¶134. Accordingly, the allegations in the Complaint and all reasonable inferences drawn therefrom establish that there was no reasonable basis for a Reserve Account of the magnitude established, maintained, and continued by the Defendants. Similarly, even though the Merchant Agreement expressly incorporated Visa and MasterCard association rules, this did not authorize the Defendants' to adopt, enforce, and or modify *any* rules, no matter how commercially unreasonable or perverse in their effect, or whether such provisions imposed *retroactive* fines, fees, and assessments which had no economic justification in terms of actual costs or harm imposed on the Defendants, and thereby amounted to a penalty or forfeiture,[9] such as the Excessive Chargeback Programs. *Id.* at ¶¶59-91. Moreover, even if the

---

[8] Although it is alleged in detail in the Complaint, it is worth summarizing herein, in part, the basis for PSW's contention that the Excessive Charegback Programs are commercially unreasonable and impose an unenforceable penalty. In the first instance, it is alleged that the $15.00 contractual chargeback fee is sufficient to reimburse any administrative costs to the system to reverse and chargeback a transaction. Comp. at ¶45. Accordingly, there is no economic or cost justification for any additional monetary imposition on a merchant, *except* as a penalty. Nor are the penalties justified as a deterrence. First, as alleged in detail in the Complaint, Internet and other card-not-present merchants have no control over "friendly fraud" or implementation of fraud prevention technologies to eliminate "friendly fraud." *Id.* at¶¶50-58. Second, a simple and reasonable deterrent is merely a policy whereby a merchant will be terminated if it exceeds a particular level of chargebacks over a given period. Third, to the extent a monetary deterrent is commercially justified, progressive and excessive penalties, which range from $25 to $100 per chargeback *and* $25,000 to 100,000 per month, is *grossly disproportionate and unreasonable*. *Id.* at¶¶66, 76. Nor is it reasonable to impose such penalties retroactively up to one year. *Id.* at¶¶65. This is particularly true in PSW's case, which faces nearly $2 million in purported excessive chargeback *penalties* retroactive over a nine month period, while its total estimated *annual* transaction volume under the Merchant Agreement was only $8.4 million. *Id.* at¶¶97, 140-143. Finally, where, as here, a merchant such as PSW has been terminated, there is no deterrent value at all to enforcement of the penalties on that merchant; ***there is no future non-compliant conduct to deter.*** *The only practical purpose of the onerous penalties under these programs is to usurp the merchant's profits, and then terminate the merchant.*

[9] *See Xerox Financial Services Life Ins. Co. v. High Plains Ltd. Partnership*, 44 F.3d 1033, (1st Cir. 1995)(applying Illinois law)(noting courts are loathe to enforce contract provisions specifying disproportionately large sum as liquidated damages where it would lead to unjust result); *Wholey Boiler Works v. Lewis*, 45 R.I. 441, 123 A. 595, 597-598 (1924)(penalty or forfeiture provisions in contract unenforceable); *Paragon Group, Inc. v. Ampleman*, 878 S.W. 2d 878, 880-81 (Mo. App. 1994)("...penalty clauses are invalid."); *2625 Bldg. Corp. v. Deutsch*, 385 N.E. 2d 1189, 1192 (Ind. App. 1979)(forfeiture clauses within contract are generally disfavored by law)(citing Pomeroy, Equity Jurisprudence, s 433, 5th Edition (1941); Restatement (second) of Contracts §356(1)(1981)([a] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty").

Excessive Chargeback Programs are authoritatively construed at some point in this litigation not to be commercially unreasonable on their face, fairly construed, the Complaint alleges sufficient facts to establish that the actual and threatened assessments under those programs against PSW were commercially unreasonable, in light of all the circumstances discussed herein, as well as the retroactive nature and substantial magnitude of the assessments imposed or threatened to be imposed—in excess of $2 million, which constitute an unenforceable penalty or forfeiture. Accordingly, the Complaint, based just on the facts pled, *let alone those to be disclosed during the course of discovery*, states claims for relief for breach of the covenant of good faith and fair dealing, based on any number of theories of liability.

### 3. Intentional Interference with Contractual Relations.[10]

The Complaint alleges that the Defendants intentionally interfered with PSW's contractual relations with respect to its website clients, Comp. at ¶157, and with respect to the Merchant Agreement, *id.* at ¶158. With respect to both counts, the Complaint expressly identifies the contracts, *id.* at ¶¶19-23, 25-30, the Defendants' knowledge thereof, *id.* at ¶¶19-23, 25-30, 81, 83, and alleges harm flowing from the interference, of which all of the Defendants were well aware, *id.* at ¶¶134-147, 149-150. Finally, the Complaint is replete with allegations as to the manner in which the Defendants' conduct in interfering with the contracts was intentional and wrongful,[11] including the

[10] Tort liability may be imposed upon another who intentionally and improperly interferes with one's rights under a contract or makes the contractual rights more costly or less valuable. *Jolicouer Furniture Co., Inc. v. Baldelli*, 653 A.2d 740, 752 (R.I. 1995)(citing W. Page Keeton et al., Prosser and Keeton on The Law of Torts, §129 at 978 (5th ed. 1984)). In Rhode Island, the elements of intentional interference with a contractual relationship are as follows: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional interference with the contract; and, (4) damages as a result of the interference. *New England Multi-Unit Housing Laundry Association v. Rhode Island Housing and Mortgage Finance Corp.*, 893 F. Supp. 1180, 1192 (D.R.I. 1995); *Banco Totta e Acores v. Fleet Nat'l Bank*, 768 F. Supp. 943, 950 (D.R.I. 1991); *Western Mass Blasting Corp. V. Metro. Property and Casualty Ins. Co.*, 783 A.2d 398, 401 (R.I. 2001); *Smith Dev. Corp. v. Bilow Enters., Inc.*, 308 A.2d 477, 480 (R.I. 1973).

[11] As to the requirement of malice, malice is defined as unjustified interference. There is no requirement of showing spite or ill-will. *New England Multi-Unit Housing Laundry Association*, 893 F. Supp. at 1191 (citing *Smith Dev. Corp.*, 308 A.2d at 480). If the interference is "found to be intentional and without justification, it is malicious in law even though it arose from good motives and without express malice." *Jolicouer Furniture Co., Inc.*, 653 A.2d at 753. Interference is unjustifiable when done for "the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff." *Stephenson v. Plastics Corporation of America, Inc.*, 150 N.W.2d 668, 679 (Minn. 1967) (citing *Louis Kamm, Inc. v. Flink*, 175 A. 62, 66 (N.J. 1934)); 99 A.L.R. 1.

motivation to secure the business from PSW's website clients for the Defendants' and/or another association member Acquiring Bank, *id.* at ¶¶ 146-147. The element of wrongfulness may be supplied by allegations establishing Defendants' conduct in violation of state and federal antitrust laws and/or by the allegations discussed in some detail in the previous section that their conduct was commercially unreasonable, arbitrary, and/or designed to punish PSW and impose a forfeiture.[12] *See id.* at ¶¶59-91. Whether or not the Defendants' had a legitimate business purpose or were otherwise legally justified is not proper for consideration in the context of a motion to dismiss, particularly in the face of PSW's well-pled allegations, and the inferences to be drawn therefrom.[13]

**4. Intentional Interference with Prospective Economic Advantage**[14]

Under Rhode Island law, there exists a tort for interference with prospective economic advantage, which has the same elements as the tort for interference with contract, except there is no requirement that an actual contract exists. The Complaint alleges that the Defendants intentionally interfered with PSW's prospective economic advantage as it relates to acquiring and continuing contracts with its website clients, Comp. at ¶159, and with respect to entering into a Merchant Agreement with another Acquiring Bank, *id.* at ¶160. For the same reasons discussed above, the Complaint properly states claims for relief under both counts. PSW would emphasize in this context, in particular, the allegations that it had grown considerably since its inception and had an excellent reputation in the industry (until its untimely demise), leading to the reasonable inference that it had a

---

[12] *See, e.g., Cherick Distributors,* 41 Mass.App.Ct. at 127, 669 N.E.2d at 220 (conduct in violation of implied covenant of good faith and fair dealing in terminating distributorship contact evidence of wrongful interference with distributors relationship with its customers).

[13] PSW concedes that a party may not intentionally interfere with its own contract. The count alleging interference with the Merchant Agreement is pled in the alternative, and should be dismissed if this Court eventually determines, as PSW urges, that Visa and MasterCard and FFB were all contracting parties to the Merchant Agreement.

[14] Under Rhode Island law, if a party "intentionally and improperly interferes with another's prospective contractual relation, [he/she] is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of: (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation; or (b) preventing the other from acquiring or continuing the prospective relation." *Mesolella v. City of Providence et al.*, 508 A.2d 661 (R.I. 1986). The elements necessary to state a claim of tortious interference with contractual relations are identical to that for intentional interference with contractual relations, except for the requirement in the latter that an actual contract exist. *Id.* at 670.

reasonable probability of continuing existing and acquiring future website clients, but for the Defendants' wrongful conduct, *id.* at ¶¶134-135, as well as the express allegation to that effect in ¶126 of the Complaint. PSW also alleges that the Defendants were aware of the impact their challenged conduct had on PSW's relations with its website clients and its business generally. *Id.* at ¶¶132-134, 139. Also relevant in this context, is the additional intentional and wrongful conduct relative to the Boycott List Programs, which ensured that neither PSW (nor any of its principals) were able to subsequently enter into a Merchant Agreement with another Acquiring Bank or otherwise acquire and attract website clients. *Id.* at ¶¶83, 88, 145.[15]

**5. Conversion[16] and Embezzlement[17]**

The Complaint alleges that the Defendants interfered with PSW's ownership interest in and exercised dominion over PSW's funds in the Reserve Account and converted the same to their own use, Comp. at ¶161, and, that the Defendants appropriated and converted to their own use PSW's funds in the Reserve Account, which were entrusted to Defendants for a specific use, and thereby embezzled the same, *id.* at ¶162. Although the Reserve Account was established with FFB, for the same reasons discussed in detail previously, due to the identity of interest between Visa and MasterCard, all of the Defendants are legally liable, either as principals, agents, joint venturers, or co-conspirators, with respect to PSW's claims arising out of the establishment, maintenance, and

---

[15] For the same reasons discussed in the previous section, the count alleging interference with prospective economic advantage with respect to the Merchant Agreement is pled in the alternative, and should be dismissed if this Court eventually determines, as PSW urges, that Visa and MasterCard and FFB were all contracting parties to the Merchant Agreement (and therefore, any future Merchant Agreement).

[16] Under Rhode Island law, an action for conversion involves: 1) defendant's taking of the plaintiff's personalty; 2) without plaintiff's consent; and, 3) defendant exercising dominion over the personalty inconsistent with the plaintiff's right to possession." *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I. 1996); *Fuscellaro v. Industrial National Corp.*, 368 A.2d 1227, 1230 (R.I. 1977). The focus of inquiry is "whether [a] defendant has appropriated to his [or her] own use the chattel of another without the latter's permission and without legal right." *Terrien v. Joseph*, 115, 53 A.2d 923, 925 (R.I. 1947).

[17] The three elements necessary to prove embezzlement under Rhode Island law are (1) that defendant was entrusted with the property for a specific use; (2) that he came into possession of the property in a lawful manner, often as a result of his employment; and, (3) that defendant intended to appropriate and convert the property to his own use and permanently deprive that person of the use. *State v. McKone*, 673 A.2d 1068, 1073 (R.I. 1996). In addition, in Rhode Island, embezzlement must be proven by clear evidence. *Resnick v. D'Amico*, 1981 WL 390944, at *2 (R.I. Super. June 22, 1981).

continuation without justification of the Reserve Account. *PSW would emphasize, in this context, the allegation that Visa and MasterCard have the power to authorize release of PSW's funds held in the Reserve Account, but have neither assessed penalties nor authorized release of the funds. Id.* at ¶144.

Fairly construed, to the extent funds were withheld from PSW and placed in the Reserve Account in amounts *in excess* of that which was necessary to provide reasonable security to the Defendants, this constituted a wrongful taking of personalty without PSW's consent. It must be kept in mind that, as discussed in detail above, the *Complaint, fairly construed, alleges that any amount withheld to fund potential Excessive Chargeback Program penalties was wrongful.* The allegation that the Defendants continued to withhold those funds from PSW some 16 months after it ceased processing for the Defendants, without assessing any penalties or otherwise releasing or accounting for the same, establishes facts sufficient to draw a reasonable inference that the Defendants' converted these funds to their own use. *Id.* at 144

Additionally, to the extent this Court determines that all or any portion of PSW's funds diverted to the Reserve Account were properly in the Defendants' control, the Complaint also states a claim for embezzlement. The Complaint alleges that funds were placed in the Reserve Account for the specific purpose of providing security to the Defendants for potential losses. As stated previously, the allegation that the Defendants continued to withhold those funds from PSW some 16 months after PSW ceased processing for the Defendants without assessing any penalties or otherwise releasing or accounting for the same, establishes facts sufficient to draw a reasonable inference that the Defendants converted the same to their own use, and thereby embezzled these funds.[18]

## V. CONCLUSION

For all the foregoing reasons, PSW respectfully prays that the Defendants' Motions to Dismiss be denied.

SERVER\SYS\USERS\SINAPI\CLIENTS\PSW\Memo.FFB.doc

[18] PSW observe that if it has not and cannot assert any state law claims against the Defendants, then there is no legal cause of action available by with to seek release of these funds, and Defendants are therefore entitled to continue to withhold the estimated $1.6 million in PSW's funds indefinitely. Such a determination, which would leave PSW with no legal recourse, is untenable and contrary to applicable law and common sense.

## CERTIFICATION

**Patricia A. Sullivan, Esq.**
**Edwards & Angell LLP**
**2800 Financial Plaza**
**Providence, RI 02903**

**John A. Tarantino, Esq.**
**Adler Pollack and Sheehan P.C.**
**2300 Financial Plaza**
**Providence, RI 02903**

**Joseph V. Cavanagh, Jr., Esq.**
**Blish & Cavanaugh LLP**
**30 Exchange Terrace**
**Providence, RI 02903**

I hereby certify that I mailed a copy of the within Memorandum of Law to the above attorneys of records via regular mail, postage pre-paid on the 28th day of January, **2005.**

DISTRICT OF RHODE ISLAND
U.S. DISTRICT COURT
'05 JAN 28 A 4: 41
FILED