**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PSW, INC., d/b/a PSW BILLING,** <br> **Plaintiff,** | : | |
| **v.** | : | **C.A. No. 04-347-T** |
| **VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION,** <br> **Defendants** | : | |

**PLAINTIFF'S OBJECTION TO VISA U.S.A., INC.'S MOTION TO DISMISS**

Now comes the Plaintiff, PSW, Inc. in the above-cited matter and does hereby object to Defendant Visa U.S.A., Inc.'s Motion to Dismiss and as grounds therefore and in support thereof relies on its Memorandum of Law filed simultaneously herewith.

**WHEREFORE,** Plaintiff prays that Defendant Visa U.S.A., Inc.'s Motion to Dismiss be denied.

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO &COMPANY, LTD.**

**Dated: January 28, 2005**

**Richard A. Sinapi, Esq. (R.I. Bar No. 2977)**
**V. Edward Formisano, Esq. (R.I. Bar No. 5512)**
**100 Midway Place, Suite 1**
**Cranston, RI 02920**
**Telephone: (401) 944-9690**
**Fax: (401) 943-9040**



39

**CERTIFICATION**

**Patricia A. Sullivan, Esq.**
**Edwards & Angell LLP**
**2800 Financial Plaza**
**Providence, RI 02903**

**John A. Tarantino, Esq.**
**Adler Pollack and Sheehan P.C.**
**2300 Financial Plaza**
**Providence, RI 02903**

**Joseph V. Cavanagh, Jr., Esq.**
**Blish & Cavanaugh LLP**
**30 Exchange Terrace**
**Providence, RI 02903**

I hereby certify that I mailed a copy of the within Objection to the above attorneys of records via regular mail, postage pre-paid on the 28th day of January, **2005.**

**F:\USERS\SINAPI\CLIENTS\PSW\Obj.Visa.doc**

DISTRICT OF RHODE ISLAND
DISTRICT COURT
'05 JAN 28 A 4:44
FILED

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PSW, INC., d/b/a PSW BILLING,
Plaintiff,

v. C.A. No. 04-347-T

VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION,
Defendants

FILED
JAN 28 2005
US DISTRICT COURT
DISTRICT OF RHODE ISLAND

**PLAINTIFF'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO VISA U.S.A., INC.'S AND MASTERCARD INTERNATIONAL INCORPORATED'S MOTIONS TO DISMISS**
[Visa]

PLAINTIFF,
By its attorneys,
SINAPI, FORMISANO &COMPANY, LTD.

Dated: January 28, 2005

Richard A. Sinapi, Esq. (R.I. Bar No. 2977)
V. Edward Formisano, Esq. (R.I. Bar No. 5512)
100 Midway Place, Suite 1
Cranston, RI 02920
Telephone: (401) 944-9690
Fax: (401) 943-9040

## I. INTRODUCTION

Plaintiff PSW, Inc. ("PSW") has brought this action seeking declaratory relief and compensatory, punitive, and treble damages, as well as attorneys' fees, against each of the above-named Defendants for violation of the Sherman Act, Clayton Act, the Rhode Island Antitrust Law, and for breach of the covenant of good faith and fair dealing, interference with contractual relations, interference with prospective economic advantage, conversion, embezzlement, and breach of contract, arising out of the use of market power by the Defendants to act arbitrarily, commercially unreasonably, and unlawfully, and thereby deprive Plaintiff of the value and fruits of its business.

PSW has filed a 163 paragraph, 38 page detailed Complaint, which far exceeds the minimum notice pleading requirements under Fed.R.Civ.P. 8, setting forth the factual background, nature, and basis of PSW's claims. Notwithstanding the foregoing, each of the Defendants, Visa, U.S.A., Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), Defendants First Financial Bank ("FFB"), and First Data Merchants Services Corporation ("FDMS"), have filed Motions to Dismiss under Fed.R.Civ.P. 12(b)(6) with respect to *all* 12 counts alleged. Under the guise of Motions to Dismiss, the Defendants seek Summary Judgment, insofar as they are asking the Court to consider facts not in the record. Moreover, the Defendants are urging the Court to apply the applicable standard of review in reverse, insofar as they are asking the Court to consider and weigh all facts and inferences in the "record" in favor of the Defendants, while ignoring well-pled facts in the Complaint. Since, for the reasons set forth below, it does not appear beyond doubt that PSW can prove no set of facts in support of its claims entitling it to relief, Defendants' Motions to Dismiss should be denied.

## II. MATERIAL ALLEGATIONS

For sake of brevity and to avoid duplication, PSW incorporates herein its lengthy summary of the material allegations in the Complaint set forth in Plaintiff's Memorandum of Law in Opposition to First Financial Bank's and First Data Merchants Services Corporation's Motion to Dismiss.

## III. ISSUE

Whether or not it appears beyond doubt that PSW can prove no set of facts in support of each of its claims entitling it to relief, taking as true all the Complaint's well-pled allegations and drawing all reasonable inferences in favor of PSW.

## IV. POINTS AND AUTHORITIES[1]

### A. Standard of Review

When considering a motion under Fed.R.Civ.P. 12(b)(6), a court must accept all facts pleaded as true and draw all inferences from those facts in a light most favorable to the non-moving party. *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir. 1976). A complaint may not be dismissed for failure to state a claim unless it appears beyond doubt from the pleadings that the party opposing the motion can prove no set of facts which would support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). While a court is not required to *assume* facts, *it must draw reasonable inferences in making the foregoing determination*—it must "connect the dots." Antitrust complaints are not subjected to any heightened pleading requirements. *DM Research, Inc. v. College of American Pathologists*, 2 F.Supp.2d 226, 228 (D.R.I. 1998). The Plaintiff is not legally obligated to allege any particular facts or elements in order to establish a claim for relief under the Federal Rules.[2] Accordingly, "[f]ollowing the simple guide of Rule 8(f) that 'all pleadings shall be so construed as to do substantial justice,' [there is] no doubt that [Plaintiffs'] complaint adequately sets forth [the claims for relief alleged and gives the Defendants] fair notice of [their] basis." *Conley*, 355 U.S. at 48. In

[1] In responding herein to the Defendants' various challenges to PSW's claims alleged in the Complaint, PSW would emphasis that, despite the length and detail of the Complaint, ***it has not alleged all the facts supporting its claims for relief*** and is under no obligation to do so under the notice pleading standard. A plaintiff is not required to plead evidence. In addition, by describing to the Court the legal and/or factual basis by which it has properly pled its various claims, PSW is not thereafter restricted in these proceedings from establishing facts or asserting theories of relief in addition to or different than those identified and discussed herein, based only on the face of the Complaint. **Discovery and further pleadings and proceedings will identify the full and proper scope and focus of the adjudication of PSW's claims.**

[2] *See Moore v. Clarke*, 821 F.2d 518, 519 (8th Cir. 1987)("whole spirit" of Federal Rules "is to discourage the pleading of evidence"). "When a federal court reviews the sufficiency of a complaint . . . [t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

any event, without the benefit of discovery, the Plaintiff cannot be expected to plead facts any more specifically than those found in the 163 paragraph, 38 page Complaint.[3]

**B. <u>Collateral Estoppel</u>**

As stated above, Plaintiff contends that there are more than sufficient facts, along with the reasonable inferences to be drawn therefrom, in order to satisfy Rule 12(b)(6). Moreover, to the extent any material and essential allegations are purported to be "bald faced assertions, subjective characterizations, and legal conclusions" or there is concern over whether factual allegations are specific enough because "further litigation is likely to be protracted and expensive," these concerns are obviated by allegations in the Complaint invoking *collateral estoppel* based on the findings and determination issued by the court in *United States v. Visa, U.S.A., Inc.*, 163 F. Supp.2d 322, 331 (S.D.N.Y. 2001), *affirmed*, 344 F.3d 229 (2nd Cir. 2003), *cert. den.*, 125 S.Ct. 45 (2004), wherein the court ruled that Visa and Master Card have used market power to unreasonably exclude competition and restrain trade in the relevant markets alleged in the Complaint, that was not outweighed by any countervailing pro-competitive effects, in violation of §1 of the Sherman Act.

15 U.S.C. § 16(a) provides in pertinent part that "A final judgment or decree . . . rendered in any civil or criminal proceeding brought by . . . the United States under the antitrust laws to the effect that a defendant has violated said laws shall be *prima facie* evidence against such defendant . . . as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto . . .." Accordingly, such a prior judgment constitutes *prima facie* evidence of "all matters of fact and law necessarily decided" by an earlier adjudication.[4] What this means is, *inter alia*, that

---

[3] In antitrust cases in particular, the Supreme Court has stated that "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976); *see also Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 53 (1st Cir. 2003)(reversing grant of motion to dismiss and holding court must assume factual allegations to be true and indulge to reasonable degree plaintiff who has not yet had opportunity to conduct discovery).

[4] *Emich Motors v. General Motors*, 340 U.S. 558, 568-569 (1951). "If by reference to the findings, opinion, and decree it is determined that an issue was actually litigated in an antitrust suit brought by the Government, the private plaintiff can treat the outcome of the Government's case as *prima facie* evidence on that issue." *Hanover Shoe,* 392 U.S. at 485-486 (applying collateral estoppel under 15 U.S.C. § 16(a) in §2 Sherman Act claim action for treble damages brought by plaintiff competitor following successful §4 Sherman Act claim against defendant brought by the United States).

"when two adversaries concentrate in attempting to resolve an issue importantly involved in a litigation, there is no unfairness in considering that issue settled for all time between the parties *and those in their shoes*." *Farmington Dowel Products Co. v. Forster Mfg. Co.* 421 F.2d 61, 79 (1st Cir. 1970)(emphasis added). Accordingly, well-pled allegations in the Complaint averring, *inter alia*, that at all relevant times, Visa and MasterCard had market power in the general purpose card market and the network services for general purpose cards market, that the Exclusivity Rules unreasonably restrained competition in those markets, that the harm to competition included an increase in prices and decrease in output in those markets (i.e. restrained trade), that the harm to competition was not outweighed by any countervailing procompetitive effects, and that Visa and MasterCard thereby unreasonably restrained trade in these markets in violation of §1of the Sherman Act, all relate to *issues actually and necessarily decided* in the *Visa* case, 163 F. Supp.2d at 322. Accordingly, far from being "bald faced' or "conclusory" allegations, in the context of this case, this Court must accept these allegations as true, and the Defendants may not contest them *at any point in this adjudication*, including the pleading stage. In deciding the within motion, this Court may also consider facts that are properly the subject of judicial notice.[5] As a consequence, "drag[ging] the defendant[s] past the pleading threshold" in this case is not the precursor to "protracted and expensive" proceedings, but rather to a more simple and focused dispute as to whether Plaintiff can establish a nexus between the harm it sustained and the Defendants' conduct, already found to have violated the antitrust laws.

**C. Identity of Interest between Visa and MasterCard and FFB and FDMS**

As stated previously, MasterCard and Visa are bankcard associations organized as open joint ventures, owned by the numerous banking institutions that are members of the respective MasterCard and Visa associations. Comp. at ¶12; *Visa*, 344 F.3d at 235. Accordingly, MasterCard is owned by its

---

[5] *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986); *see also Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988) (holding that a district court may take notice of the "proceedings and determinations" of prior related litigation without treating the Rule 12(b)(6) motion as one for summary judgment).

approximately 20,000 member banks, while Visa is owned by its approximately 14,000 member banks. *Id.* The associations' operations are conducted primarily by their member banks. *Id.* at ¶13; *Visa*, 344 F.3d at 235. The Complaint alleges that FFB was and is a member bank of MasterCard and Visa and that FDMS[6] was duly authorized by MasterCard and Visa to act as an agent of and in conjunction with FFB in performing authorization, processing, and credit card settlement services for merchants such as PSW pursuant to Merchant Agreements. *Id.* at ¶93. FFB was a member bank of MasterCard and Visa and was therefore both a principal and agent of those bankcard networks. *Id.* at ¶94. As a member bank and agent thereof respectively, FFB and FDMS expressly agreed with Visa and MasterCard to abide by the association by-laws and other regulations of those bankcard associations. *Id.* at ¶16. The Merchant Agreement expressly incorporated and was subject to MasterCard and Visa "Association Rules." *Id.* at ¶95. In particular, ¶26.9 of the Merchant Agreement expressly provided that MasterCard and Visa retained the right to require termination or modification of the Agreement with respect to transactions involving MasterCard and Visa cards. *Id.* at ¶95. Indeed, other courts have expressly found that in entering into Merchant Agreements with merchants such as PSW, Acquiring Banks such as FFB are actually "contract[ing] with retailers *on behalf* of Visa or MasterCard to purchase payment card transactions." *Reyn's Pasta Bella, LLC v. Visa*, 259 F.Supp.2d 992, 996 (N.D. Cal. 2003)(emphasis added); *accord In re Visa/Mastermoney Antitrust Litigation*, 280 F.3d 124, 130 (2nd Cir. 2001). Moreover, with respect to the various concerted activities and conduct alleged in the Complaint and discussed below, it must be kept in mind that FFB's culpability does not only arise merely out of its membership in the Visa and MasterCard association joint ventures, but also by virtue of the fact that, in almost every case, *it was FFB which implemented or enforced the challenged practices which visited the harm on PSW*--**hence, evidence of FFB's agreement and intent to participate in the challenged conduct.**[7] In light of the nature of the relationship between the Defendants, along with the facts alleged

---

[6] Insofar as and to the extent the liability of FDMS alleged in the Complaint is as an agent of FFB, the within memorandum of law shall reference only FFB.

[7] Accordingly, courts have previously ruled that member banks such as FFB could be held liable along with their Visa and MasterCard networks for claimed antitrust violations, arising out of, *inter alia*, the application and

in the Complaint generally, PSW contends that each of the Defendants herein was at all relevant times acting as either a principal, agent, and/or co-venturer or co-conspirator. *Id.* at ¶¶8, 152-163. Ultimately, the foregoing is a mixed question of law and fact to be determined by the trier of fact. At this stage of the proceedings, construing the facts in the Complaint and drawing all reasonable inferences therefrom in a light most favorable to PSW, this Court must find that each of the Defendants, along with and as part of the Visa and MasterCard association joint ventures, took the challenged conduct and imposed the various challenged parallel programs on PSW.

**D. <u>PSW's Complaint States Claims for Relief under the Sherman Act</u>**

In light of the determination in the *Visa* case that Visa and MasterCard violated §1 of the Sherman Act with respect to the general purpose card market and the network services for general purpose cards market, PSW's invocation of collateral estoppel relative thereto, and the allegation that PSW is both consumer and, in part, a competitor in relation to these relevant markets, PSW contends that it has sufficiently pled claims for relief under violated §1 of the Sherman Act. Moreover, the §1 violation and the findings on which the *Visa* court based that determination also informs and establishes, in part, the minimum pleadings required to state a §2 violation. Nevertheless, as a courtesy to the Court, Plaintiff will indulge the Defendants, and briefly discuss the legal and factual basis of its Sherman Act claims below.

**1. §1 of the Sherman Act[8]**

***a. Concerted Conduct.*** A plaintiff may establish a conspiracy under §1 of the Sherman Act by circumstantial evidence such as inferences drawn from the behavior of the alleged co-conspirators. *Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479, 1487

---

enforcement of Visa and MasterCard association rules. *See, e.g., Reyn's Pasta Bella, LLC v. Visa,* 259 F.Supp.2d 992, 996 (N.D. Cal. 2003).

[8] To state a valid claim under § 1 of the Sherman Act, a plaintiff must allege three elements: (1) the existence of a contract, combination or conspiracy, which is to say, concerted conduct; (2) that the agreement unreasonably restrained trade under the *per se* or rule of reason analysis; and (3) that the restraint affected interstate commerce. *See Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1410 (9th Cir.), *cert. denied,* 502 U.S. 994 (1991); *Lee v. Life Ins. Co. of North America*, 829 F.Supp. 529, *535 (D.R.I. 1993). PSW has expressly alleged that the challenged conduct at issue affects interstate commerce and the Defendants have not disputed this allegation. Comp. at ¶¶152-153.

(D.C.Cir.1984). Factors supporting an inference of concerted conduct include, *inter alia*, whether (1) the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) the defendants have been uniform in their actions; (3) the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) the defendants have a common motive to conspire.[9] ***In the case at bar, PSW alleges, Comp. at ¶¶83, 152-153, and the Visa court has found that MasterCard and Visa engaged in prohibited concerted action in enacting and enforcing their parallel Exclusivity Rules, see Visa*, 344 F.3d at 234 (summarizing district court determination).** Accordingly, the Complaint sufficiently pleads concerted conduct. Moreover, the Complaint describes *five (5) other parallel* policies and procedures of Visa and MasterCard, some of which are so complex and detailed, such as the Excessive Chargeback Programs, that they could not reasonably be attributed to coincidence, which, along with the Exclusivity Rules, establish ample uniform action. Comp. at ¶¶69-80, 83. More significantly, neither Visa nor MasterCard could or would have rationally adopted the Excessive Chargeback Programs, unless the other also adopted it, *because they would have lost to the other bankcard association all their customers who chose not to be subject to the perverse, commercially unreasonable, and excessive penalties imposed by such programs which was driving them out of business.* The same is true with respect to the higher interchange fee[10] charged to Internet and other card not present merchants such as PSW, and the non-cross border geographic restrictions which limited competition in the domestic market, and by reasonable inference, price competition for network services. Accordingly, there is a fair and reasonable inference that these parallel programs

[9] *See Re/Max Intern., Inc. v. Realty One, Inc.* 173 F.3d 995, 1009 (6th Cir.1999); *see also Stop and Shop Supermarket Company v. Blue Cross and Blue Shield of Rhode Island*, 239 F.Supp.2d 180, 187 (D.R.I. 2003)(citing similar factors).

[10] The actual pricing mechanism in the settlement of merchant account over the Visa and MasterCard networks works was described by the district court in Visa as follows: "In a Visa or MasterCard credit card purchase the merchant actually receives only about 98 percent of the price of the item. The remaining 2 percent is called the "merchant discount," which is the fee paid to the merchant's acquiring bank for providing its services. The acquirer, in turn, splits this fee with the card-issuing bank, which is paid about 1.4 percent of the purchase price.. . . . The 1.4 percent of the purchase price is called the "interchange fee" and is set by the associations." *Visa*, 163 F.Supp.2d at 332. The Complaint alleges that a portion of the fees received by the acquiring and issuing banks are paid over to the Visa and MasterCard associations. *Id.* at ¶29.

are contrary to the self-interest of Visa and MasterCard, because they would have eventually led to a loss of substantial market share and revenue to the less costly (i.e. more price competitive) network, and therefore would not have been adopted if the other had not also adopted it.[11] An inference of opportunity to conspire may reasonably be inferred from the allegations in the Complaint taken as a whole, as well as the "dual governance structure" of the Visa and MasterCard associations well documented in the *Visa* case. 163 F. Supp.2d at 327-328, 347 (finding Directors of associations' respective Boards consisted primarily of member banks with substantial card portfolios of both associations). Finally, an inference of common motive to conspire is established by the ability to earn monopoly profits from higher interchange rates, Excessive Chargeback Program penalties, and Registration Fee Assessments, and secure for their member banks the lucrative processing business of Adult Entertainment Websites being performed by Aggregators.[12] Comp. at ¶¶81, 83-90, 147.

In addition, as between Visa, MasterCard and FFB, in light of the identity of interest between the Defendants alleged in the Complaint previously described above, an agreement between all the Defendants, whether defined as a conspiracy or joint venture, to take the challenged conduct and impose the challenged programs on PSW is both reasonably inferred and expressly pled.

***b.*** ***Unreasonable Restraint on Trade.*** An antitrust plaintiff generally must establish an anticompetitive effect unless the antitrust violation is *per se* illegal. *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 4-6 (1958). To establish a non-*per se* or "rule of reason"

---

[11] Moreover, the unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing has been found to suggest a willingness to forsake short-term profits to achieve an anticompetitive end. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* 472 U.S. 585, 610-611 (1985). As discussed later in the text above, the merchant discount payable to Visa and MasterCard member Acquiring Banks from Aggregators like PSW *was over two and one-half times the average. This does not even take into account revenue from the Registration Programs and the Excessive Chargeback Programs.* Accordingly, the only reasonable inference from the face of the pleadings is that the Defendants were willing to drive PSW and other Aggregators out of business and forego lucrative profits therefrom in the short term, for the long term purpose of securing that processing business for FFB and other Visa and MasterCard Acquiring Banks.

[12] Moreover, the mere fact that Defendants may, can or will assert or attempt to assert an economic or business justification for their challenged parallel conduct and the various challenged programs is irrelevant in the context of a 12(b)(6) motion. The Defendant's opportunity to assert and establish a procompetitive justification for their challenged conduct, which outweighs any anticompetitive effects, occurs later in these proceedings. *See Reyn',* 259 F.Supp.2d at 1001 (defendants' challenges to accuracy of plaintiffs' theories not properly considered on motion to dismiss).

unreasonable restraint, some courts have grafted a judicial gloss which requires that a plaintiff establish an "actual[ ] . . . injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged." *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 811 (9th Cir.1988). To show antitrust injury to competition, a plaintiff must establish that, within the relevant market, the defendants' actions have had adverse effects on competition, such as increases in price, or decreases in output or quality. *See, e.g., Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990). Although the possession of market power by defendants in the relevant market supports an inference that the challenged conduct has caused antitrust harm to competition, it is not necessarily an essential element.[13] Nevertheless, where a *per se* restraint is demonstrated, no further showing of actual harm to competition is required. *See Northern Pacific Railway Company*, 356 U.S. at 4-6. Among those restraints considered *per se* unlawful are horizontal price fixing arrangements, a tying arrangement, horizontal market allocation, and group boycotts. *See id.*

1) **Relevant Market.**[14] Fairly and liberally construed, the Complaint alleges that the PSW is a consumer of network services, to the extent it consumes such services pursuant to the Merchant Agreement. In addition, PSW is also a competitor in the market for such services, to the extent certain of its activities include a portion of the processing functions normally carried out by an Acquiring bank within the Visa and MasterCard networks, with which PSW competes for the processing business of website clients. Comp. at ¶¶19-20, 81, 90, 147. The Complaint identifies three potential relevant markets: the general purpose card market, the network services for general

---

[13] *See, e.g., FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." (internal quotation marks omitted)); *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 110 n. 42 (1984)(similar); *KMB Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 128-29 (2d Cir.1995)("This court has not made a showing of market power a prerequisite for recovery in all § 1 cases.").

[14] To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a "rational relation to the methodology courts prescribe to define a market for antitrust purposes--analysis of the interchangeability of use or the cross-elasticity of demand," *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1354 (S.D.N.Y.1982), and it must be "plausible," *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir.2000).

purpose cards ("network services") market, *id.* at ¶34, and the domestic Adult Entertainment Website general purpose card processing industry ("Adult network services"), which consists of those few Acquiring Banks—perhaps five in the United States—willing to acquire and/or provide general payment card processing services to Adult Entertainment Websites, plus a limited number of Aggregator/merchants like PSW—once over a dozen and now only three—that provide credit processing services to these businesses. *Id.* at ¶81, 90. **The existence and appropriateness of the former two markets[15] for antitrust purposes has already been established in the *Visa* case, 163 F. Supp.2d at 322.** *See Emrich,* 846 F.2d at 1198.[16] The latter market, Adult network services market, is essentially a subset of the network services market, where the anti-competitive effects of the Defendants' conduct is merely more dramatic. Moreover, with respect to this market, PSW has alleged and described its existence with significant detail and specificity at this stage to withstand a motion to dismiss.

In the case at bar, the Adult network services market is described as consisting of a limited number of competitors, originally perhaps 17, and now only 8, in a highly concentrated market where there is a lack of potential competitors willing to process transactions related to internet Adult

[15] As the Second Circuit noted, these two markets are interrelated insofar as the impact of the Exclusivity Rules on the issuing of general purpose cards in turn impacted the market share and power of the Visa and MasterCard associations in the network services market. *Visa*, 344 F.3d at 238-239; *Visa*, 163 F.Supp.2d at 382. While PSW is not direct consumer or competitor in the general purpose card market, Visa and MasterCard's market power in that market leveraged or created market power in the network services market and is therefore, in the words of the Second Circuit, *interrelated* and relevant to both PSW's §1 and §2 Sherman Act claims. *See In In re Visa Check/MasterMoney Antitrust Litigation*, 2003 WL 1712568 *2 (E.D.N.Y.)[cited in full, *infra,* in succeeding footnote](triable issues presented relative to merchant's §1 and §2 Sherman Act claims alleging Visa and MasterCard acted independently and jointly in conspiracy to employ illegal tying arrangements that leveraged power in credit card [network] services market).

[16] In a similar case claiming a Sherman Act §1 violation brought by various retail merchants alleging that Visa and MasterCard along with three of their member Acquiring Banks had conspired to limit competition in the discount rate by fixing the interchange fee, since no merchant discount could be set below that fee, the court described the relevant market as the "market for the acquisition" of charge receipts. *Reyn's Pasta Bella, LLC v. Visa*, 259 F.Supp.2d 992, 1001 (N.D. Cal. 2003); *see also In In re Visa Check/MasterMoney Antitrust Litigation*, 192 F.R.D. 68, 73 (E.D.N.Y.2000), *aff'd*, 280 F.3d 124 (2nd Cir.2001), *cert. denied*, 122 S.Ct. 2382 (2002)(holding that class of merchants was proper party to assert antitrust challenge claiming Visa and MasterCard leveraged market power in credit card [network] services market to impose contractual requirement through merchant contracts tying ability to accept association general payment cards with obligation to also accept association debit cards, and thereby, *inter alia*, attempted to monopolize and/or conspired to monopolize debit card services market). However described, the relevant markets alleged in this case are more or less the same as in *Reyn's* and *In re Visa Check,* involve similar market wide harms, and involve the same cast of characters: merchants, the Visa and MasterCard networks and their various member banks.

entertainment. Comp. at ¶¶42, 90. There is essentially no cross-elasticity of demand because there is no practical alternative for the consumers in that Adult network services market: PSW and other Aggregators, as well as those adult websites that process directly with Acquiring Banks in that market, *must accept Visa and MasterCard general payment cards*. *Id.* at ¶¶34-42, 82. The pricing scheme is also different for the Adult network services market. The discount rate paid by PSW of 5.6%, *id.* at ¶97, is substantially higher than the 2% typical discount rate, *see Visa* at 163 F.Supp.2d at 332. The interchange fee fixed by Visa and MasterCard, which is a component of the discount rate,[17] is also higher. Comp. at ¶¶35-37, 83; *Visa* at 163 F.Supp.2d at 340-341. An additional cost unique to the Adult network services market is that incurred for fraud protection services of risk reduction providers like SGS mandated by the Defendants, which added an additional 5.6% charge to the network services consumed by PSW. Comp. at ¶¶ 101-104. The consumers of Adult network services are also subject to registration programs, which include the payment of fees and review and approval of the site for content by the Acquiring Bank. *Id.* ¶83. Finally, consumers of Adult network services, Aggregators such as PSW in particular, are also subject to the costs associated with the perverse, commercially unreasonable, excessive and progressive, fines, fees, and penalties under the Defendants' Excessive Chargeback Programs.[18] *Id.* at ¶¶69-80, 83. In summary, the Complaint is more than sufficient to allege a relevant market for antitrust purposes and PSW cannot and need not do anymore at the pleading stage.[19] The existence of such a market is for determination at trial based on expert testimony.[20]

---

[17] By way of comparison, in 1999, American Express' *average* merchant discount rate in 1999 was approximately 2.73 percent compared to Discover's rate of approximately 1.5 percent and Visa's and MasterCard's rates of approximately 2 percent. *Visa,* 163 F.Supp.2d at 333.

[18] *See also Visa Check/Mastermoney Antitrust Litigation*, 2003 WL 1712568 *7 (E.D.N.Y.)(finding debit card services market, which [like Adult network market] was a submarket to more inclusive general payment card [network] services market, was relevant market for antitrust purposes, characterized by inelasticity of demand and universal recognition by public, parties, and industry as whole).

[19] Moreover, it should be emphasized that because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. *See Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 53 (1st Cir. 2003)(reversing grant of motion to dismiss and holding that extent of geographic market for antitrust purposes cannot be determined from face of complaint); *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design,* 244 F.3d 521, 531 (6th Cir.2001) ("Market definition is a highly fact-based analysis

2) **Market Power.**[21] The Complaint alleges that Visa and MasterCard together control over 73% of the volume of transactions on general purpose cards in the United States. *Id.* at ¶33. In terms of cards issued, they control about 85% of the market. *Id.* Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both these Defendants have market power in the general purpose card market and the network services market, whether measured jointly or separately. *Id.* at ¶34. **Moreover, the fact that Visa and MasterCard have market power in the general purpose card and network services markets *has already been established* by the findings of the court in the *Visa* case.**[22]

3) **Harm to Competition.** As to all three markets described above, the Complaint alleges "antitrust harm to competition" due to an increase in prices, in the form of higher interchange rates, and therefore discount rates paid by PSW and other consumers of network services, *id.* at ¶¶35-40, as well as the various registration fees, fines, "recovery fees," and penalties,

---

that generally requires discovery.") (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)); *Double D Spotting Serv., Inc. v. Supervalu, Inc.,* 136 F.3d 554, 560 (8th Cir.1998) (noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997) (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers") (citing *Eastman Kodak,* 504 U.S. at 482, 112 S.Ct. 2072); *cf. Hayden Publ'g Co. v. Cox Broad. Corp.,* 730 F.2d 64, 70 n. 8 (2d Cir.1984) ("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unexpected. It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact . . ..' ") (citations and alterations omitted).

[20] It may ultimately be determined after discovery and/or trial, that the appropriate market for antitrust purposes is a larger subset of the network services market, such as all Aggregators, or all Internet and card-not-present merchants, or the entire domestic network services market as found in *Visa*, or the market as characterized by the court in *Reyn's,* 259 F.Supp.2d at 996. Plaintiff is permitted to plead in the alternative and to pursue or not pursue such theories as it may deed appropriate in light of discovery, trial court rulings, and tactical considerations, including likelihood of success and the litigation costs associated therewith. The question for the Court at this juncture is merely whether PSW can prove no facts establishing a right to antitrust relief.

[21] Market power has been defined by the Supreme Court to mean the "power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956); *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 109 n. 38 (1984). Such power may be proven through evidence of specific conduct undertaken by the defendant that indicates he has the power to affect price or exclude competition. *KMB Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir.1995). Alternatively, market power may be presumed if the defendant controls a large enough share of the relevant market. *Id.*

[22] *Visa*, 163 F.Supp.2d at 342 ("Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers.").

*id.* at ¶¶41-42, 63, 65, 81-82. The Complaint also alleges antitrust harm due to decreased output, i.e. a restraint on trade in the relevant markets, *id.* at ¶¶81-90, 148. **Moreover, antitrust harm to competition in the general purpose card and network services markets *has already been established* in the *Visa* case, 163 F. Supp.2d at 322.** The *Visa* court found, *inter alia*, that the Exclusivity Rules harmed competition in the relevant markets by "undeniably" reducing overall card output and available card features, decreasing network services output, stunting price competition in the network services market, and harming consumer welfare. *See* 344 F.3d 229 and 163 F. Supp.2d at 379-406. Moreover, to the extent the Adult network services market is a subset of the network services market, this Court may infer, based on the finding of reduced output and price competition in the network services market in the *Visa* case, that there has been a reduction in output and price competition in the Adult network services market as well. [23]

Finally, to the extent that the Complaint alleges *per se* antitrust violations, as stated above, no finding of harm is required. The Complaint alleges horizontal market division in the form of a geographic market division imposed by parallel Visa and MasterCard rules, which, *inter alia*, foreclosed offshore Acquiring Banks from competing in the domestic market for network services. Comp. at ¶¶83, 87. The Complaint also alleges horizontal price fixing with respect to the parallel Visa and MasterCard discriminatory pricing of the higher interchange rate charged to Aggregators such as PSW, as well as other Internet and card-not-present merchants, and with respect to the parallel Excessive Chargeback Program penalties. *Id.* at ¶¶83, 84-85, 146-148. [24]

---

[23] The Complaint alleges an increase in concentration in the network services market and its subset, the Adult network services market, by the loss of 75% of Aggregators in that market. Since market concentration is one indicia of the ability to control prices and output, a reasonable inference to be drawn from the well-pled facts is that output has been reduced. *Moreover, the Complaint expressly alleges that there will be and has been some loss of smaller website clients who do not qualify to process directly with an Acquiring Bank as a merchant.* Comp. at ¶¶81-82. In any event, such an inference is far more plausible than the one urged by Visa, which asks the Court to assume facts not pled and to construe them in a light most favorable to the Defendants, that market concentration has improved efficiencies, increased output and reduced costs. To ask the Court to draw such inferences at this stage of the proceedings is legally wrong and inappropriate.

[24] Indeed, the court in the *Visa* case expressly found that both Visa and MasterCard charge higher, and differing interchange rates based on the need (i.e. lack of practical alternatives) of the merchant to accept their payment card, specifically including catalog and Internet merchants, which is not supported by the Defendants' purported

4) **PSW has "Antitrust Standing."**[25] Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury. *See SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44-45 (1st Cir.1995)("[T]he presumptively 'proper' plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market.").

In the first instance, PSW is both a consumer and, in part, a competitor, in the relevant markets. Accordingly, PSW is a "presumptive" proper plaintiff with standing based on the well-pled allegations in the Complaint sufficient to withstand a 12(b)(6) claim. Secondly, contrary to Defendants' contentions, the Complaint does not allege that PSW's "injury" for which it seeks monetary relief was due merely to the Excessive Chargeback Programs and the excessive reserve account imposed by Defendants as a result. The Complaint, fairly construed in a light most favorable to PSW, alleges harm to market wide competition, *culminating* in PSW being driven out of business, flowing from the individual and combined effects of the various rules and programs of the Visa and MasterCard association joint ventures with FFB. Thirdly, at this stage of the proceedings, construing the facts in the Complaint and drawing all reasonable inferences therefrom in a light most favorable to PSW, this Court must find that each of the Defendants, along with and as part of the Visa and MasterCard joint ventures, took the challenged conduct and imposed the various challenged parallel programs and conduct on PSW.

Moreover, fairly construed, the Complaint alleges that the injury which PSW sustained included that flowing from market wide harm to competition: higher prices, in the form of higher interchange rates, and therefore discount rates paid by PSW and other consumers of network services, *id.* at ¶¶35-40, as well as the various registration fees, fines, "recovery fees," and penalties, *id.* at ¶¶41-42, 63, 65, 81-

---

justification that there are increased incidents of fraud in these merchant categories. 163 F. Supp.2d at 341. The court based this conclusion on the finding that the merchant, not Visa or MasterCard bear all the risk of fraud. *Id.*

[25] The Supreme Court has defined "antitrust injury," which is an indicia of whether an antitrust plaintiff has standing, as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The harm "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the

82. Moreover, the higher discount rate, arose from the combined effect of the challenged, parallel programs of Visa and MasterCard made possible by and flowing directly from the §1 Sherman Act violation found by the court in the *Visa* case. Specifically, the Exclusivity Rules unreasonably restrained competition and thereby created and/or maintained Visa and MasterCard's dominance of the relevant markets. The Exclusivity Rules also thereby insured there would be no competing card network to which to turn. Accordingly, PSW had to accept and process those card for its website clients in order to conduct and remain in business, *regardless of the terms imposed, even if they were commercially unreasonable*. Lack of competitors, like higher prices, is the hallmark of antitrust harm to competition. PSW also had no choice but to abide by the terms of the Excessive Chargeback programs, notwithstanding the fact, as alleged in detail in the Complaint, that these programs imposed excessive, retroactive and progressive penalties and had the perverse, arbitrary and commercially unreasonable effect of actually penalizing those merchants who took appropriate steps to combat purported internet fraud—and eventually forced it out of business. *Id.* The fact that both MasterCard and Visa adopted extremely similar policies, with the same perverse effects, ensured that PSW and other similarly situated merchants would not switch to the other bankcard network. Visa and MasterCard further enacted and enforced horizontal, geographic market restrictions, thereby foreclosing competition from offshore Acquiring Banks and thereby preventing PSW and similarly situated merchants from negotiating more favorable discount rates and/or reserve account terms. Finally, the Visa and MasterCard parallel Boycott List Programs ensured that once PSW was terminated by the Defendants and driven out of business, it could not obtain another Acquiring Bank in either network—so its website clients had to go elsewhere, including to one of the Visa and MasterCard Acquiring Banks.

In summary, the injury sustained by PSW was not indirect nor the result of a failed business plan, but a direct result of the market dominance achieved by the Visa and MasterCard, in whole or in

---

violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 125 (1969)).

part, through conduct found by the court in the *Visa* case to constitute a §1 Sherman Act violation.[26] PSW has alleged damages which are neither indirect nor speculative, nor could the Defendants conceiveably be subject to double recovery—while the injury is direct and flows from the antitrust harm of lack of output, the damages for which PSW seeks recovery are attributable to its injuries only.[27]

Moreover, even if PSW is technically defined as an "indirect" purchaser, it still has standing to assert antitrust claims under the facts of this case. As stated previously, FFB is not a "victim" of the foregoing challenged programs of Visa and Mastercard; it was a joint venturer or co-conspirator in visiting harm on the relevant markets and antitrust injury on PSW. Construing the allegations in the Complaint and all inferences therefrom in PSW's favor, *FFB and other member banks in the Visa and MasterCard networks <u>profited</u> from the higher discount rates and fees received as a result of the Excessive Chargeback Programs and the reduced competition in the relevant markets generally—they could not allege any antitrust injury, and to the extent they could, they have no incentive whatsoever to pursue it.* Accordingly, the identity of interest between the Visa and MasterCard associations and FFB in the form of a common purpose joint venture previously described, combined with the lack of any incentive to pursue such a claim, places this case in the category of one of the well settled exceptions to the indirect purchaser rule under the "co-conspirator" variant of the "control exception."[28] Moreover, in

---

[26] The self-serving characterization of PSW's harm as merely flowing from the Merchant Agreement "freely negotiated" with FFB and divorced from any action or conduct of Visa and MasterCard is both inaccurate and contrary to the applicable standard of review, which requires construction of the Complaint and all inferences therefrom in PSW's favor. In the first instance, the terms of the Merchant Agreement was not the result of a freely negotiated deal between PSW and FFB and FDMS. It was a form contract of adhesion, except for pricing related terms and the setting of the initial reserve amount. *See* Exhibit A to Memorandum of Law of FFB and FDMS. The interchange fee, on which the discount fee is largely based, is set by Visa and MasterCard. The terms of the Merchant Agreement expressly incorporated and was subject to any and all Visa and MasterCard association rules, Comp. at 95, including the interchange fee and each of the challenged parallel programs, and Visa and MasterCard retained the right to terminate or modify the agreement at any time, *id.* at 96. The Visa and MasterCard association joint ventures with FFB visited the harm complained of directly on PSW, and all the Defendants were well aware of the impact on PSW. *Id* at ¶¶134-145.

[27] There is nothing alleged in the Complaint, either directly or by inference, suggesting that any of the challenged higher prices or costs imposed on PSW by the Defendants were passed on to its website clients. Indeed, since PSW was driven out of business while purportedly exposed to millions of dollars in potential fines, fees, and penalties, the only reasonable inference is that PSW had neither the time nor opportunity to pass on any such charges.

[28] In *Illinois Brick,* 431 U.S. 70, 730 (1977), the Supreme Court suggested two possible exceptions to the direct-purchaser rule. One such exception provides that indirect purchasers might be able to maintain a damage action if they could show that "the direct purchaser is owned or controlled by its customer." *Id.* at 736 n. 16. Several

the *Visa* case, while the district court described the member Acquiring Banks as the nominal purchaser of network services for purpose of its analysis, no monetary relief was awarded, and, more significantly, *all the quantifiable harm arising out of the lack of price competition was measured with respect to its impact on merchants such as PSW.* 163 F. Supp.2d at 340-341 (MasterCard and Visa jointly raising interchange rates without losing single merchant customer and charging higher interchange rates to various card not present merchants who rely almost completely on general purpose cards). Indeed, in a similar case, *Reyn's,* 259 F.Supp.2d at 992, the court held that merchants such as PSW were a proper party to assert a §1 Sherman Act challenge to the interchange fee fixed by Visa and MasterCard and imposed on merchants as part of the merchant discount rate "negotiated" with Visa and MasterCard member Acquiring Banks. *See also In In re Visa Check/MasterMoney Antitrust Litigation*, 192 F.R.D. 68, 73 (E.D.N.Y.2000*), aff'd*, 280 F.3d 124 (2nd Cir.2001), *cert. denied*, 122 S.Ct. 2382 (2002)(holding that class of merchants was proper party to assert antitrust challenge claiming Visa and MasterCard leveraged power in credit card [network] services market through requirement imposed by association rules incorporated in merchant contracts tying ability to accept their associations' general payment cards with obligation to also accept their associations' debit cards, which carried differing and higher interchange fee set by associations). [29]

federal circuit courts have recognized a variant of this "control" exception through a so-called "co-conspirator" exception, under which an indirect purchaser could maintain a damage action upon a showing that there was a conspiracy between the manufacturers and the direct purchaser middleman. *See In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 604-05 (7th Cir.1997); *see also Lowell v. American Cyanamid Co.,* 177 F.3d 1228, 1233 (11th Cir.1999); *Arizona v. Shamrock Foods Co.,* 729 F.2d 1208, 1212-14 (9th Cir.1984); *In re Beef Antitrust Litigation,* 600 F.2d 1148, 1163 (5th Cir.1979); *see also In re Nifedipine Antitrust Litigation,* 335 F.Supp.2d 6, 13 -14 (D.D.C. 2004). Under this "co-conspirator" theory, the party who purchases from a co-conspirator middleman is treated as a "direct purchaser" because the manufacturers and the middleman direct purchaser are viewed as one entity. This is precisely on all fours with the well pled allegations in the Complaint that the Defendants are one joint venture entity in relation to the challenged conduct and harm visited on PSW.

[29] Moreover, contrary to the Defendants' contentions, the Complaint expressly alleges that Visa and MasterCard were well aware that it is merchants such as PSW who ultimately bears the burden of the financial costs of the Excessive Chargeback Programs and intended that to be the case. Comp. at ¶63. This is also consistent with the practical realities of the market as determined by the court in *Visa*, wherein the court held that merchant's such as PSW, not Visa or MasterCard or its member banks, bear all risk of fraud the Excessive Chargeback Programs were purportedly designed to combat. 163 F. Supp.2d at 341. Moreover, the Complaint also expressly alleges that all of the Defendants were well aware of the impact of the Excessive Chargeback Programs on PSW, specifically that it was driving and would drive PSW out of business, and that Visa and MasterCard had the power to authorize release of excessive funds held in the reserve account by FFB. *Id* at ¶134-135, 139, 144.

**2. §2 of the Sherman Act**

§2 of the Sherman Act seeks to limit the means by which a firm may lawfully either acquire or perpetuate monopoly power. *U.S. v. Microsoft Corp.*, 87 F.Supp.2d 30, 35 (D.D.C. 2000). Specifically, a firm violates § 2 if it attains or preserves monopoly power through anticompetitive acts. *Id.*

*a. **PSW has stated a claim for monopolization.***[30] As stated previously, the Complaint alleges and the *Visa* court found that both Visa and MasterCard had market power in the relevant markets, whether viewed individually or together.[31] Whether or not the Defendants, individually or together, possess sufficient monopoly power to support a §2 Sherman Act claim is ultimately dependant on a host of factors and is a mixed question of law and fact which is not the proper subject of a motion to dismiss. *See* Holmes, Antitrust Handbook, §3.3. In addition, as also stated previously, the Complaint alleges numerous programs by which the Defendants created and/or preserved their monopoly power, and the *Visa* court expressly found one of those programs, the Exclusivity Rules, to constitute anticompetitive exclusionary conduct in violation of §1 of the Sherman Act.[32] *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* 472 U.S. 585 (1985)(upholding §2 Sherman Act monopolization claim where monopolist terminated cooperative venture with smaller rival not justified by economic efficiency concerns).

[30] *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)("The offense of [monopolization] under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.").

[31] Moreover, contrary to MasterCard's contention, the Supreme Court has never held that two competitors may not agree or conspire to monopolize, particularly, where as here, there is such close relationship between the entities wielding monopoly power, as evidenced by ample uniform conduct between the parties and their dual governance structure. *In re Visa Check/Mastermoney Antitrust Litigation*, 2003 WL 1712568 *6 (E.D.N.Y.) (evidence of common ownership, lack of competition, and incidents of concerted activity by defendants could permit jury to conclude that MasterCard, along with Visa, attempted to monopolize relevant market); *see American Tobacco Co. v. United States*, 328 U.S. 781 (1946)(affirming conviction of horizontal competitors for conspiracy to monopolize, although not directly reaching issue of whether *competitors* were capable of conspiring to monopolize).

[32] Many circuits have held that illegal conduct like an impermissible tying arrangement under § 1 "may also qualify as anticompetitive conduct for section 2 purposes." *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1550 (10th Cir.1995) (citing cases and treatise).

*b.* ***PSW has stated a claim for attempted monopolization.***[33] For the same reasons described in the previous section, the Complaint alleges sufficient facts to establish the first element of an attempted monopolization claim, predatory or anticompetitive conduct. The second element, intent to monopolize, may be inferred from the Defendants' predatory and anticompetitive conduct and is a mixed question of law and fact not appropriate for determination on a motion to dismiss. *In re Visa Check/Mastermoney Antitrust Litigation*, 2003 WL 1712568 *7 (E.D.N.Y.). The third element, dangerous probability of achieving monopoly power, involves the consideration of numerous factors, including any barriers to entry by competitors, the nature of competition in that market, and the overall development of the industry. *Id.* (stating if Visa and MasterCard are proved to have acted in concert, this element could be satisfied as matter of law in light of combined amount of market share), *and cases cited therein*. As summarized in detail herein, sufficient facts have been alleged in the Complaint to establish this third element.

*c.* ***PSW has stated a claim for conspiracy to monopolize.***[34] Allegations in the Complaint and inferences to be drawn therefrom establishing the first element, proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, have already been addressed at length herein. Specific intent to achieve an unlawful monopoly was addressed, in part, in the previous section, while concerted action was discussed at length in §IV.C.-D.1.a. above. The second and last element, proof of an overt act in furtherance of the conspiracy is established by, *inter alia*, the allegations in the Complaint and inferences drawn therefrom relative to the six (6) challenged parallel programs of the MasterCard and Visa, including the Exclusionary Rules forming the basis of a §1 Sherman Act violation in the *Visa* case.

[33] To prevail on an attempt to monopolize claim, the merchants must show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

[34] To win a conspiracy to monopolize claim, a plaintiff must show: "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 795 (2d Cir.1987).

E. **Rhode Island Antitrust Claims**

For all the reasons discussed in §IV.C.-D. above, and in accordance with the broader scope of the plain language of the statute, the Complaint states a claim for relief under the Rhode Island antitrust statute, R.I.G.L. §6-36-5, as to all the Defendants.

F. **Rhode Island State Law Claims**

For sake of brevity and to avoid duplication, PSW incorporates herein its arguments and discussion of the sufficiency of the Complaint to allege claims for relief under state law set forth in Plaintiff's Memorandum of Law in Opposition to First Financial Bank's and First Data Merchants Services Corporation's Motion to Dismiss. PSW would reiterate that the Complaint alleges more than sufficient facts to raise a reasonable inference that Visa and MasterCard are also a party to the Merchant Agreement, or a least in privity of contract with PSW relative thereto. *See, supra*, §IV.C.-D.1.a. The terms of the Merchant Agreement expressly incorporate and is subject to any and all Visa and MasterCard association rules, Comp. at ¶95, including the interchange fee and each of the six (6) challenged parallel programs, including the Excessive Chargeback Programs, *id.* at ¶83, ***and Visa and MasterCard retained the right to terminate or modify the Merchant Agreement at any time***, *id.* at ¶96. Indeed, as stated previously, courts have expressly found that in entering into Merchant Agreements with merchants such as PSW, Acquiring Banks such as FFB are actually "contract[ing] with retailers *on behalf* of Visa or MasterCard . . .." *Reyn's*, 259 F.Supp.2d at 996 (emphasis added); *see also In re Visa/Mastermoney Antitrust Litigation*, 280 F.3d at 130 (same). Accordingly, fairly construed in a light most favorable to PSW, and drawing all reasonable inferences in favor thereof, PSW contends that the Complaint states claims for relief against all the Defendants for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with contract, intentional interference with prospective economic advantage, conversion, and embezzlement.

IV. **CONCLUSION**

For all the foregoing reasons, PSW respectfully prays that the Defendants' Motions to Dismiss be denied.

\\SERVER\SYS\USERS\SINAPI\CLIENTS\PSW\Memo.Visa.rev.doc

**CERTIFICATION**

**Patricia A. Sullivan, Esq.**
**Edwards & Angell LLP**
**2800 Financial Plaza**
**Providence, RI 02903**

**John A. Tarantino, Esq.**
**Adler Pollack and Sheehan P.C.**
**2300 Financial Plaza**
**Providence, RI 02903**

**Joseph V. Cavanagh, Jr., Esq.**
**Blish & Cavanaugh LLP**
**30 Exchange Terrace**
**Providence, RI 02903**

I hereby certify that I mailed a copy of the within Memorandum of Law to the above attorneys of records via regular mail, postage pre-paid on the 28th day of January, 2005.

Jan Braceal
_______________________