**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PSW, INC., d/b/a PSW BILLING,**<br>**Plaintiff,** | : | |
| **v.** | : | **C.A. No. 04-347-T** |
| **VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION,**<br>**Defendants** | : | |

# FIRST AMENDED COMPLAINT

## I. Introduction

1. Plaintiff has brought this action seeking declaratory relief and compensatory, punitive, and treble damages, as well as attorney's fees, against the Defendants for violations of the Sherman Act, Clayton Act, the Rhode Antitrust Act, and the First Amendment to the United States Constitution, and for breach of contract, breach of the covenant of good faith and fair dealing, interference with contractual relations, interference with prospective economic advantage, conversion, and embezzlement.

## II. Parties

2. Plaintiff PSW, Inc., d/b/a PSW Billing ("PSW") is a corporation duly organized and incorporated under the laws of the State of Rhode Island, with a principal place of business located in the City of Cranston, County of Providence, State of Rhode Island.

3. Defendant Visa U.S.A., Inc. ("Visa") is a Delaware corporation with a principal place of business located in San Francisco, California. Visa is a national bank card association whose members include more than 14,000 banks. Visa is doing business and transacts business in this judicial district.

4. Defendant MasterCard International Incorporated ("MasterCard") is a Delaware corporation with a principal place of business located in Purchase, New York. MasterCard is a national bank card association whose members include more than 20,000 banks. MasterCard is doing business and transacts business in this judicial district.



53

5. Defendant First Financial Bank ("FFB") is a corporation duly organized and incorporated under the laws of the State of Colorado, with a principal place of business located at 6200 South Quebec Street, Greenwood Village, Colorado. FFB is doing business and transacts business in this judicial district.

6. Defendant First Data Merchant Services Corporation ("FDMS") is a corporation duly organized and incorporated under the laws of the State of Florida, with a principal place of business located at 6200 South Quebec Street, Suite 240, Greenwood Village, Colorado. FDMS is doing business and transacts business in this judicial district and is registered to do business in the State of Rhode Island.

7. On information and belief, both Defendants FFB and FDMS are wholly owned subsidiaries of First Financial Management Corporation, which in turn is a wholly owned subsidiary of First Data Corporation ("FDC"), a corporation duly organized and incorporated under the laws of the State of Delaware, with a principal place of business located at 6200 South Quebec Street, Suite 240, Greenwood Village, Colorado. FDC is doing business and transacts business in this judicial district and is registered to do business in the State of Rhode Island.

## III. <u>Jurisdiction</u>

8. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§1331 (federal question), 1367 (supplemental jurisdiction), 1332 (diversity), insofar as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00, and 2201 (Declaratory Judgment Act), as well as 15 U.S.C. §15 (Clayton Act).

## IV. <u>Venue</u>

9. Insofar as Defendants transact business and/or may be found in this judicial district, and the interstate trade and commerce involved and affected by the Defendants' wrongful acts and/or omissions complained of herein have had and will continue to have anti-competitive effects in this judicial district, venue in this judicial district is proper under 28 U.S.C. §1391 and 15 U.S.C. §22.

## V. Material Facts

### A. The MasterCard and Visa Networks

10. MasterCard and Visa are two of the United States' four major network systems in the payment card industry, the other two being American Express and Discover. *United States v. Visa U.S.A., Inc.*, 163 F. Supp.2d 322, 333 (S.D.N.Y. 2001), *affirmed*, 344 F.3d 229 (2nd Cir. 2003), *cert. denied,* 125 S.Ct. 45 (2004) [hereinafter referred to as "*Visa*"].

11. MasterCard and Visa are organized as open joint ventures, meaning there is no limit to the number of banks that may become members. MasterCard and Visa are owned by the numerous banking institutions that are members of the respective MasterCard and Visa networks (also referred to herein as "associations"). Accordingly, MasterCard is owned by its approximately 20,000 member banks, while Visa is owned by its approximately 14,000 member banks. *Id.* at 332.

12. The networks' operations are conducted primarily by their member banks. While the member banks engage in the card business for profit, MasterCard and Visa themselves operate as non-profit organizations and are largely funded through service and transaction fees paid by their members. Both make a "profit" on these fees over the cost of operations. This "profit" is used to, *inter alia*, maintain a capital surplus account to pay merchants in the event of a member bank failure. *Id.*

13. The member banks of the MasterCard and Visa associations may function either as "issuers" (also referred to herein as "Issuing Bank") or "acquirers" (also referred to herein as "Acquiring Bank") or both. A member bank serving as an "issuer" issues cards to cardholders; it serves as the liaison between the network and the individual cardholder. A member bank serving as an "acquirer" acquires the card-paid transactions of a merchant; it acts as the liaison between the network and those merchants accepting the network's payment cards with which it has contracted. *Id.*

14. When a consumer uses a MasterCard or Visa card to pay for products or services, the accepting merchant relays the transaction information to the Acquiring Bank with which it has contracted. The Acquiring Bank processes that information and transmits it to the network (the applicable MasterCard or Visa association). The network then relays the transaction information to the

cardholder's Issuing Bank. On information and belief, the Issuing Bank is responsible for verifying that the card is valid, is not over the limit, and has not been reported lost or stolen, and then approves the transaction if the verification checks out. Approval is sent by the Issuing Bank to the Acquiring Bank, which relays it to the merchant. *Id.*

15. A member of either the MasterCard or Visa network may also be a member of the other network. Thus a bank that is a member of Visa's network and issues Visa cards may also be a member of the MasterCard network and issue MasterCard cards (hereinafter referred to as "dual issuance"). *On the other hand, both MasterCard and Visa have promulgated rules that prohibit their members from issuing American Express or Discover cards* (hereinafter referred to as "Exclusivity Rules"). *Id.* at 379.

16. MasterCard and Visa are each managed by a Board of Directors elected by their respective members. To qualify for the Board of Directors, a member must reach certain percentages of volume on that association's system. *Id.* at 330. On information and belief, at all relevant times, as a result of dual issuance and ownership, the Directors of the MasterCard and Visa associations' Boards of Directors consisted primarily of representatives of member banks with substantial card portfolios of both associations (hereinafter referred to as "dual governance"). *Id.* at 333, 345-347.

**B. PSW**

17. PSW is a business which operated exclusively on the Internet. PSW's business primarily involved processing payment card sales to consumers on-line for purchases of products and services delivered by the operators of various Internet websites (hereinafter referred to as "website clients").

18. At its inception, PSW's role was essentially to provide credit card billing services to website clients by processing customer payment card purchases of their on-line entertainment services. PSW played the role of what is called an "aggregator" of these transactions, and in turn accessed and utilized the network services of the MasterCard and Visa associations through its Acquiring Bank (hereinafter referred to as "Aggregator").

19. PSW, through its contracts with website clients, was authorized to facilitate and process sales on behalf of its website clients. PSW accepted MasterCard and Visa cards as payment for such

sales. PSW then submited the card transactions for settlement under PSW's own Merchant Account (i.e. an account into which MasterCard and Visa transactions are deposited and through which such transactions are "settled" and the merchant is paid) at its Acquiring Bank and paid the website clients for such sales out of the proceeds of such settled transactions. PSW provided this service to its website clients, which, for one reason or another, did not qualify for or otherwise did not have their own Merchant Account with a MasterCard or Visa member bank.

20. A substantial percentage of the website clients for which PSW processed credit card transactions involved the delivery of digital content for the Internet Adult Entertainment Industry. PSW did not produce, own, review, or manage such digital content, but rather provided a gateway that permitted such websites to accept credit card transactions from consumers and allowed consumers to view such content on the websites of PSW's clients. Consumers were ordinarily charged a monthly subscription fee, which was charged each month to the consumer's credit card.

21. Although PSW's website clients were, in fact, the parties supplying the products and services to which PSW provided access, PSW was contractually the merchant that made the sale to the consumer through the MasterCard and Visa networks.

22. Unlike a traditional "brick and mortar" business, such as a book store, restaurant or other such retail market, PSW could not, as a practical matter, accept cash or bank checks from consumers as a means of payment for the products and services purchased on-line from PSW's website clients. Rather, PSW was limited to accepting payment cards in order to make sales to consumers. Without the ability to accept these cards, PSW could not have operated its business. Essentially 100% of the transactions processed by PSW involved either a MasterCard or Visa general purpose card.

**C. FFB and FDMS**

23. At all relevant times, FFB was a special purpose (credit card) financial institution and a member bank of MasterCard and Visa, and PSW's Acquiring Bank.

24. At all relevant times, FFB, as a member bank of MasterCard and Visa, was therefore both a principal and agent of those bankcard networks.

25. At all relevant times, FDMS was, on information and belief, a credit card processing institution which assisted Acquiring Banks with the processing of general purpose card transactions, and was duly authorized by MasterCard and Visa to act as an agent of and in conjunction with FFB in performing authorization, processing and credit card settlement services for merchants such as PSW pursuant to Merchant Agreements.

### D. Identity of Interest Between the Defendants

26. As a member bank and agent thereof respectively, FFB and FDMS expressly agreed with MasterCard and Visa to abide by the association by-laws and other regulations and policies of those associations.

27. On information and belief, PSW's application for a Merchant's Agreement was subject to the approval of and separately submitted to and approved by MasterCard and Visa.

28. The Merchant Agreement which PSW entered into with FFB and FDMS expressly incorporated and was subject to MasterCard and Visa association rules.

29. In particular, ¶26.9 of the Merchant Agreement expressly provided that MasterCard and Visa retained the right to terminate or modify the Agreement with respect to transactions involving MasterCard and Visa cards.

30. In entering into the Merchant Agreement with PSW, FFB and FDMS were also acting by and on behalf of MasterCard and Visa.

31. FFB and FDMS implemented or enforced the challenged practices and policies which visited the harm on PSW complained of herein, and thereby agreed and conspired with MasterCard and Visa and intended to participate in the challenged conduct.

32. In light of the nature of the relationship between the Defendants, along with the facts alleged in the Complaint generally, each of the Defendants herein are liable for the relevant acts and/or omissions of the other, including but not limited to those expressly alleged herein, as either principal, agent, and/or co-venturer or co-conspirator.

33. Accordingly, each of the Defendants, along with and as part of the Visa and MasterCard association joint ventures, took the challenged conduct and imposed the various challenged parallel programs on PSW complained of herein.

### E. The Payment Card Processing System

#### 1. The Merchant Agreement

34. Merchants such as PSW contract with the MasterCard or Visa associations to access and utilize network services by entering into a Merchant Services Agreement ("Merchant Agreement") with a MasterCard and/or Visa association member Acquiring Bank.

35. Acquiring Banks often contract with payment card processing banks or institutions, such as Defendant FDMS, which, as agents of and in conjunction with the Acquiring Bank, process payment card transactions pursuant to Merchant Agreements.

36. A Merchant Agreement is an agreement with MasterCard and/or Visa, through their member banks, pursuant to which merchants such as PSW agree, *inter alia*, to honor payment card transactions with MasterCard and/or Visa cardholders, and MasterCard and/or Visa, and their member banks agree, *inter alia*, to accept all sales drafts generated in compliance with the Merchant Agreement and deposited by the merchant into its Merchant's Account with the Acquiring Bank.

37. Each Merchant Agreement is expressly subject to and incorporates the bylaws, rules and regulations promulgated by MasterCard and Visa. Nevertheless, merchants such as PSW are not provided with a copy of or allowed access to these rules, which, on information and belief, are hundreds of pages long. MasterCard and Visa each promulgate their own rules, although, on information and belief, they are extremely similar.

38. Payment requests are sent by the merchant to the Acquiring Bank, which in turn forwards the request to the Issuing Bank, which bills and receives payment from the cardholder. When a cardholder makes a purchase with his or her MasterCard or Visa card from a merchant, the Acquiring Bank reimburses the merchant the purchase price less a "discount fee" (typically, on information and belief, 2% for "brick and mortar" merchants during the relevant period), from which the Acquiring Bank

pays the Issuing Bank an "interchange fee" (typically, on information and belief, 1.4 % for "brick and mortar" merchants during the relevant period), which the Issuing Bank receives by withholding this amount from the payment received from the cardholder and forwarded to the Acquiring Bank. MasterCard and Visa set the interchange fee. The discount fee is based largely on the interchange fee. On information and belief, the Issuing Bank and Acquiring Bank are each, in turn, required to pay a portion of the foregoing fees they receive to MasterCard or Visa.

### 2. Market Power of MasterCard and Visa

39. Credit and charge cards issued under the MasterCard and Visa brand names are known as general purpose cards, because they are accepted by numerous, unrelated merchants, unlike those issued by department stores like Sears and Macy's and accepted only at those locations. *Visa* at 331.

40. MasterCard and Visa, through their over 20,000 member banks, issue a wide variety of payment cards, including credit and debit cards. On information and belief, Visa's current share of the general purpose card (i.e., credit and charge card) and debit card market is nearly 60%, while MasterCard's share of the general purpose card and debit card market is 33% to 36%.

41. In 1999, Visa members accounted for approximately 47% of the dollar volume of credit and charge card transactions and MasterCard members for approximately 26%. Their only competitors in the network services market for general purpose cards, American Express and Discover, accounted for approximately 20% and 6% of dollar volume respectively in 1999. Visa and MasterCard together control ***over*** 73% of the volume of transactions on general purpose cards in the United States. In terms of cards issued, they control about 85% of the market. *Id.* at 341.

42. On information and belief, at all relevant times, the foregoing market shares of MasterCard and Visa had increased since 1999.

43. Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both these Defendants have market power in the general purpose card market and the network services for general purpose cards market (hereinafter referred to as "network services"), whether measured jointly or separately. *Id.* at 342.

44. The ability of MasterCard and Visa to price discriminate also illustrates their market power. Both Visa and MasterCard charge differing interchange fees based, primarily, on the degree to which a given merchant category needs to accept general purpose cards. Transactions with card-not-present merchants (i.e., a category of merchant involved primarily in Internet or catalog sales), for example, which rely almost completely on general purpose cards, have higher interchange fees than "brick and mortar" merchants. *Id.* at 341.

45. On information and belief, the interchange fee applicable to the transactions with PSW and similarly situated merchants is as much as three times or more than the interchange fee charged with respect to transactions involving "brick and mortar" merchants. PSW paid such higher interchange fees in the form of higher discount fees paid to its Acquiring Bank.

46. Defendants MasterCard and Visa rationalize this difference by pointing to purported increased fraud in transactions involving card-not-present merchants, but this explanation is belied by the fact that such merchants, not MasterCard and/or Visa or their member banks, bear virtually all the risk of loss from fraudulent transactions. *Id.*

47. MasterCard and Visa are able to charge substantially higher and different prices to PSW and other similarly situated merchants because such merchants must accept MasterCard and Visa general purpose cards at any price, insofar as it is the only practical form of payment. *Id.*

48. MasterCard and Visa can and do base their pricing structure, *including* the fines and penalties for "chargebacks" described below, upon the degree to which a particular merchant category needs to accept its cards. *Id.*

49. As the foregoing demonstrates, MasterCard and Visa have overwhelming market power in the general purpose card market on the Internet, for which there are no commercially reasonable alternatives available to PSW or other similarly situated merchants, as a result of which MasterCard and Visa effectively dominate the marketplace.

50. In particular, because card associations such as American Express have chosen not to accept transactions related to the Internet Adult Entertainment Industry, PSW *must* accept MasterCard

and Visa branded cards. To put it another way, not enough consumers own and/or utilize payment cards of either of the two competing networks to permit PSW or other similarly situated merchants to accept only those cards and remain in business.

### 3. Chargebacks

51. When a cardholder disputes a transaction billed by PSW through the chardholder's Issuing Bank, typically because "I didn't do it" or it was otherwise purportedly not authorized by the cardholder, MasterCard and Visa, through PSW's Acquiring Bank, would reverse the transaction and charge the amount of the transaction back to PSW. A transaction may also be reversed in the less common situation where a credit card has been lost or stolen or if the credit card number is otherwise compromised.

52. Transactions which are reversed in this way are known as "chargebacks." In practice, the amount taken from a merchant such as PSW for a chargeback is the full amount of the original transaction, even though the merchant had only been paid the transaction amount *less* the discount rate in the first place. The merchant is also charged a fee by the Acquiring Bank for each chargeback.

53. On information and belief, the typical chargeback fee of $5.00 to $15.00 per transaction imposed is more than sufficient to reimburse MasterCard and Visa, and their member banks, for any costs associated with the chargeback process.

54. Ordinarily, in a "brick and mortar" operation, whenever a customer makes a purchase using a general purpose card, the card is swiped and the customer signs and returns to the merchant a paper receipt which indicates, "I agree to pay the above total according to my card issuer agreement" or words to similar effect.

55. On information and belief, when a card is swiped, a receipt provided, and/or other indicia are present indicating a consumer did engage in a disputed transaction, MasterCard and Visa permit a merchant to successfully defend against and/or otherwise reverse an "I didn't do it" or "cardholder non-authorization" chargeback.

56. When a customer makes a purchase over the Internet using a general purpose card, however, it is obviously not possible to obtain a card swipe or their physical signature on a receipt, which could then be presented in response to a chargeback.

57. However, PSW, through its fraud screening process, obtains a significant amount of information from the customer, including the customer's name, address, IP address, e-mail address, and CVV2 number, and can often establish with reasonable certainty, as a result of the information obtained as well as, *inter alia*, on some occasions, from multiple monthly billings to the customer, that the customer visited the client website for which the charge was made and in fact authorized the transaction.

58. Nevertheless, even where PSW has collected information sufficient to establish with reasonable probability that the cardholder in fact made a disputed purchase, MasterCard and Visa permit customers to chargeback such transactions on demand, and refuse to reverse such chargebacks.

### 4. <u>Friendly Fraud</u>

59. MasterCard and Visa are aware that PSW and other similarly situated merchants are and have been powerless to prevent chargebacks from cardholders claiming "I didn't do it," in an effort to avoid paying for purchases made over the Internet, so-called "friendly fraud". According to MasterCard's own publications, friendly fraud chargebacks represented more than 80% of the chargeback expenses associated with e-commerce transactions in the Fourth Quarter of 2000.

60. MasterCard also concedes that, "This poses a serious dilemma for merchants interested in tapping into today' s new business channels." The recognized prevalence of such "friendly fraud" in transactions over the Internet is exacerbated by the availability of stolen card numbers through various sources.

61. On information and belief, even when MasterCard and Visa are aware of large banks of card numbers which have been compromised, MasterCard and Visa often deliberately do nothing to block the use of those cards, because this would require Issuing Banks to incur the expense of re-issuing new cards to replace the cards which have been compromised.

62. Moreover, the technology systems which have been put into place to date to reduce fraud from stolen card numbers and non-authorized use including AVS (which compares the address and zip code listed by the purchaser with the information on file for the cardholder) and CVV2 (a three digit code written at the end of the card number on top of the card's signature strip) often do not work because, during the relevant period, many Issuing Banks failed to implement the technologies required on their end to allow merchants to take advantage of such systems. On information and belief, MasterCard and Visa are aware of the foregoing; however, they have refused to compel their Issuing Banks to fully implement such technological innovations because of the costs associated therewith.

63. Nevertheless, regardless of whether the merchant obtained an authorization code at the time the transaction was first initiated, and regardless of whether the merchant used available technologies to verify that the purchaser was the cardholder, MasterCard and Visa allow cardholders the nearly absolute right to deny that they have made an Internet purchase and to refuse to pay for it.

64. Due to the failure or refusal of Master Card and Visa to combat fraud on the Internet, PSW, along with other internet merchants, have been forced to retain, at considerable expense, outside firms approved or acceptable to MasterCard and Visa, which specialize in fraudulent or high risk transaction screening. These firms add an additional layer of protection by screening all Internet transactions in order to reduce the likelihood of fraud.

**5. <u>Chargeback Fines and Penalties</u>**

65. MasterCard and Visa each view the incidences of chargebacks emanating from PSW and other similarly situated merchants as an indicator of the level of fraudulent transactions being processed through such merchants. MasterCard and Visa each evaluate such fraud levels on the basis of the ratio of chargebacks received by a particular merchant in a given month as compared to the total transactions made by that merchant in the same month (called the merchant's "Chargeback Ratio").

66. On information and belief, MasterCard has publicly stated that, during the relevant period, the level of fraud for Internet merchants was about the same as that for all other card-not-present-merchants.

67. Although, as alleged above, all card-not-present merchants face the same risk of fraud, friendly fraud in particular, MasterCard and Visa uniformly designate merchants delivering audiotext or videotext services, specifically, the adult entertainment digital content provided by most of PSW's website clients, as "High Risk."

68. MasterCard and Visa have implemented a variety of monitoring and enforcement procedures for the purported purpose of *coercing* such merchants to take steps to reduce the level of purported "fraud" occurring in transactions processed through such merchants.

69. MasterCard and Visa have instituted parallel programs that set Chargeback Ratio target thresholds ("Chargeback Thresholds"), which they want such "High Risk" merchants to stay below, and have established departments within their respective organizations to track and report to their member Acquiring Banks any merchants whose Chargeback Ratios in any given month exceed those prescribed thresholds.

70. These parallel programs allow MasterCard and Visa, in their sole discretion, to impose substantial fines and penalties (hereinafter also referred to as "penalties") on merchants when Chargeback Ratios for "High Risk" merchants exceed the proscribed Chargeback Thresholds. Such fines and penalties are assessed to an Acquiring Bank, which in turn passes such fines and penalties on to the responsible merchant, as identified by MasterCard or Visa. On information and belief, MasterCard and Visa each know that the merchant ultimately bears the financial burden of such fines and penalties, and requires and/or intends that to be the case.

71. Moreover, MasterCard and Visa reserve the power to order an Acquiring Bank to terminate the Merchant Account of a particular offending merchant and to prohibit that merchant from accessing or utilizing MasterCard or Visa network services.

72. Under the current parallel programs of MasterCard and Visa, they have the right, in their sole and absolute discretion, to declare a merchant to be an Excessive Chargeback Merchant, if the merchant experiences more than a specifed number of chargebacks and exceeds the specified Chargeback Threshold in a specified (e.g., two month) trigger period. As soon as MasterCard or Visa

declare a merchant to be an Excessive Chargeback Merchant, their Issuing Banks are entitled to collect substantial penalties from that merchant for every chargeback incurred over a given period, *retroactively* (e.g. up to one full year prior), regardless of the merchant's subsequent Chargeback Threshold, based on a progressive scale.

73. On information and belief, at all relevant times, the penalty fees under the MasterCard program included a per chargeback fee and a monthly fine, which progressively increased from $25.00 per chargeback and a $25,000.00 per month fine for the first three months following the trigger period (wherein a merchant has exceeded the Chargeback Threshold), all the way up to a maximum of $100.00 per chargeback and a $100,000.00 per month fine for any period in excess of seven months after the trigger period (wherein a merchant continues to exceed the Chargeback Threshold). On information and belief, the Visa Excessive Chargeback Program provided, *inter alia,* for a $100.00 per chargeback fee following the trigger period, increasing to $150.00 per chargeback after the first three months.

74. Under the parallel Excessive Chargeback Programs established by MasterCard and Visa, penalties are progressive over succeeding months for at least one full year regardless of whether the merchant's Chargeback Ratio exceeds the Chargeback Threshold ever again during that year. MasterCard and Visa also claim the absolute discretion to extend the fine period for longer than the specified period if they so desire until, again, MasterCard or Visa either terminate the merchant or convince the Acquiring Bank to terminate the merchant. Such a continuing and progressive assessment of penalties, regardless of whether the merchant's Chargeback Ratio exceeds the Chargeback Threshold, cannot be justified as a necessary measure to progressively encourage merchants to take further steps to limit chargebacks. Nor can such a scheme be justified on any other commercially reasonable basis.

75. There are, however, numerous reasons, as alleged above, why PSW and similarly situated merchants merchant might experience chargebacks, which are unrelated to whether the merchant permits fraud to occur, and are therefore out of the merchant's control.

76. Moreover, it is a well-known fact in the general purpose card industry that chargebacks lag between 30 and 180 days, or more, behind sales to which they are related. In other words, it can take

a cardholder 30 to 180 days, or more, to dispute a charge and seek a chargeback. Accordingly, a merchant's *current* Chargeback Ratio is not a reliable indicator of the *current* degree of purported fraud in a merchant's general purpose card transactions. Nevertheless, once MasterCard and Visa declare a merchant to be an Excessive Chargeback Merchant, the progressive penalties charged by MasterCard and Visa for chargebacks incurred in previous months are assessed, and which therefore can have no other purpose other than to punish the merchant.

77. A merchant's Chargeback Ratio is also artificially inflated (as a purported indicia of the current degree of purported fraud in a merchant's general purpose card transactions) where, for whatever reason, a merchant's volume of business decreases in any given month as compared to the preceding month, since the Chargeback Ratio will be based on chargebacks from higher volume months, as applied against a month with a decreased volume of transactions. The arbitrariness of this policy is exacerbated and rises to the level of irrational, when a merchant, for whatever reason, winds down and stops doing business—yet continues to be assessed fines and penalties based on chargebacks applied against no or negligible transactions in a given month.

78. MasterCard also purports to reserve the right to decide, in its sole discretion, to treat *credits* issued by a particular merchant as if they were chargebacks for purposes of determining whether the merchant's Chargeback Ratio exceeds the Chargeback Threshold and to charge such merchants an additional fine for each credit processed.

79. Unlike chargebacks, which require interaction between the cardholder and the Issuing Bank, processing credits involves little or no additional expense whatsoever to MasterCard or its Issuing Banks. There is, therefore, no commercially reasonable justification for MasterCard to decide to treat credits issued in the ordinary course of business as if they were chargebacks, or to fine PSW for issuing credits that are mandated by the system which MasterCard itself has established and maintained.

80. Accordingly, a merchant's Chargeback Ratio is also artificially inflated where, MasterCard, in its discretion, for whatever reason, designates credits issued by a particular merchant as if they were chargebacks for purposes of determining the merchant's Chargeback Ratio. The arbitrariness

of this policy is exacerbated and rises to the level of irrational, where a merchant, in the exercise of reasonable business judgment, has a "money back" guarantee policy to facilitate customer satisfaction.

81. In addition, on information and belief, MasterCard rules and regulations *direct* merchants to attempt to reconcile any complaints or requests for refunds from cardholders and, where appropriate, to issue a credit at the cardholder's request. PSW is thus compelled under the system established and maintained by MasterCard to issue a credit when a cardholder insists that "I didn't do it," or else the cardholder will almost certainly call its Issuing Bank and charge back the transaction (which would naturally inflate PSW's Chargeback Ratio ).

82. Thus, on the one hand, cardholders are told by MasterCard that they will not bear the loss and merchants are directed by MasterCard to issue credits to satisfy cardholder requests, and on the other hand, MasterCard retains the right to punish merchants for complying with its directives and keeping MasterCard's promises to its cardholders.

### 6. **The Reserve Account**

83. On information and belief, MasterCard and Visa, by and through their member Acquiring Banks, require a merchant pursuant to the Merchant Agreement to maintain sufficient funds on deposit, *without interest*, in a reserve account in an amount established by and in the sole discretion of the Acquiring Bank as sufficient to cover any and all anticipated risk of loss of the Acquiring Bank. On information and belief, Acquiring Banks consider the potential imposition of penalties by MasterCard or Visa under their respective Excessive Chargeback programs as a potential loss for which funds should be retained in the reserve account.

84. Because of the retroactive and substantially progressive nature of the MasterCard and Visa Excessive Chargeback programs, the reserve account required by an Acquiring Bank may reach a substantial sum, which may be many multiples of the value of a merchant's average monthly transactions, thereby impairing or preventing the merchant from continuing in business, while, in the meantime, MasterCard and Visa, by and through their member Acquiring Banks, benefit from holding the merchant's funds interest free.

### 7. Impact of Excessive Chargeback and Other Parallel Programs

85. As alleged above, MasterCard and Visa rules essentially permit a chargeback without contest in card-not-present transactions. If the cardholder did not do it and did not authorize a transaction, the card has obviously been compromised. Where a card has been compromised in this fashion, or if it is lost or stolen, *in the exercise of common sense and commercially reasonable diligence, the card should be terminated immediately and notice thereof simultaneously transmitted throughout the MasterCard and Visa networks to prevent any further fraud.*

86. However, MasterCard and Visa rules do not mandate this, for the same reason their rules do not mandate that available fraud detection technology be implemented and utilized, because of the costs associated therewith, as well as the undisputed fact that MasterCard and Visa can and do force PSW and other similarly situated merchants to bear all the risk of and costs of such purported fraud.

87. By not mandating cancellation and/or the implementation and utilization of available fraud detection technology, MasterCard and Visa rules encourage, or at least enable, card-not-present fraud, friendly and otherwise, thereby further fueling the profits and revenues reaped from the foregoing Excessive Chargeback Programs, and the transformation of the Internet Adult Entertainment Industry, particularly as it relates to Aggregators such as PSW.

88. The net effect of the Excessive Chargeback Programs is to create a downward spiral, as in PSW's case discussed below, which inevitably leads to the Aggregator/merchant being driven out of business. First, for whatever reason, a merchant experiences a chargeback ratio in excess of the threshhold for the requisite period. Next, its reserves are substantially increased because of the potential fines and recovery fees, which *could be imposed* by MasterCard and Visa. The merchant then is unable to pay its customers. Its customers leave. The merchant's volume of transactions go down. Inexorably, the number of chargebacks, which lag behind between 30 to 180 days, as a ratio with respect to the now decreased volume of the merchant, continue to exceed the threshhold. The merchant's reserve account level is further increased, more customers are lost, and the process continues until the merchant is driven out of business.

89. Of all the potential measures that could have been taken to achieve the same result of reducing purported fraud, MasterCard and Visa selected a scheme involving excessive, retroactive, and progressive *penalties*. This permitted MasterCard and Visa, along with their Acquiring banks, to profit from Excessive Chargeback penalties imposed on and interest not paid on excessive Reserve Accounts of PSW and other similarly situated merchants, which have no practical alternative.

90. Perhaps even more troubling, this also had the inevitable and intended effect of *eliminating all small Aggregators processing for Internet Adult Entertainment Websites and consolidating that business with Aggregators large enough to spread unavoidable friendly and other fraud chargebacks against a sufficiently large volume, or with those MasterCard and Visa member Acquiring Banks willing to process such transactions* *<u>directly</u>* *with such large website clients as are also able to spread chargebacks against a sufficiently large volume to survive in business.*

91. The significant magnitude of the assessments, which have no relation to the actual economic costs of chargebacks, combined with the retroactive and progressive nature of the penalties, insure that they would impact small merchants most heavily. Using ratios based on volume assured that the penalties would impact Aggregator/merchants most heavily, which, as they reduced their chargebacks by eliminating clients causing the same, would actually be incurring progressively higher penalties. They impact Internet Adult Entertainment Websites most heavily, because most such client websites in the market, which consists largely of literally hundreds of thousands of small business entrepreneurs that have jumped into an industry which has easy entry and large profits, do not have the sophistication and/or means to qualify as a merchant for MasterCard or Visa. Such website clients must process through an Aggregator or not at all.

92. In addition to the Excessive Chargeback Programs, there were and are other, parallel programs and practices of MasterCard and Visa which have substantially and adversely affected competition in the relevant markets, and thereby caused or contributed to increased prices and/or a reduction in output:

a. ***Registration Programs***. The Visa Internet Payment Service Providers ("IPSP") program required all Aggregator/merchants such as PSW to provide Visa with the name, physical address, financial information, and URL for each website client and pay and/or collect a $750.00 registration fee for each website, and imposed a substantial fine for non-compliance. Visa also required that the password be provided for each such website, which were inspected for content by Visa. Processing approval was denied with respect to sites with certain sexual content or gambling links. The related MasterCard Member Service Providers ("MSP") program, which mandated, among other things, a change in display format, $1,000.00 registration fee, and $2,500.00 per day fine for noncompliance with the Internet Merchants Qualifications Mandate ("IMQM"), sought to essentially eliminate Aggregators from the industry.

b. ***Boycott List Programs***. MasterCard's MATCH file program and Visa's Terminated Merchant's File ('TMF") program provide member banks with the names of merchants who have been terminated or declared to be an Excessive Chargeback Merchant. On information and belief, once a merchant is identified on the MATCH file or TMF, all member Acquiring Banks refuse to deal with the merchant, or any new entity involving that merchant, its officers, and/or its principals, and that such refusal to deal is mandated by MasterCard and Visa.

c. ***Geographic Market Divisions***. MasterCard and Visa established and enforced rules prohibiting the processing of domestic transactions by offshore Acquiring Banks and/or processors, or the reverse, processing of foreign transactions by a domestic acquirer/processor, which have had and continue to have a substantial anti-competitive impact, without any countervailing pro-competitive effect.

d. ***Exclusivity Rules***. As alleged above, MasterCard and Visa adopted parallel programs whereby member banks in their respective networks were authorized to issue the general purpose card of the other network, but prohibited them from issuing general purpose cards of the competing networks, American Express and Discover, thereby unreasonably excluding competition and restraining trade in the general purpose card market and the related network services for general purpose cards market.

e. ***Price Fixing***. MasterCard and Visa have adopted parallel pricing schemes in conjunction with their member banks, whereby, *inter alia*, higher interchange and discount fees and chargeback related and other penalties are charged to PSW and other similarly situated merchants, which have no practical alternative.

93. Each of the foregoing programs is and/or was commercially unreasonable, arbitrary, tortious, otherwise wrongful, and/or a violation of applicable state and/or federal antitrust laws, and directly and/or indirectly caused or contributed to PSW's demise. Each of the parallel, disputed programs of MasterCard and Visa described above worked hand and glove to achieve the consolidation and probable eventual elimination of Aggregators such as PSW processing for Internet Adult Entertainment Websites.

94. The Excessive Chargeback Programs was a disguised means of effectuating parallel price increases. The fact that both MasterCard and Visa adopted extremely similar policies, with the same perverse effects, ensured that similarly situated merchants would not switch to the other bankcard network.

95. The Exclusivity Rules unreasonably restrained competition and thereby created and/or maintained Visa and MasterCard's dominance of the relevant markets. The Exclusivity Rules also thereby insured there would be no competing card network with enough market share to which to turn.

96. The no-cross-border processing restrictions foreclosed competition from offshore Acquiring Banks and thereby preventing PSW and similarly situated merchants from negotiating more favorable discount rates and/or reserve account terms and/or otherwise further limited competition and reduced output in the relevant markets.

97. The Boycott List Programs ensured that once PSW was terminated by the Defendants and driven out of business, it could not obtain another Acquiring Bank in either network—so its website clients had to go elsewhere, including to one of the Visa and MasterCard Acquiring Banks. *On information and belief, many of PSW's website clients were unable to secure or permanently secure an alternate Aggregator or Acquiring Bank, and therefore were forced to cease operations.*

98. The Registration Programs were an attempt to squeeze additional fees out of Aggregators, while obtaining detailed information about their client websites, for reasons, which, on information and belief, were wrongful, in whole or in part, as described in more detail below.

99. On information and belief, the foregoing programs, individually and/or together, decreased output and/or increased prices in the relevant markets.

100. On information and belief, the foregoing programs implemented and enforced by MasterCard and Visa were the result of concerted conduct.

101. These parallel programs are and were contrary to the self-interest of MasterCard and Visa, because they would have eventually led to a loss of substantial market share and revenue to the

less costly (e.g., more price competitive) network, and therefore would not have been adopted if the other association had not also adopted it.

102. That an inference of opportunity to conspire may reasonably be inferred from, *inter alia*, the dual governance structure of MasterCard and Visa.

103. The number, complexity, and similarity of the foregoing programs and policies further support an inference that they were the result of concerted conduct, as opposed to independent business decisions and coincidence.

### F. PSW Processing through the Defendants

#### 1. <u>Entering the System—the Agreement</u>

104. On or about January 17, 2002, PSW entered into a Merchant's Agreement ("Agreement") with the Defendants.

105. The Agreement initially provided for a discount fee of 5.6% and was based on, among other things, an average sales transaction of $34.00 and an estimated annual transaction volume of $8.4 million dollars. On information and belief, "Attachment I," which purported to establish "interchange fees, assessments and qualifying criteria" and was supposed to appear as an attachment to the Agreement, was not affixed thereto or ever provided to PSW.

106. The Agreement further provided that an Excessive Chargeback handling fee would be charged in addition to any fee or fine imposed by Visa or MasterCard. Specifically, in the event PSW's Chargeback Ratio exceeded 2.5% *annually*, PSW would be billed a chargeback processing fee of $7.50 for each chargeback in excess of the foregoing level, as well as a fee of $7.50 per chargeback, or a total of $15.00.

107. Based on the foregoing annual dollar volume of business, or an average of $700,000.00 per month, PSW was required to maintain a reserve account of $300,000.00. FFB reserved the right, in its sole discretion, to increase the reserve account based upon PSW's processing history and any anticipated risk of loss.

108. The Agreement also provided that PSW would reimburse FFB for any fees, charges or expenses required or imposed by MasterCard or Visa in connection with or related to the Agreement or any of the services provided thereunder.

109. As a condition to receiving the services provided pursuant to the Agreement, PSW was required to enter into and maintain appropriate arrangements to receive risk control services, which, on information and belief were mandated by MasterCard and Visa, also known as chargeback reduction services, from an entity that met minimum specifications set forth in the Agreement.

110. Accordingly, in order to fulfill the foregoing requirement, PSW entered into a remote processing service agreement with Shared Global Systems ("SGS") to provide certain remote computerized intermediate transaction processing services.

111. On information and belief, SGS is a subsidiary, agent or otherwise closely associated with FFB and/or FDMS.

112. The SGS agreement initially provided for a monthly connection fee of $1,000.00, a flat fee per transaction of $0.32, and a minimum monthly fee of $7,500.00, which, on information and belief, averaged out to approximately 3% per transaction processed by PSW.

**2. <u>Navigating the System</u>**

113. On or about December 2002, Visa suddenly began enforcing its no-cross-border processing rule. As a consequence, PSW lost 60% of its Visa transactions processed through FFB. Also, PSW was required to cease processing for certain high chargeback sponsored client websites. As a consequence of the foregoing as well as the unavoidable incidents of friendly and other fraud described previously above, PSW's chargeback ratios rose substantially in the ensuing three months.

114. In a letter dated February 3, 2003 from Visa, PSW was informed that for January, 2003, it had exceeded Visa's Risk Identification Service High Fraud parameters and was designated High Risk.

115. On or about February, 2003, FDMS informed PSW that due to increased business, PSW was required to maintain $750,000.00 in its reserve account against potential fines and/or penalties imposed by MasterCard or Visa.

116. FDMS also advised PSW that it would withhold settlement on 33% of its daily deposits until the reserve account balance reached $750,000.00.

117. On or about April 29, 2003, PSW entered into a contractual agreement with a non-Internet Adult Entertainment website client, SoftSell, to provide billing processing services for healthcare oriented products sold over the Internet and/or the phone by SoftSell.

118. SoftSell was referred and approved by SGS. Accordingly, PSW understood that SoftSell had been approved by FFB.

119. As a consequence of the SoftSell account, PSW's Visa processing volume increased substantially.

120. Prior to contracting with SoftSell, PSW maintained a merchant account with FFB for non-adult oriented transactions.

121. To assist cardholder consumers in identifying transactions from SoftSell, PSW used the merchant descriptor PSWHEALTH.COM as well as the merchant identification number 23599860012.

122. All transactions PSW processed for SoftSell were transmitted through the PSWHEALTH.COM merchant account. Additionally, all SoftSell transactions came with a 30 day money back guarantee.

123. After one week of providing billing services to SoftSell, and without any notice to PSW, FFB ceased wiring disbursements to PSW.

124. In May, 2003, as a result of an increase in volume in billings processed by PSW due to the SoftSell contract, FDMS's First Financial Risk Team commenced an investigation regarding PSW's increased processing.

125. At FDMS's request, SGS contacted PSW for financial information concerning SoftSell.

126. It was then determined that SoftSell had previously processed billing through SGS while doing business as "Commonwealth Benefits" and had ceased processing to address high chargeback volumes.

127. Based on Commonwealth Benefits' purported history of having high chargeback volumes, after PSW had been processing for SoftSell for approximately two weeks, FDMS determined that the funds in PSW's reserve account were inadequate.

128. SGS was informed by FFB that FFB was withholding settlement on 100% of PSW's daily deposits and depositing these funds into PSW's reserve account until the account balance reached $1.2 million.

129. On information and belief, FFB subsequently withheld settlement on 50% of PSW's daily deposits and deposited these funds into PSW's reserve account until the account balance reached $1.2 million.

130. FFB then notified PSW that effective on or about May 15, 2003, PSW was barred from processing for SoftSell. At the time, PSW was told that the reason it was directed to cease processing for SoftSell was due to a previous history of high chargeback volumes when SoftSell processed directly through SGS as "Commonwealth Benefits."

131. Nevertheless, pursuant to a September 16, 2003 letter from FFB, FFB contended that its directive that PSW cease processing for SoftSell *was required under Visa rules*. Visa and FFB claim that as an IPSP (i.e., Aggregator), PSW was forbidden from processing for "Buyers' Clubs, Membership Clubs, Outbound Telemarketers, and other related merchants."

132. SoftSell falls in none of the above specified categories of merchants. It had a health product related website, from which it received phone and Internet orders for such products. Moreover, if SoftSell did fall in the "prohibited merchant" category, *there was no way PSW could have know this since it was neither familiar with nor did it have access to the Visa rules, SGS was*

*also apparently unaware of the rule, and it took FFB over a week to make that purported determination.*

133. As of July 15, 2003, of the 41,157 transactions processed by PSW for SoftSell, SGS received 38 chargebacks in May, 136 in June and 77 in July for a chargeback rate of .61 %, *a rate well below the chargeback threshold. At that time, PSW had a reasonable expectation of continuing and substantially increasing the volume of business from similar, card-not-present merchants.*

134. On information and belief, on or about June 1, 2003, Visa instituted a new provision of its rules, without notice to PSW, that permitted Visa to shift a merchant that meets certain criteria to the High Risk Chargeback Monitoring Program. Visa then identified PSW's catalog account, a non-adult oriented account, as "High Risk," and combined the chargebacks in the catalog account with the chargebacks in PSW's adult-oriented account. At the time, Visa's Chargeback Threshold was 2.5%.

135. The foregoing combination of the chargebacks from both PSW's adult and non-adult accounts ensured that PSW's chargebacks would exceed the threshold and thus would subject PSW to fines and penalties imposed by Visa for exceeding the chargeback threshold of 2.5%. On information and belief, Visa required the combination of the foregoing accounts with the intent and purpose of causing PSW to exceed the threshold.

136. *Moreover, as a result of Visa's directive that PSW cease processing for SoftSell, PSW's transaction volume dropped significantly, and its chargeback ratios increased accordingly.*

137. On information and belief, in June 2003, PSW processed 9,942 Visa transactions in the combined accounts, of which there were 429 chargebacks. Visa imposed on PSW chargeback penalties in the amount of $42,900.00, because PSW purportedly exceeded the chargeback threshold of 2.5%.

138. In June of 2003, PSW received a written communication from FFB, wherein FFB and FDMS offered to use their "efforts" to have Visa reduce a purported $425,000.00 IPSP fine, for a fee of 20% of any reduction in the fine. The foregoing purported fine was never assessed by Visa.

139. In a letter dated July 24, 2003, FDMS informed PSW that due to its purported increased exposure to fines and chargebacks, FDMS and FFB were requiring PSW to increase the reserve account to $1.7 million. FDMS also advised PSW that it would withhold settlement on 25% of daily deposits until the reserve reached $1.7 million.

140. The substantial and progressively increased amounts PSW was required to maintain in its reserve account was mandated by the Defendants, due primarily to alleged potential exposure to penalties under the MasterCard and Visa Excessive Chargeback Programs.

141. The foregoing substantial increases in funds, which PSW was required to maintain in its reserve account, created a substantial cash flow problem that prevented PSW, which operated on a margin of about 5%, from forwarding payments to its website clients in a timely fashion.

142. The Defendants were well aware that PSW would be forced out of business if the Defendants continued to insist on withholding payments and maintaining a substantial and excessive reserve account, as evidenced by an e-mail dated August 18, 2003 from Terry L. Crane at SGS to Daniel Papas at FDMS, which provided in pertinent part as follows:

> ***PSW has been doing everything we ask of them from the first day they started with SGS. Their business has grown considerably and their reputation in the industry has been very good. PSW has continually sent out directives to it's [sic] merchants about adhering to all the regulations required by VISA, MC and FDMS.*** *They have built a model to be compliant with Master Card [sic] aggregator rules, at a cost of many thousands of dollars, even though the MC model will absolutely cause many more chargeback problems for our merchants then they currently have.. . .*
>
> [Over] [t]he next few months [PSW] will have very high chargeback ratios because we have essentially gutted PSW sales. We have stopped all foreign sales for MC and PSW has shut down every site that had over 3% cb [chargeback] rates.. . .
>
> Having said all this, the bottom line is, I do not believe PSW can survive with [a] 25 or 33% hold back.. . .

143. The foregoing e-mail is instructive for several reasons. First, Mr. Crane, who is not on PSW's payroll or beholden to it in any way, ***opined that PSW had grown considerably and had an excellent reputation in the industry.*** Second, that PSW at all times acted diligently and in good faith to comply with the myriad and ever changing rules of the game imposed by the various

MasterCard and Visa programs and policies in dispute. Third, that the combination of, *inter alia*, MasterCard and Visa's no-cross-border acquiring policy and excessive chargeback programs had substantially reduced PSW's sales volume. Fourth, that the perverse effect of PSW diligently complying with MasterCard and Visa directives was that PSW was going to experience high chargeback ratios. Fifth, the result of the foregoing being that PSW's reserves would be increased yet further (to account for potential excessive, progressive, and commercially unreasonable penalties under MasterCard and Visa excessive chargeback programs). Sixth, that the current level of reserves, let alone any prospective increase, would eventually be fatal to PSW.

144. Notwithstanding the foregoing e-mail, in a letter dated August 19, 2003, FDMS informed PSW that due to its purported increased exposure to penalties and chargebacks, FDMS and FFB were requiring PSW to increase the reserve account to $2 million. FDMS also advised PSW that it would withhold settlement on 33% of daily deposits until the reserve reached $2 million.

145. Because of the inability to pay its clients because its revenues were tied up in the FFB reserve account, by September of 2003, PSW had lost approximately 85% of its accounts to its competitors and was impaired in its ability to attract new clients, insofar as businesses are generally not inclined to do business with an entity which cannot or does not pay its obligations.

146. In September, 2003, Visa imposed a $81,000.00 penalty on PSW for exceeding the Chargeback Threshold.

147. In September, 2003, PSW advised MasterCard and Visa in writing that, *inter alia*, individually and in concert with others, they were using their market power to assess and continue to assess illegal fines and penalties on PSW for chargebacks in order to shift the risk of such transactions in a commercially unreasonable manner, which was not financially justified, with the intent and/or effect of driving PSW, and similar entities from the market for payment card processing of Internet transactions. PSW further advised MasterCard and Visa of its belief that the foregoing conduct constituted violations of federal and state law and of its intention to file suit.

148. *In a letter from FDMS to PSW dated September 16, 2003, FDMS notified PSW that it was terminating its relationship with PSW effective September 26, 2003, purportedly due primarily to the "very significant financial exposure" for fines and penalties under the MasterCard and Visa Excessive Chargeback Programs. In that letter, FDMS also cited PSW's threat of litigation against MasterCard and Visa and a "decrease in overall transaction volume," as purported additional grounds for termination.*

149. In a September 16, 2003 e-mail, FDMS claimed that in light of the purported potential penalties which could be assessed by MasterCard and Visa, PSW's reserves should be $3 million, rather than the approximately $1.6 million being held at that time.

150. On information and belief, the bulk of the chargebacks experienced by PSW were due to friendly fraud.

**3. Conduct Post-Termination of the Agreement**

151. In a letter dated October 3, 2003, FDMS expressly refused to reduce PSW's reserve account level, even though PSW was no longer processing with FFB and FDMS, claiming that it was purportedly undercollateralized as compared to its potential exposure for potential penalties under the MasterCard and Visa Excessive Chargeback and other programs. FDMS claimed its purported potential exposure at that time was approximately $2.2 million, of which approximately $2,050,000.00 was to MasterCard and $150,000.00 was to Visa, *assuming Visa was waiving potential fines and penalties from January through March. The potential MasterCard fines and penalties were retroactive to January of 2003.*

152. According to the foregoing letter, $372,500.00 of the potential MasterCard penalties was aggregator noncompliance fines of $2,500.00 a day, which purportedly accrued between April 30 to September 26, 2003, notwithstanding the fact that PSW, at considerable expense, had in fact satisfied the requirements imposed by the MasterCard IMQM program, as evidenced by the above quoted e-mail dated August 18, 2003 from Terry L. Crane at SGS to Daniel Papas at FDMS.

153. Since at least as early as November of 2003, MasterCard and Visa were well aware that approximately $1.6 million was being held in PSW's reserve account by FFB and FDMS, due to purported potential MasterCard and Visa penalties, yet as of the date of this Complaint, almost 18 months after PSW ceased processing through the Defendants, on information and belief, neither MasterCard nor Visa have assessed any fines or penalties, and/or have otherwise authorized the release of these funds to PSW, nor have the Defendants otherwise accounted to PSW relative to the funds in the reserve account.

154. Despite diligent efforts, due to, on information and belief, the operation of the Boycott List Programs, and/or other wrongful acts and/or omissions of the Defendants, neither PSW nor any of its officers or principals were able to secure another Acquiring Bank through which to process its business.

**G. Antitrust Violations**

155. The *Visa* case was an action brought by the United States wherein the court entered a final judgement holding that the implementation and enforcement of the Exclusivity Rules by MasterCard and Visa excluded competition and restrained trade in the general purpose card market and related network services for general purpose card markets, that was not outweighed by any countervailing pro-competitive effects, in violation of §1 of the Sherman Act. *Visa* at 406.

156. In reaching its holding, the *Visa* Court actually and necessarily decided, *inter alia*, the following facts:

a. That MasterCard and Visa engaged in prohibited concerted conduct in enacting and enforcing their parallel Exclusivity Rules. *Id.*

b. That the general purpose card market and related network services market were the relevant markets for purposes of the harm complained of. *Id.* at 342.

c. That Visa and MasterCard have market power in the foregoing relevant markets, specifically "large shares in a highly concentrated market with significant barriers to entry, whether measured jointly or separately." *Id.*

d. That the foregoing concerted conduct of MasterCard and Visa reduced overall card output and available card features, decreased network services output, stunted price

competition in the network services market, and harmed consumer welfare ("antitrust harm"). *Id.* at 379-406.

157. Pursuant to 15 U.S.C. §16, MasterCard and Visa, as well as its co-conspirators and agents, FFB and FDMS, who stand in the same shoes with respect to the harm alleged by PSW herein, are collaterally estopped from contesting or denying either the holding or facts actually and necessarily decided in the *Visa* case, including but not limited to those alleged herein above.

158. As a consumer of network services, pursuant to 15 U.S.C. §15, PSW is entitled to bring an action for treble damages for antitrust harm sustained as a result of MasterCard and Visa's foregoing §1 Sherman Act violation, including, but not limited to, the payment of higher prices for network services in the form of higher interchange fees and therefore discount fees, as well as in the form of chargeback related and other penalties imposed, and for a reduction in the output of services and the loss of PSW's revenue and profits as a result thereof.

159. Even if PSW is considered an indirect consumer, it has antitrust standing in light of the identity of interest between the Defendants, the status of FFB and FDMS as agents of MasterCard and Visa and co-conspirators in the challenged conduct, and the historical and practical lack of interest or incentive on the part of FFB and/or FDMS in pursuing any such claims insofar as, *inter alia*, they profited and/or otherwise benefited from the challenged conduct.

160. In addition, and in the alternative, PWS alleges that the concerted conduct of the Defendants alleged herein, individually and/or together, unreasonably restrained trade in the Internet Adult Entertainment Website network services market ("Adult network services"), that was not outweighed by any countervailing pro-competitive effects, in violation of the Sherman Act and the Rhode Island Antitrust Act.

161. That the Adult network services market is a submarket of the networks services market wherein the antitrust harm caused to consumers by the Defendants' conduct was more severe.

162. That, on information and belief, at all relevant times, the Adult network services market suppliers consisted of Discover and MasterCard and Visa and their relevant member banks willing to

acquire and/or provide general payment card processing services to Internet Adult Entertainment Websites and/or their Aggregators, while the consumers in the market consisted of a limited number of Aggregators like PSW—once perhaps over a dozen and now only two due to the Defendants' anticompetitive conduct—that provide credit processing services to Internet Adult Entertainment Websites and those Internet Adult Entertainment Websites that process directly with an Acquiring Bank.

163. That, on information and belief, the Adult network services market constitutes a distinct and relevant submarket for antitrust purposes in light of, *inter alia*, the following:

a. The lack of cross-elasticity of demand of consumers of those services, insofar as PSW and other Aggregators, as well as those Internet Adult Entertainment Websites that process directly with Acquiring Banks in that market, *must accept Visa and MasterCard general payment cards* to remain in business.

b. Recognition by consumers and suppliers in the relevant market that the Adult network services market constitutes a distinct market.

c. The limited number of network service providers willing to process transactions related to Adult Entertainment Websites, including, on information and belief, only five or so Acquiring Banks in the United States.

d. The difference in the pricing scheme in the Adult network services market, wherein the discount fee charged to merchants is substantially higher than the rate applicable in the network services market.

e. The interchange fee fixed by Visa and MasterCard, which is a component of the discount fee, is also significantly higher in the Adult network services market.

f. The additional cost in the Adult network services market incurred for fraud protection services from risk reduction providers mandated by the Defendants, which adds a significant per transaction cost to the network services consumed by PSW and similarly situated merchants.

g. The consumers of Adult network services are also subject to the costs and requirements of registration programs, which include the payment of fees and review and approval of client websites for content, and substantial fines for noncompliance.

h. Consumers of Adult network services, Aggregators such as PSW in particular, are also uniformly subject to the added costs associated with the perverse, commercially unreasonable, excessive and progressive penalties under the Defendants' Excessive Chargeback Programs.

164. The foregoing description of the relevant market or markets for antitrust purposes is alleged on information and belief and without the benefit of discovery, and therefore, PSW alleges

and seeks relief for antitrust harm in the alternative on the basis of such more or less inclusive or different definition of the relevant market or markets as may be established by proof at trial.

**H. First Amendment Violation**

165. The Defendants' actions in requiring detailed information regarding PSW's website clients, conducting prior review and screening of the websites of PSW's website clients, and denying PSW access to network services if the content of those websites were deemed unacceptable to the Defendants does not maximize the profits/revenues of the Defendants, and otherwise lacks a legitimate, commercially reasonable business justification.

166. The Defendants' actions in uniformly labeling consumers of Adult network services as "High Risk," subjecting them to excessive penalties under the Defendants' Excessive Chargeback and Registration Programs, and forcing Aggregators such as PSW and other Adult network services consumers out of business does not maximize the profits/revenues of the Defendants and otherwise lacks a legitimate, commercially reasonable business justification.

167. That, on information and belief, the Defendants have expended substantial funds to review and screen websites of Adult network services consumers and identify sites deemed unacceptable to the Defendants, including monitoring in excess of one million web pages per day for content.

168. That, on information and belief, the foregoing actions of the Defendants were the proximate result of the exercise of coercive power and/or the provision of significant encouragement, either overt or covert, by unknown employees and/or agents of the United States Department of Justice and/or other federal agency, department and/or branch of the federal government ("federal officials").

169. The foregoing inference is supported by, *inter alia*, the following:

a. That, on information and belief, Defendants have cooperated in sharing and/or providing information obtained from the foregoing screening process with federal officials.

b. The Defendants' conduct does not maximize their profits/revenues and otherwise lacks a legitimate, commercially reasonable business justification, and in fact, on information and belief, caused and/or contributed to a significant loss of revenue or potential revenue due to a reduction in the demand for Adult network services.

c. On information and belief, federal officials lack the technical expertise and/or skills and/or financial or other resources necessary to monitor literally billions of web pages on the Internet for potential violations of federal law, and/or otherwise could not monitor or review Internet Adult Entertainment Websites in the absence of either the applicable password or a warrant.

d. Defendants' do not review, monitor, screen and/or otherwise limit or restrict the provision of network services for consumer purchases of non-Internet adult content products and/or services, including products or services which may or do violate federal or state law.

e. That Defendants' screen for and deny network services for Adult content on the Internet that does not violate federal law, further supports the inference that the Defendants' conduct is the result of a political—as opposed to a business—agenda.

f. The transformation in the Internet Adult Entertainment Industry, which has resulted in a significant reduction in the number of Adult network services consumers and, on information and belief, the number of web pages devoted to Adult content, and has thereby substantially reduced the resources necessary to screen and/or monitor the Internet for potential, purported violations of federal law.

170. That, on information and belief, the participation of federal officials in the Defendants' foregoing conduct included, *inter alia*, direction or information as to the website clients and/or the nature and/or type of content for which to review and/or screen and/or deny Adult network services, and/or involved coercion and/or encouragement in the form of promises of unfavorable and/or favorable regulatory, legislative, and/or enforcement activity aimed at or affecting the Defendants.

171. That, in on information and belief, there is a sufficient nexus to attribute liability to the Defendants for a violation of the First Amendment as a federal governmental actor.

172. The Defendants' foregoing conduct constituted unconstitutional content based prior restraint of free expression and/or otherwise violated the First Amendment rights of PSW.

## I. Breach of Contract

173. That in light of the allegations herein, in particular, the facts establishing an identity of interest between the Defendants alleged above, MasterCard and Visa were also a party to the Agreement, or at least in privity of contract with PSW relative thereto.

174. That the fines assessed or threatened to be assessed against PSW under the Excessive Chargeback Programs and/or for purported violation of other MasterCard and/or Visa association rules were coercive in nature, commercially unreasonable and/or otherwise grossly disproportionate to the amount of any actual damages of the Defendants, and therefore constituted an unenforceable penalty or forfeiture.

175. That the Defendants breached the Agreement by, *inter alia*, the following;

a. Permitting and perpetuating "friendly fraud," and thereby improperly charging back to PSW legitimate consumer credit purchases for which PSW was entitled to payment;

b. Permitting fraud by failing or refusing to cancel and terminate compromised credit card numbers, and imposing the cost thereof on PSW;

c. Permitting fraud by failing or refusing to mandate and implement fraud prevention technologies and procedures, and imposing the cost thereof on PSW;

d. Mandating that PSW comply with association rules of which PSW was not aware, was not made aware, and/or could not reasonably ascertain on its own;

e. Directing PSW to terminate processing for SoftSell, even though it did not fall into any of the purported prohibited categories under Visa association rules;

f. Combining the SoftSell non-adult account with PSW's adult account and thereby causing PSW to exceed the permissible chargeback ratio;

g. Assessing fines and penalties which constitute unenforceable penalties or forfeitures;

h. Transferring to and/or retaining funds in the reserve account in amounts grossly in excess of that which was reasonably necessary for the contractual purpose for which it was established (i.e. provide Defendants reasonable security against *actual* losses);

i. Transferring to and/or retaining funds in the reserve account for purposes not permitted by contract;

j. Wrongfully terminating the Agreement after PSW complained about the excessive reserves and that the Defendants were using market power to assess illegal fines and penalties on PSW;

k. Failing or refusing to release to PSW or otherwise account for the approximately $1.6 million in PSW's reserve account some 18 months after the contract was terminated and PSW ceased processing for the Defendants;

l. Failing or refusing to indemnify and hold harmless PSW for, *inter alia*, breach of any warranty, covenant or agreement or any misrepresentation or gross negligence or willful misconduct.

**J. Breach of the Covenant of Good Faith and Fair Dealing**

176. That the Defendants' acted in an arbitrary and unreasonable manner and/or otherwise used discretion conferred by contract to act in a commercially unreasonable manner and thereby defeat contractual objectives, by, *inter alia*, the following acts and/or omissions:

a. In addition, and in the alternative, each of the acts and/or omissions alleged in the previous paragraph, individually and/or together;

b. Creating the circumstances which formed the purported basis of the termination of the Agreement (i.e., the potential assessment of fines and penalties under the Excessive Chargeback Programs, and a decrease in transaction volume);

c. Implementing and enforcing and/or threatening to enforce the Excessive Chargeback Programs which, *inter alia*, imposed *retroactive* fines and penalties, which had no economic justification in terms of actual costs or harm imposed on the Defendants, and was therefore commercially unreasonable and/or amounted to a penalty or forfeiture;

d. Implementing and enforcing and/or threatening to enforce the Registration Programs and other programs which, *inter alia*, imposed fines and penalties, which had no economic justification in terms of actual costs or harm imposed on the Defendants, and was therefore commercially unreasonable and/or amounted to a penalty or forfeiture;

e. Attempting to extort payment from PSW as compensation for agreeing to "negotiate" a reduction in a purported potential Visa IPSP Program fine, which was never assessed, that constituted an unenforceable penalty or forfeiture, and which was a practice, on information and belief, of which all of the Defendants were well aware and profited from, at the expense of merchants such as PSW;

f. Transferring to and retaining funds in the reserve account in an amount which was commercially unreasonable and/or designed or intended to punish PSW and/or drive it out of business, and thereby deprive PSW of the benefits of and/or destroy the object of the contract;

g. Taking action, including but not limited that alleged herein, to deprive PSW of rights secured under the First Amendment to the United States Constitution.

### K. Harm Sustained by PSW

177. As a proximate result of Defendants' acts and/or omissions, including but not limited to those alleged herein, PSW has suffered injury to its trade or business, including but not limited to the economic losses from the fines and/or penalties imposed by Defendants, lost profits and revenues from being unable to pay and, therefore, retain and/or obtain clients, and the diminution in goodwill which PSW would otherwise have enjoyed in the absence of Defendants' wrongful conduct, impairment of its civil rights, expenses for legal services, and other great damage.

178. Defendants' acts and/or omissions, including but not limited to those alleged herein, were taken in conscious disregard of PSW's statutory, common law, and/or constitutional rights and/or constituted oppression and/or bad faith and/or were taken negligently, with gross negligence, intentionally, and/or with reckless indifference to the rights of the Plaintiff, and were motivated by malice, wantonness or willfulness of such an extreme nature as to amount to criminality.

179. That certain of Defendants' acts and/or omissions as aforesaid violated clearly established constitutional rights of PSW, of which the Defendants knew or should have known. Furthermore, at all relevant times, the Defendants knew or should have known that their conduct would cause or contribute to the deprivation of the PSW's clearly established constitutional rights.

## VI. <u>Claims For Relief</u>

180. Plaintiff incorporates the allegations in ¶¶1 through 179 above in each of the counts alleged below.

### COUNT ONE
### (Violation of Sherman Act § 1--Contract or Conspiracy in Restraint of Trade)

181. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, contracted, combined, conspired and/or otherwise acted to unreasonably restrain competition and/or trade in interstate commerce in violation of the Sherman Act §1, actionable pursuant to 15 U.S.C. §15, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT TWO**
**(Violation of Sherman Act § 2--Monopolization)**

182. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, monopolized, attempted to monopolize, and/or combined, conspired and/or otherwise acted to monopolize and unreasonably restrain competition and/or trade in interstate commerce, in violation of the Sherman Act §2, actionable pursuant to 15 U.S.C. §15, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT THREE**
**(Violation of the Rhode Island Antitrust Act)**

183. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, established, maintained, or used a monopoly, or attempted to establish a monopoly of trade or commerce, for the purpose of excluding competition or controlling, fixing and/or maintaining prices, in violation of R.I.G.L. §6-36-5, which is actionable pursuant to R.I.G.L. §6-36-11, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT FOUR**
**(Violation of the First Amendment to the United States Constitution--*Bivens* Action)**

184. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, acting under the color of official right and/or federal law or authority, have engaged in prior restraint and/or otherwise impaired Plaintiff's right to freedom of speech, causing Plaintiff to suffer damages as aforesaid, and have thereby deprived Plaintiff of rights secured under the First Amendment to the United States Constitution, actionable pursuant to the holding in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

**COUNT FIVE**
**(Breach of Contract)**

185. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, breached the Agreement, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT SIX**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

186. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, breached the covenant of good faith and fair dealing, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT SEVEN**
**(Tortious Interference With Contractual Relations—Website Clients)**

187. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, wrongfully interfered with Plaintiff's contracts with its website clients, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT EIGHT**
**(Tortious Interference With Contractual Relations—the Agreement)**

188. In the alternative, to the extent it is legally determined that MasterCard and Visa were not a party to or in privity of contract with the Plaintiff relative to the Agreement, that MasterCard and Visa, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, wrongfully interfered with performance by the parties under the Agreement, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT NINE**
**(Tortious Interference With Prospective Economic Advantage)**

189. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, wrongfully interfered with Plaintiff's prospective economic advantage as it relates to a reasonable business expectancy of acquiring and continuing contracts with website clients and/or otherwise continuing to derive business advantages from the operation of its business, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT TEN**
**(Conversion)**

190. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, interfered with Plaintiff's ownership interest in and exercised

dominion over Plaintiff's funds, and thus converted the same to their own use, thereby causing Plaintiff to sustain damages as aforesaid.

**COUNT ELEVEN**
**(Embezzlement)**

191. Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, appropriated and converted to their own use Plaintiff's funds in the reserve account, which were entrusted to Defendants' for a specific use, and thus embezzled the same, thereby causing Plaintiff to sustain damages as aforesaid.

## VII. Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1. A declaratory judgment declaring that the Defendants, by their individual and concerted acts and/or omissions, including but not limited to those alleged herein, have violated the Sherman Act §1 and §2, the Rhode Island Antitrust Act, R.I.G.L. §6-36-5, and the First Amendment to the United States Constitution, and have breached the Agreement, breached the covenant of good faith and fair dealing, tortiously interfered with contracts and prospective economic advantage of Plaintiff, and converted and/or embezzled property of Plaintiff.

2. An award of compensatory damages in the amount of sixty ($60,000,000.00) million dollars;

3. An award of punitive damages in the amount of one-hundred eighty ($180,000,000.00) million dollars;

4. An award of treble damages pursuant to 15 U.S.C. §15 and/or R.I.G.L. §6-36-11;

5. An award of reasonable attorney's fees and costs of suit pursuant to 15 U.S.C. §15 and/or R.I.G.L. §6-36-11; and,

6. Such other and further relief as this Court deems just and proper.

## VIII. Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX. Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi and V. Edward Formisano as trial counsel.

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO & COMPANY, LTD.**

**Richard A. Sinapi, Esq. (R.I. Bar No. 2977)**

**V. Edward Formisano, Esq. (R.I. Bar No 5512)**
100 Midway Place, Suite 1
Cranston, RI 02920
(401) 944-9690
(401) 943-9040 (Fax)

**DAVID STEINER & ASSOCIATES**

**David Paul Steiner, Esq. (Calif. Bar No. 064638)**
1925 Century Park East, Suite 2350
Los Angeles, CA 90067
(310) 557-8422
(310) 556-0336 [Fax]

**Dated: April 6, 2005**

## CERTIFICATION OF SERVICE

**Patricia A. Sullivan, Esq.**
**Edwards & Angell LLP**
**2800 Financial Plaza**
**Providence, RI 02903**

**John A. Tarantino, Esq.**
**Adler Pollack and Sheehan P.C.**
**2300 Financial Plaza**
**Providence, RI 02903**

**Joseph V. Cavanagh, Jr., Esq.**
**Blish & Cavanaugh LLP**
**30 Exchange Terrace**
**Providence, RI 02903**

The undersigned hereby certifies that the within First Amended Complaint was caused to be served upon the above attorneys of record on the 6 day of **April, 2005.**