UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PSW, INC., d/b/a/ PSW BILLING,

Plaintiff,

v.

VISA U.S.A., INC., MASTERCARD INTERNATIONAL, INC., FIRST FINANCIAL BANK AND FIRST DATA MERCHANT SERVICES CORP.,

Defendants.

C.A. No. 04-347-T

**VISA U.S.A. INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant Visa U.S.A. Inc. ("Visa") respectfully moves the Court for an order dismissing plaintiff's first amended complaint against Visa. As explained in the accompanying memorandum, even assuming all of the allegations in the complaint to be true, plaintiff does not state any claim against Visa upon which relief may be granted under federal or state law. Accordingly, all counts of the complaint against Visa should be dismissed on the merits.

Respectfully submitted,

Patricia A. Sullivan #2120
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Telephone: (401) 274-9200
Facsimile: (888) 325-9067

SCANNED

61

**CERTIFICATE OF SERVICE**

I hereby certify that on may 20, 2005, a true and correct copy of *Visa U.S.A., Inc.'s Motion to Dismiss the First Amended Complaint for Failure to State a Claim Upon Which Relief May Be Granted* was sent via facsimile and first-class mail, postage prepaid to the following parties:

Richard A. Sinapi, Esq.
V. Edward Formisano, Esq.
Sinapi Formisano & Company, Ltd.
100 Midway Place, Suite 1
Cranston, RI 02920-5707

David Paul Steiner, Esq.
David Steiner & Associates
1925 Century Park East, Suite 2350
Los Angeles, CA 90067

Jay Fastow, Esq.
Bruce Colbath, Esq.
Denise Plunkett, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Brian Wallach, Esq.
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Joseph V. Cavanagh, Esq.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903-1765

John A. Tarantino, Esq.
Patricia K. Rocha, Esq.
Adler Pollock & Sheehan, P.C.
2300 Financial Plaza
Providence, RI 02903

Patricia A. Sullivan #2120
*Attorney for Defendant Visa U.S.A., Inc.*

*Attorney for Defendant Visa U.S.A., Inc.*

OF COUNSEL:

Daniel H. Bookin
Randall W. Edwards
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Richard G. Parker
Jonathan D. Hacker
Matthew R. Cosgrove
Nikhil M. Shanbhag
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendant Visa U.S.A., Inc.*

DATED: May 20, 2005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

PSW, INC., d/b/a/ PSW BILLING,

Plaintiff,

v.

VISA U.S.A. INC., MASTERCARD INTERNATIONAL, INC., FIRST FINANCIAL BANK AND FIRST DATA MERCHANT SERVICES CORP.,

Defendants.

Case No. 1:04cv347(ECT)

**MEMORANDUM IN SUPPORT OF VISA U.S.A. INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

OF COUNSEL:
Randall W. Edwards
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Richard G. Parker
Nikhil M. Shanbhag
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Daniel H. Bookin
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Jonathan D. Hacker
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Patricia A. Sullivan (#2120)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Telephone: (401) 274-9200
Facsimile: (888) 325-9067

*Attorneys for Defendant Visa U.S.A. Inc.*

## TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT ........ 1

PLEADINGS ........ 1

DESCRIPTION OF MOTION ........ 1

FACTS ........ 2

1. *The Visa Network System* ........ 2

2. *A Typical Visa Transaction* ........ 3

3. *Internet Transaction Fraud And "Chargebacks"* ........ 5

ISSUES ........ 6

POINTS AND AUTHORITIES ........ 7

I. PSW FAILS TO STATE A FEDERAL ANTITRUST CLAIM ........ 7

A. PSW Does Not State An Antitrust Claim Relating To Visa's Chargeback Rules ........ 7

B. PSW's Challenges To Other Visa Programs Also Fail ........ 13

II. PSW LACKS "ANTITRUST STANDING" ........ 15

III. PSW'S NEW FIRST AMENDMENT DAMAGES CLAIM IS FRIVOLOUS ........ 18

IV. PSW FAILS TO STATE ANY CLAIM UNDER RHODE ISLAND LAW ........ 20

A. Rhode Island Antitrust Claim ........ 20

B. Contract Claims ........ 21

C. Tortious Interference Claims ........ 21

D. Conversion Claim ........ 23

E. Embezzlement Claim ........ 23

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998) ........ 13

*American Express Travel Related Servs. Co. v. Visa U.S.A. Inc.*, No. 04-CV-8967 (S.D.N.Y.) ........ 14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ........ 7

*Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ........ 16

*Augusta News Co. v. Hudson News Co.*, 269 F.3d 41 (1st Cir. 2001) ........ 8

*Belliveau Bldg. Corp. v. O'Coin*, 763 A.2d 622 (R.I. 2000) ........ 21, 22

*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) ........ 18

*Bomar Resources, Inc. v. Sierra Rutile Ltd.*, No. 90 Civ. 3773(JFK), 1991 U.S. Dist. LEXIS 396 at *25-26 (S.D.N.Y. Jan. 15, 1991) ........ 22

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001) ........ 19

*Carlson v. Green*, 446 U.S. 14 (1980) ........ 18

*Centerville Builders v. Wynne*, 683 A.2d 1340 (R.I. 1996) ........ 21

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) ........ 18

*Davis v. Passman*, 442 U.S. 228 (1979) ........ 18

*DeChristofaro v. Machala*, 685 A.2d 258 (R.I. 1996) ........ 23

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) ........ 17

*Discover Fin. Servs. v. Visa U.S.A. Inc.*, No. 04-CV-7844 (S.D.N.Y.) ........ 14

*DM Research, Inc. v. College of Am. Pathologists*, 2 F. Supp. 2d 226 (D.R.I. 1998) ........ 7, 10, 15

*Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1 (1st Cir. 2004) ........ 8

*ERI Max Entm't v. Streisand*, 690 A.2d 1351 (R.I. 1997) ........ 20

*Ford Motor Co. v. Lane*, 86 F. Supp. 2d 711 (E.D. Mich. 2000) ........ 17

## TABLE OF AUTHORITIES

**Page**

*George v. Pacific-CSC Work Furlough*, 91 F.3d 1227 (9th Cir. 1996) ........ 19

*H&H Internet, N.V. v. P.S.W., Inc.*, C.A. No. 04-324-L (D.R.I. July 28, 2003) ........ 17

*Hairston v. Pac. 10 Conf.*, 101 F.3d 1315 (9th Cir. 1996) ........ 16

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972) ........ 15

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ........ 17

*Implement Serv., Inc. v. Tecumseh Prods. Co.*, 726 F. Supp. 1171 (S.D. Ind. 1989) ........ 21

*In re Citicorp Credit Servs., Inc.*, 116 F.T.C. 87 (1993) ........ 6

*In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238(JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ........ 12

*Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000) ........ 16

*Interface Group v. Massachusetts Port Auth.*, 816 F.2d 9 (1st Cir. 1987) ........ 7

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990) ........ 17

*Larson v. Dawson*, 53 A. 93 (R.I. 1902) ........ 23

*Logiodice v. Trustees of Maine Central Institute*, 296 F.3d 22 (1st Cir. 2002) ........ 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........ 10

*Menasha Corp. v. News Am. Mtg. In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir. 2004) ........ 12

*Mesolella v. Providence*, 508 A.2d 661 (R.I. 1986) ........ 21, 22

*Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702 (D. Md. 2001) ........ 17

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir. 1989) ........ 13

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ........ 10

*Nat'l Bancard Corp. v. Visa U.S.A. Inc.* ["*NaBanco*"], 779 F.2d 592 (11th Cir. 1986) ........ 3, 4

*Nat'l Bancard Corp. v. Visa U.S.A. Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984) ........ 3, 4

*Nat'l Bancard Corp. v. Visa U.S.A. Inc.*, 779 F.2d 592 (11th Cir. 1986) ........ 2

*Paycom Billing Services, Inc. v. MasterCard International, Inc.*, No. 03-CV-6150, 2005 U.S. Dist. LEXIS 4920 (E.D.N.Y. March 29, 2005) ........ 9, 11, 14

## TABLE OF AUTHORITIES

**Page**

*Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 861 F. Supp. 1498 (D. Or. 1994)......... 7

*Polk Bros., Inc. v. Forest City Enterps., Inc.*, 776 F.2d 185 (7th Cir. 1985)................................. 8

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982)................................................................... 19

*Reyn's Pasta Bella, LLC v. Visa U.S.A. Inc.*, 259 F. Supp. 2d 992 (N.D. Cal. 2003)............. 2, 12

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986)................... 8

*Sarro v. Cornell Corrections, Inc.*, 248 F. Supp. 2d 52 (D.R.I. 2003)................................. 18, 19

*SCFC ILC, Inc. v. Visa U.S.A. Inc.*, 36 F.3d 958 (10th Cir. 1994)............................................ 8

*Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)............................................. 15, 16

*Solar Travel Corp. v. Nachtomi*, 2001 U.S. Dist. LEXIS 7549 at *37 (S.D.N.Y. June 8, 2001)........................................................................................................................ 22

*State Dep't of Corr. v. ADP Marshall, Inc.*, 2004 R.I. Super. LEXIS 66 at *22-23 (2004)......... 21

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 239 F. Supp. 2d 180 (D.R.I. 2003)........................................................................................................................ 8, 21, 22

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57 (1st Cir. 2004)... 1, 8, 12

*Sullivan v. NFL*, 34 F.3d 1091, 1097 (1st Cir. 1994)............................................................ 8, 12

*Sullivan v. Tagliabue*, 25 F.3d 43 (1st Cir. 1994)................................................................ 15, 16

*Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)........................................................... 12

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001)........................... passim

**Statutes**

15 U.S.C. §§ 1 & 2.................................................................................................................. 1

R.I. Gen. Laws § 6-36-2(b)........................................................................................................ 20

R.I. Gen. Laws § 6-36-5........................................................................................................ 1, 20

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)............................................................................................................. 1

P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 2103d, at 38 (2d ed. 2000)............................ passim

# TABLE OF AUTHORITIES

**Page**

Restatement (Second) of Torts § 222A ........ 23

*Taxpayer Beware: Schemes, Scams and Cons: Hearing Before the Committee on Finance of the United States Senate*, 107th Cong. 31-33, at 109, 112 (2001) ........ 5

## PRELIMINARY STATEMENT

This is the second attempt of plaintiff PSW, Inc. ("PSW") to turn a business dispute into an antitrust case. But "[s]ome antitrust cases are intrinsically hopeless because . . . they merely dress up in antitrust garb what is, at best, a business tort or contract violation." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 69 (1st Cir. 2004). PSW's amended complaint only confirms the point. In fact, it makes matters worse: rather than streamline the complaint by sharpening its allegations, narrowing its claims or dropping unnecessary defendants, PSW has actually broadened its complaint by loading onto it an entirely new – and entirely frivolous – claim under the First Amendment to the United States Constitution. PSW's amended complaint does nothing to cure its defects or to clarify the issues; to the contrary, it only further obscures the garden-variety contract dispute at the heart of this case – a dispute that has nothing to do with antitrust law, with the First Amendment, or with defendant Visa U.S.A. Inc. ("Visa").

## PLEADINGS

PSW alleges that certain Visa rules and practices violate § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and the Rhode Island Antitrust Law, R.I. Gen. Laws § 6-36-5. PSW also alleges that Visa's enforcement of those rules constituted breach of contract and of the implied covenant of good faith and fair dealing, tortious interference with contractual relations and prospective economic advantage, conversion, and embezzlement. Finally, PSW contends that Visa's private actions violate restrictions imposed on Government actors by the First Amendment. Visa submits that the facts alleged in the complaint fail to state any cognizable federal or state claim.

## DESCRIPTION OF MOTION

This is a motion by defendant Visa for an order dismissing plaintiff's First Amended Complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

## FACTS

1. *The Visa Network System*[1]

Visa is a joint venture established by financial institutions (mostly banks) to develop and promote an internationally recognized credit or "payment" card. Visa itself neither issues payment cards to consumers nor contracts with merchants to "accept" Visa cards. Both ends of the transaction are handled by individual Visa members. The Visa network facilitates such transactions by providing its members with a system for approving and processing charges involving millions of merchants and cardholders and thousands of banks every day. Visa has approximately 14,000 members in the United States. Individual banks may issue cards to consumers, or they may "acquire" merchants to accept Visa cards, or they may do both. Am. Compl. ¶ 13; *Visa*, 163 F. Supp. 2d at 333.

There are two other major general payment card networks: American Express ("Amex") and Discover. In contrast to Visa and MasterCard, Amex and Discover are wholly integrated for-profit enterprises, referred to as "closed loop" systems. *Visa*, 163 F. Supp. 2d at 333. Discover and Amex issue their own cards to consumers and process merchant transactions themselves. *Id.*

The courts uniformly have recognized that the Visa system embodies a classic pro-competitive joint venture: a group of banks have joined together in a limited fashion to offer an innovative product that none could offer on its own – bank-issued credit cards that can be used in virtually every consumer transaction in virtually every corner of the world. *See, e.g.*, *id.* at 333-34. At the same time, individual member banks continue to compete with each other in terms of issuing credit cards to consumers, signing up merchants to process payment card transactions, and, of course, in other aspects of their businesses. *Id.* at 332-33. In short, the members of the

[1] Although PSW's Amended Complaint includes many inaccurate statements and characterizations of Visa's system, for purposes of this motion, we treat the alleged facts as true. The basic operation of Visa's system is also elaborated in numerous published judicial opinions. *See, e.g.*, *Nat'l Bancard Corp. v. Visa U.S.A. Inc.*, 779 F.2d 592, 594-96 (11th Cir. 1986) ("*NaBanco*"); *Reyn's Pasta Bella, LLC v. Visa U.S.A. Inc.*, 259 F. Supp. 2d 992, 996-97 (N.D. Cal. 2003); *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 331-34 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003).

Visa venture "work together . . . to achieve benefits for themselves they could not provide independently, including globally recognized brands and sophisticated computer networks for processing transactions." *Id.* at 332. That cooperation, in turn, facilitates vigorous competition: "The members of Visa and MasterCard compete with each other on practically every other dimension that directly impacts consumers, including pricing, fees and finance charges, product features and other services for cardholders and merchants." *Id.* at 332-33; *see* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 2103d, at 38 (2d ed. 2000) ("*Antitrust Law*") (Visa is an "elaborate network-style venture" in which there is "robust competition" among the individual members). The ability of Visa's members to compete with each other, and with Amex, Discover, and members of the MasterCard network, in the provision of payment card services is made possible by the "plethora of ancillary regulations" that govern membership in the Visa joint venture. *Nat'l Bancard Corp. v. Visa U.S.A. Inc.*, 596 F. Supp. 1231, 1253 (S.D. Fla. 1984); *see NaBanco*, 779 F.2d at 602.

Visa operates on a not-for-profit basis. It does not charge merchants or cardholders fees, but receives funds from members as fees for its network services; any funds it receives in excess of the costs of those services are held for the benefit of merchants such as PSW, in the form of security accounts to pay merchants in the event of a bank default on a payment card transaction. Am. Compl. ¶ 12; *Visa*, 163 F. Supp. 2d at 332.

2. *A Typical Visa Transaction*

The typical payment-card transaction within the Visa network involves at least four entities: (1) a cardholder, who uses a payment card to purchase goods or services; (2) a merchant, which accepts the card as payment for the goods or services; (3) an "acquiring" member bank, which has contracted with the merchant to acquire payment card charges; and (4) an "issuing" member bank, which issued the card to the cardholder. Am. Compl. ¶ 38; *NaBanco*, 779 F. 2d at 594. To be clear: the merchant does not contract with Visa, but with the Visa member bank, Am. Compl. ¶¶ 28, 34, which competes with other Visa and MasterCard banks, and with Amex and Discover, for the business of acquiring the merchant's payment-card transactions. As any

payment-card user knows from experience, some merchants contract for payment card services with Visa banks, MasterCard banks, Amex and Discover, while others contract with only one or two payment-card service providers and thus only "accept" certain payment cards for purchases.

A typical Visa payment card transaction begins with a purchase of goods or services by a consumer who holds a payment card issued by a member bank (the "issuing" bank). Am. Compl. ¶ 38. The merchant will accept the Visa-branded bank card for payment if the merchant has already contracted with a Visa bank for the bank to "acquire" the merchant's payment card transactions. The merchant submits a request for payment of the card charge to its "acquiring bank." *Id.* The acquiring bank reimburses the merchant the face amount of the charge, minus a small discount (the "merchant discount fee") as part of the price for providing payment card services. *Id.*[2] The acquiring bank then submits, through the Visa system, a request for payment on the card charge to the cardholder's issuing bank. The issuing bank reimburses the acquiring bank the face amount of the charge, minus a fee (the "interchange fee") slightly smaller than the merchant discount fee. *Visa*, 163 F. Supp. 2d at 332; *Nabanco*, 779 F.2d at 594. The issuing bank, finally, bills the cardholder and receives payment for the face amount of the charge. Am. Compl. ¶ 38.

As part of its contract with the acquiring bank, a merchant must establish a "Merchant Account" with the bank. *Id.* ¶ 36. The merchant deposits card charges to its Merchant Account, and receives reimbursements from the acquiring bank for such charges through that account. Because of their relatively small size, many adult entertainment websites handle payment-card transactions through an "aggregator" such as PSW, which essentially combines the charges of numerous Internet merchants and presents a potential acquiring bank with a sufficiently large number of transactions to make the business commercially attractive to the bank. *Id.* ¶¶ 17-19.

[2] In general, merchants are willing to pay a price for payment card services because such cards allow them to make sales to customers on credit without bearing the risk that the customer will default on the payment; if a cardholder defaults, the issuing bank remains responsible for the cardholder's purchases. *Nat'l Bancard*, 596 F. Supp. at 1260.

The aggregator serves as the merchant from the acquiring bank's perspective. *Id.* ¶ 21. PSW's acquiring bank was defendant First Financial Bank ("FFB").

3. *Internet Transaction Fraud And "Chargebacks."*

Internet payment-card transactions involve a comparatively high rate of disputed consumer transactions, in part because of the known risk of fraud associated with such transactions. *Id.* ¶ 57, 59. Fraud of many types – by merchant, by cardholder, by third party – is a special problem on the Internet because there is no face-to-face transaction and no customer signature. PSW asserts that the most prevalent form of fraud on the Internet is "friendly fraud," which occurs when the cardholder simply denies that he made a charge that appears on his bill. *Id.* ¶ 60. In a traditional "brick and mortar" business, disputes can be resolved by reviewing a signed receipt. *Id.* ¶ 54. Not so for "card not present" transactions, including many Internet transactions. If such a merchant chooses to offer its customers the option of paying on credit, and the customer later denies the charge, the Internet merchant may have difficulty proving that the customer did, in fact, make the transaction. *Id.* ¶¶ 56, 59. Payment-card transactions conducted by Internet merchants and other "card not present" merchants pose a significantly higher risk of fraud than do transactions conducted by "brick and mortar" merchants. *Id.* ¶ 59; *Taxpayer Beware: Schemes, Scams and Cons: Hearing Before the Committee on Finance of the United States Senate*, 107th Cong. 31-33, 109, 112 (2001) (statement of Hugh Stevenson, Assoc. Director, Div. of Planning and Information, F.T.C. Bureau of Consumer Protection) (describing high incidence of fraud in Internet adult entertainment industry). PSW acknowledges that disputed transactions impose costs on the Visa system, and that Visa can and should take measures to prevent such costs by reducing the number of disputed transactions. Am. Compl. ¶¶ 59-61.

"Chargebacks" are part of the process Visa has adopted to address disputed transactions. When a cardholder denies a charge and the merchant cannot verify the transaction with a customer signature, the issuing bank may "reverse" the transaction. *Id.* ¶ 51. In accordance with Visa's rules, the acquiring bank reimburses the issuing bank the amount of the transaction (less

the interchange fee). The acquiring bank typically compels the merchant to reimburse the bank the amount of the transaction (it is a reimbursement since the acquiring bank already paid the merchant the transaction amount minus discount fee upon approval of the transaction) plus a fixed "fee" for the chargeback, under whatever terms and procedures are set forth in the Merchant Agreement between the acquiring bank and the merchant. *Id.* ¶ 52. Both the reimbursement and the fee are drawn directly from the merchant account. Because both Visa, *id.* ¶ 65, and the U.S. Government (*e.g.*, *In re Citicorp Credit Servs., Inc.*, 116 F.T.C. 87, 92 (1993)) consider the rate of chargebacks a reasonable proxy for the amount of fraud occurring in a given merchant's transactions, Visa's efforts to mitigate and deter the costs of such fraud step up when a given merchant's chargeback rate increases. When chargebacks as measured against the volume of sales exceed a specified threshold, Visa imposes certain fees on the member bank that serves as the merchant's acquirer. Am. Compl. ¶ 70. The levels are set to identify only the most extreme problematic merchants: in a given month, only approximately 30-50 merchants out of the 5 million merchants in the Visa system – less than one-hundredth of one percent – experience chargeback problems severe enough to satisfy the excessive chargeback thresholds. Acquiring banks subjected to the fees triggered by such high chargeback levels may pass them on to the merchants involved in accordance with their Merchant Agreements. *Id.* ¶ 70. As alleged in the complaint, Visa's chargeback rules have the effect of encouraging merchants to take steps to reduce the level of fraud, *id.* ¶ 68, thereby reducing the costs such fraud imposes on the system.

**ISSUES**

1. Whether the complaint states claims under Sherman Act §§ 1 & 2.

2. Whether PSW has standing to bring its antitrust claims.

3. Whether the complaint alleges a cognizable action for violation of the First Amendment.

4. Whether the complaint alleges facts sufficient to state claims for breach of contract and the duty of good faith and fair dealing, tortious interference with contract and prospective economic advantage, embezzlement, and conversion.

## POINTS AND AUTHORITIES

The basic standard governing a motion to dismiss under Rule 12(b)(6) is familiar: whether the plaintiff has stated a claim upon which relief could be granted, taking as true all the complaint's well-pled allegations and drawing all reasonable inferences in the plaintiff's favor. *DM Research, Inc. v. College of Am. Pathologists*, 2 F. Supp. 2d 226, 228 (D.R.I. 1998) (Torres, J.), *aff'd*, 170 F.3d 53 (1st Cir. 1999). The plaintiff carries an important burden under that standard:

> [T]he complaint must allege facts that establish all of the elements of the claim[s] asserted.... Moreover, the factual allegations must be specific enough to justify dragging a defendant past the pleading threshold.... These principles are especially applicable in antitrust cases where further litigation is likely to be protracted and expensive and, therefore, the impact of unfounded claims is severe.... While antitrust complaints are not subjected to any heightened pleading requirements, courts must be vigilant to insure that the underlying facts are pled with sufficient specificity to state a claim.

*Id.* (internal quotation marks and citations omitted).

## I. PSW FAILS TO STATE A FEDERAL ANTITRUST CLAIM

### A. PSW Does Not State An Antitrust Claim Relating To Visa's Chargeback Rules

The gravamen of PSW's complaint is Visa's "chargeback" system for deterring fraudulent transactions. PSW's federal antitrust attack on that system fails because PSW has not alleged facts that, if true, would demonstrate harm to overall competition in a relevant market.[3]

Rules designed to reduce disputed consumer transactions are a necessary and integral part of any payment-card joint venture. Because Visa's chargeback rules are "part of a larger, legitimate economic [joint] venture," they are not per se unlawful, but must be analyzed under

[3] The analysis set forth below applies equally to PSW's claims under § 1 (agreements in restraint of trade) and § 2 (monopolization) of the Sherman Act: both provisions require allegation and proof of harm to marketwide competition. *Interface Group, Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 10 (1st Cir. 1987). Further, PSW does not a state a § 2 claim because PSW fails to allege, as it must under § 2, that Visa's chargeback rules impaired the competitive opportunities of rivals Amex, Discover or MasterCard. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 & n.32 (1985). Further, thousands of competing rivals cannot create a single-firm *mono*poly; claims of concerted action among rivals must arise under § 1, not § 2. *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 861 F. Supp. 1498, 1514-15 (D. Or. 1994).

the "rule of reason." *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001); *see Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 4 n.1 (1st Cir. 2004); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985). Antitrust courts have uniformly applied rule of reason analysis to Visa's rules. *See, e.g.*, *Visa*, 344 F.3d at 238; *SCFC ILC, Inc. v. Visa U.S.A. Inc.*, 36 F.3d 958, 963-65 (10th Cir. 1994).[4]

To articulate a rule of reason challenge to a particular restraint of trade, a plaintiff must allege, inter alia, that the challenged restraint harms "competition" in a relevant market. *See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 239 F. Supp. 2d 180, 191 (D.R.I. 2003) (Torres, J.), *aff'd*, 373 F.3d 57 (1st Cir. 2004). It is not enough to allege harm to a single purchaser or competitor. Antitrust law is "concerned not with wrongs directed against the private interest of an individual business," *Eastern Food*, 357 F.3d at 4, but with "activities that interfere with competitive markets and their ability to provide adequate supplies of quality goods at reasonable prices," *Stop & Shop*, 239 F. Supp. 2d at 186. Accordingly, an antitrust plaintiff challenging an ancillary restraint as unreasonable must allege harm to competition "marketwide." *Id.* at 192; *see Antitrust Law* ¶ 1912f, at 330 ("An anti-competitive restraint on trade is one that tends to reduce *marketwide* output." (emphasis added)). To establish such "marketwide" harm, the plaintiff must allege that "the challenged restraint is reasonably likely to effect an output reduction" – and thus an increase in prices – "in the relevant market considered *as a whole*." *Antitrust Law* ¶ 1912e, at 330 (emphasis added); *see Sullivan v. NFL*, 34 F.3d 1091, 1097 (1st Cir. 1994) (harm to competition is "usually measured by a *reduction in output* and an *increase in* prices in the relevant market") (emphasis added); *Rothery*, 792 F.2d at 217. Determining "whether the plaintiff has plausibly alleged that the challenged restraint can yield lower market output or higher market prices" is a key "early screening device[]" for antitrust cases. *Antitrust Law* ¶ 2103a, at 27. On a motion to dismiss, the court should ask "[w]hether the

[4] It is appropriate for the court to determine at the pleading stage whether the facts alleged in an antitrust complaint implicate a *per se* or rule of reason challenge. *See Stop & Shop*, 373 F.3d at 61.

restraint considered on its face makes any plausible threat to reduce marketwide output and thus increase prices; if not, the complaint can be dismissed." *Id.* ¶ 2100g2, at 17; *see id.* ¶ 1912j, at 340.

There are at least two respects in which PSW's complaint fails to allege facts plausibly demonstrating marketwide harm to competition.

*First*, Visa's chargeback rules restrict only competition *within the Visa brand*, and not competition marketwide. The recent decision in *Paycom Billing Services, Inc. v. MasterCard International, Inc.*, No. 03-CV-6150, 2005 U.S. Dist. LEXIS 4920 (E.D.N.Y. March 29, 2005), dismissing another aggregator's challenge to the distinct chargeback rules adopted by MasterCard, applies with full force here. Like PSW, Paycom argued that MasterCard's "'chargeback system' is a violation of antitrust laws because it constitutes an agreement among defendant's member banks not to compete regarding risk allocation for internet transactions." *Id.* at *9. The *Paycom* court, however, rejected that claim because MasterCard's chargeback rules "only restrict competition within its own brand," and where "a dispute involves a single product by a manufacturer or service provider, courts have generally found that where inter-brand competition exists, an agreement to limit *intra*-brand competition does not harm competition." *Id.* at *11 (citing cases). MasterCard's internal chargeback rules, the court explained, harm Paycom only because they "increase its costs," and not because MasterCard itself enforced any marketwide restriction on competition. *Id.* at *11-12.

Just the same is true here: PSW, like Paycom, is challenging Visa rules that at most restrict competition among Visa member banks as to the terms on which they will assume the risk of fraud in pornographic website transactions. If those rules harm PSW, it is only because they increase PSW's costs, not because Visa has seized control over competition in the Internet payment card services market.

To be sure, the *Paycom* opinion points to the existence of other brands in the market, including Discover and Visa, *id.*, whereas PSW here alleges that *both* Visa and MasterCard have adopted injurious chargeback rules. But PSW's tactical decision to include both Visa and

MasterCard as defendants does not change the fact that, as *Paycom* recognizes, each separate entity's internal rule is only an intrabrand restriction and thus is *not* a restriction on interbrand competition across the *market as a whole*. And, on top of the interbrand competition between Visa and MasterCard and their member banks, there is also strong competition from American Express and Discover. To be sure, as PSW alleges, Amex has elected not to do business with pornographic website aggregators such as PSW, but that is Amex's own independent market choice, and it necessarily inflicts *much* greater injury on PSW than the Visa-member chargeback restrictions PSW finds too demanding. Indeed, Amex's decision not to do business with entities such as PSW only illustrates why the difficulty PSW has experienced does not result from Visa's restriction on marketwide competition – Visa obviously does not control Amex any more than it controls Discover or MasterCard – but from risks inherent in PSW's business model.

PSW attempts to plead away the existence of interbrand competition by hinting at a conspiracy between MasterCard and Visa to adopt onerous chargeback rules, Am. Compl. ¶¶ 100-103, but the attempt is unavailing. To plead an agreement between MasterCard and Visa within the meaning of § 1, PSW must allege *facts* that, if true, would "establish that [MasterCard and Visa] reached an agreement or understanding to accomplish an unlawful purpose." *DM Research*, 2 F. Supp. 2d at 229; *see Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 756 (1984). "Conclusory allegations of conspiracy or unlawful purpose do not satisfy the requirement that sufficient supporting facts be pled. . . . Nor is the invocation of 'antitrust terms of art'" – such as "conspiracy" – "a substitute for the necessary factual allegations." *DM Research*, 2 F. Supp. 2d at 229; *see DM Research*, 170 F.3d at 56 (agreeing that "a court is not required to accept such terms [as 'conspiracy' or 'agreement'] as a sufficient basis for a complaint"). The existence of a conspiracy can be inferred, but the inference must be reasonable from the facts pled, and an inference of conspiracy is reasonable *only* when the pleaded facts are more suggestive of an unlawful conspiracy than they are of "rational, independent action." *DM Research*, 2 F. Supp. 2d at 229 (internal quotation marks omitted); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986).

PSW's allegations here are plainly more consistent with a rational, independent decision by Visa to adopt its chargeback rules than with an unlawful agreement between Visa and MasterCard. Amex's refusal to do business with PSW conclusively demonstrates that a rational, independent actor will see serious risks in doing business with PSW, and rebuts PSW's assertion, Am. Compl. ¶ 103, that Visa would only risk the loss of PSW's business from chargeback rules if Visa could be sure that MasterCard would adopt similar rules. Indeed, PSW itself acknowledges that if a payment card system *is* going to expose itself to risks associated with certain Internet transactions, it will need some way to limit and deter fraud, Am Compl. ¶¶ 59-60, 62, 64, establishing Visa and MasterCard each had rational economic incentives to adopt *some form* of chargeback rules. Further, Visa and MasterCard each adopted their *own distinct rules*; as PSW itself elaborates, MasterCard's in many ways impose greater demands on member banks doing business with pornographic website aggregators. *Id.* ¶¶ 73; 78-82. The *Paycom* court made the same point. *Paycom*, 2005 U.S. Dist. LEXIS 4920, at *12 n.5 (dual-member banks "are handling Visa payment card transactions with less stringent chargeback policies"). In short, PSW fails to allege facts more suggestive of an unlawful agreement between Visa and MasterCard than of a rational, independent choice by each to adopt their own distinct intrabrand rules to discourage fraudulent payment-card transactions.[5] The continued vigorous *inter*brand competition between Visa and MasterCard – as well as Amex and Discover – for sales in the network services market demonstrates why Visa's intrabrand chargeback rules do not affect competition in the market as a whole.

*Second*, even if PSW could allege that Visa's internal rules have marketwide effects of *any* kind, PSW does not allege facts plausibly demonstrating that Visa's chargeback rules actually *restricted output* or *increased prices* across the entire market. PSW alleges that the relevant market in this case is the market for payment card services sales to pornographic

---

[5] PSW asserts that the "dual governance structure" of Visa and MasterCard suffices to prove an agreement to adopt chargeback rules, Am. Compl. ¶ 102, but the *Visa* opinion on which PSW relies makes clear that dual governance has not remotely undermined vigorous competition between the networks. *Visa*, 163 F. Supp. 2d at 345-79.

websites and/or their aggregators. Am. Compl. ¶ 162. That is not a plausible market in this context.[6] But even if it were, PSW still has failed to allege harm to competition marketwide because it has not alleged a general price increase or output reduction. PSW alleges only that the chargeback rules have caused the number of smaller buyers in that market to decline, leaving only larger Aggregators able to spread costs more effectively and large websites available to negotiate Merchant Agreements with acquiring banks. Am. Compl. ¶ 90. But injury to competition occurs only when the number of *sellers* is reduced and the remaining sellers are able to conspire or otherwise restrict output and increase prices. *Stop & Shop*, 373 F.3d at 66; *Sullivan*, 34 F.3d at 1097. Here, where the only allegation is that the number of *buyers* was reduced – leaving only two large buyers – the only economic plausible outcome is that prices will *decrease* in the Internet pornography card processing market, because "[l]arge buyers are frequently able to obtain price concessions unavailable to smaller buyers," *Antitrust Law* § 517c5, at 136, and because competition among thousands of banks to sell their payment card services to fewer and fewer buyers can only exert downward pressure on prices, *Stop & Shop*, 373 F.3d at 66. Because PSW cannot plausibly allege that Visa's chargeback rules have caused

[6] *See Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (market must be "plausible"). Every other antitrust challenge to a Visa rule has analyzed a general payment-card market, not a segment of the market defined solely by the characteristics of particular purchasers (such as Internet pornographers or their aggregators). *See, e.g., SCFC*, 36 F.3d at 966; *Reyn's Pasta Bella*, 259 F. Supp. 2d at 1000; *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238(JG), 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *Visa*, 163 F. Supp. 2d at 338. There is no basis for analyzing the market more narrowly here; the question of whether Visa's chargeback rules caused "harm" to a market must be asked with respect to the market in which they operate "as a whole." That market is certainly no narrower than the overall payment-card services market: Visa's rules apply to all member banks that sell services in the payment-card market, and they govern any and all merchant transactions that result in chargebacks, regardless of the merchant's identity. To be sure, the rules do effectively impose higher costs on those merchants with higher chargeback rates, but that does not justify treating those particular merchants as a distinct market unto themselves. The characteristics of the product or service define the market, not the characteristics of a few purchasers. *See Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir. 2004) ("Attributes of shoppers do not identify markets."). PSW's attempt to define the relevant market as the Internet pornography card processing industry is circular: it effectively defines the market as "purchasers who claim to be injured by the rules" to assess whether the "market" was harmed by the rules. That tautological definition is not "plausible" and thus not acceptable, even at the pleading stage. *Todd*, 275 F.3d at 200; *see Menasha*, 354 F.3d at 665-66. It is especially preposterous given PSW's own representation that the Internet pornography card processing "market" was comprised, at its height, of a grand total of twelve purchasers, Am. Compl. ¶ 162, out of the millions of merchants who purchase payment card services, and also given the fact – which PSW cannot in good faith dispute – that in a typical month less than .001% of the 5 million merchants in the Visa system trigger the excessive chargeback fees, *see supra* at 6.

an increase in payment card prices across the entire Internet pornography card processing market, PSW cannot state an antitrust claim. *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense.").[7]

**B. PSW's Challenges To Other Visa Programs Also Fail**

The clear focus of PSW's complaint is the chargeback program, but PSW also briefly mentions other Visa programs and activities. These passing challenges fail as well.

1. *Internet Payment Service Providers Program*: PSW's kitchen-sink list of policies at issue starts with Visa's "Internet Payment Service Providers" registration program, which requires all aggregators to provide certain identifying and financial information about each of their website clients and a $750.00 registration fee, and allows Visa to deny approval for websites with "certain sexual content or gambling links." Am. Compl. ¶ 92(a). PSW does not even begin to suggest how this program harmed competition in the payment card services markets or pornography website card processing markets overall. It may have adversely affected websites with "certain sexual content or gambling links," but it is facially obvious why Visa should have heightened concerns with such sites, and PSW alleges no facts demonstrating the modest registration fee and identification requirements for approval are anything other than reasonable business requirements in this context.

2. *Terminated Merchant's File*: PSW next identifies the Terminated Merchant's File ("TMF"), which provides member banks with the names of terminated merchants and those deemed "high risk." Am. Compl. § 92(b). But again, PSW does not allege facts demonstrating that the TMF itself harms competition in any relevant market. Indeed, by PSW's own account the TMF is merely ancillary to the chargeback program and allows Visa member banks to avoid the costs associated with proven high-chargeback merchants.

[7] PSW also alleges that Visa should have increased prices on consumers by shifting chargeback- and fraud-related costs to issuing bank members and card-using consumers, rather than toward high-chargeback merchants such as PSW. Am. Compl. ¶¶ 61-62, 86-87. PSW cannot state an antitrust claim against Visa's chargeback rules on the ground that Visa should have adopted different rules more likely to increase consumer prices. *See Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 527 (1st Cir. 1989) ("The Sherman Act's very purpose is to help consumers, in part by bringing about low, nonpredatory prices.").

3. _Cross-Border Acquiring_: PSW also refers to Visa's rule barring overseas member banks from acquiring U.S. based transactions. Am. Compl. ¶ 92(c). Yet again, PSW fails to allege facts establishing that the cross-border rule harmed overall competition in any relevant market. Further, PSW appears to be alleging that it should be allowed to do business with any Visa member bank anywhere in the world, but PSW fails to explain how the cross-border rule inflicted any injury on PSW distinct from the chargeback rules.

4. _Exclusivity Rules_: PSW also tosses Visa's exclusivity rules into the mix, as if the opinions in the Department of Justice action, *United States v. Visa U.S.A., Inc.* ("DOJ Action") gave license to all parties unhappy with Visa to state a federal antitrust claim. PSW claims that the exclusivity rules restrained competition in the network services market and precluded the formation of rival networks. This claim fails on many levels. First, as the *Paycom* court recognized in rejecting an identical aggregator claim based on MasterCard's exclusivity rule, a merchant-aggregator lacks standing to challenge such rules because its injury, if any, is entirely derivative of the injuries suffered in the first instance by Amex and Discover. *Paycom*, 2005 U.S. Dist. LEXIS 4920, at *13-14. Amex and Discover have already sued to vindicate those injuries, *see American Express Travel Related Servs. Co. v. Visa U.S.A. Inc.*, No. 04-CV-8967 (S.D.N.Y.); *Discover Fin. Servs. v. Visa U.S.A. Inc.*, No. 04-CV-7844 (S.D.N.Y.), rendering a claim by PSW unnecessary and duplicative. "Plaintiff is a remote party and allowing it to recover under this theory could result in punishing [Visa] multiple times for the same offense." *Paycom*, 2005 U.S. Dist. LEXIS 4920, at *13-14. Second, the Visa rule in the DOJ Action (unlike MasterCard's) was, in any event, only a bar on member banks *issuing* Amex or Discover cards; it did not bar member banks from *acquiring* Amex and/or Discover transactions. *Visa*, 163 F. Supp. 2d at 379 (quoting rule). Accordingly, the Visa rule in no way prevented Amex and Discover from partnering with Visa banks to acquire PSW (and other) transactions. Third, contrary to PSW's conclusory assertion that Visa's rule prevented the formation of rival networks, in fact Amex and Discover remain strong competitors and available to do business with PSW and other aggregators if they so chose.

_Parallel Pricing_: PSW finally asserts that Visa and MasterCard adopted "parallel pricing schemes" to charge higher interchange rates to PSW and similarly situated merchants. Am. Compl. ¶ 92(e). But as this Court has recognized, "parallel behavior, by itself, does not constitute a conspiracy" under § 1. *DM Research*, 2 F. Supp. 2d at 229. As noted above, PSW must allege facts more suggestive of an unlawful agreement between Visa and MasterCard than of rational, independent economic action. *Supra* at 10-11. Yet PSW says nothing more than that the conduct is "parallel," and it offers nothing to rebut the obvious inference that Visa sets it interchange fee in part to reflect the conceded risk of fraud presented by certain merchant transactions, Am. Compl. ¶¶ 56, 59, rather than because of any unlawful agreement with MasterCard. And, as also noted above, Amex has categorically refused to do business with PSW and other Internet pornography aggregators and merchants, again confirming that Visa had entirely rational business reasons for treating high-risk and fraud-plagued merchants like PSW cautiously. That MasterCard chose to do the same thing is simply predictable, not evidence of a conspiracy.

## II. PSW LACKS "ANTITRUST STANDING"

PSW's action is also barred because PSW lacks "antitrust standing." A prudential doctrine more restrictive than constitutional standing, *see Sullivan v. Tagliabue*, 25 F.3d 43, 45 n.5 (1st Cir. 1994), "antitrust standing" principles are founded upon the recognition that "Congress did not intend the antitrust laws to provide a remedy . . . for all injuries that might conceivably be traced to an antitrust violation," *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264 (1972); *see Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999). "[A]lthough theoretically possible to allow all affected persons to sue . . . the Supreme Court and the lower courts have never doubted the need for some cutoff." *Antitrust Law* ¶ 339d, at 331. That "cutoff" is provided by the "antitrust standing" doctrine, which narrows the class of assertedly injured persons who may bring suit under the federal antitrust statutes. *See Serpa*, 199 F.3d at 10; *Sullivan*, 25 F.3d at 45.

The plaintiff has the burden to allege and prove all of the numerous factors that must be satisfied to establish antitrust standing. *See Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1321 (9th Cir. 1996); *Antitrust Law* ¶ 335a, at 286-87. At least three are pertinent here: the directness of the injury; the speculative nature of damages; and the risk of duplicative recovery or complex apportionment of damages. *See Serpa*, 199 F.3d at 10 (listing factors). In particular, when the plaintiff's alleged injury is not direct, but derives from the injury of a more immediate victim of the alleged anti-competitive conduct, the plaintiff "is routinely denied standing." *Antitrust Law* ¶ 339c, at 327; *see id.* ¶ 339d, at 329; *see Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 541 (1983) (no antitrust standing where "injuries were only an indirect result of whatever harm may have been suffered by" more proximate parties); *Sullivan*, 25 F.3d at 51 (rejecting antitrust standing where injury is "indirect, and a consequence of the direct injury inflicted on the [more immediate victim]"). Similarly, recovery is barred when "the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000).

PSW lacks standing because the injury it asserts from chargeback-related costs does not result directly from Visa's conduct, but that of the acquiring bank – FFB – with which PSW contracted for card services. Chargeback-related fees are assessed by Visa *on the acquiring banks*, who then allegedly choose to pass the fees on to merchants such as PSW. Am. Compl. ¶¶ 34, 106, 108. PSW cannot plausibly allege that FFB is contractually required by any agreement with Visa to pass on chargeback-related fees to merchants. *See infra* at 21 (describing contractual relationship). To the contrary, PSW alleges that the amount required in the reserve account to provide for chargeback fees and penalties is "established by and in *the sole discretion of the Acquiring Bank*," *id.* ¶¶ 83, 107 (emphasis added), and every allegation concerning increases in the amount of the reserve account specifies FFB or FDMS – not Visa – as the source of the demand, *id.* ¶¶ 84, 107, 115, 116, 127, 139, 144, 149.

In short, the pass-through from which PSW claims "injury" derives from the terms of a freely negotiated contractual agreement between FFB and PSW – an agreement *to which Visa is not a party*. Visa's chargeback rules govern only the relationship between Visa and acquiring banks such as FFB, and if those rules are anti-competitive, the party immediately "injured" by such rules is the acquiring bank that is required to pay the fees. If merchants such as PSW suffer any injury, it is only because the acquiring banks elect to pass the fees on to them in accordance with the terms of each individual bank's independent Merchant Agreement.

PSW's alleged injury is thus indirect, derivative of an "injury" ostensibly suffered by the acquiring bank in the first instance. Likewise, the existence of any damage to PSW depends on whether FFB decided to pass on the assertedly anti-competitive chargeback fees and penalties, thus rendering any damage to PSW a speculative consequence of FFB's own decisions.[8] Finally, allowing PSW to recover for its indirect, derivative injury would risk duplicative recovery, because if there is any anti-competitive conduct at all, then the more immediate "victim" of that conduct – FFB – could also sue and seek recovery of its own damages, i.e., the fees it was required to pay under the supposedly anti-competitive chargeback rules adopted by the Visa joint venture. Thus Visa could be forced to pay essentially the same damages twice. Avoiding that result – or, at a minimum, avoiding the difficulty of sorting out the various damage claims under such circumstances[9] – is one of the main reasons the antitrust standing doctrine limits the right to sue to the first injured party. *See, e.g., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 738-39 (1977).

[8] Although the complaint alleges that FFB *did* pass on the chargeback fees, that is irrelevant for antitrust standing purposes. PSW is at best an "indirect purchaser" of Visa's payment-card-processing network services, which are "sold" in the first instance to Visa's member banks, subject to Visa's network rules. *See Visa*, 163 F. Supp. 2d at 338-39. It is settled that an indirect purchaser cannot pursue an antitrust claim against the ultimate supplier of a good or service, even when the direct purchaser – here, FFB – has indisputably passed the allegedly unlawful cost through to the plaintiff. *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213-14 (4th Cir. 2002); *Ford Motor Co. v. Lane*, 86 F. Supp. 2d 711, 716-17 (E.D. Mich. 2000). The "very purpose" of the rule "is to prevent indirect purchasers . . . from recovering any portion of a passed-through overcharge." *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 712 (D. Md. 2001).

[9] It bears emphasis that PSW itself appears to have passed on chargeback-related fees and penalties to its own merchant customers, further complicating any apportionment of damages. *See H&H Internet, N.V. v. P.S.W., Inc.*, C.A. No. 04-324-L (D.R.I. July 28, 2003) (action by merchant against PSW alleging that PSW withheld 10% of all receipts to cover the cost of chargebacks and related expenses).

## III. PSW'S NEW FIRST AMENDMENT DAMAGES CLAIM IS FRIVOLOUS

PSW's amended complaint adds a startling new count: Visa, a private actor, violated the First Amendment to the United States Constitution because it impaired the speech of PSW and its Internet pornography clients, also private actors, simply by screening websites and enforcing its chargeback program. PSW alleges that these private acts were carried out under color of federal law and that Visa is therefore subject to money damages under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), which authorized private damages claims against individual public officers for violation of Fourth Amendment rights. PSW's new claim is nothing short of frivolous.

*First*, as this Court has recognized, the U.S. Supreme Court has squarely held that a *Bivens*-type damages claim will not lie against a *corporate* entity – public or private. *See Sarro v. Cornell Corrections, Inc.*, 248 F. Supp. 2d 52, 62-63 (D.R.I. 2003) (discussing *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001)). As *Malesko* explains, the purpose of *Bivens* was "to deter *individual* federal officers from committing constitutional violations," and the "threat of suit against an individual's employer was not the kind of deterrence contemplated by *Bivens*," because "if a corporate defendant is available for suit, claimants will focus their collection efforts on it, and not the individual directly responsible for the alleged injury." *Malesko*, 534 U.S. at 70-71 (emphasis added). "[A] constitutional tort remedy against a private [corporate] entity . . . is therefore foreclosed." *Id.* at 71; *see Sarro*, 248 F. Supp. 2d at 54 (after *Malesko*, "corporate defendants cannot be held liable" in *Bivens* actions); *id.* at 62-63. PSW's *Bivens* claim cannot survive *Malesko* and *Sarro*.

*Second*, the Supreme Court has emphatically refused to imply a *Bivens*-type remedy to any context other than the Fourth Amendment (*Bivens*), the Fifth Amendment's Due Process Clause (*Davis v. Passman*, 442 U.S. 228 (1979)), and the Cruel and Unusual Punishment Clause of the Eighth Amendment (*Carlson v. Green*, 446 U.S. 14 (1980)). *See Malesko*, 534 U.S. at 68 (noting that Court has "consistently refused to extend *Bivens* liability to any new context").

PSW offers no basis for extending *Bivens* damages liability to its novel private First Amendment claim.

*Third*, a *Bivens*-type remedy is of course available only for certain *constitutional* violations, and (with the exception of the Thirteenth Amendment) the Constitution – including the First Amendment – restrains only *Government* actors, not private actors. "It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government," *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976), and "the First Amendment [thus] protects individuals only against government, not private, infringements upon free speech," *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1229 (9th Cir. 1996); *see Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982). Accordingly, where, as here, a plaintiff is challenging a private entity's conduct as infringing First Amendment rights, the plaintiff must plead facts establishing that the private conduct "somehow constitutes state action." *George*, 91 F.3d at 1229.

Courts have employed several related but different tests to determine when private conduct constitutes Government action. *See Logiodice v. Trustees of Maine Central Institute*, 296 F.3d 22, 26 (1st Cir. 2002); *George*, 91 F.3d at 1231; *Sarro*, 248 F. Supp. 2d at 59. The bottom line of all the tests, however, is that "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001) (internal quotation marks omitted).

It is difficult to know which test for Government action PSW seeks to invoke here, for its complaint is virtually devoid of concrete *factual* allegations that would support treating Visa as the Government itself on *any* theory. PSW alleges conclusorily that Visa screens websites and pursues its chargeback policies as a result of "coercion" and "encouragement" by the Government in the form of extortionate regulatory threats and promises, Am. Compl. ¶ 168, 170, but PSW does not allege a single *fact* that would support such conclusory inferences. PSW does allege vaguely that Visa must be motivated by a "political agenda" rather than a business

purpose because the screened websites do not violate federal law and because Visa loses revenue from the chargeback program, and that the federal Government does not itself possess the resources necessary to monitor pornographic websites. *Id.* ¶ 169. But none of those allegations establishes that the Government "coerced" or even "encouraged" Visa to adopt its rules, or that Visa and the Government were so closely entwined as to constitute the same entity. At most they show only that Visa wanted its members to deal with Adult-oriented websites only with the utmost caution – hardly surprising, given the known risk of fraud in the business and the intensely controversial nature of the subject matter, concerns that have kept major rival Amex from doing business in this area altogether.

*Fourth*, even if PSW could attribute the adoption of Visa's rules to the Government, PSW does not even properly allege a substantive First Amendment violation. PSW claims the Visa's conduct constitutes an unlawful "prior restraint" of speech, Am. Compl. ¶¶ 172, 184, but PSW does not allege either (a) that any speech was prohibited by the Government through Visa, or (b) that PSW's own speech (as opposed to its clients') was prohibited. At most it appears from PSW's complaint that Visa required screening of websites for "certain sexual content and gambling links" and then denied card-processing approval for such sites. Am. Compl. ¶ 92(a). That is not a prior restraint on speech, it is a refusal by Visa and its members to facilitate one form of *payment* for speech.

For all the foregoing reasons, PSW's First Amendment *Bivens* count against Visa is utterly without reasonable basis in law.

## IV. PSW FAILS TO STATE ANY CLAIM UNDER RHODE ISLAND LAW

### A. Rhode Island Antitrust Claim

PSW asserts a monopolization claim under R.I. Gen. Laws § 6-36-5. Am. Compl. ¶ 183. Because that statute is construed *in pari materia* with Sherman Act § 2, *see* R.I. Gen. Laws § 6-36-2(b); *ERI Max Entm't v. Streisand*, 690 A.2d 1351, 1353 n.1 (R.I. 1997), PSW's state antitrust claim fails for the same reasons its Sherman Act claims fail.

**B. Contract Claims**

PSW's claims for breach of contract (Count Five) and breach of the implied covenant of good faith and fair dealing (Count Six) must be dismissed as against Visa because each claim depends on the existence of a contract between Visa and PSW, *see State Dep't of Corr. v. ADP Marshall, Inc.*, No. PB99-4704, 2004 R.I. Super. LEXIS 66, at *22-23 (Mar. 29, 2004); *Centerville Builders v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996), and Visa and PSW have no contractual relationship. PSW's contract unambiguously states that it is between "the Customer [PSW] ... First Financial Bank . . . and First Data Merchant Services Corporation." FFB Opening Br., Exh. A., at 1; *see Visa*, 344 F.3d at 235 (merchant contracts with acquiring bank, not with Visa). PSW again tries to plead around this problem with conclusory allegations that FFB is Visa's "agent" and that PSW contracts with Visa "through" FFB, Am. Compl. ¶¶ 24, 26, 34, 36, 173, but PSW does not plead *facts* sufficient to establish the existence of a legal agency or privity relationship between Visa and FFB. PSW alleges *only* that there is an "identity of interest" between Visa and FFB, Am. Compl. ¶ 173, but of course a third party does not assume full rights and obligations as party to a contract just because it benefits from a contract or shares an interest with one of the contracting parties. *See Implement Serv., Inc. v. Tecumseh Prods. Co.*, 726 F. Supp. 1171, 1182-83 (S.D. Ind. 1989) (third-party beneficiary cannot be liable for breach of contract).

**C. Tortious Interference Claims**

PSW alleges that Visa tortiously interfered with PSW's existing contracts with and prospective economic advantage from its website clients (Counts Seven and Nine) and with the Merchant Agreement (Count Eight). Am. Compl. ¶¶ 187-189. To state a claim of tortious interference with business relationships under Rhode Island law, PSW must allege that Visa intended to interfere with the PSW's contracts or business expectancies through "improper" means. *Stop & Shop*, 239 F. Supp. 2d at 194; *Belliveau Bldg. Corp. v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000); *Mesolella v. Providence*, 508 A.2d 661, 669-70 (R.I. 1986).

1. <u>*Tortious Interference With Website Client Relations*</u>. PSW alleges that Visa interfered with PSW's business relations with its website clients by raising the reserve account requirement when PSW continually showed chargeback rates over the allowed ratio, which caused PSW a serious cash flow problem that prevented it from meeting its obligations to its website clients. Am. Compl. ¶ 88. But the reserve account was raised by FFB, not by Visa. *E.g.*, *id.* ¶¶ 107, 115. And because the reserve account is established pursuant to the PSW-FFB Merchant Agreement, which gives FFB the "sole discretion" to determine the reserve amount, *id.* ¶ 83, the raising of the reserve amount was contractually sanctioned and thus not an "improper" means of acting. *Belliveau*, 763 A.2d at 628. Finally, PSW fails to allege any specific or imminent website client contracts with which Visa intentionally interfered. *See Solar Travel Corp. v. Nachtomi*, No. 00 Civ. 3564 (AGS), 2001 U.S. Dist. LEXIS 7549, at *37 (S.D.N.Y. June 8, 2001); *Bomar Resources, Inc. v. Sierra Rutile Ltd.*, No. 90 Civ. 3773 (JFK), 1991 U.S. Dist. LEXIS 396, at *25-26 (S.D.N.Y. Jan. 15, 1991). Absent specification of a particular relationship, a plaintiff cannot plausibly allege that the defendant knew of and intended to interfere with that relationship. *Mesolella*, 508 A.2d at 669-70.

2. <u>*Tortious Interference With the Merchant Agreement.*</u> Count Seven alleges that Visa tortiously interfered with the PSW's performance under the FFB-PSW Merchant Agreement. Am. Compl. ¶ 188. Again, PSW fails to allege a legally improper purpose or means: as just noted, the chargeback-related costs and reserve account requirements were all sanctioned by PSW's Merchant Agreement and thus were not "improper" under state tort law. In addition, as explained above, Visa's chargeback rules are an ancillary restraint imposed as part of a larger economic enterprise, designed to reduce loss-causing fraud and thus enhance the efficiency of the enterprise. The enforcement of a pro-competitive ancillary restraint, lawful (indeed, encouraged) under the federal antitrust laws cannot be an "improper" means of competing in the market. *See Stop & Shop*, 239 F. Supp. 2d at 195 (defendant should not be held liable in tort for competing lawfully in market).

**D. Conversion Claim**

Count Ten alleges a conversion claim, *viz.*, that Visa interfered with PSW's ownership interest in and exercised dominion over PSW's funds in the reserve account, and thus converted those funds to Visa's own use. Am. Compl. ¶ 190. The tort of conversion requires "an intentional exercise of dominion or control over a *chattel* which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A (emphasis added); *see Larson v. Dawson*, 53 A. 93 (R.I. 1902). Money can be the subject of conversion only where the defendant is under an obligation to deliver a specifically identifiable body of money to the plaintiff. *See DeChristofaro v. Machala*, 685 A.2d 258, 263 (R.I. 1996). Because PSW has not alleged the conversion of any chattel or that Visa is under an obligation to return any specific bills or coins to PSW (rather than simply general funds not specifically identifiable), the conversion claim must be dismissed.

**E. Embezzlement Claim**

PSW alleges that Visa "appropriated and converted to [its] own use [PSW's] funds in the reserve account, which were entrusted to [Visa] for a specific use, and thus embezzled the same." Am. Compl. ¶ 191. But PSW did not maintain any account with or otherwise entrust funds to Visa. PSW's acquiring bank at all times held any funds at issue. *Id.* ¶ 83, 107. Accordingly, Visa "embezzled" nothing from PSW.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be granted.

Respectfully submitted,

Daniel H. Bookin
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Jonathan D. Hacker
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Patricia A. Sullivan (#2120)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Telephone: (401) 274-9200
Facsimile: (888) 325-9067

OF COUNSEL:
Randall W. Edwards
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Richard G. Parker
Nikhil M. Shanbhag
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendant Visa U.S.A. Inc.*

DATED: May 20, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20 , 2005, a true and correct copy of *Visa U.S.A., Inc.'s* Motion to Dismiss Plaintiff's First Amended Complaint was sent via facsimile and first-class mail, postage prepaid to the following parties:

Richard A. Sinapi, Esq.
V. Edward Formisano, Esq.
Sinapi Formisano & Company, Ltd.
100 Midway Place, Suite 1
Cranston, RI 02920-5707

David Paul Steiner, Esq.
David Steiner & Associates
1925 Century Park East, Suite 2350
Los Angeles, CA 90067

Jay Fastow, Esq.
Bruce Colbath, Esq.
Denise Plunkett, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Brian Wallach, Esq.
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Joseph V. Cavanagh, Esq.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903-1765

John A. Tarantino, Esq.
Patricia K. Rocha, Esq.
Adler Pollock & Sheehan, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

Patricia A. Sullivan #2120
*Attorney for Defendant Visa U.S.A., Inc.*