**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PSW, INC., d/b/a PSW BILLING,**<br>**Plaintiff,** | : | |
| **v.** | : | **C.A. No. 04-347-T** |
| **VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION,**<br>**Defendants** | : | |

**PLAINTIFF'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO VISA U.S.A., INC.'S, MASTERCARD INTERNATIONAL INCORPORATED'S, FIRST FINANCIAL BANK'S AND FIRST DATA MERCHANT SERVICES CORPORATION'S MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT**

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO & COMPANY, LTD.**

**Dated: July 7, 2005**

**Richard A. Sinapi, Esq. (R.I. Bar No. 2977)**
**V. Edward Formisano, Esq. (R.I. Bar No. 5512)**
**100 Midway Place, Suite 1**
**Cranston, RI 02920**
**Telephone: (401) 944-9690**
**Fax: (401) 943-9040**

## I. INTRODUCTION

PSW, Inc. ("PSW") has filed a 191 paragraph, 40 page detailed First Amended Complaint ("Complaint"), which far exceeds the minimum notice pleading requirements under Fed.R.Civ.P. 8, setting forth the factual background and basis of its claims. Notwithstanding the foregoing, each of the Defendants, Visa, U.S.A., Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), First Financial Bank ("FFB"), and First Data Merchants Services Corporation ("FDMS"), have filed Motions to Dismiss under Fed.R.Civ.P. 12(b)(6) with respect to *all* 11 counts alleged. Under the guise of Motions to Dismiss, the Defendants seek Summary Judgment, insofar as they are asking the Court to consider facts not in the record. Moreover, the Defendants are urging the Court to apply the applicable standard of review in reverse, insofar as they are asking the Court to consider and weigh all facts and inferences in the "record" in favor of the Defendants, while ignoring well-pled facts in the Complaint. Since, for the reasons set forth below, it does not appear beyond doubt that PSW can prove no set of facts in support of its claims entitling it to relief, Defendants' Motions to Dismiss should be denied.

## II. SUMMARY OF CASE[1]

In summary, contrary to the Defendants' contentions, while the within dispute includes claims of breach of contact and of the covenant of good faith and fair dealing and interference with contract, it is anything but a "garden variety" contract or business dispute. The outcome of the dispute will not only impact the litigants before this Court, but the integrity of the free enterprise system and freedom of expression in this country, as internet sales and payment card transactions continue to transform and play an ever more dominant role in this country's economy.

In a ruling which can only be described as "extraordinary," in light of the lack of frequency with which antitrust claims are successfully brought, Visa and MasterCard were found by a federal court to have violated §1 of the Sherman Act, by enacting and enforcing parallel "association rules," which, among other things, excluded competition, increased prices, and reduced output in the market for network services for

---

[1] Due to applicable page limitations, this memorandum assumes familiarity with the detailed allegations in the First Amended Complaint, which sets forth the background and specific factual basis for the Plaintiff's claims. Citation to and discussion of specific allegations in the Complaint appear throughout the body of the memorandum.

payment cards. PSW, an Internet Adult Entertainment Website aggregator merchant ("Aggregator"), by and through FFB and FDMS, contracted with Visa and MasterCard for the provision of network services. The content, parties to, and, in part, the implementation of that contract were controlled and approved by Visa and MasterCard, and their respective "association rules" were incorporated by reference. Under the guise of ever changing "association rules," Visa and MasterCard promulgated and enforced no less than six (6) parallel policies which permitted them to charge higher prices, reduce the output in the network services market, and manipulate and drastically transform and reduce a subset of that market, the Adult network services market, by driving PSW and the majority of consumers of those services out of business. The Defendants accomplished this largely by imposing excessive and commercially unreasonable *penalties* for purported excessive chargebacks, whereby the Defendants created or permitted the circumstances to exist, which led to the imposition of those penalties. The potential assessment of penalties, for violating the Excessive Chargeback and other parallel programs of Visa and MasterCard, became the basis for FFB and FDMS withholding ever increasing sums in a reserve account. As a consequence, PSW lost website clients, because of the inability to pay them, and became subject to ever increasing penalties in a downward spiral made inevitable by the perverse impact of the Excessive Chargeback Programs. Moreover, Visa and MasterCard expended substantial sums to monitor Internet web pages, and denied PSW (and other Aggregators) access to network services if the content of those websites were deemed unacceptable to them. This manipulation of the market not only resulted in a significant reduction in the number of Adult network services consumers, but also in the number of web pages devoted to adult content. Perhaps most disturbing is that, in whole or in part, Defendants acted at the behest of unknown federal officials in engaging in the foregoing conduct, for the purpose of censoring content on the Internet, without any legitimate, commercially reasonable business justification, in violation of PSW's First Amendment rights.

In assessing the legal significance of the foregoing, it must be kept in mind that Visa and MasterCard dominate the payment card and network services market—PSW, as an Internet merchant, could not survive unless it accepted their payment cards. Accordingly, the terms of the deal were not really

"negotiable," nor did or could PSW "expressly agree" to all the provisions of the ever changing, unknown, and largely unknowable "association rules" incorporated merely by reference in the contract.

*Some 21 months after PSW ceased processing through the Defendants,* FFB and FDMS continue to hold approximately $1.6 million of PSW's funds in a reserve account to purportedly secure payment of penalties, which could potentially be assessed by Visa and MasterCard. To date, neither Visa nor MasterCard have assessed any such penalties, nor have they, or FFB and FDMS, authorized the release of or otherwise accounted to PSW for these funds in the reserve account. ***Nevertheless, without materially disputing the foregoing, the Defendants claim that PSW has not and cannot assert any claims for relief against them.***

## III. POINTS AND AUTHORITIES[2]

### A. Standard of Review

When considering a motion under Fed.R.Civ.P. 12(b)(6), a court must accept all facts pleaded as true and draw all inferences from those facts in a light most favorable to the non-moving party. *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir. 1976). A complaint may not be dismissed for failure to state a claim unless it appears beyond doubt from the pleadings that the party opposing the motion can prove no set of facts which would support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). While a court is not required to *assume* facts, *it must draw reasonable inferences in making the foregoing determination.* The Plaintiff is not legally obligated to allege any particular facts or elements in order to establish a claim for relief under the Federal Rules. In any event, without the benefit of discovery, PSW cannot be expected to plead facts in any more detail.[3]

[2] In responding to the Defendants' various challenges to PSW's claims, PSW would emphasize that, despite the length and detail of the Complaint, ***it has not alleged all the facts supporting its claims for relief*** and is under no obligation to do so under the notice pleading standard. In addition, by describing the legal and/or factual basis by which it has properly pled its various claims, PSW is not thereafter restricted from establishing facts or asserting theories of relief in addition to or different from those identified and discussed herein, based only on the face of the Complaint. **Discovery and further proceedings will identify the full and proper scope and focus of the adjudication of PSW's claims.**

[3] *See Moore v. Clarke*, 821 F.2d 518, 519 (8th Cir. 1987)("whole spirit" of Federal Rules "is to discourage the pleading of evidence"). "When a federal court reviews the sufficiency of a complaint . . . [t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also DM Research, Inc. v. College of American Pathologists*, 2 F.Supp.2d 226, 228 (D.R.I. 1998)(antitrust complaints are not subjected to any heightened pleading requirements). In antitrust cases in particular, the Supreme Court has stated that "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976); *see also Morales-Villalobos v.*

**B. Identity of Interest between and Joint Conduct of the Defendants**

MasterCard and Visa are bankcard associations organized as open joint ventures, owned by the numerous banking institutions that are members of the respective MasterCard and Visa associations. Comp. ¶11; *United States v. Visa, U.S.A., Inc.*, 163 F. Supp.2d 322, 332 (S.D.N.Y. 2001), *affirmed*, 344 F.3d 229 (2nd Cir. 2003), *cert. den.*, 125 S.Ct. 45 (2004)[hereinafter referred to as "*Visa*"]. Accordingly, MasterCard is owned by its approximately 20,000 member banks, while Visa is owned by its approximately 14,000 member banks. *Id.*; *Visa* at 332. The associations' operations are conducted primarily by their member banks. *Id.* ¶12; *Visa* at 322. PSW alleges that FFB was and is a member bank of MasterCard and Visa and that FDMS[4] was duly authorized by MasterCard and Visa to act as an agent of and in conjunction with FFB in providing credit card settlement or "network" services for merchants such as PSW pursuant to Merchant Agreements. *Id.* ¶¶23,25. FFB was a member bank of MasterCard and Visa and was therefore both a principal and agent of those bankcard networks. *Id.* ¶24. As a member bank and agent thereof respectively, FFB and FDMS expressly agreed with Visa and MasterCard to abide by the association by-laws and other regulations of those bankcard associations. *Id.* ¶26. PSW's application for a Merchant's Agreement was subject to the approval of MasterCard and Visa. *Id.* ¶27. The Merchant Agreement expressly incorporated and was subject to MasterCard and Visa "association rules." *Id.* ¶28. ¶26.9 of the Merchant Agreement expressly provides that MasterCard and Visa retain the right to require termination or modification of the agreement with respect to transactions involving MasterCard and Visa cards. *Id.* ¶¶29,71. In entering into the Merchant Agreement with PSW, FFB and FDMS were acting on behalf of MasterCard and Visa.[5] *Id.* ¶30.

Moreover, with respect to the concerted conduct alleged in the Complaint discussed below, FFB's culpability does not only arise merely out of its membership in the Visa and MasterCard association joint

---

*Garcia-Llorens*, 316 F.3d 51, 53 (1st Cir. 2003)(reversing grant of motion to dismiss and holding court must assume factual allegations to be true and indulge to reasonable degree plaintiff who has not yet had opportunity to conduct discovery).

[4] Insofar as and to the extent the liability of FDMS alleged in the Complaint is as an agent of FFB, the within memorandum of law shall reference only FFB.

ventures, but also by virtue of the fact that, in almost every case, *it was FFB which implemented or enforced the challenged concerted practices which visited the harm on PSW*--**hence, evidence of FFB's agreement and intent to participate in the challenged conduct.**[6] *Id.* ¶31. In light of the nature of the relationship between the Defendants, along with the facts alleged in the Complaint generally, PSW contends that each of the Defendants was at all relevant times acting as either a principal, agent, and/or co-venturer or co-conspirator.[7] *Id.* ¶¶32,180-191. Ultimately, the foregoing is a mixed question of law and fact to be determined by the trier of fact. Construing the facts in the Complaint and drawing all reasonable inferences therefrom in a light most favorable to PSW, this Court must find that each of the Defendants, along with and as part of the respective Visa and MasterCard association joint ventures and as part of a conspiracy between those associations, took the challenged conduct and imposed the various challenged parallel programs on PSW. *Id.* ¶33.

### C. PSW's Complaint States Claims for Relief under the Sherman Act[8]

**1. §1 of the Sherman Act--collateral estoppel.** The *Visa* case was an action brought by the United States wherein a final judgment entered holding that implementation and enforcement of the Exclusivity Rules[9] by MasterCard and Visa excluded competition and restrained trade in the general

[5] *See* note 57, *infra*. ***It is also worthy of note that, in contracting on behalf of MasterCard and Visa, FFB uses the same, joint contract, as opposed to a separate contract for each association.***

[6] Accordingly, courts have previously ruled that member banks such as FFB could be held liable, along with their Visa and MasterCard networks, for claimed antitrust violations arising out of, *inter alia*, the application and enforcement of Visa and MasterCard association rules. *See, e.g., Reyn's Pasta Bella, LLC v. Visa,* 259 F.Supp.2d 992, 996 (N.D. Cal. 2003).

[7] It is black letter law that each co-conspirator is liable for all acts of the other co-conspirators committed within the scope of the conspiracy, *Beltz Travel Serv., Inc. v. International Air Transp. Ass'n,* 620 F.2d 1360, 1367 (9th Cir.1980)("If [plaintiff] can establish the existence of a conspiracy in violation of the antitrust laws and that [defendants] were a part of such a conspiracy, [defendants] will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of [defendants'] own actions."), and that each co-conspirator is jointly and severally liable for the injury imposed, *Paper Systems Incorp. v. Nippon Paper Industries Co., Ltd.*, 281 F.3d. 629, 633 (7th Cir. 2002).

[8] For all the reasons discussed in §III.B.-C., and in accordance with the broader scope of the plain language of the statute, the Complaint also states a claim for relief under the Rhode Island Antitrust Act, R.I.G.L. §6-36-5, as to all the Defendants. *See ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351, 1353 n.1 (R.I. 1997).

[9] The Exclusivity Rules were parallel programs adopted by MasterCard and Visa, whereby member banks in their respective networks were authorized to issue the general purpose card of the other network, but prohibited their member banks from issuing general purpose cards of the competing networks, American Express and Discover, thereby unreasonably excluding competition and restraining trade in the general purpose card market and the related network services for general purpose cards market. *See* Comp. ¶¶10,92.d.,95,155-156.

purpose card market and related network services for general purpose card markets, that the harm to competition included an increase in prices and decrease in output in those markets (*i.e.*, restrained trade), that was not outweighed by any countervailing pro-competitive effects, in violation of §1 of the Sherman Act. *Visa,* 163 F.Supp.2d at 406. PSW expressly invokes collateral estoppel pursuant to 15 U.S.C. §16 on the basis of the final judgment entered in *Visa.*[10] Comp. ¶¶155-158. Accordingly, MasterCard and Visa, as well as its co-conspirators and agents, FFB,[11] which stand in the same shoes with respect to the harm alleged by PSW herein, are collaterally estopped from contesting or denying either the holding or facts actually and necessarily decided in the *Visa* case, including but not limited to those findings alleged in the Complaint and discussed, in part, below. Comp. ¶157. As a consumer of network services, PSW is a presumptively proper plaintiff with *standing* to allege *antitrust injury. Id.* ¶158; *see SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.,* 48 F.3d 39, 44-45 (1st Cir.1995)("[T]he presumptively 'proper' plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market."). Accordingly, pursuant to 15 U.S.C. §15, PSW is entitled to bring an action for treble damages for *antitrust harm* sustained as a result of MasterCard and Visa's foregoing §1 Sherman Act violation, including, but not limited to, the payment of higher prices for network services in the form of higher interchange fees and therefore discount fees, as well as in the form of chargeback related and other penalties imposed, and for a reduction in the output of

---

[10] 15 U.S.C. §16(a) provides in pertinent part that "[a] final judgment or decree . . . rendered in any civil or criminal proceeding brought by . . . the United States under the antitrust laws to the effect that a defendant has violated said laws shall be *prima facie* evidence against such defendant . . . as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto . . .." Accordingly, such a prior judgment constitutes *prima facie* evidence of "all matters of fact and law necessarily decided" by an earlier adjudication. *Emich Motors v. General Motors*, 340 U.S. 558, 568-569 (1951). "If by reference to the findings, opinion, and decree it is determined that an issue was actually litigated in an antitrust suit brought by the Government, the private plaintiff can treat the outcome of the Government's case as *prima facie* evidence on that issue." *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 485-486 (1968)(applying collateral estoppel under 15 U.S.C. §16(a) in §2 Sherman Act action for treble damages brought by competitor following successful §4 Sherman Act claim against defendant brought by the United States). What this means is "when two adversaries concentrate in attempting to resolve an issue importantly involved in a litigation, there is no unfairness in considering that issue settled for all time between the parties *and those in their shoes*." *Farmington Dowel Products Co. v. Forster Mfg. Co.* 421 F.2d 61, 79 (1st Cir. 1970)(emphasis added). In deciding the within motion, this Court may also consider facts that are properly the subject of judicial notice, in particular those as found by the court in *Visa. MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986); *see also Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir.1988)(holding that a district court may take notice of the "proceedings and determinations" of prior related litigation without treating the Rule 12(b)(6) motion as one for summary judgment).

[11] *See* discussion and citations in notes 5-7, *supra,* as well as in notes 31-33 and the associated text, *infra*, relative to the theory and applicable case law establishing antitrust liability of FFB for implementing MasterCard and Visa rules, *even if* involuntarily imposed upon it as an "innocent," intermediary co-conspirator.

services and the loss of PSW's profits and business as a result thereof. *Id.* ¶¶93-98,158. By pleading and invoking collateral estoppel as a consumer, and therefore presumptive antitrust plaintiff, PSW has pled sufficient facts to withstand a motion to dismiss its §1 Sherman Act claim.[12]

**2. §1 of the Sherman Act[13]--elements and application.[14]**

***a. Concerted Conduct.*** Conspiracy under §1 of the Sherman Act may be established by circumstantial evidence such as inferences drawn from the behavior of the alleged co-conspirators. *Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479, 1487 (D.C.Cir.1984). Factors supporting an inference of concerted conduct include, *inter alia*, whether (1) the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) the defendants have been uniform in their actions; (3) the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) the defendants have a common motive to conspire.[15] ***In the case at bar, PSW alleges, Comp. ¶¶92-103, 156, 181-182, and the Visa Court found that MasterCard and Visa engaged in prohibited concerted action in enacting and enforcing their parallel Exclusivity Rules, see Visa*, 163 F.Supp.2d at 406.** Accordingly, PSW sufficiently pleads concerted conduct. Moreover, the Complaint describes *five (5) other parallel* policies and procedures of Visa and MasterCard, that are so similar, complex, and detailed, that they could not reasonably be attributed to coincidence, and which,

---

[12] Whether or not this Court, after a proper record is developed, applies collateral estoppel as pled, in whole or in part, to some or all of the Defendants, is not before the Court at this time. Since PSW's pleading and invocation of the doctrine is neither implausible nor legally erroneous, its § 1 Sherman Act allegations state a claim for relief; in fact, they establish a *prima facie* case.

[13] In light of the determination in the *Visa* case that Visa and MasterCard violated §1 of the Sherman Act, PSW's invocation of collateral estoppel relative thereto, and the allegation that PSW is a consumer in relation to the relevant market, PSW contends that it has sufficiently pled claims for relief under §1 of the Sherman Act. Moreover, the §1 violation and the findings on which the *Visa* Court based that determination also informs and establishes, in part, the minimum pleadings required to state a §2 violation. Nevertheless, PSW will indulge the Defendants, and briefly discuss the legal and factual basis of its Sherman Act claims below, including additional and broader theories of liability under §1.

[14] To state a valid claim under § 1 of the Sherman Act, a plaintiff must allege three elements: (1) the existence of a contract, combination or conspiracy, which is to say, concerted conduct; (2) that the agreement unreasonably restrained trade under the *per se* or rule of reason analysis; and (3) that the restraint affected interstate commerce. *See Bhan v. NME Hosp., Inc.,* 929 F.2d 1404, 1410 (9th Cir.), *cert. denied,* 502 U.S. 994 (1991); *Lee v. Life Ins. Co. of North America*, 829 F.Supp. 529, 535 (D.R.I. 1993). PSW has expressly alleged that the challenged conduct at issue affects interstate commerce and the Defendants have not disputed this allegation. Comp. ¶¶181-182.

along with the Exclusivity Rules, establish ample concerted action. Comp. ¶¶65-103. More significantly, neither Visa nor MasterCard could or would have rationally adopted the Excessive Chargeback Programs, unless the other also adopted it, *because they would have lost to the other bankcard association all their merchants who chose not to be subject to the perverse, commercially unreasonable, and excessive penalties* imposed by their respective programs, which were costing Aggregators such as PSW substantial money and driving some out of business. *Id.* ¶¶85-96,101. The same is true with respect to the higher interchange fee[16] charged to Internet and other card not present merchants, in particular Aggregators such as PSW, as well as the non-cross border geographic restrictions which limited competition in the domestic market, and by reasonable inference, price competition for network services. *Id.* ¶¶92-93,96,99. Accordingly, there is a fair and reasonable inference that these parallel programs are contrary to the self-interest of Visa and MasterCard, because they would have eventually led to a loss of substantial market share and revenue to the less costly (*i.e.*, more price competitive) network, and therefore would not have been adopted if the other had not also adopted it.[17] *Id.* ¶101. An inference of opportunity to conspire may reasonably be inferred from the allegations in the Complaint taken as a whole, as well as the "dual governance structure" of the Visa and MasterCard associations well documented in the *Visa* case.[18] 163 F. Supp.2d at 327-333, 345-347 (finding Directors of associations' respective Boards consisted primarily of member banks with substantial card portfolios of both associations); *see also* Comp. ¶¶16,102. Finally, an inference of

---

[15] *See Re/Max Intern., Inc. v. Realty One, Inc.* 173 F.3d 995, 1009 (6th Cir. 1999); *see also Stop and Shop Supermarket Company v. Blue Cross and Blue Shield of Rhode Island*, 239 F.Supp.2d 180, 187 (D.R.I. 2003)(citing similar factors); *affirmed*, 373 F.3d 57 (1st Cir. 2004).

[16] The actual pricing mechanism in the settlement of a merchant account over the Visa and MasterCard networks works was described by the district court in Visa as follows: "In a Visa or MasterCard credit card purchase the merchant actually receives only about 98 percent of the price of the item. The remaining 2 percent is called the "merchant discount," which is the fee paid to the merchant's acquiring bank for providing its services. The acquirer, in turn, splits this fee with the card-issuing bank, which is paid about 1.4 percent of the purchase price.. . . . The 1.4 percent of the purchase price is called the "interchange fee" and is set by the associations." *Visa,* 163 F.Supp.2d at 332. PSW alleges that a portion of the fees received by the acquiring and issuing banks are paid over to the Visa and MasterCard associations. Comp. ¶38.

[17] Moreover, the unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing has been found to suggest a willingness to forsake short-term profits to achieve an anticompetitive end. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* 472 U.S. 585, 610-611 (1985).

[18] Contrary to the Defendants' contention, the mere fact that the *Visa* Court found that dual governance was not anti-competitive in and of itself, does not mean that such a management structure did not provide an *opportunity* for the

common motive to conspire is established by the ability to earn greater profits from higher interchange rates, Excessive Chargeback Program penalties, and Registration Program fees, and, in part, to secure for their member banks some or all of the lucrative processing business of Adult Entertainment Websites being performed by Aggregators. Comp. ¶45 (PSW and other similarly situated merchants paid as much as three times or more than the interchange rate charged for non-Adult network services), *see also id.* ¶¶90,92-103. Another possible motive reasonably inferred from the pleadings is the desire to avoid unfavorable and promote favorable regulatory, legislative, and/or enforcement activity by federal officials aimed at or affecting the Defendants, by achieving the desired governmental goal of eliminating Aggregators and otherwise reducing the supply of Adult content web pages on the Internet. ¶¶85-93,165-172. In addition, as between Visa, MasterCard and FFB, in light of the identity of interest and joint conduct between the Defendants alleged in the Complaint previously described above, an agreement between all the Defendants, whether defined as a conspiracy or joint venture, to take the challenged conduct and impose the challenged programs on PSW is both reasonably inferred and expressly pled.

***b. Unreasonable Restraint on Trade.***[19]

1) **<u>Relevant Market</u>.**[20] The Complaint identifies three potential relevant markets: the general purpose card market,[21] the network services for general purpose cards ("network services") market,

---

Defendants to conspire. To the contrary, as a matter of common sense, joint meetings of competitor representatives and ongoing joint management obligations provide a unique opportunity.

[19] Although the possession of market power by defendants in the relevant market supports an inference that the challenged conduct has caused antitrust harm to competition, it is not necessarily an essential element. *See, e.g., FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460 (1986)("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.")(internal quotation marks omitted)); *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 110 n. 42 (1984)(similar). Nevertheless, where a *per se* restraint is demonstrated, no further showing of actual harm to competition is required. *See Northern Pacific Railway Company v. United States,* 356 U.S. 1, 4-6 (1958). Among restraints considered *per se* unlawful are horizontal price fixing arrangements, tying arrangements, horizontal market allocations, and group boycotts. *Id.*

[20] To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a "rational relation to the methodology courts prescribe to define a market for antitrust purposes--analysis of the interchangeability of use or the cross-elasticity of demand," *Gianna Enters. v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1354 (S.D.N.Y.1982), and it must be "plausible," *Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 86 (2d Cir.2000); *see also Visa Check/Mastermoney Antitrust Litigation*, 2003 WL 1712568 *7 (E.D.N.Y.)(relevant market for antitrust purposes characterized by inelasticity of demand and universal recognition by consumers, parties, and industry as whole).

*id.* ¶155, and the domestic Internet Adult Entertainment Website network services market ("Adult network services"), *id.* ¶¶160-163. **The existence, composition, and appropriateness of the former two markets for antitrust purposes has already been established in the *Visa* case, 163 F. Supp.2d at 322, and therefore need no further elaboration either in the pleadings or here.**[22].

PSW alleges that suppliers in the Adult network services market consisted of Discover and MasterCard and Visa, and their relevant member banks willing to acquire and/or provide payment card processing services to Internet Adult Entertainment Websites and/or their Aggregators. Comp. ¶162. The consumers in the market are identified as a limited number of Aggregators like PSW—once perhaps over a dozen and now only two—that provide credit processing services to Adult Entertainment Websites and those Adult Entertainment Websites that process directly with an Acquiring Bank. *Id.* PSW alleges the Adult network services market is a submarket of the networks services market, wherein the antitrust harm caused to consumers by the Defendants' conduct was more severe. *Id.* ¶161. The Complaint also contains detailed allegations supporting PSW's contention that the Adult network services market constitutes a distinct and relevant submarket for antitrust purposes.[23] *Id.* ¶163.

---

[21] *See Emrich,* 846 F.2d at 1198. PSW is not claiming standing with respect to the general purpose card market, with respect to which it is neither a competitor nor customer. That market is only relevant on the basis of the *Visa* Court finding that Visa and MasterCard used their market power in the general purpose card market to leverage and increase market power in the network services market. *Visa*, 344 F.3d at 238-239; *Visa*, 163 F.Supp.2d at 382. Therefore, in the words of the Second Circuit, the two markets are *interrelated* and, therefore, relevant to both PSW's §1 and §2 Sherman Act claims. *See In re Visa Check/MasterMoney Antitrust Litigation*, 2003 WL 1712568 *2 (E.D.N.Y.)(triable issues presented relative to merchant's §1 and §2 Sherman Act claims alleging Visa and MasterCard acted independently and jointly in conspiracy to employ illegal tying arrangements that leveraged power in credit card [network] services market).

[22] In a similar case claiming a Sherman Act §1 violation brought by various retail merchants alleging that Visa and MasterCard along with three of their member Acquiring Banks had conspired to limit competition in the discount rate by fixing the interchange fee, the court described the relevant market as the "market for the acquisition" of charge receipts. *Reyn's,* 259 F.Supp.2d at 1001; *see also In re Visa Check/MasterMoney Antitrust Litigation*, 192 F.R.D. 68, 73 (E.D.N.Y.2000*), aff'd*, 280 F.3d 124 (2nd Cir.2001), *cert. denied*, 122 S.Ct. 2382 (2002)(holding class of merchants was proper party to assert Sherman Act §1 and §2 challenge claiming Visa and MasterCard leveraged market power in credit card [network] services market through requirement imposed by association rules incorporated in merchant contracts tying ability to accept their associations' general payment cards with obligation to also accept associations' debit cards, which carried higher interchange fee, and thereby, *inter alia*, attempted to monopolize and/or conspired to monopolize debit card services market). However described, the relevant markets alleged in this case are more or less the same as in *Reyn's* and *In re Visa Check,* involve similar market wide harms, and involve the same cast of characters: merchants, the Visa and MasterCard networks and their various member banks.

[23] Whether or not the Adult network services market is a distinct submarket or merely part of the broader network services market is ultimately a determination for the trier of fact. However, there is some analogous precedent in the payment card processing context wherein a court has found a submarket to the network services market to be the relevant market for antitrust purposes. *See Visa Check/Mastermoney Antitrust Litigation*, 2003 WL 1712568 *7 (E.D.N.Y.)(finding

In summary, the Complaint is more than sufficient to allege a relevant market for antitrust purposes and PSW cannot and need not do anymore at the pleading stage. The existence of such a market is for determination at trial based on expert testimony.[24]

2) **Market Power.**[25] PSW alleges that Visa and MasterCard together control over 73% of the volume of transactions on general purpose cards in the United States. *Id.* ¶41. In terms of cards issued, they control about 85% of the market. *Id.* ¶41. **Moreover, the fact that Visa and MasterCard have market power in the general purpose card and network services markets *has already been established* by the findings of the court in *Visa*.**[26] With respect to the ***Adult network services market***, insofar as American Express has chosen not to participate in that market, ***Visa and MasterCard control in excess of 92% of the market***. *Id.* ¶¶41, 50.

3) **Harm to Competition.** PSW alleges "antitrust harm to competition" due to higher prices for networks services in the form of higher interchange rates, and therefore discount rates paid by

---

debit card services market, which [like Adult network services market] was a submarket to more inclusive general payment card network services market, was relevant market for antitrust purposes).

[24] Moreover, it should be emphasized that because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. *See Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 53 (1st Cir. 2003)(reversing grant of motion to dismiss and holding that extent of geographic market for antitrust purposes cannot be determined from face of complaint); *Fund. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir.2001)("Market definition is a highly fact-based analysis that generally requires discovery.")(citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992)); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir.1998)(noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery"). It may ultimately be determined after discovery and/or trial, that the appropriate market for antitrust purposes is a larger subset of the network services market, such as all Aggregators, or all Internet and card-not-present merchants, or the entire domestic network services market as found in *Visa*, or the market as characterized by the court in *Reyn's*, 259 F.Supp.2d at 996. Plaintiff is permitted to plead in the alternative and to pursue or not pursue such theories as it may deem appropriate in light of discovery, trial court rulings, and tactical considerations, including likelihood of success and the litigation costs associated therewith. Moreover, the Complaint expressly alleges and seeks relief, in the alternative, on the basis of such more or less inclusive or different definition of the relevant market or markets as may be established by proof at trial. Comp. ¶164.

[25] The Supreme Court has defined market power to mean the "power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *see also National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 109 n. 38 (1984). Such power may be proven through evidence of specific conduct undertaken by the defendant that indicates it has the power to affect price or exclude competition. *KMB Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995). Alternatively, market power may be presumed if the defendant controls a large enough share of the relevant market. *Id.*

[26] *Visa*, 163 F.Supp.2d at 342 ("Because Visa and MasterCard have large shares in a highly concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers."); Comp. ¶43.

PSW and other consumers of network services, as well as in the form of registration fees and chargeback related and other penalties. *Id.* ¶¶44-50,92,99,158,163. PSW also alleges antitrust harm due to decreased output.[27] *Id.* ¶¶92-97,99,158,163,169.f. **Moreover, antitrust harm to competition *market wide*, due to increased prices and reduced output in the network services market *has already been established* in the *Visa* case.**[28] Finally, to the extent that the Complaint alleges *per se* antitrust violations, no finding of harm is required.[29] *See* note 19, *supra.*

**4) <u>PSW has "Antitrust Standing."</u>**

***<u>Standing as a Consumer</u>***. Contrary to the Defendants' contentions, even if PSW is considered an "indirect" purchaser of network services, it still has "antitrust standing."[30] FFB is not a

---

[27] In addition to the express allegations relative thereto, loss of output in the Adult network services market may also be inferred from allegations relative to, *inter alia*, the Defendants' refusal to provide network services to websites deemed to have unacceptable content, Comp. ¶92a., many of PSW's website clients being forced to cease operations, *id.* ¶¶90-91,97, an overall reduction in the amount of web pages devoted to adult content, *id.* ¶169.f., the loss of over 83% of the Aggregators in that market, *id.* ¶162, refusals to deal with terminated merchants, *id.* ¶¶92.b.,97, and the non-cross border acquiring rules which prevented offshore Acquiring Banks from competing to provide network services in the domestic market, *id.* ¶¶92,96. In any event, such an inference is far more plausible than the one urged by Defendants, which asks this Court to assume facts not pled and to construe them in a light most favorable to the Defendants, that market concentration, supply restrictions, and refusals to deal have improved efficiencies, increased output and reduced costs.

[28] *Visa*, 163 F.Supp.2d at 379-406 (anti-competitive conduct of MasterCard and Visa reduced overall card output and available card features, decreased network services output, stunted price competition in the network services market, and harmed consumer welfare); Comp. ¶156.d.; *see also* notes 26-27, *supra,* and note 35, *infra.*

[29] PSW alleges horizontal market division in the form of a geographic market division imposed by parallel Visa and MasterCard rules, which, *inter alia*, foreclosed offshore Acquiring Banks from competing in the domestic market for network services. Comp. ¶¶92,96. PSW also alleges a group boycott by the Defendants, and their member banks pursuant to parallel MasterCard and Visa Boycott List Programs, whereby all member Acquiring Banks are required to refuse to deal with any merchant terminated due to excessive chargebacks, along with any new entity involving that merchant, its officers, and/or its principals. *Id.* ¶92.b. PSW alleges horizontal price fixing with respect to parallel discriminatory pricing of the higher interchange rate charged to Aggregators such as PSW, as well as other Internet and card-not-present merchants, and with respect to the parallel Excessive Chargeback Program penalties. *Id.* ¶¶92,93-94,88-91. Indeed, the court in the *Visa* case expressly found that both Visa and MasterCard charge higher, and differing interchange rates based on the need (i.e. lack of practical alternatives) of the merchant to accept their payment card, specifically including catalog and Internet merchants, which was not supported by the Defendants' purported justification that there are increased incidents of fraud in these merchant categories. 163 F. Supp.2d at 341. The court based this conclusion on the finding that the merchant, not Visa or MasterCard bear all the risk of fraud. *Id.* Moreover, contrary to Defendants' contentions, *per se* analysis has been applied by at least two courts in the joint venture context. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 (9th Cir. 2003), *as amended on den'l of reh.,* (Apr. 24, 2003)(applying *per se* analysis to price fixing claim by purchaser of real estate listing services in antitrust claim against joint venture between realtor associations that was allegedly misused by its members to raise service support fees charged to venture and, through it, to prospective purchasers such as plaintiff); *Dagher v. Saudi Refining Inc.*, 369 F.3d 1108, 1121 (9th Cir. 2004). **Finally, *per se* analysis is particularly appropriate here insofar as PSW is challenging a conspiracy between *<u>competing associations of competitors</u>*, and not merely rules promulgated by a *single* association of competitors.**

[30] Whether or not PSW is technically a "direct" or "indirect" purchaser depends on how the description of the relevant market is *ultimately* framed, which is a question of fact inappropriate for determination by the Court under a motion to

"victim" of the foregoing challenged programs of Visa and Mastercard; it was a joint venturer and/or co-conspirator in visiting harm on the relevant markets and antitrust injury on PSW. *Id.* ¶¶32-33,159. Construing the allegations in the Complaint and all inferences therefrom in PSW's favor, *FFB and other member banks in the Visa and MasterCard networks profited from the higher discount rates, as well as the fines and penalties received as a result of the Excessive Chargeback and other parallel programs, as well as the reduced competition in the relevant markets generally. Accordingly, they cannot allege any antitrust injury, and to the extent they could, they have no incentive whatsoever to pursue it.*[31] *Id.* As a consequence, the identity of interest between the Visa and MasterCard associations and FFB in the form of a common purpose joint ventures and conspiracy previously described, combined with the lack of any incentive to pursue such a claim, places this case in the category of one of the well settled exceptions to the indirect purchaser rule: the "co-conspirator" variant of the "control" exception.[32] *Id.* As the court reasoned

---

dismiss standard of review. The plaintiff merchants in *Reyn's* were considered "direct" purchasers merely because of the way in which the relevant market was described. As stated previously, however described, the relevant market alleged in this case is more or less the same as in *Reyn's* and *In re Visa Check,* and involve similar market wide harms and participants. Moreover, for all the reasons discussed above, it is irrelevant for antitrust purposes whether PSW is ultimately deemed to be a "direct" or "indirect" purchaser of network services, as it has standing either way.

[31] It is undisputed that the higher interchange rate and Excessive Chargeback and other penalties and fees imposed by MasterCard and Visa are passed on to PSW and other merchants by FFB. Comp. ¶¶38,43-50,70. Accordingly, the situation in the case at bar is akin to a scenario involving a manufacturer (MasterCard and Visa) who illegally conspires with its dealers (FFB and other member banks) to set the latter's resale price. In that scenario, "the consumer plaintiff [PSW] is a direct purchaser [of network services] from the dealer who . . . has conspired illegally with the manufacturer with respect to the very price paid by the consumer. There is no problem of duplication or apportionment, because the consumer is the only party who has paid any overcharge. Although the manufacturer did not sell directly to the consumer, it is regarded as a fellow conspirator with the direct-selling dealer even though the latter might be subjectively 'innocent' [to the extent] that the maintained price was forced upon it." Phillip E. Areeda & Herbert Hovenkamp, II, *Antitrust Law* ¶346h (rev.ed. 2002). Moreover, a dealer (FFB) challenging the anticompetitive conduct identified by the court in *Visa*, which, in part, forms the basis of the PSW's antitrust claim in the case at bar, "would not base its damages on an 'overcharge' at all. Its action [would] not be based on a higher product price to itself, but rather on the constraint on [competition in the market for network services], and its damages would be for lost profits resulting from the reduced volume of sales as a result. [As this scenario illustrates,] lost profits for damages for the intermediary [FFB] and overcharge damages for the consumer [PSW] are not in any way duplicative . . .." *Id.* Finally, under a similar scenario hypothesized by the First Circuit, as an intermediary supplier of network services to PSW, a failed customer, FFB would not even be a proper antitrust plaintiff. *SAS,* 48 F.3d at 44 ("One [common antitrust scenario] involves the *supplier* [FFB] who suffers because an antitrust violation curtails a business [PSW] that would otherwise have purchased from the supplier. In general such a supplier . . . is held not to have suffered "antitrust injury"; while there may be a violation and causal harm to the supplier, the *failed business is the immediate victim and the preferred plaintiff.*")(emphasis added).

[32] In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 730 (1977), the Supreme Court suggested that indirect purchasers might be able to maintain a damage action if they could show that "the direct purchaser is owned or controlled by its customer." *Id.* at 736 n. 16. Numerous federal circuit courts have recognized a "co-conspirator" variant of this "control" exception, under which an indirect purchaser may maintain a damage action upon a showing that there was a conspiracy between the manufacturers and the direct purchaser middleman. *See Paper Systems,* 281 F.3d. at 631-632; *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 604-05 (7th Cir.1997); *see also Lowell v. American Cyanamid*

in *Paper Systems Inc. v. Nippon Paper Industries Co., Ltd.* 281 F.3d 629, 631-632 (7th Cir. 2002), "[t]he right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator 'exception' to *Illinois Brick*, but it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages."[33] Indeed, in a case almost directly on point, *Reyn's,* 259 F.Supp.2d at 992, merchants like PSW were held to be proper parties to assert Sherman Act claims brought against Visa and MasterCard and certain of their member banks challenging the interchange fee fixed by Visa and MasterCard and imposed on merchants as part of the merchant discount rate "negotiated" with their member Acquiring Banks. *See also In re Visa Check,* 192 F.R.D. at 73 (described in notes 22-23, *supra*).

***"Antitrust Injury."***[34] Contrary to Defendants' contentions, the Complaint does not allege that PSW's "injury" for which it seeks monetary relief was due merely to the Excessive Chargeback Programs and the excessive reserve account imposed by the Defendants' as a result. The Complaint, fairly

---

*Co.,* 177 F.3d 1228, 1233 (11th Cir.1999); *Arizona v. Shamrock Foods Co.,* 729 F.2d 1208, 1212-14 (9th Cir.1984); *In re Beef Antitrust Litigation,* 600 F.2d 1148, 1163 (5th Cir.1979). Under this "co-conspirator" theory, the party who purchases from a co-conspirator middleman is treated as a "direct purchaser" because the manufacturers and the middleman direct purchaser are viewed as essentially one entity. *See Freeman,* 322 F.3d at 1145 (*Illinois Brick* did not bar price fixing claim by purchaser of real estate listing services against joint venture of realtor associations that was allegedly misused by its members to raise service support fees charged to venture and, through it, to prospective purchasers such as plaintiff). One antitrust authority has described this as the "vertical conspiracy" exception. William C. Holmes, *Antitrust Law Handbook,* ¶9:10 (2005 ed.), pp 914-15 (indirect purchaser exception "for 'vertical conspiracy' cases in which the direct purchasing middleman is himself part of the conspiracy, thereby requiring that suit be extended to the plaintiff as the true direct purchaser victim and the most likely antitrust enforcer"). This is precisely the same situation in the case at bar insofar as all the increased costs are passed through to PSW. *See* note 31, *supra.* The logic of the foregoing is also illustrated by the *Visa* case. While the court described the member Acquiring Banks as the nominal purchasers of network services for purpose of its analysis, no monetary relief was awarded, and, more significantly, *all the quantifiable harm arising out of the lack of price competition was measured with respect to its impact on merchants such as PSW.* 163 F. Supp.2d at 340-341 (MasterCard and Visa jointly raising interchange rates without losing single merchant customer and charging higher interchange rates to various card not present merchants who rely almost completely on general purpose cards).

[33] Accordingly, PSW is entitled to collect damages from both MasterCard and Visa and their intermediaries, FFB. *See Paper Systems,* 281 F.3d. at 632; *Fontana Aviation, Inc. v. Cessna Aircraft Co.,* 617 F.2d 478, 481 (7th Cir.1980); Phillip E. Areeda & Herbert Hovenkamp, II, *Antitrust Law,* ¶346f, 346h (rev.ed. 2002).

[34] The "injury" sustained by PSW is higher prices and loss of its business, two types of harm commonplace in the antitrust context. While sometimes complex, calculation of such damages is reasonably susceptible to quantification with expert analysis and testimony, and is done so all the time in the antitrust context. *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 565-567 (1981)(discussing relaxed proof of damages once antitrust injury is shown and affirming that it does not " 'come with very good grace' " for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted"); *see also* William C. Holmes, *Antitrust Law Handbook,* ¶9:27 (2005 ed.), pp 994-998 (discussing various methods for calculating antitrust damages), *and cases collected.* The real issue which Defendants appear to raise is one of "proximate cause," that is whether there has been an antitrust violation, and if so, whether PSW's harm flows therefrom, which is discussed in the text above.

construed in a light most favorable to PSW, alleges harm to market wide competition, *culminating* in PSW being driven out of business, flowing from the *individual and combined* effects of the concerted conduct of the Defendants, specifically the various challenged parallel programs of the Visa and MasterCard associations' joint ventures as implemented by FFB. *Id.* ¶¶90-93. PSW alleges the injury which it sustained included that flowing from market wide harm to competition: higher prices, in the form of higher interchange rates, and therefore discount rates paid by PSW and other consumers of network services, *id.* ¶¶44-49, as well as the various registration fees and penalties under the Excessive Charegback and other programs, *id.* ¶¶48-49,70, 72, 89-91. Moreover, the foregoing higher prices arose from the combined effect of the challenged programs made possible by and flowing directly from the §1 Sherman Act violation found by the court in the *Visa* case. *Id.* ¶¶155-158. Specifically, the Exclusivity Rules unreasonably restrained competition and thereby created and/or maintained Visa and MasterCard's dominance of the relevant markets. *Id.* ¶95. The Exclusivity Rules also insured there would be no competing card network with sufficient market share to which to turn. *Id.* Accordingly, PSW had to accept and process those cards for its website clients in order to conduct and remain in business, *regardless of the terms imposed, even if they were commercially unreasonable.* *Id.* ¶¶22,92,95. PSW also had no choice but to abide by the terms of the Excessive Chargeback Programs, notwithstanding the fact that these programs imposed excessive, retroactive and progressive penalties and had the perverse, arbitrary and commercially unreasonable effect of actually penalizing those merchants who took appropriate steps to combat purported Internet fraud—and eventually forced it out of business. *Id.* ¶¶48-49,51-92. These programs were also a disguised means for the Defendants to effectuate concerted, parallel price increases. *Id.* ¶94. The fact that both MasterCard and Visa adopted extremely similar policies, with the same perverse effects, ensured that PSW and other similarly situated merchants would not switch to the other bankcard network. *Id.* ¶¶92,94-95. Visa and MasterCard enacted and enforced horizontal, geographic market restrictions, thereby foreclosing competition from offshore Acquiring Banks and thus prevented PSW from negotiating more favorable discount rates and/or reserve account terms, and otherwise further limited competition and reduced output in the relevant markets. *Id.* ¶92,96. Finally, the Visa and MasterCard parallel Boycott List Programs

ensured that once PSW was terminated by the Defendants and driven out of business, it could not obtain another Acquiring Bank in either network—so its website clients had to go elsewhere, including to one of the Visa and MasterCard Acquiring Banks.[35] *Id.* ¶92,97,99.

In summary, the injury sustained by PSW was not indirect nor the result of a failed business plan, but a direct result of the market dominance achieved by MasterCard and Visa, in whole or in part, through conduct found by the court in the *Visa* case to constitute a §1 Sherman Act violation. PSW has alleged damages, which are neither indirect nor speculative, nor could the Defendants conceivably be subject to double recovery—while the injury is direct and flows from the antitrust harm of lack of output and increased prices, the damages for which PSW seeks recovery are attributable to its injuries only.[36]

### 3. §2 of the Sherman Act.[37]

***a. PSW has stated a claim for monopolization.***[38] As stated previously, PSW alleges and the *Visa* court found that both Visa and MasterCard had market power in the relevant markets, whether viewed

---

[35] As the Supreme Court has noted, "[r]estraints on competition [constitute antitrust violations if they] have or [are] intended to have an effect upon prices in the market *or otherwise . . . deprive purchasers or consumers of the advantages which they derive from free competition. Apex Hosiery Co. v. Leader,* 310 U.S. 469, 500-501 (1940)(emphasis added). One of the advantages that derive from free competition is other, competing providers with different and/or more flexible terms and/or prices. In the case at bar, this was not available to PSW in the relevant market, however defined. *See* notes 26-32, *supra*. Even if there is some pro-competitive justification for the various challenged, parallel programs, PSW contends that concerted conduct which forecloses competition with respect to such specific terms and/or pricing among competitors controlling between 73% and over 92% of the relevant market is anti-competitive and actionable as a violation of antitrust law. Moreover, the mere fact that Defendants may, can or will assert or attempt to assert an economic or business justification for their challenged parallel conduct and the various challenged programs is irrelevant in the context of a Rule 12(b)(6) motion. *See Dagher,* 369 F.3d at 1121 (reversing grant of summary judgment to defendants and holding that proper inquiry is not whether joint venture itself is anti-competitive, or whether defendants *intended* to destroy competition, but whether concerted conduct is so important to attaining lawful objective of joint venture that anti-competitive effects may be disregarded); *Reyn',* 259 F.Supp.2d at 1001 (defendants' challenges to accuracy of plaintiffs' theories not properly considered on motion to dismiss); *see also In re Brand Name Prescription Drugs,* 123 F.3d at 614 (reversing summary judgment where issue was not whether defendant wholesalers were in fact participants in price-fixing conspiracy; but whether there was sufficient evidence to create jury issue; defendants' interpretations may be correct; but they are not inevitable). ***Moreover, even if, at the proper time, Defendants can establish a legitimate pro-competitive purpose for one or all of the challenged programs, PSW's claim that, on balance, the combined effect of the challenged conduct was anti-competitive is ultimately a question for the trier of fact.*** **Finally, it must be kept in mind that PSW is also challenging a conspiracy between *competing associations of competitors*, for which *per se* analysis is appropriate, and not merely rules promulgated by a single association of competitors, to which the more deferential rule of reason analysis applies.**

[36] There is nothing alleged in the Complaint, either directly or by inference, suggesting that any of the challenged higher prices or costs imposed on PSW by the Defendants were passed on to its website clients. Indeed, since PSW was driven out of business while purportedly exposed to millions of dollars in potential fines and penalties, the only reasonable inference is that PSW had neither the time nor opportunity to pass on any such charges. *See* note 35, *supra.*

individually or together.[39] Whether or not the Defendants, individually or together, possess sufficient monopoly power to support a §2 Sherman Act claim is ultimately dependant on a host of factors and is a mixed question of law and fact, which is not the proper subject of a motion to dismiss. *See* William C. Holmes, *Antitrust Law Handbook*, ¶3:4 (2005 ed.), pp. 454-461. Moreover, as previously noted, where, as here, anti-competitive effects are shown, an inquiry into market power is unnecessary. *See* note 19, *supra*. As previously argued, the Complaint alleges numerous programs by which the Defendants created and/or preserved their monopoly power, and the *Visa* court expressly found one of those programs, the Exclusivity Rules, to constitute anticompetitive exclusionary conduct in violation of §1 of the Sherman Act.[40]

***b. PSW has stated a claim for attempted monopolization.***[41] For the same reasons described in the previous section, the Complaint alleges sufficient facts to establish the first element of an attempted monopolization claim, predatory or anticompetitive conduct. The second element, intent to monopolize, may be inferred from the Defendants' anticompetitive conduct and is a mixed question of law and fact not appropriate for determination on a motion to dismiss. *In re Visa Check/Mastermoney Antitrust Litigation*, 2003 WL 1712568 *7 (E.D.N.Y.). The third element, dangerous probability of achieving monopoly power,

---

[37] §2 of the Sherman Act seeks to limit the means by which a firm may lawfully either acquire or perpetuate monopoly power. *U.S. v. Microsoft Corp*., 87 F.Supp.2d 30, 35 (D.D.C. 2000). Specifically, a firm violates § 2 if it attains or preserves monopoly power through anticompetitive acts. *Id.*

[38] *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)("The offense of [monopolization] under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.").

[39] Contrary to MasterCard's contention, the Supreme Court has never held that two competitors may not agree or conspire to monopolize, particularly, where as here, there is such close relationship between the entities wielding monopoly power, as evidenced by ample uniform conduct between the parties and their dual governance structure. *In re Visa Check,* 2003 WL 1712568 *6 (evidence of common ownership, lack of competition, and incidents of concerted activity by defendants could permit jury to conclude that MasterCard, along with Visa, attempted to monopolize relevant market); *see American Tobacco Co. v. United States,* 328 U.S. 781 (1946)(affirming conviction of horizontal competitors for conspiracy to monopolize, although not directly reaching issue of whether competitors were capable of conspiring to monopolize).

[40] Many circuits have held that illegal conduct like an impermissible tying arrangement under § 1 "may also qualify as anticompetitive conduct for section 2 purposes." *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1550 (10th Cir.1995) (citing cases and treatise); *see also Aspen Skiing,* 472 U.S. at 585 (upholding §2 Sherman Act monopolization claim where monopolist terminated venture with smaller rival not justified by economic efficiency concerns).

[41] To prevail on an attempt to monopolize claim, a plaintiff must show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

involves the consideration of numerous factors, including any barriers to entry by competitors, the nature of competition in that market, and the overall development of the industry. *Id.* (stating if Visa and MasterCard are proved to have acted in concert, this element could be satisfied as matter of law in light of combined amount of market share), *and cases cited therein.* As summarized in detail herein, sufficient facts have been alleged in the Complaint to establish this third element.

*c.* ***PSW has stated a claim for conspiracy to monopolize.***[42] Allegations in the Complaint and inferences drawn therefrom establishing the first element, proof of concerted action deliberately entered into with the specific intent to achieve unlawful monopoly, have already been addressed at length herein. Specific intent to achieve an unlawful monopoly was addressed, in part, in the previous section, while concerted action was discussed at length in §III.B.-C.2.a. above. The second and last element, proof of an overt act in furtherance of the conspiracy is established by, *inter alia*, the allegations in the Complaint and inferences drawn therefrom relative to the six (6) challenged parallel programs of MasterCard and Visa, including the Exclusionary Rules forming the basis of the §1 Sherman Act violation in the *Visa* case.[43]

## D. The Complaint Alleges an Actionable First Amendment Violation under *Bivens*.[44]

---

[42] To win a conspiracy to monopolize claim, a plaintiff must show: "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 795 (2nd Cir.1987).

[43] The case of *Paycom Billing Services, Inc. v. MasterCard International, Inc.*, 2005 WL 711658 (E.D.N.Y.), is inapposite to the case at bar. That case involved a challenge to MasterCard policies, which the court held restricted competition ***only*** within its own brand. The court found there was no antitrust harm to competition because such intrabrand restrictions generally do not harm competition, and that Paycom was free to choose to cease accepting MasterCard branded cards, and instead accept the cards of its competitors in the relevant market, Visa and Discover. The court expressly noted that Paycom did not allege a conspiracy with Visa. The case at bar does not merely involve an agreement in the form of intrabrand association rules applicable only to that association's members, but rather, involves an agreement *among competing associations* of competitors to promulgate and enforce six (6) parallel anticompetitive policies and programs; specifically, a conspiracy between MasterCard and Visa, two competing associations controlling between 73% and over 92% of the relevant market, depending on how it is ultimately defined. Accordingly, as expressly pled, unlike in *Paycom*, there were no practical alternatives available to PSW. PSW has expressly pled collateral estoppel based on the *Visa* case, Paycom did not. PSW alleges antitrust injury as a customer, and therefore, unlike Paycom, PSW's injuries are not "merely derivative of the injury to Discover," a competitor. *See* note 31, *supra.* Moreover, as a customer, the foreclosure of offshore Acquiring Banks did not enhance PSW's competitive position; instead, it harmed it by foreclosing a potential source of lower cost network services. PSW has pled market wide harm, and not merely harm to its business, which has raised prices and reduced output for network services, dramatically so in the submarket for Adult network services. *See* notes 26-29, 31-32, 35, *supra.* Finally, as noted previously, PSW's damages are not speculative, and are capable of reasonable determination. *See* note 34, *supra.*

[44] To establish a *Bivens* claim, a plaintiff must prove that 1) a federal official, 2) acting under color of federal law, 3) has violated the plaintiff's constitutional rights. *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 397 (1971).

First, as this Court has expressly held, a *Bivens* action may lie for violation of First Amendment rights.[45] Second, while on the surface, *Correctional Services Corp. v. Malesko,* 534 U.S. 61 (2001), appears to suggest that a *Bivens* claim may not lie against private individuals, as this Court has also expressly held, private individuals may be held liable for constitutional violations, provided they act under the color of federal law.[46] Third, as also expressly held by this Court, where as here, there is a sufficiently close nexus between governmental officials and the challenged action of a private party, it may be treated as action of the government itself.[47] Fourth, while it is true the majority in *Malesko* declined to apply liability under *Bivens* to

---

[45] *Kenna v. United States Department of Justice*, 727 F. Supp. 64, 68 (D.N.H. 1989)(Torres, J.)(prior related precedent "and fact that freedom of speech is one of the most fundamental of constitutional rights leads this Court to conclude that *Bivens* extends to First Amendment violations"); *accord Dobyns v. E-Systems, Inc.*, 667 F.2d 1219 (5th Cir. 1982); *Yiamouyiannis v. Chemical Abstracts Service*, 521 F.2d 1392, 1393 (6th Cir. 1975); *Purkey v. CCA Detention Center*, 339 F. Supp.2d 1145, 1152-1153 (D.Kan. 2004); *Paton v. LaPrade*, 471 F. Supp. 166, 172 (D.N.J. 1979).

[46] *Sarro v. Cornell Corrections, Inc.*, 248 F.Supp.2d 52 (D.R.I. 2003)(Torres, J.)(post *Malesko* case wherein court held *Bivens* action could be maintained against employees of operator of private prison which contracted to house federal detainees); *accord Purkey,* 339 F. Supp.2d at 1149-51(same; citing *Sarro*); *see Malesko,* 534 U.S. at 79 n.6 (Stevens, J., dissenting)(noting parties and United States as *amicus* acknowledge individual guards would be liable under *Bivens*).

[47] In *Sarro,* 248 F.Supp.2d at 59-60, this Court cited to numerous tests employed for determining whether a private party acted under color of federal law. At a minimum, the allegations in the Complaint are more than sufficient to establish federal action under the well-settled "nexus" test. *See Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, 449–450 (1st Cir. 1983)(quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982))("[T]he government 'normally can be held responsible for a private decision . . . when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]."); *Ponce v. Basketball Federation of Commonwealth of Puerto Rico*, 760 F.2d 375, 378 (1st Cir. 1985)(state action may be shown where government encouraged or affirmatively induced conduct of private defendant); *Piazza v. Major League Baseball*, 831 F. Supp. 420, 429 (E.D.Pa. 1993)(Major League Baseball ("MLB"), in refusing to move baseball team to another city, acted under color of state law under nexus test, where it was alleged City of San Francisco provided significant encouragement to MLB by pleading with it to intervene in sale and relocation of team and agreeing to indemnify MLB). PSW alleges Defendants acted at the behest of federal officials in requiring detailed information regarding PSW's website clients, expending substantial funds to conduct prior screening of the websites of its clients and other Aggregators, denying PSW and other Aggregators access to network services if the content of those websites were deemed unacceptable by Defendants, uniformly labeling consumers of Adult network services as "High Risk," subjecting them to excessive penalties under the Defendants' Excessive Chargeback and Registration Programs, and forcing Aggregators such as PSW and other Adult network services consumers out of business. Comp. ¶¶165-172. PSW further alleges that participation of federal officials in the Defendants' foregoing conduct included, *inter alia*, direction or information as to the website clients or the nature or type of content for which to screen and/or deny Adult network services, and/or involved coercion and/or encouragement in the form of promises of unfavorable and/or favorable regulatory, legislative, or enforcement activity aimed at or affecting the Defendants. *Id.* ¶170. PSW also alleges numerous facts supporting the foregoing contention, including the fact that federal officials do not have the expertise nor resources to perform the foregoing screening ***and could not constitutionally perform it or ban websites based on content in the absence of a warrant and/or a prior judicial determination that the content was obscene or otherwise in violation of federal law.*** *Id.* ¶169. PSW alleges Defendants do not review, monitor, screen and/or otherwise ban the provision of network services in other contexts, where federal and state officials have the resources, expertise, and traditional law enforcement tools with which to enforce obscenity laws. *Id.* ¶169.d. Accordingly, PSW has alleged more than sufficient facts to establish state action under the nexus test. *See Carlin Communications, Inc. v. Mountain States Tel. and Tel. Co.*, 827 F.2d 1291, 1296 (9th Cir. 1987)(termination of dial-a-message phone line service to plaintiff by phone company following threat to prosecute company for violating obscenity laws sufficient governmental coercion to qualify phone company conduct as state action for purposes of §1983 First Amendment claim). In the absence of discovery, PSW cannot allege any additional or more specific facts—the conduct alleged is not the type about which information is

the corporate operator of a private prison half-way house under contract with the federal Bureau of Prisons ("BOP"), as the dissent (in a 5-4 decision) noted in *Malesko*[48] and this Court noted in *Sarro*,[49] there is ample precedent finding corporate liability under *Bivens* ***in other contexts***, and with good reason—the graver danger posed by corporate wide conduct and policies.[50] Moreover, the *Malesko* Court expressly based its decision on the fact that the plaintiff *had alternative remedies available*[51] and there was therefore no need to "extend" *Bivens* beyond its "core purpose" of deterring individual conduct. 534 U.S. at 71-73. Indeed, the *Malesko* Court did not merely imply that liability under *Bivens* could be applied beyond its core purpose in the proper context, but it cited to cases where liability had previously been extended in the absence of effective, alternative remedies[52]. This is the precise situation in the case at bar: PSW is challenging corporate conduct, which has impaired its right to free expression under the First Amendment and caused it harm,[53] and for which

---

normally publicly available. ***Moreover, unless PSW is allowed to proceed with discovery, no one, but the Defendants, will ever know what precisely was said and done, by which Defendants and/or federal officials, or what motivated them—which is exactly what they want.***

[48] *Malesko,* 534 U.S. at 76-77 (Stevens, J., dissenting)(noting that prior to *FDIC v. Meyer,* 510 U.S. 471 (1994), Courts of Appeals had consistently and correctly held corporate agents performing federal functions, like human agents doing so, to be proper defendants in *Bivens* actions), *and cases cited at note 3.*

[49] *Sarro,* 248 F.Supp.2d at 58-59 (citing eight federal court decisions, including First Circuit decision, holding or assuming private corporate defendants acting under color of federal law liable under *Bivens*), *and cases cited.* The First Circuit case cited by the Defendants for the contrary proposition, *Stoutt v. Banco Popular de Puerto Rico*, 320 F.3d 26 (1st Cir. 2003), was decided two and a half weeks *before Sarro* and involved a situation where there were numerous state law remedies available to redress the very grievance complained of.

[50] *See Malesko,* 534 U.S. at 81 (Stevens, J., dissenting)("[A] tragic consequence of [the majority's decision] is the clear incentive it gives to corporate managers of privately operated custodial institutions to adopt cost-saving policies that jeopardize constitutional rights of the tens of thousands of inmates in their custody."); *Heinrich,* 62 F.Supp.2d at 308 (disallowing *Bivens* actions against private corporate entities would have perverse effect of encouraging institutionalization of unconstitutional practices, and insofar as such entities enact organization-wide policies and procedures, threat of *Bivens* suit against entities creates strong incentives which can prevent greatest amount of unlawful conduct with greatest ease).

[51] *Malesko,* 534 U.S. at 71-73 (noting availability in private prison context of such alternative remedies as *Bivens* action against individual offending officer, state tort action, and access to remedial mechanisms established by BOP, including administrative grievance procedure). ***None of these remedies are available to PSW.***

[52] The *Malesko* Court noted that in *Davis v. Passman,* 442 U.S. 228 (1979) and *Carlson v. Green,* 446 U.S. 14 (1980), *Bivens* liability was extended to claims for money damages against federal officers, who abused their constitutional authority, because the plaintiffs lacked any remedy or, at least, any effective remedy. 534 U.S. at 67-68.

[53] Despite Defendants' baseless suggestion to the contrary, PSW has both standing and a viable claim for violation of its First Amendment rights. *See Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963)(book publishers had standing to challenge scheme of informal censorship as unlawful prior restraint because they suffered legal injury, impaired sales of listed publications, insofar as First Amendment protection applies to circulation of books as well as their publication); *Carlin,* 827 F.2d at 1296 (termination of dial-a-message phone line service to plaintiff by phone company following threat to prosecute phone company for violating obscenity laws was unlawful prior restraint); *Penthouse Int'l. Ltd. v. McAuliffe,*

there is no other remedy available—in tort, contract, or otherwise—except under *Bivens*. Moreover, the conduct for which PSW seeks relief is the result of a corporate wide policy, corporately made and enforced—there is no single individual or group of individuals who are or could be identified and sued, nor would such a remedy effectively deter such corporate conduct in the future. Finally, if the foregoing was not enough, there are no significant factors present "counseling hesitation" to find liability under *Bivens*.[54] To the contrary, the case at bar cries out for the application of corporate liability under *Bivens*. There is no graver danger to our democratic form of government than the situation present here, where governmental officials, acting through private corporate actors (whose power and reach are international in scope), are able to shield themselves from both liability and discovery, and thereby circumvent and subvert constitutional rights of such fundamental importance as freedom of expression under the First Amendment.[55]

**E. <u>Rhode Island State Law Claims</u>**

**1. Breach of contract.**[56] First, construed in a light most favorable to PSW, the Complaint alleges sufficient facts to raise a reasonable inference that Visa and MasterCard are also parties to the Merchant

---

610 F.2d 1353, 1359-1362 (5th Cir.)(intimidation of retailers who carried certain purportedly obscene magazines constituted unlawful prior restraint), *cert. dismissed*, 447 U.S. 931 (1980). The facts of *Bantam Books* are similar to those in the case at bar. The only material difference is the censorship is of websites and not books, and it is carried out by federal officials coercing or encouraging the private Defendants to terminate processing of "objectionable" websites of Aggregators such as PSW, instead of a state governmental commission coercing book stores to refuse to sell blacklisted books.

[54] As noted in *Sarro*, *Bivens* actions have generally been allowed only in cases where there is no indication of a contrary Congressional intent or "special factors counseling hesitation," such as conflict with federal fiscal policy; existence of a comprehensive remedial scheme created by Congress; and unique nature of the military. 248 F.Supp.2d at 57. None of these factors are present in the case at bar, nor is one of the factors present noted in *FDIC v. Meyer*, 510 U.S. 471, 485 (1994)—an identifiable individual who caused the injury for which relief is sought. In the absence of corporate liability, the question presented is ***who is PSW to sue in this case: the members of the Boards of MasterCard and Visa that enacted the policy, <u>who are themselves representatives of corporate entities</u>, and/or the myriad of unknown employees and agents of these associations who implemented the challenged prior restraint at the direction of these Boards? The foregoing is a practical impossibility as neither PSW nor the average plaintiff has the resources to identify and sue individuals in the situation presented here, while there would appear to be little, if any, deterrent value.***

[55] *See Bantam Books*, 372 U.S. at 69-70 (non-reviewable, administrative prior restraint provides no safeguards against suppression of non-obscene, and therefore constitutionally protected matter, and is form of regulation creating hazards to protected freedoms markedly greater than those imposed under criminal law).

[56] The elements of a breach of contract claim under Rhode Island law are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; and 3) breach of the contract by defendant. *See Del Farno v. Aetna Casualty & Surety Co.*, 673 A.2d 71, 72 (R.I. 1996).

Agreement ("Agreement"), or at least in privity of contract with PSW relative thereto.[57] Comp. ¶173. In any event, a determination of the foregoing is an issue of fact not proper for determination on a motion to dismiss.[58]

Secondly, PSW alleges in detail the basis on which it claims the Defendants breached the Agreement, Comp. ¶¶174-175, including the following: 1) permitting and perpetuating "friendly fraud," and thereby improperly charging back to PSW legitimate consumer credit purchases for which PSW was entitled to payment, *id.* ¶¶51-92;150,175.a-c; 2) permitting fraud by failing or refusing to cancel compromised credit card numbers, and/or refusing to mandate and implement fraud prevention technologies and procedures, and imposing the cost thereof on PSW, *id.*; 3) directing PSW to terminate processing for SoftSell, even though it did not fall into any of the purported prohibited categories under Visa association rules, *id.* ¶¶117-132;175.e., 4) combining the SoftSell non-adult account with PSW's adult account and thereby causing PSW to exceed the permissible chargeback ratio, *id.* ¶¶133-135,175.f.; 5) assessing $123,900.00 in penalties, *id.* ¶¶137,146;175.g.; 6) transferring and/or holding funds in the reserve account in amounts grossly in excess of that which was reasonably necessary for

---

[57] While it is true that neither MasterCard nor Visa signed the Agreement, it is equally clear that they are far more than mere third party beneficiaries. They are named in the agreement, FFB Memo, Exhibit A, p.1, are beneficiaries of the agreement, approve the agreement, retain the right to modify or terminate it, their rules are incorporated in it, including the interchange fee and each of the six (6) challenged parallel programs, and they retain the right to assess fines and/or direct the release of funds from the reserve account, Comp. ¶153. *See also* discussion and citations to Complaint in §III.B., *supra.* Indeed, courts have expressly found that in entering into Merchant Agreements with merchants such as PSW, Acquiring Banks such as FFB are actually "contract[ing] with retailers *on behalf* of Visa or MasterCard . . .." *Reyn's,* 259 F.Supp.2d at 996 (emphasis added); *accord In re Visa Check,* 280 F.3d at 130 (same). Finally, the Agreement expressly provides that FFB was acting as a member of the two associations in entering into it. FFB Memo, Exhibit A, p.1. Under New York law, a non-signatory may be held liable for breach of contract where there is "a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity." *Parrott v. Coopers & Lybrand, L.L.P.,* 95 N.Y.2d 479, 484, 718 NYS.2d. 709, 711 (2000), *and cases cited and quoted therein.* Sufficient facts have been pled to establish contractual liability on the part of MasterCard and Visa either as joint venturers under the agreement, *ESI, Inc.* v. *Coastal Corporation,* 61 F. Supp.2d 35, 73-74 (S.D.N.Y. 1999)(sufficient facts alleged to establish privity of non-signatory to joint venture agreement even though defendant not named in contract), or as principals to the agreement entered into by FFB as their agent, *Carruthers v. Flaum,* 365 F.Supp.2d 448, 472 (S.D.N.Y.2005)(principal-agency relationship establishes requisite privity of non-signatory to contract). Courts have also found liability in suits against non-signatories under a theory of equitable estoppel, reasoning that a party benefiting from a contract could not refuse to be bound by its terms. *See Medical Air Technology Corporation v. Marwan Investment,* Inc., 303 F.3d 11, 18-19 (1st Cir. 2002), *and cases cited therein*; *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2nd Cir. 1995)(recognizing five theories to bind non-signatories to contract).

[58] *See Raphely International, Inc. v. Waterman Steamship Corporation,* 764 F. Supp. 47, 52 (S.D.N.Y. 1991)(denying summary judgment on grounds issue of fact existed as to whether contract existed); *Christy v. Harvey,* 691 N.Y.S.2d 609, 610, 262 A.D.2d 755 (1999)(upholding denial of motion to dismiss based on question of fact as to privity of contract between plaintiff and defendant); *Carruthers,* 365 F.Supp.2d at 472 (denying motion to dismiss contract claim against non-signatory based on agency theory).

the contractual purpose for which it was established (*i.e.*, provide Defendants reasonable security against *actual* losses) and/or for purposes not otherwise permitted by contract, *id.* ¶¶83-92,142-153,175.h-i; 7) wrongfully terminating the Agreement after PSW complained about the excessive reserves and that the Defendants were using market power to assess illegal fines and penalties on PSW, *id.* ¶¶142-153,175.j.; and, 8) failing or refusing to release to PSW or otherwise account for the $1.6 million in PSW's reserve account some 21 months after the contract was terminated and PSW ceased processing for the Defendants, *id.* ¶¶153,175.k. PSW also alleges Defendants breached the Agreement by the failure to indemnify and hold harmless PSW for, *inter alia*, breach of any warranty, covenant or agreement or any misrepresentation or gross negligence or willful misconduct, *id* ¶175.l, as expressly mandated under ¶24.2 of the agreement, FFB Memo, Exhibit A, p.4. Fairly construed, "breach of covenant" would include breach of the covenant of good faith and fair dealing discussed below, and "willful misconduct" would include breach of antitrust laws or violation of the First Amendment discussed above.[59] Accordingly, the Complaint more than provides fair notice to the Defendants as to the basis of PSW's breach of contract claim.[60]

---

[59] Finally, both with respect to PSW's breach of contract claim and breach of the covenant of good faith and fair dealing claim, it must be kept in mind that the purported basis of the termination of the Agreement was 1) potential fines and penalties under the Excessive Chargeback Programs, and 2) a decrease in transaction volume. Comp. ¶148. Aside from the fact that, as discussed below, PSW alleges that the Excessive Chargeback Programs were commercially unreasonable and imposed unenforceable penalties, *the only reason its chargeback ratio increased and exposed it to significant fines and penalties was a loss of transaction volume due largely to the Defendants' wrongly directing PSW to cease processing for SoftSell, as well as PSW's efforts to comply with the non-cross border restrictions and the other myriad, ever changing rules of the Defendants. Id.* ¶¶117-150. Moreover, because of the perverse impact of the Excessive Chargeback Programs, the more transaction volume decreased, the more the ratio increased, *even if actual incidents of fraud decreased.* Accordingly, the Defendants <u>*created*</u> the circumstances, which formed the purported basis for PSW's termination.

[60] At the appropriate time, Defendants will have the opportunity to adduce facts and raise inferences to contest the foregoing—this is not that time. In addition, contrary to the Defendants contentions, nowhere in the Agreement are the Defendants authorized to chargeback to PSW legitimate consumer credit purchases, transfer and hold in a reserve account funds in excess of potential exposure for *actual losses,* assess or threaten to assess coercive penalties and forfeitures, arbitrarily direct the termination of processing for a website client, and/or maintain funds in the reserve account indefinitely. Nor does the Agreement define what constitutes "excessive Chargebacks" so as to constitute a default. Moreover, the self-serving characterization of PSW's harm as merely flowing from enforcement of "unambiguous terms" in the Agreement "freely negotiated" with Defendants and divorced from any action or conduct of the Defendants is both inaccurate and contrary to the applicable standard of review, which requires construction of the Complaint and all inferences therefrom in PSW's favor. Both with respect to PSW's breach of contract and bad faith claims, it must be kept in mind that Visa and MasterCard dominate the payment card and network services markets—PSW, as an Internet merchant, could not survive unless it accepted their payment cards. ***Accordingly, the terms of the deal were not really "negotiable," nor did or could PSW "expressly agree" to all the provisions of the ever changing, unknown, and largely***

**2. Breach of the covenant of good faith and fair dealing.**[61] To the extent the Agreement is authoritatively construed at some point to permit the Defendants the *discretion* to take any or all of the acts cited in the previous section, PSW alleges the Defendants breached the implied covenant of good faith and fair dealing by taking those actions.[62] The essence of a claim for breach of the implied covenant of good faith is *using discretion conferred by contract*[63] to act in a commercially unreasonable manner so as to deprive another contracting party of the benefits thereof or to destroy the object of the contract.[64] The covenant of good faith is based on common sense.[65] It is premised on the

***unknowable "association rules" incorporated merely by reference in the contract.*** The Agreement is essentially a form contract of adhesion. *See Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y. 1996)(typical adhesion contracts are standard-form contracts offered by large, economically powerful corporations on take-it-or-leave-it basis, with no opportunity to change any contract terms, and inflict substantive unfairness on weaker party, because terms are not within reasonable expectation of that party, or because terms are unduly oppressive, unconscionable or contrary to public policy). Moreover, other than the discount rate, ***none*** of the six parallel programs and/or policies of which PSW complains (in particular the Excessive Chargeback and Registration Programs and penalties imposed pursuant thereto) **are set forth in the Agreement**—they are merely incorporated by reference as part of MasterCard and Visa "association rules," which are constantly changing, and the details of which PSW was not aware, was not made aware, and/or could not reasonably ascertain on its own. Comp. ¶¶28,37,143,175.d. ***Indeed, the Registration Programs were not even in effect at the time the Agreement was signed.*** Accordingly, the application of the foregoing provisions, in particular the imposition of excessive fines and penalties, could not possibly have been within the contemplation of PSW when entering into the contract. *Psaty & Fuhrman, Inc. v. Hous. Auth. of City of Prov.*, 76 R.I. 87, 68 A.2d 32, 35 (1949).

[61] The elements to establish a breach of the implied covenant of good faith and fair dealing are as follows: the failure of a party to a contract, by such party's acts and/or omissions; to observe reasonable commercial standards of fair dealing in the trade and comply with the standard of honesty in fact in order to achieve contractual objectives; and instead, use discretion conferred by contract to act dishonestly, arbitrarily, capriciously, unreasonably, and/or outside of accepted commercial practice; and, thereby deprive the other party of the benefit of the contract. *See Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 739, 297 A.2d 643 (1972).

[63] Comp. ¶176,186. An act need not constitute a breach of contract to breach the covenant of good faith and fair dealing; otherwise the cause of action would be redundant and unnecessary. *See Hord Corporation v. Polymer Research Corporation of America*, 275 F.Supp.2d 229, 238 (D.R.I. 2003)(merely because action contractually permissible does not exempt party from complying with obligation of good faith imposed by covenant of good faith and fair dealing); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp.2d 317, 330 (D.R.I. 1999)(breach of implied covenant of good faith and fair dealing may give rise to breach of contract, but not every breach of contract is violation of implied covenant).

[64] *State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2nd Cir. 2004)(applying New York law)(covenant implied in every contract and embraces pledge that neither party will do anything to destroy or injure right of other party to receive fruits of contract, and where contract contemplates exercise of discretion, requires promise not to act arbitrarily or irrationally in exercising that discretion.); *Rhode Island Charities Trust v. Engelhard Corp.*, 109 F.Supp.2d 66, 74 (D.R.I. 2000)( where contract confers discretion on one party, such discretion is limited by obligation that it be exercised in good faith); *Thompson Trading, Ltd. v. Allied Breweries Overseas, Trading, Ltd.*, 748 F.Supp. 936, 942 (D.R.I.1990) (covenant prohibits contracting parties from acting in arbitrary or unreasonable manner); *Jaffe v. Paramount Communications, Inc.*, 644 N.Y.S.2d 43, 47, 222 A.D.2d 17, 22-23 (App.Div. 1996)(covenant breached where party acts in manner that, although not expressly forbidden, would deprive other party of right to receive benefit of contract); *Ide Farm*, 110 R.I. at 739, 297 A.2d at 643 (purpose of covenant is to ensure contractual objectives are achieved).

[65] *Tagare v. NYNEX Network Systems Co.*, 921 F.Supp. 1146, 1150 (S.D.N.Y. 1996)("[T]he concept [of implied covenant of good faith and fair dealing] is rooted in notions of *common sense* and *fairness*.")(emphasis added).

implied assumption that, despite any ambiguity in or discretion conferred by contract, a contracting party is not thereby legally immunized from liability for any and all actions taken pursuant thereto, no matter how unfair, oppressive, or egregious they may be.

In other words, even though the Agreement expressly incorporated Visa and MasterCard association rules, this did not authorize the Defendants' to adopt, enforce, and or modify *any* rules, no matter how commercially unreasonable or perverse in their effect, or whether such provisions imposed *retroactive* fines which had no economic justification in terms of actual costs or harm imposed on the Defendants, and thereby amounted to a penalty or forfeiture,[66] such as the Excessive Chargeback Programs.[67] The same is true of the Registration Programs, specifically, the MasterCard IMQM program,

[66] *See Xerox Financial Services Life Ins. Co. v. High Plains Ltd. Partnership*, 44 F.3d 1033 (1st Cir. 1995)(applying Illinois law)(noting courts are loathe to enforce contract provisions specifying disproportionately large sum as liquidated damages where it would lead to unjust result); *Amaro v. Capital One Bank,* 1998 WL 299396, *11 (N.D. Ill.)(denying summary judgment to defendant credit card bank on claim alleging unlawful liquidated damages where defendant failed to show any actual damages incurred as result of late payments or that over limit and past due fees imposed on credit card accounts were in proportion to any actual loss); New York law: *Ryan v. Orris,* 463 N.Y.S.2D 883, 95 A.D.2d 879, 881 (App. Div. 1983)(where liquidated damage amount is so disproportionate to anticipated loss that it is designed to ***induce*** performance rather than to provide just compensation for losses, damages clause would be treated as an unenforceable penalty); *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424-426, 361 N.E.2d 365 (1977)(liquidated damage provision will be enforceable if amount liquidated bears reasonable proportion to potential harm, but where sum is so grossly disproportionate to probable losses that promissor would be ***compelled*** to continue performance out of fear of economic devastation, provision would not be enforced); Rhode Island law: *Psaty & Fuhrman, Inc. v. Housing Authority of City of Providence*, 76 R.I. 87, 99-100, 68 A.2d 32, 39 (1949)(imposition of per day fines as liquidated damages where no damage or loss could be shown was ***coercive*** in nature and therefore constituted unenforceable penalty); *Paolilli v. Piscitelli*, 45 R.I. 354, 121 A. 531, 534 (R.I. 1923)(payment was in nature of penalty because it was intended ***to act as an inducement to secure performance*** and not as substitute for damages); *Aetna Casualty & Surety Co. v. Rhode Island Electric Protective Co.*, 1979 WL 200328 (R.I. Super.)(denying motion to dismiss as issue of fact existed as to whether liquidated damage clause constituted penalty according to three part test of whether damages are difficult to estimate, parties intended to provide for damages and not penalty, and sum stipulated is reasonable pre-estimate of loss).

[67] Although it is alleged in detail in the Complaint, it is worth summarizing herein the basis for PSW's contention that the Excessive Chargeback Programs are commercially unreasonable and impose an unenforceable penalty. In the first instance, it is alleged that the $15.00 contractual chargeback fee is sufficient to reimburse any *actual* costs to the system to reverse and chargeback a transaction. Comp. ¶53. Accordingly, there is no economic or cost justification for any additional monetary imposition on a merchant, *except* as a penalty. Nor are the penalties justified as a "deterrence." First, monetary impositions designed to coerce or induce performance are unenforceable. *See* note 66, *supra*. Second, as alleged in detail in the Complaint, Internet and other card-not-present merchants have no control over "friendly fraud" or implementation of fraud prevention technologies to eliminate "friendly fraud." *Id.* at¶¶59-64. Third, to the extent a monetary deterrent is commercially justified and legally enforceable, progressive and excessive penalties, which range from $25 to $100 per chargeback *and* $25,000 to 100,000 per month, ***are grossly disproportionate and unreasonable, particularly since the average PSW transaction amount was only $34.00.*** *Id.* ¶¶72-82,105. Nor is it reasonable to impose such penalties retroactively up to one year. *Id.* ¶72. This is particularly true in PSW's case, which faces nearly $2 million in purported excessive chargeback *penalties* retroactive over a nine month period, while its total estimated *annual* transaction volume under the Agreement was only $8.4 million, of which PSW's gross margin is only 5%! *Id.* ¶¶105,141,148-152. Finally, where, as here, a merchant such as PSW has been terminated, there is no deterrent value at all to enforcement of the penalties on that merchant; ***there is no future non-compliant conduct to deter. The only possible purpose of the onerous penalties under these programs is to punish the merchant and usurp its profits.*** The fact that

for which PSW was assessed fines of $2,500.00 per day for purported non-compliance, even though PSW alleges *it had already complied* with the requirements of that program. *Id.* ¶¶92.a.,142,152. Moreover, merely because Defendants may have had discretion to increase the funds held in the reserve account in light of purported potential losses, the implied covenant of good faith requires that the Defendants refrain from setting a reserve which is commercially unreasonable and/or designed or intended to punish PSW or drive it out of business, and thereby deprive PSW of the benefits of and destroy the object of the contract. *Id.* ¶¶83-92,142-143. More importantly, it must be kept in mind that the primary basis for which the Defendants' are claiming they had established and are withholding $1.6 million of PSW's funds in the reserve account is purported potential penalties under the Excessive Chargeback and other programs, which PSW has alleged in detail were commercially unreasonable and designed to impose an unenforceable penalty or forfeiture. ***Accordingly, PSW alleges that the very reason the excessively high reserve was established—potential exposure for unenforceable penalties—was wrongful, and therefore obviously not authorized by contract.*** Thus, the allegations in the Complaint and all reasonable inferences drawn therefrom establish there was no ***reasonable nor legally authorized or enforceable basis*** for a reserve account of the magnitude established, maintained, and continued by the Defendants.[68]

Moreover, even if the Excessive Chargeback and/or Registration Programs are authoritatively construed at some point in this litigation not to be commercially unreasonable on their face, fairly construed, the Complaint alleges sufficient facts to establish that the actual and/or threatened assessments against PSW under those programs were commercially unreasonable, in light of all the circumstances discussed herein,[69] as well as the retroactive nature and substantial magnitude of the assessments imposed

there was no legitimate business purpose for the penalties is further supported by the attempt by the Defendants, through a representative of FFB, to extort money of out of PSW under the guise of negotiating a purported reduction in a potential Excessive Chargeback fine. *Id.* ¶¶138,176.e.

[68] Accordingly, the case at bar is inapposite to the cases cited by FFB, insofar as PSW alleges that there was no enforceable contractual or legal basis for increasing and maintaining such an excessive reserve. Accordingly, and in any event, for all the reasons discussed above, there was no "legitimate" business reason.

[69] As discussed in note 59, *supra*, PSW alleges that the Defendants *intentionally and wrongfully* created the circumstances, which led to its demise. This inference is supported by, *inter alia*, the fact that the Defendants were all well aware that the Excessive Chargeback Programs were driving and would inevitably drive PSW out of business, due, in part, to their perverse effect of penalizing merchants such as PSW, which take good faith action to comply. *Id.* ¶¶51-92,142-

or threatened to be imposed—in excess of $2 million, which constitute an unenforceable penalty or forfeiture. Accordingly, the Complaint, based just on the facts pled, *let alone those to be disclosed during the course of discovery*, states claims for relief for breach of the covenant of good faith, based on any number of theories of liability. *See* Comp. ¶176.a.-g. (summarizing factual bases for claim).

3. **Tortious Interference with Contractual Relations.**[70] The Complaint alleges that the Defendants intentionally interfered with PSW's contractual relations with respect to its website clients, Comp. ¶187, and with respect to the Agreement, *id.* ¶188. With respect to both counts, the Complaint expressly identifies the contracts, *id.* ¶¶18-21,34-38,92a,104 the Defendants' knowledge thereof, *id.*, and alleges harm flowing from the interference, of which all of the Defendants were well aware, *id.* ¶¶142-154,177-178. Finally, the Complaint is replete with allegations as to the manner in which the Defendants' conduct in interfering with the contracts was intentional and wrongful,[71] including the motivation to secure the business from PSW's website clients for the Defendants and/or another association member Acquiring

---

143,147,153. Moreover, the termination of the Agreement ***immediately after*** PSW complained in writing about the excessive reserves and that Defendants were using market power to assess illegal penalties on PSW, supports an inference that Defendants were motivated by a desire to silence and punish PSW. *Id.* ¶¶147-152, 175.j.,176.f; *see, e.g., Cherick Distributors, Inc. v. Polar Corp.*, 41 Mass.App.Ct. 125, 127, 669 N.E.2d 218, 220 (1996)(termination of distributorship contract on four days notice immediately following discovery distributor wrote letter urging other distributors to form association to negotiate with defendant was calculated to put plaintiff out of business and discourage other distributors from pursuing recommendation to form association and was unreasonable and constituted breach of covenant of good faith and fair dealing). An inference Defendants' conduct was intentional and wrongful is also established by allegations that the Defendants violated PSW's First Amendment rights by acting at the behest of federal officials—and not for any legitimate business purpose—to achieve the desired governmental goal of driving Adult network services consumers such as PSW out of business and otherwise reducing the supply of Adult content web pages on the Internet. *See* §III.D., *supra.*

[70] Tort liability may be imposed upon another who intentionally and improperly interferes with one's rights under a contract or makes the contractual rights more costly or less valuable. *Jolicouer Furniture Co., Inc. v. Baldelli*, 653 A.2d 740, 752 (R.I. 1995)(citing W. Page Keeton et al., Prosser and Keeton on The Law of Torts, §129 at 978 (5th ed. 1984)). In Rhode Island, the elements of intentional interference with a contractual relationship are as follows: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional interference with the contract; and, (4) damages as a result of the interference. *New England Multi-Unit Housing Laundry Association v. Rhode Island Housing and Mortgage Finance Corp.*, 893 F. Supp. 1180, 1192 (D.R.I. 1995); *Banco Totta e Acores v. Fleet Nat'l Bank*, 768 F. Supp. 943, 950 (D.R.I. 1991); *Western Mass Blasting Corp.v. Metro. Property and Casualty Ins. Co.*, 783 A.2d 398, 401 (R.I. 2001); *Smith Dev. Corp. v. Bilow Enters., Inc.*, 308 A.2d 477, 482 (R.I. 1973). PSW concedes that a party may not intentionally interfere with its own contract. The count alleging interference with the Agreement is pled in the alternative, and should be dismissed if this Court eventually determines, as PSW urges, that Visa and MasterCard and FFB were all contracting parties to the Agreement, or at least in privity relative thereto.

[71] As to the requirement of malice, malice is defined as unjustified interference. There is no requirement of showing spite or ill-will. *New England Multi-Unit Housing,*, 893 F. Supp. at 1191. If the interference is "found to be intentional and without justification, it is malicious in law even though it arose from good motives and without express malice." *Id.* at 1192 (quotation and citation omitted). Even the exercise of a contractual right may constitute tortious interference if found to be unreasonable. *Id.* Interference is unjustifiable when done for "the indirect purpose of injuring the plaintiff, or of

Bank, *id.* ¶90. The element of wrongfulness may be supplied by allegations establishing Defendants' conduct in violation of state and federal antitrust laws and/or PSW's First Amendment rights and/or by the allegations that their conduct was commercially unreasonable, arbitrary, and/or designed to punish PSW and impose a penalty or forfeiture.[72] *See id.* ¶¶155-179 and discussion in §III.C-E.1-2, *supra*. Whether the Defendants had a legitimate business purpose or were otherwise legally justified is not proper for consideration in the context of a motion to dismiss, particularly in the face of PSW's well-pled allegations, and the inferences to be drawn therefrom.[73]

**4. Intentional Interference with Prospective Economic Advantage**[74] PSW alleges the Defendants intentionally interfered with its prospective economic advantage as it relates to a reasonable business expectancy of acquiring and continuing contracts with its website clients, securing another Acquiring Bank, and/or otherwise continuing to derive business advantages from the operation of its business. Comp. ¶¶133,154,189. For the same above reasons, PSW has properly alleged claims for relief

---

benefiting the defendant at the expense of the plaintiff." *Stephenson v. Plastics Corporation of America, Inc.*, 276 Minn. 400, 416, 150 N.W.2d 668, 680 (1967) (citing *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 587, 175 A. 62, 66 (1934)).

[72] *See, e.g., Cherick Distributors,* 41 Mass.App.Ct. at 127, 669 N.E.2d at 220 (conduct in violation of implied covenant of good faith and fair dealing in terminating distributorship contact evidence of wrongful interference with distributors relationship with its customers).

[73] The finger pointing at other defendant parties contained in the Defendants' memoranda would appear to be a concession that at least one or more of the *other* defendant parties has wronged PSW. However, such efforts to exonerate themselves are to no avail in light of PSW's well pled allegations that the harm visited upon it was the result of the concerted conduct of the parties, whether as joint venturers, co-conspirators, or otherwise. *See* §III.B., *supra*. Moreover, this self-serving finger pointing illuminates the calculated and contrived nature of the relationship between them, as well as of the penalty programs they have enacted and the motivation therefore. FFB and other competing banks are members of two associations of competitors (MasterCard and Visa) formed for the ostensibly pro-competitive purpose of establishing, *inter alia*, credit card processing networks to which each member bank would have access. However, they discovered along the way that they could manipulate and control merchant consumers (and the markets they serve) by the imposition of association rules through, *inter alia*, unlawful tying arrangements, *In re Visa Check,* unreasonably excluding competition, *Visa*, fixing prices, *Reyn's,* and by imposing coercive penalties and fines, which is the case at bar. What is more, to insulate themselves from liability with respect to the latter, they come up with a clever, although patently contrived, plan: the competing member banks would assess otherwise unenforceable penalties and fines on themselves through the associations. The member banks would then pass it on to the merchant as an additional charge, to enforce merchant compliance to whatever it was the associations or member banks wanted. In this way, the associations could say they are not liable to the merchant because they have only assessed the member bank, while the member bank can say it is not imposing a fine or penalty, it is just passing through a charge incurred for processing credit transactions for the merchant. ***PSW is hopeful that this Court will recognize, as have other courts in similar contexts, the Defendants' contrived conduct for what it really is: self-serving, commercially unreasonable, oppressive, and wrongful behavior, enacted and enforced under the guise of purported pro-competitive association rules.***

[74] The tort of interference with prospective contractual relations has the same elements as the tort of interference with contract, except there is no requirement that an actual contract exists—all that is required is the existence of a business relationship or *expectancy*. *Mesolella v. City of Providence*, 508 A.2d 661, 669-670 (R.I. 1986).

under all of these theories. The Complaint alleges that PSW had grown considerably since its inception and had an excellent reputation in the industry (until its untimely demise), leading to the reasonable inference that it had a reasonable probability of continuing in business and acquiring new website clients, but for the Defendants' wrongful conduct. ¶¶133,142-143. PSW also alleges the Defendants were aware of the impact their challenged conduct had on PSW's relations with its website clients and its business generally. *Id.* ¶¶140-147. Also relevant is the Defendants' Boycott List Programs, which ensured that neither PSW (nor any of its principals) could subsequently enter into a Merchant Agreement with another Acquiring Bank or otherwise acquire and attract new website clients.[75] *Id.* ¶¶92-93,97,145,154,177.

**5. Conversion[76] and Embezzlement[77]** PSW alleges Defendants interfered with its ownership interest in and exercised dominion over PSW's funds and converted the same to their own use, Comp. ¶190, and, that Defendants appropriated and converted to their own use PSW's funds in the reserve account, which were entrusted to Defendants for a specific use, and thereby embezzled the same, *id.* ¶191. Although this account was established with FFB, for reasons discussed previously, all the Defendants are legally liable, either as principals, agents, joint venturers, or co-conspirators, with respect to PSW's claims arising out of the establishment, maintenance, and continuation without justification of the reserve account. *PSW would also emphasize that Visa and MasterCard have the power to authorize release of PSW's funds held in that account, but have neither assessed penalties nor authorized release of the funds. Id.* ¶153.

[75] PSW contends that it had a reasonable expectancy of deriving business advantage from ongoing commercial operation of its business through increased business with existing and future website clients, which is actionable even without citation to any specific prospective contract interfered with. *See Mesolella,* 508 A.2d 669 n.9 (citing favorably cases in other jurisdictions wherein property owners wrongfully denied full use and enjoyment of property were deemed to have actionable claim for interference with prospective economic advantage without identifying specific contract interfered with). Finally, contrary to the authority cited by FFB, as a matter of common sense, given MasterCard's and Visa's dominance of the relevant market and control and approval of Merchant Agreements, placement on a terminated merchant's list is not a "mere suggestion," it is the kiss of death.

[76] Under Rhode Island law, an action for conversion involves: 1) defendant's taking of the plaintiff's personalty; 2) without plaintiff's consent; and, 3) defendant exercising dominion over the personalty inconsistent with the plaintiff's right to possession." *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I. 1996*); Fuscellaro v. Industrial National Corp.*, 117 R.I. 558, 561, 368 A.2d 1227, 1230 (1977). The focus of the inquiry is "whether [a] defendant has appropriated to his [or her] own use the chattel of another without the latter's permission and without legal right." *Terrien v. Joseph*, 53 A.2d 923, 925 (R.I. 1947).

[77] The three elements necessary to prove embezzlement under Rhode Island law are (1) that defendant was entrusted with the property for a specific use; (2) that he came into possession of the property in a lawful manner, often as a result of

To the extent funds were withheld from PSW and placed in the reserve account in amounts *in excess* of that which was necessary to provide reasonable security to Defendants (*i.e.*, not contractually authorized), PSW alleges this constituted a wrongful taking of personalty without its consent. It must be kept in mind that, as discussed in detail above, the *Complaint, fairly construed, alleges that any amount withheld to fund potential Excessive Chargeback Program and other penalties was wrongful.* The allegation the Defendants continued to withhold those funds from PSW some 18 (now 21) months after it ceased processing for the Defendants, without assessing any penalties or otherwise releasing or accounting for the same, establishes facts sufficient to draw a reasonable inference that the Defendants' converted these funds to their own use. *Id.* ¶153. The Complaint also states a claim for embezzlement to the extent it is determined that all or any portion of PSW's funds diverted to the reserve account were, at least initially, *properly* within the Defendants' control. PSW alleges funds were authorized for deposit in the reserve account for the *specific purpose* of providing security to Defendants for potential losses. The Defendants' refusal to release these funds to PSW long after PSW ceased processing through the Defendants and the purpose of the reserve had been fulfilled, establishes facts sufficient to draw a reasonable inference that the Defendants converted the same to their own use, and thereby embezzled these funds.[78]

## IV. CONCLUSION

For all the foregoing reasons, PSW prays that the Defendants' Motions to Dismiss be denied.[79]

---

his employment; and, (3) that defendant intended to appropriate and convert the property to his own use and permanently deprive that person of the use. *State v. McKone*, 673 A.2d 1068, 1073 (R.I. 1996).

[78] *Traffix, Inc. v. Herold*, 269 F.Supp.2d 223 (S.D.N.Y.2003), is inapposite insofar as PSW is alleging Defendants were not legally authorized to deposit funds in the reserve account to offset potential *penalties*, and therefore, PSW should have had the right to immediate access. To the extent funds were properly placed in the account initially, but not subsequently remitted within a reasonable period of time after the purpose of the reserve had been fulfilled (*i.e.*, security for any actual losses from processing PSW transactions), an embezzlement occurred because PSW was and is now entitled to these funds. ***Moreover, it is patently obvious the only reason the funds have not been released is to further oppress PSW and use it as leverage to compel it to abandon its pending claims. Accordingly, the refusal to release the funds is more than a mere breach of contract; it is tortious, entitling PSW to tort damages, <u>including punitive damages</u>.***

[79] As an aside and in conclusion, PSW would observe that if it has not and cannot assert any state law claims against the Defendants, then there is no legal cause of action available by which to seek release of these funds, and Defendants are therefore entitled to continue to withhold the estimated $1.6 million in PSW's funds indefinitely. Such a determination, which would leave PSW with no legal recourse, is untenable and contrary to applicable law and common sense. *See, e.g.*, The Green Sheet, Inc., "Jury Orders Cardservice International, Humboldt Bank to pay Escort Service $3.15 Million," http://www.greensheet.-com /priorissues-/030901-/.4html (adult entertainment merchant awarded return of $150K security deposit and $3M in punitive damages against credit card processors for wrongfully seizing and refusing to release deposit).

**CERTIFICATION**

**Patricia A. Sullivan, Esq.**
**Edwards & Angell LLP**
**2800 Financial Plaza**
**Providence, RI 02903**

**John A. Tarantino, Esq.**
**Adler Pollack and Sheehan P.C.**
**One Citizens Plaza, 8th Floor**
**Providence, RI 02903**

**Joseph V. Cavanagh, Jr., Esq.**
**Blish & Cavanaugh LLP**
**30 Exchange Terrace**
**Providence, RI 02903**

I hereby certify that I caused the within Memorandum of Law to be delivered to the above attorneys of records on the 7th day of July, **2005.**

Bethann Trent