**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PSW, INC., d/b/a PSW BILLING,** **Plaintiff,** | : | |
| **v.** | : | **C.A. No. 04-347-T** |
| **VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION,** **Defendants** | : | |

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff, PSW, Inc., in the above-cited matter does hereby submit this Notice of Supplemental Authority to bring to the Court's attention the attached decision issued in *Brennan v. Concord EFS, Inc.*, 369 F. Supp.2d 1127 (N.D. CA. 2005), which applies and summarizes precedent cited in Plaintiff's opposition memorandum of law relative to horizontal price restraints in the joint venture context, which Plaintiff submits, in part, in response to Defendants First Financial Bank and First Data Merchant Services Corporation Notice of Supplemental Authority, previously filed in this matter.

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO &COMPANY, LTD.**

**Richard A. Sinapi, Esq. (R.I. Bar No. 2977)**
**Sinapi, Formisano & Company, Ltd.**
**100 Midway Place, Suite 1**
**Cranston, RI 02920**
**Telephone: (401) 944-9690**
**Fax: (401) 943-9040**

**CERTIFICATION**

**Patricia A. Sullivan, Esq.**
**Edwards & Angell LLP**
**2800 Financial Plaza**
**Providence, RI 02903**

**John A. Tarantino, Esq.**
**Adler Pollack and Sheehan P.C.**
**One Citizens Plaza, 8th Floor**
**Providence, RI 02903**

**Joseph V. Cavanagh, Jr., Esq.**
**Blish & Cavanaugh LLP**
**30 Exchange Terrace**
**Providence, RI 02903**

I hereby certify that I caused the within Plaintiff's Notice of Supplemental Authority to be served upon the above described attorneys of record via fax and hand delivery on the 1st day of November, 2005.

Rita S. Aldrian

Westlaw.



**Motions, Pleadings and Filings**

United States District Court,
N.D. California.
Pamela BRENNAN et al, Plaintiffs,
v.
CONCORD EFS, INC et al, Defendants.
**No. C042676VRW.**

May 4, 2005.

**Background:** Claim was brought that banks and others, owning automated teller machines (ATM's), committed per se violation of Sherman Act § 1 by engaging in horizontal price fixing, through assessment of fixed interchange fees when the ATM servicing a withdrawal request was not owned by bank issuing ATM card. Defendants moved to dismiss.

**Holdings:** The District Court, Walker, Chief Judge, held that:
(1) claim of per se violation was stated, and
(2) claim was not stated that bank holding company engaged in price fixing.
Motions granted in part, denied in part.

West Headnotes

**[1] Monopolies 🔑17(1.12)**
265k17(1.12) Most Cited Cases
Claim was stated that banks and others, owning automated teller machines (ATM's), committed per se violation of Sherman Act by engaging in horizontal price fixing, through assessment of fixed interchange fees when the ATM servicing withdrawal request was not owned by bank issuing ATM card. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[2] Monopolies 🔑17(1.12)**
265k17(1.12) Most Cited Cases
Claim was not stated that bank holding company engaged in per se horizontal price fixing, in violation of Sherman Act, by participating in setting of fixed interchange fees charged by ATM machine owners servicing withdrawals using ATM cards of other issuers; there was insufficient showing of alter ego relationship between holding company and subsidiary allowed to appoint director of board of ATM network regulator, as required for vicarious liability, and no factual showing of holding company's participation in conspiracy. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

***1128** Joseph R. Saveri, Jahan C. Sagafi, Joshua P. Davis, San Francisco, CA, Andrew W. Hutton, Channel P. Townsley, Deborah Brown McIlhenny, Mark G. Ayesh, Wichita, KA, Anthony J. Bolognese , Bart D. Cohen, Daniel B. Allanoff, Joel Cary Meredith, Joseph C. Kohn, Merrill G. Davidoff, William E. Hoese, Philadelphia, PA, Daniel E. Gustafson, Karla M. Gluek, W. Joseph Bruckner, Minneapolis, MN, George A. Shohet, Venice, CA, Gretchen M. Nelson, Los Angeles, CA, Kim Keevers, Michael J. Brickman, Charleston, SC, Marc S. Moller, New York, NY, for Plaintiffs.

Buckmaster Dewolf, Menlo Park, CA, Charles H. Samel, Los Angeles, CA, Brian Wallach, Peter Edward Moll, Esq., Carrie M. Anderson, James Christopher Egan, Jr., Peter D. Isakoff, Steven A. Newborn, Donald Baker, Washington, DC, Sarkis Ohannes Beudjekian, Redwood Shores, CA, Sonya D. Winner, Kathryn Ann Vaclavik, Diane E. Pritchard, Jesse William Markham, Jr., Michele D. Floyd, J. Thomas Rosch, Joshua N. Holian, Mark Jeremy Seifert, San Francisco, CA, for Defendants.

ORDER

WALKER, Chief Judge.

In this putative class action, plaintiffs assert that defendants--banks and other entities involved in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

processing of withdrawals from automated teller machines (ATMs) in the "Star" ATM network ("Star")--have engaged in horizontal price fixing declared illegal by section 1 of the Sherman Antitrust Act, 15 USC § 1. Plaintiffs argue that defendants' conduct is condemned *per se;* they disclaim any intention of proceeding on a rule of reason theory. Several defendants move to dismiss the complaint (or for judgment on the pleadings) on the ground that Star is a procompetitive cooperative joint venture subject only to rule of reason analysis. Doc 26, 29, 42. Other defendants move to dismiss on the ground that the complaint does not sufficiently allege their involvement in setting the terms of Star's operations. Doc 17, 33.

I

"On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit Partnership v. Turner Broadcasting System, Inc.,* 135 F.3d 658, 661 (9th Cir.1998) (citing *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995)). Accordingly, what follows is drawn from plaintiffs' complaint (Doc # 1), taking its allegations as true.

As almost anyone who has an ATM card knows, withdrawals can be made from an account at one bank--the bank that issues the ATM card (the "issuing bank")-- using an ATM owned by a third party (the "ATM owner"). Only banks can issue ATM cards, but banks and non-banks alike can operate ATMs. Transactions in which the issuing bank is not the ATM owner--known as "foreign ATM transactions"--are mediated by an ATM network that connects the ATM to the issuing bank. One such network (the subject of this suit) is Star, which is owned by defendant Concord EFS, Inc ("Concord EFS"); Concord EFS is a wholly owned subsidiary of First ***1129** Data Corp ("First Data"). Compl (Doc # 1) ¶ 8. Transactions in which the issuing bank is also the ATM owner--known as "on us" transactions, see Doc # 26 at 6 n4--do not involve the ATM network; such transactions are not the subject of this suit.

Another thing that ATM cardholders know is that while "on us" transactions are typically free, foreign ATM transactions involve fees. First, there is the "ATM surcharge," which is typically displayed on the ATM screen and collected by the ATM owner as part of the cardholder's withdrawal. The ATM surcharge ranges from zero (offered as an promotional enticement by some ATM operators) to $3.00 or more. Second, there is the "foreign ATM fee," which is assessed by the issuing bank and typically appears on the cardholder's bank statement as a fee. The foreign ATM fee ranges from zero (offered by banks that own few ATMs and are at a competitive disadvantage relative to banks that own many ATMs) to about $2.00 (currently the fee charged by the large banks that are defendants here). Third, there is a "switch fee" on the order of $0.05 paid by the issuing bank to the ATM network (Star in this case) for the network's services in mediating a foreign ATM transaction. Fourth, there is an "interchange fee" of $0.45 or $0.55 paid by the issuing bank to the ATM owner for use of the foreign ATM. See Compl (Doc # 1) ¶ 1 (defining fees); ¶ 2 & Fig A (diagraming typical foreign ATM transaction); ¶ 52 (describing current foreign ATM fees); ¶ 57 (describing interchange fees).

This suit concerns the interchange fee, which is fixed by Star and applies to all foreign ATM transactions mediated by the network. Presently, the interchange fee is $0.45 for on-bank-premise cash withdrawals and $0.55 for off-bank-premise cash withdrawals. Id. ¶ 57. The interchange fee is supposedly passed on to plaintiffs--ATM cardholders who have paid (or expect to pay) foreign ATM fees for transactions mediated by Star--in the form of artificially inflated foreign ATM fees.

The complaint is somewhat fuzzy on Star's corporate constitution, but at a minimum, see id. ¶ 8, Star is controlled directly or indirectly via its board of directors by a host of large banks that are defendants in this case: Bank of America Corp ("B of A"); Bank One Corp; Bank One NA; J P Morgan Chase & Co ("JPMorgan Chase"); Citibank (West) FSB ("Citibank"); SunTrust

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Banks, Inc ("SunTrust"); Wachovia Corp ("Wachovia"); Wells Fargo & Co; Wells Fargo Bank, NA; Servus Financial Corp ("Servus") (collectively, the "defendant banks"). The whirlwind of bank mergers and acquisitions in the last five years makes for quite a tangle of rights and liabilities, but the complaint clearly states that each of the defendant banks either (1) is entitled to appoint outside directors to the Star board of directors, or (2) controls or succeeded to the rights and liabilities of an entity that was so entitled. Id. ¶ ¶ 9- 14. (The one exception is Wachovia Bank NA, which appears in the complaint's caption but is mentioned nowhere in the complaint.) Through this control structure the defendant banks "have caused Star to continue to impose [i]nterchange [f]ees," from which the defendant banks benefit, both because they charge foreign ATM fees and because the defendant banks receive interchange fees to the extent they own ATMs. Id. ¶ 61.

Although the defendant banks control Star, an ATM network derives value from the participation of a large number of issuing banks and ATM owners--indeed, the complaint effectively concedes that Star is a joint venture that benefits consumers and fosters competition among issuing banks by allowing smaller banks that cannot afford to deploy a large number of ***1130** ATMs nonetheless to compete with larger banks that do own many ATMs. Id. ¶ 49. As such, Star accepts as members issuing banks and ATM owners other than the defendant banks. Id. ¶ 50. Although bound by Star's network policies, those issuing banks and ATM owners have "virtually no role" in setting network policies; but the bank defendants "have a significant role in establishing network policies." Id. On information and belief, plaintiffs allege that "some or all of the [b]ank [d]efendants" serve on an advisory committee "with the authority to veto or propose operating rules for the network and external [i]nterchange rates and fees payable between or passed to network participants." Id. ¶ 58. Although plaintiffs implicitly concede that some horizontal restraints are necessary to create Star and thereby benefit consumers, plaintiffs contend that "[i]mposing fixed [i]nterchange [f]ees is unnecessary to Star operations." Id. ¶ 64.

Plaintiffs seek both damages (for past payment of putatively inflated foreign ATM fees) and an injunction (against future fixing of interchange fees). Plaintiffs propose to proceed on behalf of four classes: two classes of California residents (one seeking retrospective damages relief; the other seeking injunctive relief), and two classes of non-California residents (seeking similar relief). Combined, those classes would roughly comprise all persons and business entities who (1) opened a bank account with a bank defendant and (2) either (a) paid a foreign ATM fee directly to a bank defendant or its affiliate or (b) currently have a bank account with a bank defendant.

II

Several dispositive motions are now before the court. Some are motions to dismiss pursuant to FRCP 12(b)(6) for failure to state a claim upon which relief can be granted; some are motions for judgment on the pleadings pursuant to FRCP 12(c). The pertinent legal standard is the same. *In re World War II Era Japanese Forced Labor Litigation,* 114 F Supp 2d 939, 944 (N.D.Cal.2000) (citing *Enron Oil Trading & Transp. Co. v. Walbrook Insurance Co.,* 132 F.3d 526, 529 (9th Cir.1997)), aff'd sub nom *Deutsch v. Turner Corp.,* 324 F.3d 692 (9th Cir.2003). Accordingly, the court will treat all pending motions under FRCP 12(b)(6) and refer to them as "motions to dismiss."

FRCP 12(b)(6) motions to dismiss essentially "test whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). FRCP 8(a), which states that a plaintiff's pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," provides the standard for judging whether such a cognizable claim exists. *Lee v. City of Los Angeles,* 250 F.3d 668, 679 (9th Cir.2001). This standard is a liberal one that does not require a plaintiff to set forth all the factual details of the claim; rather, all that the standard requires is that a plaintiff give the defendant fair notice of the claim and the grounds for making that claim. *Leatherman v. Tarrant County Narcotics Intell & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1993) (citing *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). To this end, a plaintiff's complaint should set forth "either direct or inferential allegations with respect to all the material elements of the claim". *Wittstock v. Mark A. Van Sile, Inc.,* 330 F.3d 899, 902 (6th Cir.2003).

Under Rule 12(b)(6), a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." ***1131***Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). See also *Conley,* 355 U.S. at 45-46, 78 S.Ct. 99. All material allegations in the complaint must be taken as true and construed in the light most favorable to plaintiff. See *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 980 n. 10 (9th Cir.1999).

The court will first take up the bank defendants' motions to dismiss on the ground that plaintiffs do not state a claim for a *per se* violation of the antitrust laws. Then the court will turn to the individual motions by Bank One Corp and JPMorgan Chase and by First Data to dismiss for failure adequately to allege those entities' involvement in setting Star's terms.

A

[1] Citibank and Suntrust (the "Citibank movants") (Doc # 26) and B of A, Bank One Corp, Bank One NA and JPMorgan Chase (the "B of A movants") (Doc # 29) move to dismiss the complaint for failure to state a *per se* antitrust claim. Although the bank defendants' memoranda in connection with these motions run several dozen pages, the nub of their argument is a simple syllogism: (1) Restraints in furtherance of procompetitive cooperative joint ventures are subject to rule of reason analysis, see, e g, *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ("*BMI*"); *National Collegiate Athletic Association v. Board of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("*NCAA* "); (2) fixing the interchange fee is necessary to the existence of Star, the joint venture at issue; therefore (3) the fixing of the interchange fee should be analyzed under the rule of reason.

Defendants' logic is impeccable, but the syllogism's minor premise--that fixing the interchange fee is necessary--is an inherently factual contention that cannot properly be resolved on a motion to dismiss. In fact, plaintiffs have pled exactly the *opposite:* "Imposing fixed [i]nterchange [f]ees is unnecessary to Star operations. Interchange [f]ees neither create a product that would not exist absent the fees nor enhance or promote competition in the ATM market." Compl (Doc # 1) ¶ 64. This is a factual contention and it is axiomatic that the court must accept it as true for purposes of the present motions. It is a plausible inference from plaintiffs' complaint, for example, that modern information technology could inexpensively automate competitive price setting among even the hundreds or thousands of Star members, making fixed interchange fees unnecessary to Star's existence. If plaintiffs are right, then horizontal price fixing is horizontal price fixing--and it is beside the point that prices were fixed in the context of an otherwise-lawful joint venture.

The court must note at the outset that plaintiffs' challenge to the "fixed interchange fee" is susceptible of two interpretations, only one of which is the proper subject of a *per se* challenge. On the one hand, plaintiffs might seek to replace the $0.45 or $0.55 fee with a fee of $0.00--a "zero fee," so to speak. This interpretation is suggested by the historical account of interchange fees described in ¶¶ 49-60 of the complaint and the conclusion in ¶ 62 that "the widespread adoption of [s]urcharges has eliminated any purported justification for [i]nterchange [f]ees." Under the "zero fee" argument, plaintiffs would contend that although interchange fees were necessary back when ATM owners had no other source of remuneration (that is, when surcharges were banned), interchange fees can now be set at zero because ATM owners can fend for themselves through surcharges. But to say that interchange fees should be abolished (the same thing as "set at zero") is to concede that ***1132** setting the interchange fee with certainty at *some* level is necessary to Star's existence--which is fatal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to plaintiffs' *per se* claim. (Indeed, such an argument is not an antitrust argument at all, for it amounts to a dispute over prices and competition law is not concerned with setting a proper price.) By contrast to the "zero fee" argument, plaintiffs do have a viable *per se* argument if what they seek is to permit competitive (e g, bilateral) negotiation of interchange fees among issuing banks and ATM owners. The court proceeds--as must plaintiffs to maintain a *per se* case--on the premise that a challenge to the "fixed interchange fee" is a challenge not to the fee's existence but to the *fixed* nature of the fee; that is, plaintiffs challenge the fixing of the interchange fee.

On that understanding, recent Ninth Circuit authority is squarely on plaintiffs' side. In *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133 (9th Cir.2003) (Kozinski, J), the Ninth Circuit considered a joint venture among several realtor associations to create a centralized multiple listing service (MLS) database. Access to the centralized MLS database, maintained by Sandicor, was sold to individual realtors, with the realtor associations providing billing services and technical support. Sandicor charged realtors $44 per month; the realtor associations agreed that Sandicor would pay $22.50 per month to each of them for each subscriber they supported. *Id.* at 1146. The plaintiffs--realtors who contended they were overpaying for MLS services-- brought suit to challenge the fixed $22.50 price for support services. The Ninth Circuit held that the realtor associations' agreement to fix support services pricing was illegal *per se* under section 1 of the Sherman Act. *Id.* at 1150-54. Indeed, the Ninth Circuit explicitly rejected the argument that "the inherent cooperative aspects of the MLS as a joint venture warrant more deferential review," explaining that "any elements of novelty and cooperation in the MLS are irrelevant to whether support fees are fixed or set competitively." *Id.* at 1151. Put succinctly:

> Antitrust law doesn't frown on all joint ventures among competitors--far from it. If a joint venture benefits consumers and doesn't violate any applicable per se rules, it will often be perfectly legal. The decision to combine MLS databses fits comfortably within this category. The further decision to fix support fees does not.

*Id.* at 1157 (citation omitted).

The same point is made in *Dagher v. Saudi Refining, Inc.,* 369 F.3d 1108 (9th Cir.2004), petition for cert pending. *Dagher* concerned a joint venture between the oil refining and marketing companies Texaco and Shell; the joint venture included an agreement to fix prices in the retail market for gasoline produced under the joint venture. The Ninth Circuit summarized the question presented and its holding:

> The question we confront in this case * * * is not whether two companies engaged in run-of-the-mill price fixing. Instead, the defendants have asked us to find an exception to the *per se* prohibition on price-fixing where two entities have established a joint venture that unifies their production and marketing function, yet continue to sell their formerly competitive products as distinct brands. In doing so, the companies fixed the prices of these two brands of gasoline, Texaco and Shell, by agreeing *ex ante* to charge the same price for each. We think the exception the defendants seek is inconsistent with the Sherman Act as it has been understood to date.

*Id.* at 1116. And again, the Ninth Circuit explained that "joint venture" is not a mantra to escape *per se* analysis:

> ***1133** It is not the case * * * that the mere existence of a bona fide joint venture means that participating companies may use the enterprises to do anything they please with full immunity from *per se* analysis under § 1, including price fixing. * * * [T]he issue with respect to legitimate joint ventures is whether the price fixing is "naked" (in which case the restraint is illegal) or "ancillary" (in which case it is not).

*Id.* at 1118 (citing Herbert Hovenkamp, XI Antitrust Law ¶ 1908 (1998) ("[A] restraint is not saved from the 'naked' classification simply because it is included in some larger joint venture arrangement that is clearly efficient.")).

The core question identified in *Dagher*--whether a restriction such as fixing the interchange fee is a

"naked" restraint or an "ancillary" restraint-- is quintessentially one of fact, and one that plaintiffs have pled in their favor in the complaint. If the restraint proves to be naked, it is subject to *per se* analysis and plaintiffs have stated a claim. Against these elementary propositions, the bank defendants offer several arguments, none of which persuades.

The B of A movants try to beg the question. See, e g, Doc # 29 at 7:22-8:3 ("In the context of an arrangement like this, in which some form of agreement among the parties is necessary to permit the system to operate, it is well established * * * that the *per se* doctrine does *not* apply."); id. at 9:5 (referring to the fixed interchange fee as "one of the many rules that have been adopted of necessity to make the network work"); id. at 11:1-2 ("The challenged interchange fee is therefore plainly ancillary to a lawful joint enterprise * * *."). These conclusory statements are, of course, insufficient to sustain a motion to dismiss.

The Citibank movants do somewhat better in arguing that "[w]ithout [the] advance certainty of obligation [that comes from a fixed interchange fee], no bank would agree to pay out money to individuals with whom it has no depository relationship" and that "there is no way that each member bank [or ATM owner, presumably,] possibly could reach agreement with each and every other bank about the terms on which they will make their machines available to each other." Doc # 26 4:3-5, 11-13. The Citibank movants also make a game theoretical argument that in the absence of a collective promise by the issuing banks to pay a minimum interchange fee to ATM owners, individually self-interested issuing banks would set foreign ATM fees so high that ATM owners would be unable to collect a surcharge large enough to entice them to enter the market--and there would be no ATM service. See Doc # 115 at 6-7. Whatever the merits of these arguments, they are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage.

The bank defendants also rely on several cases to support their position, but they are distinguishable. For example, while *BMI* supports the bank defendants in stating that "[j]oint ventures and other cooperative arrangements are * * * not usually unlawful," the *BMI* Court immediately added the caveat "at least not as price-fixing schemes where the agreement on price is necessary to market the product at all." 441 U.S. at 23, 99 S.Ct. 1551. Moreover, the "blanket license" to musical compositions offered by BMI was upheld as lawful by the Court not at the pleadings stage, but *after an eight-week trial on the merits;* it was this trial that established that "[a] middleman with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided." *Id.* at 20, 99 S.Ct. 1551.

***1134** Likewise, *National Bancard Corp. v. VISA U.S.A., Inc.,* 779 F.2d 592 (11th Cir.1986) (" *NaBanco* "), is distinguishable. There, the Eleventh Circuit based its rejection of a *per se* analysis on the fact that the interchange fee between banks operating the Visa credit card payment system was a " 'necessary' term without which the system would not function." *Id.* at 602. And again, that conclusion rested on the district court's finding of fact following *a nine-week bench trial* that the interchange fee was "an agreement on the terms of interchange necessary for VISA to market its product and be an effective competitor." *National Bancard Corp. v. VISA U.S.A., Inc.,* 596 F.Supp. 1231, 1253 (S.D.Fla.1984).

*NCAA* is not especially helpful to the bank defendants in that it too followed an "extended trial," 468 U.S. at 88, 104 S.Ct. 2948, and ultimately held the restraints in question to violate the Sherman Act (albeit under a rule of reason analysis). *NCAA* supports the bank defendants in one respect, however: *NCAA* treated the question whether "the agreement on price is necessary to market the product at all" as germane to an efficiencies defense under a rule of reason analysis, see *id.* at 113-15, 104 S.Ct. 2948 (citing *BMI* ), and (apparently) irrelevant to the threshold issue whether *per se* or rule of reason analysis governed the case, see *id.* at 100-04, 104 S.Ct. 2948. This analytical reordering--rarely if ever seen outside the context of sports leagues--appears to be the product

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the Court's pronouncement (again, following a lengthy trial) that "what is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 101, 104 S.Ct. 2948. But a sports league, while appearing to be a joint venture of competitors (and on the field, they are), is really only one firm and cases involving the leagues may be essentially *sui generis.* See, e g, Gary R Roberts, *Sports Leagues and the Sherman Act: The Use and Abuse of Section 1 to Regulate Restraints on Intraleague Rivalry,* 32 UCLA L Rev 219 (1984). For present purposes, it suffices to say that the ATM industry may be as exceptional as the televised college sports industry, but that is subject to proof by defendants.

The one case cited by the bank defendants that is both legally and procedurally on point is the decision by Judge White of this court in *Reyn's Pasta Bella LLC v. Visa USA, Inc.,* 259 F Supp 2d 992 (N.D.Cal.2003). In *Reyn's,* the court determined on a motion to dismiss that a horizontal price fixing challenge to the fixing of credit card interchange fees should be analyzed under the rule of reason. Three reasons persuade this court not to follow Judge White's opinion in this case: First, the *Reyn's* court had the benefit of *NaBanco*'s decision on a very similar (if not identical) set of credit card interchange fees; this court does not have analogous appellate authority with respect to the ATM interchange fee in this case. (Though similar in name, the interchange fees in the two industries are structurally rather different.) While perhaps not unflinchingly faithful to the Eleventh Circuit's analytical path in *NaBanco* and distinguishing that decision in certain respects, the *Reyn's* decision pragmatically took the same path as *NaBanco* in analyzing the credit card interchange fee under the rule of reason. Second, *Reyn's* did not have the benefit of *Dagher* and *Freeman: Dagher* was decided over a year after *Reyn's,* and although *Freeman* had issued only weeks before *Reyn's, Reyn's* does not cite *Freeman,* which may not have been brought to Judge White's attention. Third, *Reyn's* quotes the canonical language from *BMI* --that the rule of reason applies "where the agreement on price is necessary to market the product at all"--***1135** yet the analysis in *Reyn's* focuses entirely on whether the Visa payment system is a joint venture, and it ignores the "necessary" language of *BMI.* See 259 F Supp 2d at 1000.

In some respects, a better analogy to the case that plaintiffs have pled is a case not yet mentioned: *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Topco was "a cooperative association of approximately 25 small and medium-sized regional supermarket chains." *Id.* at 598, 92 S.Ct. 1126. The cooperative procured and distributed to its members a variety of food and nonfood items, branded under various names owned by Topco. *Id.* As a buying cooperative, Topco's "very existence * * * improved the competitive potential of Topco members with respect to other large and powerful chains." *Id.* at 600, 92 S.Ct. 1126. Topco was, in more recent parlance, a cooperative procompetitive joint venture. But the darker side of Topco--its bylaws required horizontal territorial division among the association's members--led the Court to condemn it as a *per se* violation of the Sherman Act. *Id.* at 608, 92 S.Ct. 1126.

The parallels between this case and *Topco* are crystallized by Chief Justice Burger's dissent in *Topco,* in which he stressed the interbrand competition fostered by Topco's existence:

> [W]e have here an agreement among several small grocery chains to join in a cooperative endeavor that, in my view, has an unquestionably lawful principal purpose; in pursuit of that purpose they have mutually agreed to certain minimal ancillary restraints that are fully reasonable in view of the principal purpose * * *.

*Id.* at 613, 92 S.Ct. 1126 (Burger, CJ, dissenting). But of course, the Chief Justice's view did not prevail. The law is this: Horizontal restraints in the context of a procompetitive joint venture remain unlawful *per se* unless they are necessary to (or, in certain formulations, "reasonably ancillary to") the achievement of the joint venture's procompetitive benefits.

The bank defendants offer various reformulations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of their basic argument, but the court is constrained to reject them at this stage. Accordingly, the bank defendants' motions to dismiss (Doc 26, 29) are DENIED.

B

[2] Bank One Corp and JPMorgan Chase move to dismiss the complaint against them pursuant to FRCP 12(b)(6) on the ground that it fails adequately to allege their participation in the alleged conspiracy. Doc # 17. Bank One Corp and JPMorgan Chase contend that they are "nonoperating holding corporations," id. at 1:22, and that the complaint does not explain how they participated in the alleged conspiracy or are liable for the actions of a subsidiary, Bank One NA. As alleged in the complaint, the holding company structure is this: JPMorgan Chase was created on July 1, 2004, by the holding company merger between J P Morgan Chase & Co and Bank One Corp. Bank One NA, which was a wholly owned subsidiary of Bank One Corp at the time of the July 2004 merger, had previously acquired Bank One of Arizona NA, which was entitled to appoint outside directors to Star's board. Compl (Doc # 1) ¶ 10. In short, the complaint alleges that at present Bank One NA is a subsidiary of JPMorgan Chase; it is unclear whether Bank One Corp continues to exist following the July 2004 holding company merger. There is no dispute--at least at this stage--that Bank One NA has successor liability for Bank One of Arizona NA's actions.

Bank One Corp and JPMorgan Chase make two arguments, both of which the court would have to accept to grant their ***1136** motion to dismiss. One argument goes to vicarious liability, the other to conspiracy liability. As to vicarious liability, they contend that the complaint does not adequately plead alter ego liability on Bank One Corp's part for actions of Bank One NA; and that in turn, JPMorgan Chase cannot be liable because Bank One Corp had no liability to which JPMorgan Chase could have succeeded in the holding company merger. As for liability for conspiracy, Bank One Corp and JPMorgan Chase argue that the complaint's pleading format--specifically, grouping them with the other bank defendants and alleging that the group in general conspired to fix interchange fees--is inadequate under FRCP 8, which sets a minimum threshold of defendant-by-defendant specificity that a plaintiff must meet.

These arguments are convincing. The allegations of the complaint regarding both the vicarious liability and conspiracy theories are simply legal conclusions without supporting facts. For example, plaintiffs allege that "Bank One [Corp] exercised such dominion and control over Bank One, NA and Bank One Arizona that it is liable according to the law for the acts of Bank One, NA and Bank One Arizona." Compl (Doc # 1) ¶ 10. See, e g, *Neilson v. Union Bank of California, NA,* 290 F Supp 2d 1101, 1116 (C.D.Cal.2003) ("Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each.").

With respect to the conspiracy theory of liability, Bank One Corp and JPMorgan Chase are quite correct that the complaint lumps them in with the other bank defendants for purposes of pleading the conspiracy. They are equally correct that the allegations of the complaint doing the work under FRCP 8 of pleading the conspiracy are not the generalized allegations of, for example, ¶ 61 ("The [b]ank [d]efendants * * * have caused Star to continue to impose [i]nterchange [f]ees * * *."), but rather the particularized allegations of ¶¶ 9-14 that state how each bank, individually, exerted control over Star's rulemaking. Consequently, there are no allegations in the complaint specifically connecting Bank One Corp and JPMorgan Chase to the alleged conspiracy that controlled Star. Cf *In re Sagent Technology, Inc., Derivative Litigation,* 278 F Supp 2d 1079, 1094 (N.D.Cal.2003) ("While [ FRCP] 8 requires only that the a pleading set forth a short and plain statement of the claim showing that the pleader is entitled to relief, the underlying requirement is that a pleading give fair notice of the claim being asserted and the grounds upon which it rests. A complaint that lumps together thirteen individual defendants, where only three of the individuals was alleged to have been present for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

entire period of the events alleged in the complaint, fails to give fair notice of the claim to those defendants." (citation and quotation marks omitted)).

In response to this, plaintiffs argue principally that Bank One Corp and JPMorgan Chase are conspirators in this case for an entirely different reason--to wit, because they exerted control over Visa USA Inc and Visa International Corp (collectively, "Visa") and Mastercard International Inc ("Mastercard"). Id. ¶¶ 17-20. Visa and Mastercard own, respectively, Plus and Cirrus, the two worldwide ATM networks. Id. ¶¶ 18-19. Plaintiffs contend--and the complaint is far from clear on the causation or conspiracy in this--that action by these two networks precipitated the adoption of ATM surcharges in all ATM networks. Id. ¶¶ 54-55. This in turn rendered fixed interchange fees unnecessary. Id. ¶ 62. Plaintiffs' tale about the involvement of Bank One Corp and JPMorgan ***1137** Chase in all this is not totally improbable. But the complaint is so poorly developed in this particular respect that it does not give fair notice under FRCP 8 to Bank One Corp and JPMorgan Chase (or the court, for that matter) of the role they are alleged to have played in the conspiracy. Indeed, the complaint is ambiguous on just what the scope of the alleged conspiracy was: The complaint concentrates largely on the decisionmaking surrounding Star, yet Visa and Mastercard--avowed competitors of Star, no less--are announced as coconspirators, see Compl (Doc # 1) ¶¶ 17-18.

Accordingly, Bank One Corp and JPMorgan Chase's motion to dismiss is GRANTED. The defects in the complaint against these entities could possibly be resolved by an amended pleading; accordingly, plaintiffs are given leave to amend their complaint against Bank One Corp and JPMorgan Chase. See *United States v. SmithKline Beecham Clinic Labs,* 245 F.3d 1048, 1052 (9th Cir.2001). On the other hand, the parties may wish to defer resolution of the liability of Bank One Corp and JPMorgan Chase by entering into a tolling agreement pending the outcome of other issues. The choice is, in the first instance, plaintiff's and then, possibly, Bank One Corp's and JPMorgan Chase's.

C

First Data moves to dismiss the complaint on the ground that it fails to allege First Data's involvement in the claimed conspiracy. Doc # 33. First Data proceeds from a simple premise: The complaint states that "Concord [EFS] was acquired by First Data * * *, the largest U.S. credit card processor, and is now a wholly-owned subsidiary of First Data," Compl (Doc # 1) ¶ 8, but beyond this, the complaint says nothing specific about First Data. Plainly, the allegation quoted above is insufficient to state a claim for alter ego liability on First Data's part for acts taken by its subsidiary Concord EFS. And although the complaint repeatedly refers to "the defendants" or "the bank defendants" in the aggregate--groups that include First Data, even though it is not a bank--there are no allegations in the complaint specific to First Data that suggest how it could have taken the actions ascribed to "the defendants" or "the bank defendants." The court agrees with First Data that the complaint does not give it fair notice of the claims against it.

Plaintiffs' response largely ignores their complaint. They assert that "First Data has now owned Star for over a year," Doc # 109 at 16:10-11, but of course, that is not what the complaint alleges: The complaint asserts that First Data owns a corporation that in turn owns Star. Plaintiffs rely on material outside the complaint to suggest that First Data acts as Star's agent. Id. at 18-19. They ask the court to take judicial notice of several hundred pages of SEC filings made by First Data, Doc # 111, and they parse this material at length in their filings, Doc # 109 at 5-10.

Perhaps under certain circumstances, SEC filings are the proper subject of judicial notice; the court expresses no view on this question. Judicial notice at the pleadings stage is properly invoked to fill in a small gap in an otherwise complete portrait painted by the complaint. But here, the canvass is missing as well as the image: Plaintiffs would defeat a motion to dismiss by piling a ream of SEC filings (literally) onto one half-sentence in their complaint.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This is not proper at the pleadings stage--not as a matter of procedure and certainly not as a matter of good practice. Plaintiffs are manifestly in command of vast knowledge about First Data's activities; the length of their opposition paper, which runs to the very limits of Civ L R 7- 4(b), more than amply illustrates that. Distilling the material in plaintiffs' ***1138** opposition paper into an amended complaint should be trivial for plaintiffs, will likely give fair notice to First Data and will surely be a boon to the court.

Accordingly, First Data's motion to dismiss (Doc # 33) is GRANTED, and plaintiffs are given leave to file an amended complaint to amplify their allegations against First Data.

III

Plaintiffs have filed a paper styled "plaintiffs' submission regarding scheduling and arbitration." Doc # 120. Defendants have filed a paper in response. Doc # 125. Plaintiffs seek an order directing defendants (1) to state by a date certain their intentions to file a motion to compel arbitration and (2) if they so intend, to file such a motion by a date certain. The court is not entirely satisfied that it has the authority to force the issue, and even if the court were so empowered, the issue seems better resolved by litigating equitable defenses such as waiver and estoppel in the context of an actual motion to compel arbitration--if and when such a motion should be presented to the court.

IV

In sum, the court DENIES the motions to dismiss the complaint for failure to state a *per se* antitrust claim (Doc 26, 29); GRANTS First Data's motion to dismiss (Doc # 33); and GRANTS Bank One Corp and JPMorgan Chase's motion to dismiss (Doc # 17). Plaintiffs are given leave to file an amended complaint. The parties may stipulate to a pleading schedule in accordance with their respective positions, but shall appear on July 13, 2005, at 10:00am for a hearing on any motions filed and for a scheduling conference, at which the parties should be prepared to address a discovery plan and any outstanding pleading issues. As previously set at the January 26, 2005, case management conference, defendants' initial disclosure are due 60 days from the date of this order.

IT IS SO ORDERED.

369 F.Supp.2d 1127, 2005-1 Trade Cases P 74,815

**Motions, Pleadings and Filings (Back to top)**

- 3:04cv02676 (Docket) (Jul. 02, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.