**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PSW, INC., d/b/a PSW BILLING,** **Plaintiff,** | : | |
| **v.** | : | **C.A. No. 04-347-T** |
| **VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION,** **Defendants** | : | |

**PLAINTIFF'S OBJECTION TO U.S. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION DATED FEBRUARY 3, 2006**

Now comes the Plaintiff, PSW, Inc., in the above-cited matter pursuant to Fed.R.Civ.P. 72(b) and LR Cv 72(d) and does hereby object to the U.S. Magistrate Judge's Report and Recommendation dated February 3, 2006, to the extent of and for the reasons specified in its Memorandum of Law filed simultaneously herewith.

**WHEREFORE,** Plaintiff prays that the U.S. Magistrate Judge's Report and Recommendation dated February 3, 2006 be rejected to the extent of and for the reasons and on the grounds specified in its Memorandum of Law.

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO & COMPANY, LTD.**

**Dated: February 17, 2006**

**Richard A. Sinapi, Esq. (R.I. Bar No. 2977)**
**V. Edward Formisano, Esq. (R.I. Bar No. 5512)**
**100 Midway Place, Suite 1**
**Cranston, RI 02920**
**Telephone: (401) 944-9690**
**Fax: (401) 943-9040**

**CERTIFICATION**

**Patricia A. Sullivan, Esq.**
**Edwards & Angell LLP**
**2800 Financial Plaza**
**Providence, RI 02903**

**John A. Tarantino, Esq.**
**Adler Pollack and Sheehan P.C.**
**One Citizens Plaza, 8th Floor**
**Providence, RI 02903**

**Joseph V. Cavanagh, Jr., Esq.**
**Blish & Cavanaugh LLP**
**30 Exchange Terrace**
**Providence, RI 02903**

I hereby certify that I caused the within Objection to be served upon the above attorneys of record on the 17 day of February, **2006.**

Jessica D Payea

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **PSW, INC., d/b/a PSW BILLING,**<br>**Plaintiff,** | : | |
| **v.** | : | **C.A. No. 04-347-T** |
| **VISA U.S.A., INC., MASTERCARD INTERNATIONAL INCORPORATED, FIRST FINANCIAL BANK, and FIRST DATA MERCHANT SERVICES CORPORATION,**<br>**Defendants** | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO THE U.S. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION DATED FEBRUARY 3, 2006**

## I. INTRODUCTION

Now comes the Plaintiff, PSW, Inc., in the above-cited matter pursuant to Fed.R.Civ.P. 72(b) and LR Cv 72(d) and does hereby submit the within memorandum of law in support of its objection to the U.S. Magistrate Judge's Report and Recommendation dated February 3, 2006 ("Report"), specifying the recommendations to which objection is made and the basis therefore.

## II. OBJECTIONS TO RECOMMENDATIONS

### A. Objection to Recommendation to Dismiss Count One

### 1. It was error to reject application of the per se test at the pleading stage

The Complaint alleges, *inter alia*, horizontal price fixing, geographic market division, and group boycotts.[1] While acknowledging that price-fixing and horizontal market division should be

[1] PSW alleges horizontal market division in the form of a geographic market division imposed by parallel Visa and MasterCard rules, which, *inter alia*, foreclosed offshore Acquiring Banks from competing in the domestic market for network services. Comp. at ¶¶92,96. PSW also alleges a group boycott by the Defendants, and their member banks pursuant to parallel MasterCard and Visa Boycott List Programs, whereby all member Acquiring Banks are required to refuse to deal with any merchant terminated due to excessive chargebacks, along with any new entity involving that merchant, its officers, and/or its principals. *Id.* at ¶92.b. PSW alleges horizontal price fixing with respect to parallel and discriminatory pricing of the higher interchange rate charged to Aggregators such as PSW, as well as other Internet and card-not-present merchants, and with respect to the parallel Excessive Chargeback

subject to *per se* analysis, Rep. at 9, the U.S. Magistrate Judge ("Magistrate") rejected application of the *per se* rule based on a determination that the alleged conduct was not "manifestly anticompetitive" and that it was part of a "larger legitimate economic venture," Rep. at 10. This was error for several reasons.

First, fairly construed, the Complaint alleges agreements to restrain trade *among* the members of the MasterCard and Visa associations by promulgation and implementation of the six challenged policies, that is an intra-association conspiracy between member bank competitors in the same association acting as a joint venture. However, the Complaint also alleges a conspiracy *between* competing associations of competitors, that is MasterCard and Visa, which, by their separate but parallel promulgation and implementation of the challenged policies, have engaged in concerted conduct in restraint of trade. **Accordingly, PSW is also challenging a conspiracy between *competing associations of competitors*, and not merely rules promulgated by a *single* association of competitors.**

With respect to the conspiracy between the competing associations, no deferential rule of reason applies, because it is not a joint venture or other similar arrangement to which this less rigorous standard applies. *See* Rep. at 10-11. Binding Supreme Court and First Circuit precedent mandate application of the *per se* rule in this context.[2]

---

Program penalties and registration fees. *Id.* at ¶¶44-49,70, 72, 87-95; *see* Plaintiff's Combined Memorandum of Law in Opposition to Motions to Dismiss First Amended Complaint ("Pl. Memo") at p. 15. Indeed, the court in the *Visa* case expressly found that both Visa and MasterCard charge higher, and differing interchange rates based on the need (i.e. lack of practical alternatives) of the merchant to accept their payment card, specifically including catalog and Internet merchants, which was not supported by the Defendants' purported justification that there are increased incidents of fraud in these merchant categories. *United States v. Visa, U.S.A., Inc.*, 163 F. Supp.2d 322, 341 (S.D.N.Y. 2001), *affirmed*, 344 F.3d 229 (2nd Cir. 2003), *cert. den.*, 125 S.Ct. 45 (2004)[hereinafter referred to as "*Visa*"]. The court based this conclusion on the finding that the merchant, not Visa or MasterCard, bears all the risk of fraud. *Id.; see also,* Pl. Memo at note 35.

[2] *See Northern Pacific Railway Company v. United States,* 356 U.S. 1, 4-6 (1958) (restraints considered *per se* unlawful include horizontal price fixing arrangements, tying arrangements, horizontal

Second, with respect to conspiracies arising out of the policies promulgated respectively by the MasterCard and Visa joint ventures, *per se* analysis applies at the pleading stage as well. In the *NaBanco* case cited by the Defendants, the court ruled that the challenged joint venture conduct normally subject to *per se* analysis may be subject to the rule of reason *if* it 1) is no greater than reasonably necessary to achieve a legitimate commercial objective (i.e., has a procompetitive purpose), 2) has no substantial anticompetitive impact, and 3) is no broader than necessary to accomplish its procompetitive goals.[3] Accordingly, it is black letter law that "horizontal restraints in the context of a procompetitive joint venture remain unlawful *per se* unless they are necessary to (or, in certain formulations, 'reasonably ancillary to') the achievement of the joint venture's procompetitive benefits." *Brennan v. Concord EFS, Inc.*, 369 F.Supp.2d 1127, 1135 (N.D.Cal.. 2005). That is to say, to pass antitrust muster, the challenged conduct must satisfy the *NaBanco* three prong test cited above, and "is not saved from the 'naked' classification simply because it is included in some larger joint venture arrangement that is clearly efficient."[4] Whether or not the Defendants' challenged horizontal conduct constitutes

---

market allocations, and group boycotts); *see also,* relevant cases cited in Rep. at 9. *Per se* analysis has also been applied recently by at least two courts in the joint venture context. *See Dagher v. Saudi Refining Inc.*, 369 F.3d 1108, 1121 (9th Cir. 2004)(applying *per se* analysis to joint venture of two defendants which unified production and marketing functions for purported efficiency purposes and agreed to charge same price for subject two gasoline brands, yet continued to sell formerly competitive products as distinct brands); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 (9th Cir. 2003), *as amended on den'l of reh.*, (Apr. 24, 2003)(applying *per se* analysis to price fixing claim by purchaser of real estate listing services in antitrust claim against joint venture between realtor associations that was allegedly misused by its members to raise service support fees charged to venture and, through it, to prospective purchasers such as plaintiff).

[3] *National Bancard Corp. (NaBanco) v. Visa, U.S.A., Inc.* 779 F.2d 592, 601 (11th Cir. 1986)(citing *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 556 (E.D.Pa.1960), *aff'd mem.*, 365 U.S. 567 (1961), after analyzing, *inter alia*, *Broadcast Music, Inc. v. Columbia Broadcasting Co.*, 441 U.S. 1 (1979) ("*BMI*") and *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977)).

[4] Herbert Hovenkamp, XI Antitrust Law ¶ 1908 (1998), as cited in *Dagher,* 369 F.3d at 1116 ("It is not the case . . . that the mere existence of a *bona fide* joint venture means that participating companies may use the enterprises to do anything they please with full immunity from *per se* analysis under §1, including price fixing.").

permissible "ancillary restraints" is "an inherently factual contention that cannot properly be resolved on a motion to dismiss."[5] *Brennan,* 369 F.Supp.2d at 1131 ("Whatever the merits of [defendants' pro-competitive] arguments, they are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage.").[6]

---

[5] Nor may PSW's price-fixing challenge in this case be short circuited because of the holding in *NaBanco,* wherein the court, *after trial*, held that Visa's interchange fee did not constitute an unlawful restraint of trade. First, PSW is challenging the *parallel* discriminatory pricing of the higher interchange rate charged by the Defendants to Aggregators such as PSW, as well as other Internet and card-not-present merchants, as well as the *parallel* Excessive Chargeback Program penalties and registration fees, which PSW contends is a disguised means to carry out concerted, parallel price increases. Comp. at ¶¶44-49,70, 72, 87-95; *see* Pl. Memo at p.15. In other works, unlike *NaBanco*, PSW is also challenging inter-association conduct as it relates to setting of their interchange rates, that is price fixing *between* two competing associations of competitors (and not merely the setting of interchange rates for and by each association *of* competitors). Second, PSW is not challenging as price-fixing the mere setting and imposition of the interchange rate by the two joint ventures, but also the reasonableness and necessity of the rate, which PSW alleges is excessive and discriminatory. *Id.* Third, at the time *NaBanco* was decided, Visa permitted member banks to bypass its computerized system and avoid the interchange fee (leaving its members to negotiate their own rate), 779 F.2d at 594, and did not impose an interchange fee where the issuing and acquiring bank where the same (also know as "on us" transactions), *id.* at 596. PSW submits that discovery and testimony at trial will confirm that Visa did not permit either during the relevant period. Indeed, in a pending lawsuit cited by one of the Defendants, First Data Corporation (the parent company of Defendants FFB and FDMS) has asserted antitrust counterclaims against Visa arising out of Visa's prohibition against such "private arrangements." *Visa U.S.A., Inc. v. First Data Corporation*, *et al.*, C.A. No. C 02-1786-JSW (N.D. Calif.). It is also worthy of note that a witness who appeared as an expert on behalf of Visa in *NaBanco,* Professor Baxter, subsequently published an article wherein he opined, *inter alia*, that the interchange fee was legally valid only so long as the parties to the system were permitted the option to bypass the required fee and negotiate their own fee. *See* Baxter, *Bank Interchange of Transactional Paper: Legal and Economic Perspectives,* 26 J.L. & Econ. 541, 586 (1981), as cited in *NaBanco*, 779 F.2d at 600, n. 13.

[6] Indeed, the court in *Brennan* expressly noted and discussed several cases wherein joint venture price fixing was upheld, but only after trial and extensive testimony relative to the reasonableness and necessity thereof. *Id.* at 1133-1135. Accordingly, the mere fact that Defendants may, can or will assert or attempt to assert an economic or business justification for their challenged parallel conduct and the various challenged programs is irrelevant in the context of a Rule 12(b)(6) motion. *See Dagher v. Saudi Refining Inc.*, 369 F.3d 1108, 1121 (9th Cir. 2004)(reversing grant of summary judgment to defendants and holding that proper inquiry is not whether joint venture itself is anti-competitive, or whether defendants *intended* to destroy competition, but whether concerted conduct is so important to attaining lawful objective of joint venture that anti-competitive effects may be disregarded); *Reyn's Pasta Bella, LLC v. Visa,* 259 F.Supp.2d 992, 1001 (N.D. Cal. 2003)(defendants' challenges to accuracy of plaintiffs' theories not properly considered on motion to dismiss); *see also In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 614 (7th Cir.1997)(reversing summary judgment where issue was not whether defendant wholesalers were in fact participants in price-fixing conspiracy; but whether there was sufficient evidence to create jury issue; defendants' interpretations may be correct; but they are not inevitable). ***Moreover, even if, <u>at the proper time</u>, Defendants can establish a legitimate pro-***

Third, where a *per se* restraint is demonstrated, no showing of actual harm to competition is required. *See Northern Pacific Railway Company v. United States,* 356 U.S. 1, 4-6 (1958). Accordingly, the Magistrate erred in ruling PSW's purported failure to allege an injury to competition (which PSW disputes below) was fatal to its antitrust claims. Rep. at 12.

Fourth, contrary to the applicable standard of review for a motion to dismiss, the Magistrate made inherently factual determinations and otherwise failed to construe all allegations in the Complaint and all inferences therefrom in a light most favorable to PSW in rejecting application of the *per se* rule (i.e., in finding that the alleged conduct was not "manifestly anticompetitive"). Rep. at 10-11.

**2. It was error to rule that PSW failed to allege injury to competition.**

On more than one occasion in recommending dismissal of Count One, the Magistrate ruled that the Complaint failed to allege injury to competition. Rep. at 11-18. This was error.

First, PSW alleges "antitrust harm to competition" due to higher prices for network services in the form of higher interchange rates, and therefore discount rates paid by PSW and other consumers of network services, as well as in the form of registration fees and chargeback related and other penalties. Comp. at ¶¶44-50,92-99,158,163. PSW also alleges antitrust harm due to decreased output.[7] *Id.* at ¶¶92-97,99,158,163,169.f. **Moreover, antitrust harm to**

***competitive purpose for one or all of the challenged programs, PSW's claim that, on balance, <u>the combined effect of the challenged conduct</u> was anti-competitive is <u>also</u> ultimately a question for the trier of fact.***

[7] In addition to the express allegations relative thereto, loss of output in the Adult network services market may also be inferred from allegations relative to, *inter alia*, the Defendants' refusal to provide network services to websites deemed to have unacceptable content, Comp. at ¶92a., many of PSW's website clients being forced to cease operations, *id.* at ¶¶90-91, 97, an overall reduction in the amount of web pages devoted to adult content, *id.* at ¶169.f., the loss of over 83% of the Aggregators in that market, *id.* at ¶162, refusals to deal with terminated merchants, *id.* at ¶¶92.b., 97, and the non-cross border acquiring rules which prevented offshore Acquiring Banks from competing to provide network services in the domestic market, *id.* at ¶¶92, 96. In any event, such an inference is far more plausible than the one urged by Defendants, which asks this Court to assume facts not pled and to construe them in a light most favorable to the Defendants, that

**competition *market wide*, due to increased prices and reduced output in the network services market *has already been established* in the *Visa* case.**[8] *See* Pl. Memo at pp. 14-16. Finally, as previously argued above, to the extent that the Complaint alleges *per se* antitrust violations, no finding of harm is required. *See* §II.A.1. above.

Second, in ruling that PSW failed to allege harm to competition, the Magistrate failed to identify the relevant market or markets with respect to which PSW purportedly failed to allege harm to competition, and when the relevant market is mentioned in the Rep. at 18, the Magistrate failed to include in his analysis the impact on competition alleged relative to the Internet Adult Entertainment Website network services market alleged in the Complaint or any other relevant market which could be established after discovery and/or trial.[9] Rep. at 11-17.

Third, contrary to the applicable standard of review for a motion to dismiss, the Magistrate made inherently factual determinations and otherwise failed to construe all allegations in the Complaint and all inferences therefrom in a light most favorable to PSW in ruling that the Complaint failed to allege harm to competition, and instead, drew numerous inferences adverse to PSW, Rep. at 11-17.[10] *See* Pl. Memo at pp. 11-12, 14-16.

---

market concentration, supply restrictions, and refusals to deal have improved efficiencies, increased output and reduced costs.

[8] *Visa*, 163 F.Supp.2d at 379-406 (anti-competitive conduct of MasterCard and Visa reduced overall card output and available card features, decreased network services output, stunted price competition in the network services market, and harmed consumer welfare); Comp. at ¶156.d.; *see also* Pl. Memo, notes 26-27, and 35.

[9] The failure to identify and discuss the impact on competition in the Internet Adult Entertainment Website network services market as alleged in the Complaint is particularly significant, since PSW alleges that the antitrust harm to competition caused by the challenged conduct was more severe in that market. Pl. Memo at p. 10 and notes 27 and 35; Comp. at ¶¶161-163. In addition, a finding of no harm to competition at the motion to dismiss stage requires an express determination that no harm to competition was alleged or could be inferred with respect to any relevant market, which could be established after discovery or trial. *See* Pl. Memo at p. 11 and notes 23 and 24.

[10] First, while it is true the Complaint alleges that the Excessive Chargeback Programs caused PSW harm and ultimately caused or contributed to it being forced out of business, Rep. at 11-13, PSW also

Fourth, since, as a consumer of network services, PSW was a presumptively proper plaintiff, Pl. Memo at pp.6, 12-14, who sustained "anti-trust injury," Pl. Memo at pp. 6, 14-16, and had sustained damages which were neither speculative nor remote, but flowed directly from the Defendant's anti-competitive conduct alleged in the Complaint, Pl. Memo, notes 31-34, the Magistrate erred in refusing to apply *collateral estoppel* at the pleading stage, Pl. Memo at p.5-7, at least as it relates to the impact of the Exclusivity Rules,[11] and in recommending dismissal of Count One as a result, Rep. at 16-17.

Fifth, whether applying a *per se* or rule of reason analysis, the Complaint sufficiently alleges unlawful price-fixing arising out of the parallel setting of the interchange rate and the imposition of Excessive Chargeback fees and penalties and Registration Program fees, viewed individually or together, and the Magistrate's ruling to the contrary was based on improper

expressly alleged that these programs "caused or contributed to increased prices and/or a reduction in output," Comp. at ¶92; *see also supra*, note 7; therefore, the Magistrate erred in drawing an adverse inference and ruling no harm to competition was alleged. Additionally, as a point of clarification, the Complaint does not allege that the Defendants were *permitted* to impose penalties on PSW under the Merchant Agreement, but instead expressly alleges that they were not permitted under the Agreement or under applicable law. *See* Pl. Memo at pp. 21-27, Comp. at 174, 175g.-j., 176;

Second, as with the Excessive Chargeback Programs, it may be reasonably inferred that the imposition of Registration Program fees was a disguised means for the Defendants to effectuate parallel price increases, and in fact, increased prices in the relevant market, Comp. at ¶92a. and e., 94, 98, 99; therefore, the Magistrate erred in drawing an adverse inference and ruling no harm to competition was alleged.

Third, aside from the fact harm to competition need not be alleged where the challenged concerted conduct is a group boycott, PSW expressly alleges that certain of its website clients were forced out of business when PSW went out of business, thereby establishing a reduction in output by inference, Comp. at ¶¶90-91, 97; therefore, the Magistrate erred in drawing an adverse inference and ruling no harm to competition was alleged.

Fourth, it is a reasonable inference that the parallel, non-cross border processing rules did not benefit PSW as a *customer* in the relevant market, but instead increased prices by preventing offshore Acquiring Banks from competing to provide network services in the domestic market. Comp. at ¶¶92,96; therefore, the Magistrate erred in drawing an adverse inference and ruling no harm to competition was alleged.

[11] The harm to competition found by the court in the *Visa* case expressly included decreased network services output and stunted price competition in that market, *see supra*, note 7, and the court expressly found that merchants such as PSW were adversely affected by the payment of higher prices. *See* 163 F. Supp.2d at 340-341 (MasterCard and Visa jointly raised interchange rates without losing single merchant customer and charged higher interchange rates to various card not present merchants who rely almost completely on general purpose cards).

adverse inferences and was otherwise erroneous, Rep. at 17-18.[12] *See* Pl. Memo at 15-16; *see also*, *supra*, note 5.

Sixth, the Magistrate improperly relied on factual determinations and conclusions rendered in the *Paycom* case, wherein all claims were disposed of on a motion to dismiss (hence no evidence was adduced), which has neither *collateral estoppel* nor *res judicata* affect on PSW's claims in this case ***and*** is ***legally and factually inapposite***, in recommending dismissal of Count One, Rep. at 12-13, 15, 17, 18. [13]

---

[12] Making a factual determination that the MasterCard and Visa Excessive Chargeback Programs were "materially" different at this stage of the proceedings was error, not only because it was an improper adverse inference, but also in light of the allegations in the Complaint and lack of any expert or other testimony on the aggregate impact of the two programs, while reliance on *Paycom* for any reason at any point in the proceedings was error for the reasons discussed in the text above and in *infra*, note 13. In addition, the Magistrate's contention that PSW's price-fixing allegations were undermined because "PSW could still deal with Discover, and high prices could potentially invite American Express to enter or reeneter the market" was an improper adverse inference which was contrary to the express allegations in the Complaint that American Express was not currently in the market and that neither of the two competing networks had enough cardholders to permit PSW to accept only those cards and remain in business. Comp. at ¶50. Moreover, not only was the foregoing expressly pled, but it is both a plausible and compelling, if not irrefutable, inference drawn from the relative market shares of the four networks. *See, infra*, note 15.

[13] The case of *Paycom Billing Services, Inc. v. MasterCard International, Inc.*, 2005 WL 711658 (E.D.N.Y.), is inapposite to the case at bar. That case involved a challenge to MasterCard policies **only**, which the court held restricted competition ***only*** within its own brand. The court found there was no antitrust harm to competition because such intrabrand restrictions generally do not harm competition, and that Paycom was free to choose to cease accepting MasterCard branded cards, and instead accept the cards of its competitors in the relevant market, Visa and Discover. The court expressly noted that Paycom did not allege a conspiracy with Visa. The case at bar does not merely involve an agreement in the form of intrabrand association rules applicable only to that association's members, but rather, involves an agreement *among competing associations* of competitors to promulgate and enforce six (6) parallel anticompetitive policies and programs; specifically, a conspiracy between MasterCard and Visa, two competing associations controlling between 73% and over 92% of the relevant market, depending on how it is ultimately defined. Accordingly, as expressly pled, unlike in *Paycom*, there were no practical alternatives available to PSW. PSW has expressly pled *collateral estoppel* based on the *Visa* case, Paycom did not. PSW alleges antitrust injury as a customer, and therefore, unlike Paycom, PSW's injuries are not "merely derivative of the injury to Discover," a competitor. *See* Pl. Memo, note 31. Moreover, ***as a customer***, the foreclosure of offshore Acquiring Banks did not enhance PSW's competitive position; instead, it harmed it by foreclosing a potential source of lower cost network services. PSW has pled market wide harm, and not merely harm to its business, which has raised prices and reduced output for network services, dramatically so in the submarket for Adult network services. *See* Pl. Memo at pp. 11-14, 16 and notes 26-29, 31-32, 35. Finally, as noted previously, PSW's damages are not speculative, and are capable of reasonable determination. *See* Pl. Memo at p. 14 and note 34.

**B. Objection to Recommendation to Dismiss Count Two**

**1. Although the majority of courts appear to hold that market shares may not be combined to determine the existence of monopoly power under Sherman Act §2, neither the Supreme Court nor the First Circuit (to PSW's knowledge) have ever ruled on this issue, and that under the unique circumstances alleged in the Complaint, the aggregation of the market shares of MasterCard and Visa is appropriate and the better rule of law; therefore, the Magistrate erred in failing to permit aggregation of their market shares, and in recommending dismissal of Count Two as a result, Rep. at 19-22.**[14]

Based on the allegations in the Complaint, and before any discovery has been conducted, the relevant market determined, and/or expert or other testimony adduced, the approximate combined market share of MasterCard and Visa is either 73% or 92.5%, depending on how the relevant market is defined.[15] Case law cited by the Magistrate in his Report supports the proposition that market share of as little as 60% may be enough to establish the requisite element of monopoly power, depending on the circumstances, and that 90% is sufficient. *See, e.g., United States v. Aluminum Co. of N. Am.*, 148 F.2d 416, 424 (2nd Cir. 1945); *see also Stewart Glass & Mirror, Inc., v. U.S.A. Glass, Inc.*, 940 F. Supp. 1026, 1037 (E.D. Tex. 1996)(combined market share of at least 50% sufficient to allege joint monopolization claim).

---

[14] The unique circumstances in this case include a close relationship between the entities wielding monopoly power, as evidenced by ample uniform conduct between the parties and their dual governance structure. *In re Visa Check/Mastermoney Antitrust Litigation*, 2003 WL 1712568 *6 (E.D.N.Y.) (evidence of common ownership, lack of competition, and incidents of concerted activity by defendants could permit jury to conclude that MasterCard, along with Visa, attempted to monopolize relevant market); *see Stewart Glass & Mirror, Inc., v. U.S.A. Glass, Inc.*, 940 F. Supp. 1026, 1037 (E.D. Tex. 1996); *Continental Airlines, Inc. v. Am. Airlines, Inc.*, 842 F. Supp. 689, 706 (S.D. Tex.1993); *Minpeco S.A. v. Hunt*, 718 F. Supp. 168, 172 (S.D.N.Y. 1989); *see also American Tobacco Co. v. United States*, 328 U.S. 781 (1946)(affirming conviction of horizontal competitors for conspiracy to monopolize, although not directly reaching issue of whether competitors were capable of conspiring to monopolize).

[15] The Complaint alleges that market share in the network services market as follows: Visa 47% and MasterCard 26%, or a combined 73% of that market. Comp. at ¶41. American Express's share of this market is approximately 20% while Discover's share is approximately 6%. *Id.* Insofar as American Express has chosen to not process transactions related to the Internet Adult Entertainment Website market, *id.* at 50, simple extrapolation to account for the loss of American Express (assuming the remaining networks absorb Adult Entertainment processing in the same proportion as other transactions) readjusts the approximate relative market shares in the Internet Adult Entertainment Website network services market as follows: Visa 59.5 %, MasterCard 33%, or a 92.5% combined market share, and Discover 7.5%.

**2. The allegations in the Complaint along with all reasonable inferences to be drawn therefrom establish sufficient market share on the part of Visa to establish the element of market power under Section 2; therefore, the Magistrate erred in recommending dismissal of Count Two based on lack of monopoly power, Rep. at 18-22.**

Based on the allegations in the Complaint, and before any discovery has been conducted, the relevant market determined, and/or expert or other testimony adduced, the approximate market share of Visa is either 47% or 59.5%, depending on how the relevant market is defined. This is a sufficient allegation of monopoly power to withstand a motion to dismiss as to Visa, FFB, and FDMS. See *United States v. Aluminum Co. of N. Am.*, 148 F.2d at 424; *Stewart Glass & Mirror,* 940 F. Supp. at 1037; *see also, supra*, note 15.

**3. The allegations in the Complaint along with all reasonable inferences to be drawn therefrom establish sufficient market share on the part of MasterCard and Visa to establish the element of market power under a Section 2 conspiracy to monopolize theory; therefore, the Magistrate erred in recommending dismissal of Count Two based on lack of monopoly power, Rep. at 18-22.**[16]

**4. FFB and FDMS may be held liable along with MasterCard and Visa under a Section 2 claim as co-conspirators, joint venturers, and/or agents who have cooperated and assisted in implementing or carrying out the prohibited conduct, therefore, the Magistrate erred in recommending their dismissal under Count Two based on lack of monopoly power, Rep. at 19. See Pl. Memo at pp. 4-5.**

**C. <u>Objection to Recommendation to Dismiss Count Three</u>**

For all the reasons discussed above, the Magistrate erred in recommending dismissal of Count Three, Rep. at 21- 22. *See* Pl. Memo, note 8.

**D. <u>Objection to Recommendation to Dismiss Count Four</u>**

**The Complaint and all reasonable inferences to be drawn therefrom establish a sufficient nexus between the Defendants' conduct at issue in reviewing, screening, and censoring the websites of PSW's clients and the alleged coercion or encouragement of unknown federal officials to establish a *Bivens* claim; therefore, the Magistrate erred in recommending dismissal of Count Four due to the failure to allege the involvement of "some identifiable federal official," Rep. at 23.**

[16] It would appear that aggregation of market shares would be appropriate in a conspiracy to monopolize claim under Section 2. *Cf. American Tobacco Co. v. United States,* 328 U.S. 781 (1946)(affirming conviction of horizontal competitors for conspiracy to monopolize, although not directly reaching issue of whether *competitors* were capable of conspiring to monopolize).

First, PSW alleges in some detail, *inter alia*, that it does not serve any commercially reasonable purpose or financially or otherwise benefit Defendants to expend substantial sums of money to review, screen and censor the content of websites of PSW's clients and other Adult networks services consumers, particularly in the absence of any claimed legal or regulatory obligation to do so. Comp. at ¶¶165, 167, 169.b. Second, PSW alleges that the Registration Programs, which, *inter alia*, required PSW to provide Defendants with detailed information (which Defendants never previously required) about its website clients—***with whom Defendants had no contractual relationship***, did not financially or otherwise benefit Defendants or otherwise serve any commercially reasonable purpose. *Id.* at ¶¶92.a. 98, 165, 169.b. Not only are the foregoing allegations plausible, but they are compelling, if not irrefutable.

Third, PSW alleges that driving PSW and other Adult network services consumers out of business by subjecting them to excessive penalties under the Excessive Chargeback Programs, also did not financially benefit Defendants, and in fact has resulted in a loss of revenue. *Id.* at ¶¶166, 169.b. Nor does their parallel non-cross border processing rules, which, *inter alia*, reduces the Adult content websites which may process through Defendants by proscribing processing for foreign websites, appear to financially benefit them. However, the combination of these two programs has resulted in the transformation of the Internet Adult Entertainment Industry, which has resulted in a significant reduction in the amount of web pages on the Internet devoted to Adult content. *Id.* at ¶¶169.f. Fourth, the foregoing transformation of the Internet Adult Entertainment Industry has reduced the resources necessary to continue reviewing and screening the Internet for potential violations of federal law. *Id.* Fifth, PSW alleges that federal officials, i.e., those responsible for enforcing federal obscenity laws in the Justice Department, lack the resources and technical expertise to conduct the review and screening carried out by the

Defendants in order to monitor the Internet for potential violations of federal law. *Id.* at ¶¶168, 169.c. Sixth, that in any event, federal officials lack the legal basis and/or ability to review and screen Adult content websites in the absence of either the applicable password, which PSW was compelled to provide to Defendants, or a warrant. *Id.* Seventh, that Defendants cooperated in sharing and/or providing information obtained from the foregoing screening process with federal officials. *Id.* at ¶169.a. Eighth, PSW alleges that the participation of federal officials in the challenged censorship included, direction or information as to the website clients and/or the nature and/or type of content for which to review and/or screen and/or deny Adult network services. *Id.* at ¶170. Ninth, PSW alleges the motive for the Defendants acquiescence to the demands of federal officials is coercion and/or encouragement in the form of promises of unfavorable and/or favorable regulatory, legislative, and/or enforcement activity aimed at or affecting the Defendants. *Id.* at ¶¶168, 170. Tenth, PSW alleges that there is a sufficient nexus to attribute liability to the Defendants for a violation of the First Amendment as a federal governmental actor. *Id.* at ¶171.

PSW submits that the foregoing allegations and/or inferences drawn therefrom, while not necessarily irrefutable, are plausible and well pled in the Complaint, and PSW believes they have the added advantage of being true.[17] In any event, this Court *must* accept them as true.[18]

---

[17] The Complaint contains additional allegations which support an inference of the exertion of encouragement and/or coercion by federal officials including that Defendants' do not review, monitor, screen and/or otherwise limit or restrict the provision of network services for consumer purchases of non-Internet adult content products and/or services, including products or services which may or do violate federal or state law, *id.* at ¶169.d.; and that Defendants' screen for and deny network services for Adult content on the Internet that does not violate federal law, which further supports the inference that the Defendants' conduct is the result of a political—as opposed to a business—agenda; *id.* at ¶169.e.

[18] Moreover, with the exception of the last allegation above, which is not essential to allege PSW's *Bivens* claim and is merely an inference flowing directly from the express allegations which precede it, none of the allegations are "conclusory." Nor are any of the allegations "vague," although certain of the allegations are not detailed or specific. For the reasons described above in the text, no further details or specifics regarding this claim are known or available to PSW. In light of the applicable standard of

The conduct of which PSW complains is unlawful, in violation of the First Amendment. *Id.* at ¶¶172, 184. Such conduct is not the type which is engaged in overtly or publicly acknowledged. Accordingly, ***unless PSW is allowed to proceed with discovery, no one, but the Defendants, will ever know what precisely was said and done, by which Defendants and/or federal officials, or what motivated them--which is exactly what they want.***[19] PSW has alleged far more in its Complaint than a short plain statement showing it is entitled to relief. Indeed the allegations as to the *Defendants' conduct* are both detailed and specific. Defendants have not and cannot show that PSW can prove no set of facts sufficient to establish its *Bivens* claim.[20] Accordingly, it was error to recommend dismissal of Count Four.[21]

---

review on a motion to dismiss, PSW would reiterate its contention in the text that no further or more detailed allegations are required. Requiring more detailed pleading is further error, in particular, where, as here, the facts at issue are known to the defendants, but not the plaintiff, and are otherwise not publicly available. Notwithstanding the gloss added by lower court precedent, the standard of review for a motion to dismiss established by the Supreme Court does not mandate nor permit dismissal because certain allegations may be subjectively characterized as "conclusory" or "vague." Moreover, the precedent cited in the Report for the foregoing proposition of law is also inapposite. In *Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, 450 (1st Cir. 1983), the court dismissed *after trial* a nexus theory claim where the only governmental involvement pled was supervision and funding, and there was no connection established between the foregoing and the private defendant's decision to terminate the plaintiff. Although the travel of the case and facts are somewhat confusing, it appears that the case of *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d 97, 106-107 (2nd Cir. 1981) was decided on *summary judgment*, and that with respect to the only claim dismissed for failure to state a claim, the court apparently *accepted all facts pled as true*. *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2nd Cir. 1977) involved a claim of conspiracy to deprive the plaintiff of constitutional rights, wherein the court found the allegations of the defendants' conduct were, *inter alia*, "conclusory" and "vague." As summarized and stated above in the text, the allegations as to the *Defendants' conduct* in the case at bar are specific and detailed.

[19] If PSW is correct, the Defendants have participated in a serious and dangerous violation of First Amendment rights, as there can be no graver danger to our democratic form of government than the situation present here, where governmental officials, acting through private corporate actors (whose power and reach are international in scope), are able to shield themselves from both liability and discovery, and thereby circumvent and subvert constitutional rights of such fundamental importance as freedom of expression under the First Amendment. On the other hand, if discovery fails to establish sufficient evidence of a nexus between the Defendants' conduct and coercion or encouragement of federal officials to withstand summary judgment, the claims can and should then be dismissed.

[20] The only things not expressly alleged in the Complaint are the political and specific regulatory or other benefits which Defendants may have hoped to secure by acting in concert with federal officials, and the degree to which the former United States Attorney General had publicly made "cleaning up the

**E. Objection to Recommendation to Dismiss Count Eleven**

PSW contends that the Magistrate erred in recommending dismissal of Count Eleven alleging a claim for embezzlement. Rep. at 31.

The three elements necessary to prove embezzlement under Rhode Island law are (1) that the defendant was entrusted with the property for a specific use; (2) that the defendant came into possession of the property in a lawful manner; and, (3) that defendant intended to appropriate and convert the property to his or her own use. *State v. McKone*, 673 A.2d 1068, 1073 (R.I. 1996). It is beyond dispute not only that the first two elements are alleged in the Complaint, but that they occurred as a matter of undisputed fact. It is also undisputed that PSW has expressly alleged that the Defendants have appropriated and converted funds in the reserve account for their own use. Comp. at ¶191.

Nevertheless, the Magistrate has recommended dismissal because it is a "disguised breach of contract claim," which he appears to claim is evidenced by purported "inconsistencies" in the allegations in the Complaint. Rep. at 30-31. In the first instance, in almost every entrustment case, the first two elements of embezzlement are established by ***some form of contract***, such as a trust agreement, escrow agreement, or the like. Accordingly, merely because in determining whether a defendant's conduct is wrongful, it is first necessary to examine whether the defendant breached the contractual terms of entrustment, this does not immunize a defendant's conduct from tort damages, including punitive damages, just because that conduct

---

Internet" a major goal of the Justice Department, and the coincidence between the foregoing Justice Department initiative and the Defendants' challenged conduct in screening and censoring Internet Adult Entertainment websites, with respect to which there is some publicly available material. However, as PSW conceded at oral argument, none of this material contains a "smoking gun." None of the foregoing is expressly alleged because the allegations currently in the Complaint are more than sufficient to allege a *Bivens* claim for relief.

[21] See Pl. Memo at pp. 18-21 (discussing how the allegations in the Complaint are sufficient to legally establish all elements of a *Bivens* claim).

also may constitute a breach of contract. PSW submits that no citation to authority is necessary for the foregoing self-evident proposition of law.

The question then becomes at what point does the failure to apply or transfer the funds in the manner and/or for the purposes contractually agreed upon and/or the extent of any deviation from the contractually agreed upon purpose amount to more than a mere breach of contract and constitute an embezzlement. The question may, in part, be a temporal one. That is, whether sufficient time has passed between the condition or event triggering application or transfer of the entrusted funds such that a jury could infer that the failure of the defendant to apply or transfer the money evidences an intent to convert the funds to the defendant's own use. This is so, in part, because the "use" need not necessarily be immediate or permanent. For instance, if an attorney utilized client trust funds to make a purchase and then paid it back, this would constitute an actionable embezzlement. The question, in part, may also be one of degree. A trustee, who is entitled under a trust agreement to reimbursement for time and expenses incurred in performing duties as a trustee, is probably entitled to reimburse him/herself travel expenses by the mile for performing routine banking duties, but may be guilty of embezzlement if the trustee uses trust funds to purchase a luxury automobile for him/herself. PSW would submit that, in almost every case, the foregoing inquiry is inherently fact intensive and inappropriate for determination on a motion to dismiss.

Accordingly, in light of the foregoing as well as PSW's right to plead in the alternative, there are no "inconsistencies" in PSW's allegations. Moreover, further in light of the foregoing, and construing all allegations in the Complaint in a light most favorable to PSW, PSW does not allege that at the time the Complaint was filed that $1.6 million was *necessarily* <u>currently</u> being held in the reserve account, as suggested by the Magistrate, Rep. at 31. In fact, the *only* reasonable interpretation of the allegations in the Complaint, taken as a whole and accounting for

the right to plead in the alternative, is that due to the failure of the Defendants to *release* and/or *otherwise account* for funds diverted to the reserve account, PSW is seeking relief; meaning PSW is not expressly averring knowledge of the amount of funds currently in the reserve account, *if any*, or how they have been applied, if at all. *See* Comp. at ¶¶153, 175.h.-i., 176.f., and 191. Hence, PSW has pled in the alternative.

Construing all allegations in the Complaint in a light most favorable to PSW, the Complaint alleges an embezzlement arising out of the Defendants' refusal to release funds in the reserve account to PSW long after PSW ceased processing through the Defendants and the contractual purpose of the reserve had been fulfilled (i.e., as security for liability arising of processing PSW credit card transactions), such that it may reasonably be inferred that the Defendants converted the same to their own use. Such use includes holding and having the benefit of these funds interest free, Comp. at ¶83, in derogation of PSW's ownership interests and entitlement to immediate release and return of the funds.[22] Moreover, construing all allegations in the Complaint in a light most favorable to PSW, a claim for embezzlement is also pled arising out of PSW's funds, which lawfully came into Defendants' possession, were

---

[22] Although Defendants have not yet answered the Complaint, it was admitted at oral argument that there are in fact some funds remaining in the reserve account. Assuming, *arguendo*, that there are no further liabilities arising of processing PSW credit card transactions, yet Defendants have withheld and continue to withhold these funds some nearly two and one-half years after PSW ceased processing through Defendants, PSW contends that such conduct is more than a mere breach of contract. This is particularly true, where, as here, Defendants continue to benefit from the interest free use of these funds and there is an inference that ***the real reason the funds have not been released is to further oppress PSW and use it as leverage to compel it to abandon its pending claims. Accordingly, the refusal to release the funds is more than a mere breach of contract; it is tortious, entitling PSW to tort damages, including punitive damages, as an embezzlement.*** If Defendants are only exposed to contract damages by their conduct (i.e., return of the funds, plus statutory interest) and have no exposure for tort damages, there would appear to be little legal incentive to apply the money in the manner entrusted, at least where, as here, it may have more value to Defendants as leverage, while they continue to have the interest free benefit of the funds remaining in the reserve account. *See, e.g.,* The Green Sheet, Inc., "Jury Orders Cardservice International, Humboldt Bank to pay Escort Service $3.15 Million," http://www.greensheet.-com /priorissues-/030901-/.4html (adult entertainment merchant awarded return of $150K security deposit and $3M in punitive damages against credit card processors for wrongfully seizing and refusing to release deposit).

diverted to the reserve account, and were then converted to Defendants' own use by application of the funds for an improper purpose, specifically to pay legally unenforceable and grossly excessive penalties amounting to a forfeiture. *See* Comp. at ¶¶137, 146, and 191.

## III. CONCLUSION

**WHEREFORE,** Plaintiff prays that the Magistrate's Report and Recommendation dated February 3, 2006 be rejected to the extent of and for the reasons and on the grounds specified in its Memorandum of Law.

**PLAINTIFF,**
By its attorneys,
**SINAPI, FORMISANO & COMPANY, LTD.**

**Dated: February 17, 2006**

**Richard A. Sinapi, Esq. (R.I. Bar No. 2977)**
**V. Edward Formisano, Esq. (R.I. Bar No. 5512)**
**100 Midway Place, Suite 1**
**Cranston, RI 02920**
**Telephone: (401) 944-9690**
**Fax: (401) 943-9040**

## CERTIFICATION

**Patricia A. Sullivan, Esq.**
**Edwards & Angell LLP**
**2800 Financial Plaza**
**Providence, RI 02903**

**John A. Tarantino, Esq.**
**Adler Pollack and Sheehan P.C.**
**One Citizens Plaza, 8th Floor**
**Providence, RI 02903**

**Joseph V. Cavanagh, Jr., Esq.**
**Blish & Cavanaugh LLP**
**30 Exchange Terrace**
**Providence, RI 02903**

I hereby certify that I caused the within document to be served upon the above attorneys of record on the 17 day of February, **2006.**