# EXHIBIT A*

MERCHANT SERVICES BANKCARD AGREEMENT

| | |
|---|---|
| PSW, INC. | PSW BILLING |
| Customer's Legal Name | Doing Business As |

| | | | |
|---|---|---|---|
| 806 RESERVOIR AVE | CRANSTON | RI | 02910 |
| Street Address | City | State | Zip Code |

| | |
|---|---|
| | 05-0509097 |
| Specify Whether Customer is (circle one) a Corporation, Partnership, Sole Proprietorship, Non-Profit or Other Type of Entity | Taxpayer Identification Number |
| JOHN LOMBARDI | 401-943-1480 |
| Recipient For Notices Under Paragraph 26.5 | Facsimile Number |

This Merchant Services Bankcard Agreement ("Agreement") is among the CUSTOMER identified above, FIRST FINANCIAL BANK, a special purpose (credit card) state bank headquartered in Atlanta, Georgia ("BANK") and FIRST DATA MERCHANT SERVICES CORPORATION ("FDMS") (BANK and FDMS are collectively referred to as "SERVICERS").

BANK, as a member of Visa U.S.A., Inc. ("VISA") and MasterCard International Incorporated ("MasterCard"), is responsible for its VISA and MasterCard bankcard programs and has authorized FDMS or its members pursuant to a separate agreement (the "Agency Agreement") to act as an agent of and in conjunction with BANK in performing authorization, processing and settlement services for merchants participating in BANK's MasterCard and VISA bankcard programs, in performing the additional services with respect to other cards as specified on the schedules to this Agreement and in taking related actions. FDMS is acting in such capacity by executing and performing this Agreement. As between themselves, the respective rights and obligations of FDMS and BANK shall be governed by the Agency Agreement and Association Rules.

In consideration of the mutual covenants and agreements set forth herein and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, SERVICERS and CUSTOMER agree as follows:

4. **Operating Guide; Association Rules.**
CUSTOMER acknowledges that it has received, (or will receive promptly upon execution of this Agreement) the Operating Guide, the terms of which are incorporated into this Agreement. CUSTOMER agrees to follow the procedures in the Operating Guide in connection with each Card transaction and to comply with all applicable Association Rules. From time to time, SERVICERS may change the Operating Guide in whole or in part, and other operating procedures, by providing CUSTOMER with at least 30 days' prior written notice of the change. However, in the event of changes in the Association Rules or due to security reasons, certain changes in Card procedures may become effective on shorter notice. If there is any conflict between the terms of this Agreement and the Operating Guide, the terms of this Agreement will govern, unless the conflict is directly related to a change in the Operating Guide which specifically addresses a procedure or requirement detailed in this Agreement. If CUSTOMER loses or otherwise misplaces the Operating Guide or notices of changes thereto, CUSTOMER shall be responsible for contacting SERVICERS to obtain replacement copies.

11. **Settlement of Card Transactions.**

11.2 All settlements to CUSTOMER for VISA and MasterCard Card transactions will be based upon gross sales, less credits/refunds, adjustments, applicable discount fees when due, Chargebacks, and any other amounts then due from CUSTOMER to SERVICERS.
11.3 All credits to CUSTOMER's Settlement Account or other payments to CUSTOMER are provisional and are subject to, among other things, SERVICERS' final audit, Chargebacks (including SERVICERS' related losses), fees and fines imposed by the Associations. CUSTOMER agrees that SERVICERS may debit or credit CUSTOMER's Settlement Account for any deficiencies, overages, fees and pending Chargebacks, or may deduct such amounts from settlement funds due to CUSTOMER. Alternatively, SERVICERS may elect to invoice CUSTOMER for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified.

*To comply with page limitation for exhibits contained in this Court's Amended General Order #2002-01, defendants FFB and FDMS have excerpted the relevant provisions of the Merchant Services Agreement in this Exhibit. These defendants would be pleased to provide a complete copy of this Agreement upon the Court's request.

12. **Financial Accommodation.**

CUSTOMER acknowledges and agrees that the Services constitute the extension of financial accommodations to or for the benefit of CUSTOMER within the meaning of Section 365(c) of the Bankruptcy Code and entail the assumption by SERVICERS of significant credit risks. By reason of the assumption of such credit risks, CUSTOMER has granted to and conferred upon SERVICERS certain security, authorization to take reserves and other assurances of payment, all of which are material to SERVICERS' willingness to continue to provide services under this Agreement. The parties acknowledge that this Agreement creates a contract for the extension of financial accommodations to CUSTOMER within the meaning of Section 365(c) of the Bankruptcy Code.

13. **Fees; Adjustments; Collection of Amounts Due.**

13.5 In addition to the regular Chargeback fees, as set forth on the Schedules, CUSTOMER agrees to pay SERVICERS any fines imposed on SERVICERS by any Association, resulting from Chargebacks and any other fees or fines imposed by an Association with respect to acts or omissions of CUSTOMER.

13.6 If CUSTOMER's Chargeback Percentage for any line of business exceeds the estimated industry chargeback percentage, CUSTOMER shall, in addition to the regular Chargeback fees due to SERVICERS and any applicable Chargeback handling fees or fines imposed by the applicable Association, pay SERVICERS the excessive Chargeback fee shown on the Schedules for all Chargebacks occurring in such month in such line(s) of business. Each estimated industry chargeback percentage is subject to change from time to time by SERVICERS in order to reflect changes in the industry chargeback percentage reported by VISA or MasterCard. Each then-current industry chargeback percentage for CUSTOMER's applicable line(s) of business will be reflected in the monthly loss prevention report furnished to CUSTOMER.

14. **Chargebacks.**

14.1 CUSTOMER shall be responsible for all Chargeback amounts relating to Card transactions settled by SERVICERS where:

(i) merchandise is returned and a proper credit for Cardholder is not received by SERVICERS for processing;
(ii) the Sales Draft is, or is alleged to have been, executed, accepted, endorsed, completed or assigned improperly without authority or not in accordance with the Authorization requirements or provisions of this Agreement;
(iii) regardless of any Authorization obtained (including without limitation, telephone and mail order transactions), CUSTOMER completed a transaction when the Cardholder did not sign the Sales Draft;
(iv) the signature on the draft was unauthorized as compared to the signature appearing on the Card, the signature panel on the Card was blank, or a limited purpose business purchasing card was accepted without appropriate authorization of the nature of the goods or services purchased (in addition to Authorization of the transaction amount);
(v) the Sales Draft is incorrectly completed, incomplete or illegible;
(vi) the Cardholder disputes the sale, quality or delivery (or availability for pre-arranged pick-up) of merchandise or the performance or quality of service covered by the Sales Draft or agreement accepted by such Cardholder;
(vii) the circumstances in which the Sales Draft was created or submitted by, or credit was received by, CUSTOMER constituted or otherwise involved a breach of any term, condition, representation, warranty or duty of CUSTOMER hereunder;
(viii) multiple Sales Drafts were executed to avoid the need to obtain authorization necessary to complete the transaction;
(ix) the extension of credit for merchandise sold or rented or services performed was in violation of law or the rules or regulations of any governmental agency, whether federal, state, local or otherwise;
(x) a legible copy of the Sales Draft or Credit Voucher cannot be produced by CUSTOMER within ten days of SERVICERS' request (except to the extent SERVICERS are responsible pursuant to Paragraph 16.1);
(xi) the Cardholder asserts any claim or defense which the Cardholder has as a consumer of goods or services;
(xii) the Cardholder disputes the validity of a telephone or mail order Card transaction;
(xiii) the Card transaction is otherwise subject to Chargeback by the Card issuing bank or Cardholder in accordance with the Association Rules or applicable law; or
(xiv) the Card transaction is subject to Chargeback in accordance with the procedures set forth in the Operating Guide.

14.2 CUSTOMER shall reimburse SERVICERS for any Chargebacks, return items, or other losses resulting from CUSTOMER's failure to produce a Card transaction record requested by SERVICERS within the applicable time limits.

21. Term; Events of Default.

21.1 This Agreement and the applicable Schedules shall become effective upon the date this Agreement and the applicable Schedules are signed by BANK, which shall in all instances be on or after the date(s) CUSTOMER and FDMS sign this Agreement and the applicable Schedules and CUSTOMER will be advised of the effective date by SERVICERS.

21.2 The initial term of this Agreement shall commence and shall continue in force for three (3) years after it becomes effective. This Agreement shall renew for successive one-year periods unless any party terminates this Agreement by notice to the others, in writing, at least 60 days prior to the expiration of the term or renewal term, as the case may be.

21.3 If any of the following events shall occur (each an "Event of Default"):

(i) a material adverse change in the business, financial condition, business procedures, products or services of CUSTOMER; or

(ii) any assignment or transfer of voting control of CUSTOMER or its parent; or

(iii) a sale of all or a substantial portion of CUSTOMER's assets; or

(iv) irregular Card sales by CUSTOMER, excessive Chargebacks or any other circumstances which, in SERVICERS' sole discretion, may increase SERVICERS' exposure for CUSTOMER's chargebacks or otherwise present a financial or security risk to SERVICERS; or

(v) any representation or warranty of CUSTOMER in this Agreement is breached in any material respect or was or is incorrect in any material respect when made or deemed to be made; or

(vi) CUSTOMER shall default in any material respect in the performance or observance of any term, covenant, condition or agreement contained in this Agreement, including, without limitation, the establishment or maintenance of funds in a Reserve Account, as detailed in Paragraph 22;

(vii) CUSTOMER shall default in any material respect in the performance or observance of any term, covenant or condition contained in any agreement with any affiliate of SERVICERS, including, but not limited to, any agreement governing check guarantee or check verification services; or

(viii) CUSTOMER shall default in the payment when due, whether upon maturity or otherwise, of any material indebtedness for borrowed money or any material trade payable (other than any trade payable subject to a good faith dispute by CUSTOMER so long as CUSTOMER is actively pursuing resolution of such dispute); or

(ix) CUSTOMER shall: commence a voluntary case under the Bankruptcy Code; file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or entry into a composition agreement or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; generally become unable to pay its debts or trade obligations as they become due; make a general assignment for the benefit of creditors; or take any corporate action for the purpose of authorizing any of the foregoing; or

(x) a case or other proceeding shall be commenced against CUSTOMER, in any court of competent jurisdiction seeking relief under the Bankruptcy Code or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts, the appointment of a trustee, receiver, custodian, liquidator or the like of CUSTOMER, or of all or any substantial part of the assets, domestic or foreign, of CUSTOMER, and such case or proceeding shall continue undismissed or unstayed for a period of 60 consecutive days, or an order granting the relief requested in such case or proceeding against CUSTOMER (including, but not limited to, an order for relief under the Bankruptcy Code) shall be entered; or

(xi) the independent certified accountants retained by CUSTOMER shall refuse to deliver an unqualified opinion with respect to the annual financial statements of CUSTOMER and its consolidated subsidiaries;

then, upon the occurrence of (1) an Event of Default specified in subparagraphs (iv), (ix) or (x) above, SERVICERS may consider this Agreement to be terminated immediately, without notice, and all amounts payable hereunder by CUSTOMER to SERVICERS shall be immediately due and payable in full without demand or other notice of any kind, all of which are expressly waived by CUSTOMER, and (2) any other Event of Default, this Agreement may be terminated by SERVICERS by giving not less than 10 days' notice to CUSTOMER, and upon such notice all amounts payable hereunder by CUSTOMER to SERVICERS shall be due and payable on demand.

21.4 Neither the expiration nor termination of this Agreement shall terminate the obligations and rights of the parties pursuant to provisions of this Agreement which by their terms are intended to survive or be perpetual or irrevocable and such provisions shall survive the expiration or termination of this Agreement.

21.5 If any Event of Default shall have occurred and be continuing, SERVICERS may, in their sole discretion, exercise all of their rights and remedies under applicable law, including, without limitation, exercising their rights under Section 22.

21.6 This Agreement also may be terminated by SERVICERS prior to the then-current expiration date upon at least 90 days' advance written notice, if CUSTOMER's Card transactions fail to conform to the volume or average transaction size representations as set forth in the Schedules.

21.7 If this Agreement is terminated for cause, CUSTOMER acknowledges that SERVICERS may be required to report CUSTOMER's business name and the names and other identification of its principals to the Combined Terminated Merchant File maintained by VISA and MasterCard. CUSTOMER expressly agrees and consents to such reporting in the event CUSTOMER is terminated as a result of the occurrence of an Event of Default or for any reason specified as cause by VISA or MasterCard. Furthermore, CUSTOMER agrees to waive and hold SERVICERS harmless from and against, any and all claims which CUSTOMER may have as a result of such reporting.

21.8 The provisions governing processing and settlement of Card transactions, all related adjustments, fees and other amounts due from CUSTOMER and the resolution of any related chargebacks, disputes or other issues involving Card transactions will continue to apply even after termination of this Agreement, until all Card transactions made prior to such termination are settled or resolved. In addition the provisions of Sections 13 through 18, inclusive, 20, 22, 24 and 25, and Subsections 21.7, 21.9, 26.2 and 26.3, all in this Agreement shall survive any termination. Upon termination of this Agreement, CUSTOMER agrees to immediately send SERVICERS all the data relating to Card transactions made up to the date of termination.

21.9 After termination of this Agreement for any reason whatsoever, CUSTOMER shall continue to bear total responsibility for all Chargebacks, fees, credits and adjustments resulting from Card transactions processed pursuant to this Agreement and all other amounts then due or which thereafter may become due to SERVICERS under this Agreement or which may be due to SERVICERS before or after such termination to either SERVICERS or any of SERVICERS' affiliates for any related equipment or related services.

22. Reserve Account; Security Interest.

22.1 CUSTOMER expressly authorizes SERVICERS to establish a Reserve Account pursuant to the terms and conditions set forth in this Section 22. The initial amount of such Reserve Account shall be set by SERVICERS, in their sole discretion, based upon CUSTOMER processing history and the anticipated risk of loss to SERVICERS.

22.2 The Reserve Account shall be fully funded upon three days notice to CUSTOMER, or in instances of fraud or an Event of Default, reserve account funding may be immediate. Such Reserve Account may be funded by all or any combination of the following: (i) one or more debits to CUSTOMER's Settlement Account or any other accounts held by BANK or any of its affiliates; (ii) one or more deductions or off sets to any payments otherwise due to CUSTOMER; (iii) CUSTOMER's delivery to SERVICERS of a letter of credit; or (iv) if SERVICERS so agree, CUSTOMER's pledge to SERVICERS of a freely transferable and negotiable certificate of deposit. Any such letter of credit or certificate of deposit shall be issued or established by a financial institution acceptable to SERVICERS and shall be in a form satisfactory to SERVICERS. In the event of termination of this Agreement by either CUSTOMER or SERVICERS, an immediate Reserve Account may be established without notice in the manner provided above. Any Reserve Account will be held by BANK for the greater of ten months after termination of this Agreement or for such longer period of time as is consistent with BANK's liability for Card transactions in accordance with Association Rules. CUSTOMER's funds held in a reserve account may be held in a commingled Reserve Account for the reserve funds of BANK's customers, without involvement by an independent escrow agent.

22.3 If CUSTOMER's funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges due from CUSTOMER, or if the funds in the Reserve Account have been released, CUSTOMER agrees to promptly pay SERVICERS such sums upon request. In the event of a failure by CUSTOMER to fund the Reserve Account, SERVICERS may fund such Reserve Account in the manner set forth in subsection 22.2, above.

22.4 To secure CUSTOMER's obligations to SERVICERS and their affiliates under this Agreement and any other agreement for the provision of related equipment or related services, CUSTOMER grants to SERVICERS a lien and security interest in and to any of CUSTOMER's funds pertaining to the Card transactions contemplated by this Agreement now or hereafter in the possession of SERVICERS, whether now or hereafter due or to become due to CUSTOMER from SERVICERS. Any such funds, money or amounts may be commingled with other funds of SERVICERS, or, in the case of any funds held pursuant to the foregoing paragraphs, with any other funds of other customers of SERVICERS. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, SERVICERS are hereby authorized by CUSTOMER at any time and from time to time, without notice or demand to CUSTOMER or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to apply any and all such funds against and on account of CUSTOMER's obligations to SERVICERS and their affiliates under this Agreement and any other agreement with SERVICERS or any of SERVICERS' affiliates for any related equipment or related services (including any check guarantee and check verification services), whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. CUSTOMER agrees to duly execute and deliver to SERVICERS such instruments and documents as SERVICERS may reasonably request to perfect and confirm the lien, security interest, right of set off, recoupment and subordination set forth in this Agreement.

24. Indemnification.

24.1 CUSTOMER agrees to indemnify and hold harmless SERVICERS from and against all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) resulting from any breach of any warranty, covenant or agreement or any misrepresentation by CUSTOMER under this Agreement, or arising out of any gross negligence or willful misconduct of CUSTOMER or its employees, in connection with CUSTOMER's Card transactions or otherwise arising from CUSTOMER's provision of goods and services to Cardholders.

24.2 SERVICERS agree to indemnify and hold harmless CUSTOMER from and against all losses, liabilities, damages and expenses resulting from any breach of any warranty, covenant or agreement or any misrepresentation by SERVICERS under this Agreement or arising out of the gross negligence or willful misconduct of SERVICERS or their employees in connection with this Agreement.

26. Miscellaneous.

26.3 This Agreement, along with any Schedules and the Operating Guide, constitutes the entire agreement between the parties with respect to the subject matter, supersedes any previous agreements and understandings and, except as provided in other Sections of this Agreement, the Schedules or the Operating Guide, can be changed only by a written agreement signed by all parties. A party's waiver of a breach of any term or condition of this Agreement shall not be deemed a waiver of any subsequent breach of the same or another term or condition.

The parties hereto have caused this Agreement to be executed by their duly authorized officers. THIS AGREEMENT IS NOT BINDING UPON SERVICERS UNTIL SIGNED BY SERVICERS OR UPON THE OCCURRENCE OF ONE OF THE EVENTS SET FORTH IN SUBSECTION 21.1.

PSW INC.
("CUSTOMER")

By: ____________

Name: John R. Lombardi
(Please Print or Type)

Title: OFFICER

First Financial Bank
("BANK")

By: ____________ PHILIP LEVINE

Name: VICE PRESIDENT
(Please Print or Type)

Title: ____________

1/17/02

First Data Merchant Services Corporation
("FDMS")

By: ____________

Name: PHILIP LEVINE
(Please Print or Type) VICE PRESIDENT

Title: FIRST DATA MERCHANT SERVICES

Date: 1/17/02

Schedule A

3. Fees for Services:

**Chargeback Processing:** An excessive Chargeback handling fee will be charged in addition to any fee or fine imposed by Visa or MasterCard. In the event the Chargeback percentage of sales exceeds 2.50% annually, Customer will be billed a Chargeback Processing Fee of $7.50 per Chargeback that exceeds the 2.50% level. Customer will be charged a fee of $7.50 per Chargeback.

## CERTIFICATE OF SERVICE

I hereby certify that, on the 17th day of February, 2006, I caused a true copy of the within document to be forwarded by first class mail, postage prepaid, to the following parties:

Richard A. Sinapi, Esquire
V. Edward Formisano, Esquire
Sinapi, Formisano & Company, Ltd.
100 Midway Place, Suite 1
Cranston, Rhode Island 02920

Jay N. Fastow, Esquire
Bruce A. Colbath, Esquire
Denise L. Plunkett, Esquire
Weil, Gotshall & Manges, LLP
767 Fifth Avenue
New York, New York 10153

John Tarantino, Esquire
Patricia K. Rocha, Esquire
Adler Pollock & Sheehan PC
2300 Financial Plaza
Providence, Rhode Island 02903

Daniel Bookin, Esquire
Randall W. Edwards, Esquire
O'Melveny & Myers
275 Battery Street
San Francisco, California 94111

Brian Wallach, Esquire
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue, NW
Washington, D.C. 20004-2402

Patricia A. Sullivan, Esquire
Edwards & Angell, LLP
2800 Financial Plaza
Providence, Rhode Island 02903

[signature]
_______________________