UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

PSW, INC., d/b/a PSW          :
BILLING                        :
                            :
        v.                    :       C.A. No. 04-347T
                            :
VISA U.S.A., INC., et al.         :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

        This is an antitrust action initiated on August 16, 2004 under both federal and state law by Plaintiff, PSW, Inc. d/b/a PSW Billing ("PSW" or "Plaintiff"). Plaintiff amended its Complaint on April 6, 2005. (Document No. 53). Defendants VISA, U.S.A., Inc. ("Visa"), MasterCard International, Inc. ("MasterCard"), First Financial Bank ("FFB") and First Data Merchant Services Corp. ("FDMS") have filed Motions to Dismiss all claims under Fed. R. Civ. P. 12(b)(6). (Document Nos. 59 (MasterCard), 61 (Visa) and 62 (FFB/FDMS)). The Motions have been referred to me for findings and recommendation. 28 U.S.C. § 636(b)(1)(B); DRI LR Cv 72(a). A hearing was held on November 2, 2005. After listening to the arguments of counsel, reviewing the memoranda submitted by the parties and performing independent research, I recommend that the Motions to Dismiss be GRANTED in part, and DENIED in part, as set forth below.

**Background**

**I.     The Parties**

        PSW is an Internet business that processes MasterCard and Visa credit card sales on behalf of its clients, which are primarily adult entertainment websites. PSW's clients are either not

qualified or otherwise not authorized to accept MasterCard or Visa payment cards directly. First Amended Complaint ("FAC") ¶¶ 17-20, 91.

Defendants MasterCard and Visa are national bank card associations. Both MasterCard and Visa are organized as open joint ventures, and are owned by their member banks. Id. ¶¶ 10-11. A member bank of either MasterCard or Visa is classified as an issuing bank, which issues MasterCard or Visa payment cards to consumers; an acquiring bank, which contracts with merchants to acquire and process credit card sales; or both an issuing and acquiring bank. Id. ¶¶ 13, 17-20, 91. FFB is PSW's acquiring bank, and FDMS assists FFB with processing its transactions. Id. ¶¶ 23, 25.

## II.    Credit Card Transactions

A basic MasterCard or Visa transaction involves several steps. The transaction commences when a cardholder presents a payment card to a merchant in exchange for products or services. The merchant accepts the card and then transmits the transaction information to its acquiring bank. Id. ¶¶ 14, 38. The acquiring bank processes the transaction information, and sends the information to the cardholder's issuing bank, which reviews and approves the transaction. Id. Finally, the issuing bank posts the charge to the cardholder's account. Both the acquiring and issuing banks charge fees in connection with processing the transactions. Id. The acquiring bank withholds its fee from the amount it reimburses the merchant, and the issuing bank withholds its fee from the acquiring bank. Id. ¶ 38.

For PSW and its clients, a Visa or MasterCard charge transaction involves an additional party, PSW, and therefore, an additional level of processing. When a merchant such as PSW's website clients are not authorized to accept Visa and MasterCard charge cards, they must obtain

services from a third party like PSW to accept and process credit card sales on their behalf. Businesses such as PSW are classified as "aggregators" because they collect (or aggregate) the credit card transactions for numerous merchants and present those transactions to an acquiring bank. Id. ¶¶ 18-19. PSW essentially acts as a "gateway," which makes the sale to the consumer, while its website clients deliver the product to the consumer. Id. ¶¶ 20, 21.

### III.   The Merchant Agreement

On January 17, 2002, PSW entered into a Merchant Services Bankcard Agreement with FFB and FDMS (the "Merchant Agreement"). Id. ¶ 104. In the Merchant Agreement, FFB/FDMS agreed to provide authorization, processing and credit card settlement services for PSW. Id. ¶ 25. Essentially, as described above, PSW and FFB agreed that FFB would serve as PSW's acquiring bank and would process all the credit card transactions of PSW. The Merchant Agreement expressly incorporated the association rules adopted by Visa and MasterCard. Id. ¶ 28.

The Merchant Agreement also sets forth how chargebacks would be handled by PSW and FFB/FDMS. A chargeback occurs when a consumer disputes a charge on his charge account, and the merchant is unable to provide proof (such as a signed receipt) that the consumer authorized the transaction.[1] If there is no proof of authorization, the disputed transaction is credited (or "charged back") to the consumer's payment card account. Id. ¶¶ 51-52. Under the Merchant Agreement,

_____

[1] Internet businesses typically experience a higher volume of disputed transactions than regular merchants, due in part to "friendly fraud," i.e., consumers that dispute valid charges on their account, in order to avoid paying for purchases of products or services. Since Internet transactions occur without any signed receipt, there is no mechanism to verify a consumer's charge. Id. ¶ 59. Online purveyors of adult entertainment experience even higher rates of chargebacks than do other Internet merchants. Id. ¶ 67. PSW concedes there are "unavoidable incidents of friendly and other fraud" concerning Internet payment card transactions, and that PSW is "powerless to prevent" such chargebacks and fraud. Id. ¶¶ 59, 113. PSW concedes that MasterCard has deemed the chargebacks and Internet fraud a "serious dilemma." Id. ¶ 60.

PSW agrees to reimburse FFB for "any fees, charges or expenses required or imposed by MasterCard or Visa" in connection with a chargeback.  Id. ¶ 108.

In addition to requiring PSW to pay any chargeback fees, the Merchant Agreement also provided two other mechanisms to guard against FFB/FDMS' potential loss in the event of a chargeback – it required PSW to maintain a bank account or "reserve account" with FFB to cover potentially excessive chargeback expenses, Id. ¶ 107, and it provided for an "Excessive Chargeback handling fee" in the event that the number of chargebacks exceeded a certain threshold.  Id. ¶ 106.

## IV.    Termination of the Merchant Agreement

PSW alleges that its business difficulties began in late 2002 when Visa started to enforce its so-called "cross-border acquiring rule," which prohibits a domestic bank from processing any foreign transactions and prohibits foreign banks from processing any domestic transactions. FAC ¶ 113. PSW asserts that 60% of its Visa transactions were lost as a result of the enforcement of this rule. Id. At the same time, PSW "was required" to stop processing sales for "certain high chargeback sponsored clients." Id. Apparently, after ceasing business with international banks and after cutting ties with high-chargeback client, PSW's rates of chargebacks began to significantly rise. Id.

It is alleged that the enforcement of these two rules caused PSW to enter into a downward spiral. PSW states that as a result of the decline in business and the increased ratios of chargebacks, FFB/FDMS exercised its right in February 2003 under the Merchant Agreement to require PSW to increase the balance in its reserve account. At that point in time, PSW was required to increase the reserve account to $750,000.00, which FFB collected by withholding settlement of 33% of PSW's deposits until the reserve account was funded. Id. ¶ 116.

-4-

Around the same time, PSW secured a website client that did not sell adult entertainment. Ultimately, however, FFB determined that this non-adult oriented client was "high risk" and FFB ceased processing for that client. Id. ¶¶ 117-128. Subsequently, FFB required another increase in the reserve account balance, this time withholding 50% of PSW's daily deposits until the reserve account reached $1.2 million. Id. ¶ 129. Following that, and over a relatively short period of time, FFB apparently determined that PSW's potential liabilities were rapidly increasing, and it therefore required PSW to increase the reserve account to $2 million. FFB withheld a percentage of PSW's daily deposits in an attempt to increase the reserve account. Id. ¶ 139.

In September 2003, Visa imposed an $81,000.00 penalty on PSW for exceeding its chargeback threshold. Id. ¶ 146. Following that penalty, PSW apparently sent MasterCard and Visa a letter outlining its intent to file suit. Id. ¶ 147. Subsequently, FDMS sent PSW a letter notifying it that FDMS was terminating the relationship due to "very significant financial exposure." Id. ¶ 148. Shortly thereafter, FDMS sought to increase the reserve account balance to $3 million, rather than the $1.6 million being held at that time. Id. ¶ 149. Following termination of the Merchant Agreement and the breakdown of the parties' relationship, FFB has retained the holdings in the reserve account. PSW has been unable to retain another acquiring bank. Id. ¶ 154.

## V.   Case Posture

Plaintiff initiated this action by filing its Complaint against Defendants on August 16, 2004. Defendants responded to the Complaint by filing Motions to Dismiss. On April 6, 2005, PSW exercised its right to amend its Complaint as a matter of course under Fed. R. Civ. P. 15(a). It appears from the docket that this amendment may have been prompted, at least in part, by comments

-5-

made by Chief Judge Torres at a status conference held on February 14, 2005 regarding the confusing structure of PSW's lengthy Complaint.

There was little, if any, change in the structure of PSW's allegations from the Complaint to the FAC and only minor substantive changes. The FAC is 40 pages long and consists of 180 substantive paragraphs and 11 counts. Each count is brought against all four Defendants, and PSW incorporated all 150 "factual" allegations into each and every substantive count. The FAC does not identify which particular factual allegations show that PSW is entitled to relief on each particular count. Further, even though they are separate legal entities, the FAC does not distinguish between the Defendants in any meaningful way and alleges in a conclusory fashion that each individual Defendant is liable for the acts and/or omissions of the others. See, e.g., FAC ¶ 32. Further adding to the confusing nature of the FAC, the Introduction to both Complaints contains reference to an alleged violation of the Clayton Act, 15 U.S.C. § 14, but no substantive count regarding such claim. The Clayton Act generally prohibits selling a commodity on the condition that the purchaser refrain from dealing with the seller's competitors and, on its face, such Act does not appear reasonably related to PSW's allegations.

Turning to substantive changes, the original Complaint included a count against all Defendants under the Robinson-Patman Act, 15 U.S.C. § 13, claiming that the Defendants' "Excessive Chargeback Programs" gave larger aggregators a discriminatory preference over smaller aggregators such as PSW. See Compl. ¶ 154 (Count 3). The Robinson-Patman Act by its clear terms is limited generally to claims that a seller of "commodities" discriminated in price as between "different purchasers." 15 U.S.C. § 13(a). See Volvo Trucks N.A., Inc. v. Reeder-Simco GMC, Inc.,

-6-

126 S. Ct. 860 (2006). PSW dropped its Robinson-Patman Act claim from the FAC presumably because this case does not involve commodity purchasers and also presumably because the allegation of discrimination between <u>competitors</u> (large aggregators versus small aggregators) could be construed as inconsistent with its claims alleging harm to <u>competition</u> under the Sherman Act. PSW did not, however, remove the factual allegation of cost discrimination in favor of large aggregators as compared to smaller ones from its FAC. <u>Compare</u> Compl. ¶ 81 <u>with</u> FAC ¶ 90.

In replace of its Robinson-Patman Act claim, PSW added a First Amendment <u>Bivens</u> count against all Defendants. FAC ¶ 184. PSW alleges that Defendants' corporate actions, including that they purportedly reviewed and screened the content of pornographic websites operated by PSW's clients, was "on information and belief," the result of coercion and/or encouragement by "unknown" federal officials and unlawfully impaired PSW's "right to freedom of speech." <u>Id.</u> ¶¶ 168, 184. No other "new" claims were added by PSW to its FAC. Therefore, in addition to its <u>Bivens</u> claim, the FAC includes all the other counts alleged in PSW's original Complaint – Violation of Section 1 and Section 2 of the Sherman Act, Violation of the Rhode Island Antitrust Act, Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Tortious Interference with Contractual Relations, Tortious Interference with Prospective Economic Advantage, Conversion and Embezzlement.

### Standard of Review

In ruling on a motion to dismiss pursuant to Rule 12(b), the Court construes the complaint in the light most favorable to the plaintiff, <u>see</u> <u>Greater Providence MRI Ltd. P'ship v. Med. Imaging Network of S. New England, Inc.</u>, 32 F. Supp. 2d 491, 493 (D.R.I. 1998); <u>Paradis v. Aetna Cas. &</u>

Sur. Co., 796 F. Supp. 59, 61 (D.R.I. 1992), taking all well-pleaded allegations as true and giving

the plaintiff the benefit of all reasonable inferences, see Arruda v. Sears, Roebuck & Co., 310 F.3d

13, 18 (1ˢᵗ Cir. 2002); Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1446 (1ˢᵗ Cir. 1995); Negron-

Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27 (1ˢᵗ Cir. 1994). If under any theory the allegations

are sufficient to state a cause of action in accordance with the law, the motion to dismiss must be

denied. See Hart v. Mazur, 903 F. Supp. 277, 279 (D.R.I. 1995). The Court "should not grant the

motion unless it appears to a certainty that the plaintiff would be unable to recover under any set of

facts." Roma Constr. Co. v. aRusso, 96 F.3d 566, 569 (1ˢᵗ Cir. 1996); accord Conley v. Gibson, 355

U.S. 41, 45-46 (1957); see also Arruda, 310 F.3d at 18 ("[W]e will affirm a Rule 12(b)(6) dismissal

only if 'the factual averments do not justify recovery on some theory adumbrated in the

complaint.'").

### Discussion

### I.    Count 1 – Sherman Act, 15 U.S.C. § 1

In Count 1 of the FAC, PSW alleges Defendants violated Section One of the Sherman

Antitrust Act, 15 U.S.C. § 1, through their programs and concerted conduct, and that their actions

restrained "competition and/or trade in interstate commerce." Defendants argue that Plaintiff does

not have antitrust standing nor has it sufficiently alleged an antitrust injury, and move that the

Section One claim be dismissed.

Section One of the Sherman Act states, "[e]very contract, combination in the form of trust

or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with

foreign nations, is declared to be illegal." 15 U.S.C. § 1. Although the statute is broadly worded,

-8-

the Supreme Court has "long recognized that the Act prohibits only *unreasonable* restraints of trade." See Lee v. Life Ins. Co. of N. Am., 829 F. Supp. 529, 534 (D.R.I. 1993) (citation omitted). The next question, therefore, is what constitutes an unreasonable restraint of trade. Courts determine whether an alleged restraint is unreasonable by applying either the per se rule or the "rule of reason." The per se rule applies to "certain agreements...[which] are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused...." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984) (citation omitted). In defining what conduct is subject to per se classification, courts have been "very careful" to limit per se treatment only to "conduct of the type that is almost always actually or potentially anticompetitive and has no redeeming benefits (e.g., reduced costs, increased competition) worthy of being weighed against the negative effects." Addamax Corp. v. Open Software Foundation, Inc., 152 F.3d 48, 51 (1st Cir. 1998) citing Broadcast Music, Inc. v. Columbia Broadcasting System, 441 U.S. 1 (1979).

Accordingly, conduct is deemed a per se violation only when it is a "manifestly anticompetitive" act or practice. Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723-724 (1998). Addressing what might be considered manifestly anticompetitive, the First Circuit Court of Appeals has noted that there are "only a couple of 'serious candidates' for per se treatment," and that the offenses falling under that classification are an "ever narrowing...niche." Addamax Corp., 152 F.3d at 51-52 citing U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 593 (1st Cir.1993). The classic examples of per se violations are agreements to set prices, fix output or engage in horizontal market division. Augusta News Co. v. Hudson News Co., 269 F.3d 41, 47 (1st Cir. 2001).

-9-

Case 1:04-cv-00347-T-LDA   Document 80   Filed 02/03/2006   Page 10 of 32

While the per se rule applies to a narrow set of alleged antitrust violations, the rule of reason applies to all other alleged violations. The rule of reason consists of a "burdensome multi-part" analysis, which requires a plaintiff to prove, "that the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anti-competitive consequences, and that those detriments outweighed efficiencies or other economic benefits." Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004). The Supreme Court has noted that "...mergers, joint ventures, and various vertical agreements...are judged under a rule of reason, i.e., an inquiry into market power and market structure designed to assess the combination's actual effect." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984) (citation omitted).

In the present case, Plaintiff claims that the per se rule should be applied, stating, "PSW is ... challenging a conspiracy between competing associations of competitors, for which per se analysis is appropriate..." Pl.'s Memo at p. 16, n. 35. Defendants, on the other hand, argue that the rule of reason analysis must be applied. After considering the applicable legal standards and reviewing all of Plaintiff's claims, the conduct alleged is simply not "manifestly anticompetitive," and therefore does not fall under the well-defined per se rule. Additionally, MasterCard and Visa, and their rules and policies, are part of a "larger legitimate economic venture," and therefore must be analyzed under the rule of reason. Courts which have considered antitrust challenges to MasterCard and Visa's policies and procedures have applied the rule of reason. See Paycom Billing Svcs. v. MasterCard Int'l, Inc., 2005 WL 711658, *3 (E.D.N.Y. March 29, 2005) (stating that, "[b]ecause MasterCard is organized as a joint venture, its policies must be analyzed under the rule of reason.");

see also Augusta News, 269 F.3d at 47; and Addamax Corp., 152 F.3d at 52 (internal citation omitted) ("Joint venture enterprises ...unless they amount to complete shams, are rarely susceptible to per se treatment."); and Stop & Shop, 373 F.3d at 61 (joint ventures, "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively.")

Having determined that the rule of reason applies to Plaintiff's antitrust claims, the Court turns to consideration of each of PSW's alleged antitrust injuries.

1.    **Excessive Chargeback Program/Reserve Account**

PSW's first allegation is that the reserve account it was required to maintain with FFB, and FFB's policy for handling chargebacks are antitrust violations. PSW states that the programs, "substantially and adversely affected competition...and thereby caused or contributed to increased prices and/or a reduction in output." FAC ¶ 92. Both the reserve account and the excessive chargeback program were contracted-for conditions of the Merchant Agreement. PSW concedes that the purpose of the reserve account was to guard against the "potential imposition of penalties" for any excessive chargebacks by PSW. Id. ¶ 83. Similarly, the excessive chargeback program is a series of penalties FFB was permitted to impose on PSW if PSW exceeded a preestablished ratio of chargebacks. Id. ¶ 69-75.

The FAC thoroughly outlines the financial difficulties PSW experienced as a result of the increases to the reserve account and the chargeback penalties imposed by FFB. PSW has failed, however, to allege harm to competition. Ironically, PSW pleads facts that are antithetical to the basic elements of an antitrust case. For example, PSW alleges that the complained-of actions and policies would "impact small merchants most heavily." Id. ¶ 91. Further, PSW states that the policies and

-11-

actions would have the "[i]nevitable and intended effect of eliminating all *small* Aggregators processing for Internet Adult Entertainment Websites and consolidating that business with Aggregators large enough to spread unavoidable friendly and other fraud chargebacks against a sufficiently large volume..." Id. ¶ 90 (emphasis added).

The reserve account requirements and the excessive chargeback programs may have harmed or even destroyed PSW's business, but such an allegation, even if true, utterly fails to state an antitrust claim because it alleges no harm or injury to competition. The purpose of the federal antitrust laws is "the protection of *competition*, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962) (emphasis added). Moreover, "antitrust claims are concerned not with wrongs directed against the private interest of an individual business but with conduct that stifles competition." Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc., 357 F.3d 1, 4 (1ᵗ Cir. 2004).

PSW's failure to allege an injury to competition is fatal to its antitrust claim. The injury to competition requirement is at the heart of the determination of whether there is antitrust injury and antitrust standing. The antitrust injury requirement merely requires an allegation of loss or damage of the type the antitrust laws are intended to prevent and that flows from the allegedly unlawful acts. See Atlantic Richfield Co. V. USA Petroleum Co., 495 U.S. 328, 334 (1990). Under these rules, the "removal of one or a few competitors need not equate with injury to competition." Lee, 829 F. Supp. at 536.

In Paycom Billing, the United States District Court for the Eastern District of New York considered and dismissed similar antitrust claims brought by an aggregator against MasterCard.

-12-

2005 WL 711658 (E.D.N.Y. March 29, 2005)    One of the claims alleged that MasterCard's chargeback policy was an antitrust violation. Applying Fed. R. Civ. P. 12(b)(6), the Court rejected that claim, stating, "plaintiff has merely shown that MasterCard's 'chargeback system' harms plaintiff because it increases its costs." Id. at *4.    The Court noted that the plaintiff failed to demonstrate that the complained-of policies harm competition.    The same reasoning applies here. Therefore, for all the reasons stated, I conclude that PSW's antitrust claim stemming from the reserve account and the chargeback program fails to state a claim as a matter of law.    I therefore recommend that all antitrust claims regarding the chargeback penalties and reserve account be dismissed.

## 2.    Registration Policy

Next, PSW claims that the Visa Internet Payment Service Providers ("IPSP") program and the MasterCard Member Service Providers ("MSP") programs are anticompetitive and violate Section One of the Sherman Act.    Despite PSW's claim that the programs are related, the only common feature pled by PSW is that the programs seek to gain certain basic registration information about a website prior to authorizing the website to accept Visa or MasterCard payment cards.    Visa's IPSP, for example, requires that a web site client pay a registration fee of $750.00, and provide Visa with the "name, physical address, financial information, and URL for each website client..." FAC ¶ 92(a).    MasterCard's MSP, on the other hand, mandates a higher one-time registration fee of $1,000.00 from the website client, and a "change in display format" among other requirements. PSW notes that there is a "substantial fine" for non-compliance with these programs. Id. ¶ 92(a).

-13-

Having described the harm alleged and the programs underlying Plaintiff's claimed harm, the Court turns to the task of analyzing whether an antitrust claim is alleged. Once again, the Court credits each of PSW's allegations, however this second pass at an antitrust claim fares no better than the first. In short, as PSW alleges, these registration programs applied to "all aggregators/ merchants." Yet, despite PSW's claim that programs applied equally, PSW makes no analogous claim of equal harm to all competitors. The Court must accept these facts as true and conclude that these registration programs which were equally applied to all potential website clients resulted in harm only to PSW. Such allegations are insufficient to state an antitrust claim under the Sherman Act, and I also recommend these antitrust claims be dismissed.

### 3.    Boycott List Programs

Like the previous claim, PSW's next claim is aimed at separate programs of MasterCard and Visa which apparently have similar goals. PSW alleges that Visa and MasterCard have created programs to monitor the names of "merchants who have been terminated or declared to be an Excessive Chargeback Merchant." Id. ¶ 92(b). Visa's program is entitled the "Terminated Merchant's File" program and MasterCard's is called the MATCH file program. The effect of these programs is to create a black list for terminated and high risk merchants.

PSW's antitrust claim regarding these "boycott" programs fails for a variety of reasons. First, PSW's allegations related to this claim are inconsistent and contradictory. At first, PSW claims that as a result of being placed on the MasterCard and Visa blacklists, its clients were unable to secure another aggregator, and the clients were forced out of business. Id. ¶ 97. Later, however, PSW

-14-

states that it lost approximately 85% of its clients to competitors. Id. ¶ 145.  The Court's mandate

to accept all of Plaintiff's allegations as true does not reach a sensible conclusion as to these claims.

The conflicting allegations trouble the Court, but the Court nonetheless concludes that the

harm to PSW (if any exists) is ancillary to the chargeback program and does not allege an antitrust

injury to competition on its own. See Paycom Billing, 2005 WL 711658, *3.  Moreover, it is evident

that the party directly injured by the boycotting program is the black-listed merchant, and not PSW.

For all these reasons, I recommend that the antitrust claims regarding the boycott programs be

dismissed.

**4.     Geographic Market Divisions or Cross-Border Restrictions**

The next policy challenged by PSW is MasterCard's and Visa's rules which prohibit cross-

border processing by acquiring banks.  PSW states, "MasterCard and Visa established and enforced

rules prohibiting the processing of domestic transactions by offshore Acquiring Banks and/or

processors," as well as the "processing of foreign transactions by a domestic [Acquiring Bank]."

FAC ¶ 92(c).  Although PSW claims its website clients were harmed by this policy, PSW does not

sufficiently allege how this policy harmed competition in PSW's relevant market.  Once again, the

directly injured party, if any, is PSW's website client, which would have fewer acquiring banks with

which to contract.

Moreover, the rule restricts the number of acquiring banks in the market, and it is the

acquiring banks which compete with PSW and other aggregators, so this policy arguably benefits

PSW, and does not harm it.  In addition to the lack of alleged harm to competition, the federal

antitrust laws do not allow recovery for potentially advantageous "injuries."  See Matsushita Elec.

-15-

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 583 (1986). For all these reasons, I recommend that Plaintiff's antitrust claims regarding the cross-border rules be dismissed.

### 5.   Exclusivity Rules

Next, PSW lodges a challenge against Visa's and MasterCard's exclusivity rules. The exclusivity rules are "parallel programs whereby member banks in their respective networks were authorized to issue the general purpose card of the other network, but prohibited them from issuing general purpose cards of the competing networks, American Express and Discover..." Id. ¶ 92(d). The complained-of rules do not restrict PSW from contracting with American Express or Discover. The rules, rather, only prohibit acquiring banks like FFB from issuing Discover or American Express cards if they also issue Visa or MasterCard payment cards. PSW concedes that American Express has decided not to process transactions involving Internet adult entertainment. Id. ¶ 50. PSW does not allege that it is unable to accept Discover-branded cards. Id. ¶ 162.

These exclusivity rules were the subject of a Department of Justice action in United States v. Visa, USA, Inc., 163 F. Supp. 2d 322 (S.D.N.Y. 2001), aff'd, 344 F.3d 229 (2nd Cir. 2003). PSW argues that collateral estoppel prevents Defendants from contesting the "holding or facts" decided in that case. Then, PSW contends that on the basis of the United States v. Visa Court's holding, PSW has suffered cognizable antitrust harm. This Court notes that the exclusivity rules were invalidated because they caused harm to cardholders and banks, because fewer payment cards were available with fewer benefits. 163 F. Supp. 2d at 340-341. The holding in the United States v. Visa case, therefore, is not relevant or applicable in the absence of any harm to PSW, its competitors or the relevant market. PSW, in short, alleges the existence of the United States v. Visa case, and then

-16-

claims on the basis of the Court's finding in that case and the nature of its business, that it is entitled to recovery under the federal antitrust statutes. Such a claim is unjustified.

The Paycom Court addressed this issue and reached a sound conclusion applicable in the present dispute. That Court rejected the claimed damages as a result of the United States v. Visa litigation and held that the Plaintiff-aggregator lacked standing because its claimed injury was highly speculative and derivative of the injury already being claimed by American Express and Discover. See Paycom Billing, 2005 WL 711658 at 13-14 ("Plaintiff is a remote party and allowing it to recover under this theory could result in punishing [Visa] multiple times for the same offense"). In addition to failure to claim harm to competition in its market, Plaintiff is a remote party, seeking derivative and speculative damages. For all these reasons, the claim of antitrust violations stemming from the United States v. Visa litigation fails to state a claim, and I recommend that it be dismissed.

**6.    Price Fixing**

Plaintiff's final claim under Section One of the Sherman Act relates to an alleged parallel pricing scheme by MasterCard and Visa. PSW claims Defendants undertook a "parallel pricing scheme...in conjunction with their member banks, whereby, inter alia, higher interchange and discount fees and chargeback related and other penalties are charged to [Aggregators]." FAC ¶ 92(e). PSW claims that the "inevitable and intended" effect of the pricing scheme was to eliminate aggregators, however, PSW also claims that larger aggregators have survived. See FAC ¶ 90. For all the reasons outlined previously, this pass at an antitrust claim fails to state a cognizable injury or any harm to competition.

In addition to the insufficient allegation of a larger injury to competition, there are several other deficiencies in this attempted price fixing claim. First, PSW claims that aggregators have "no practical alternative" but to do business with MasterCard and Visa. After a thorough reading of the FAC, this statement is patently incorrect. PSW could still deal with Discover, and high prices could potentially invite American Express to enter or reenter the market. Second, it is undisputed that MasterCard's chargeback policies and penalties are much more onerous than Visa's policies and penalties. The fact that their penalties materially differ undermines any price fixing claim. See Paycom, 2005 WL 711658 at *4, n.5 ("plaintiff's claim that the MasterCard banks are engaged in a...price fixing for internet transactions appears on its face to lack merit. These same banks are handling Visa payment card transactions with less stringent chargeback policies.") Because the alleged price fixing scheme fails to state a claim, I recommend that it be dismissed.

## II.   Count 2 – Sherman Act / Monopolization, 15 U.S.C. § 2

In Count 2 of the FAC, Plaintiff claims that Defendants violated Section Two of the Sherman Act. Section Two makes it unlawful for a party to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. Plaintiff claims all four Defendants violated Section Two of the Sherman Act by monopolizing, attempting to monopolize, conspiring to monopolize and combining to monopolize the "general purpose card market and/or network services for general purpose cards." See FAC ¶¶ 40-43.

First, any claim under Section Two requires evidence that, "the defendant has monopoly power and the defendant 'has engaged in impermissible exclusionary practices with the design or effect of protecting or enhancing its monopoly position.'" CCBN.Com, Inc. v. Thomson Fin., Inc.,

270 F. Supp. 2d 146, 156-157 (D. Mass. 2003) citing Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 195-96 (1ˢᵗ Cir.1996) (emphasis added) (citations omitted). The first issue before the Court, therefore, is whether each Defendant has monopoly power. Monopoly power, also referred to as market power, has been defined as the "power to control prices or exclude competition." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481 (1992). Importantly, monopoly power is measured based on the "relevant market," which Plaintiff claims is the "general purpose card...and debit card market." FAC ¶ 40. See United States v. Grinnell Corp., 384 U.S. 563, 570-571 (1966).

To start, the Court considers whether FFB or FDMS has sufficient market power in the general purpose card and debit card market. In short, the FAC is silent on this issue, and Plaintiff has not alleged that it competes in the self-defined relevant market of the general purpose and debit card market. Plaintiff states various ways in which it asserts that Visa and MasterCard have attempted to, or have actually obtained, a monopoly in the relevant market. On the other hand, there are absolutely no allegations that FFB or FDMS had sufficient market power, that they conspired or had specific intent to monopolize or could realistically attain sufficient market power to monopolize a relevant market. Accordingly, without any sufficient allegations whatsoever against FFB/FDMS other than Plaintiff's conclusory allegations of violation of Section Two, the Court recommends that the Section Two claim against FFB/FDMS be dismissed.

Proceeding with the analysis of the Section Two claim as applied to Visa and to MasterCard, the Court considers each entity's market power. In this regard, the Court notes an additional relevant consideration in any calculation of market power under Section Two – market power is determined on the basis of each individual defendant. In simpler terms, in order to state any claim under Section

-19-

Two's actual or attempted monopoly clauses, a claimant is required to assert that the <u>individual</u> market power of a defendant is sufficient to constitute a monopoly, in this analysis, the combined monopoly power of competitors is irrelevant and insufficient.[2]

In the present case, PSW claims that Visa's "current share of the general purpose card...and debit card market is nearly 60%, while MasterCard's share...is 33% to 36%." FAC ¶ 40. Additionally, Plaintiff claims that Visa and MasterCard "control *over* 73% of the volume of transactions on general purpose cards in the United States...[and] about 85% of the market" for cards issued. <u>Id</u>. ¶ 41. The alleged market power, assuming it to be accurate, is still not sufficient to state a claim for a monopoly under Section Two. First, the allegations of shared power must be ignored. It is well-established that an allegation of "shared monopoly" is simply insufficient to satisfy the test for monopoly power. <u>See</u> <u>Santana Prod., Inc. v. Bobrick Washroom Equip.</u>, 249 F. Supp. 2d 463, 518-19 (M.D. Pa. 2003) (collecting cases). In <u>Sun Dun, Inc. v. Coca-Cola Co.</u>, 740 F. Supp. 381, 390 (D. Md. 1990), the District Court dismissed a Section Two claim pursuant to Fed. R. Civ. P. 12(b)(6) in which the plaintiff had asserted that defendants "together...monopolize the market." That Court stated that the Complaint "alleges facts amounting to oligopoly and then simply applies a monopoly label to these facts in an effort to state a Section 2 claim." <u>Id.</u> The Court noted that, "an examination of the history of the Sherman Act reveals that Congress' concept of 'monopoly' did not include 'shared monopolies' or 'oligopolies' at all, but rather the complete domination of a market by a *single* economic entity." <u>Sun Dun</u>, 740 F. Supp. at 391; <u>See also</u> <u>Consol. Terminal Sys., Inc. v. ITT World Communications, Inc.</u>, 535 F. Supp. 225, 229 (S.D.N.Y. 1982) ( "a shared monopoly,

---

[2] Similarly, in order to state a claim for an attempted conspiracy under Section Two, a claimant must, at a minimum, allege an attempt to form a single monopolizing power, not merely that two entities may share monopoly power.

does not in itself violate Section 2 of the Sherman Act; rather, in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant.")

Second, after ignoring the shared monopoly allegation, neither Visa nor MasterCard has a share of the market which is sufficient to state a claim for a monopoly. For example, PSW states that Visa enjoys "nearly 60%" of the relevant market and that MasterCard has "33% to 36%" of the relevant market. These figures simply do not constitute monopoly power. Courts have stated that "70% to 90% of the sales in a well-defined marketplace [are] indicative of monopoly power." Town of Concord v. Boston Edison Co., 915 F.2d 17, 30 (1st Cir. 1990) (citations omitted); see also United States v. Aluminum Co. of N. Am., 148 F.2d 416, 424 (2nd Cir. 1945) (stating that a 90% market share "is enough to constitute a monopoly" but that 60% is probably, and 30% is "certainly," not enough).

Based on PSW's failure to sufficiently pled the individual market power of any one of the Defendants, all the claims for monopoly under Section Two should be dismissed.[3]

## III.   Count 3 – Rhode Island Antitrust Act (R.I. Gen. Laws § 6-36-5)

Plaintiff's claim under Count 3 of the FAC for violation of the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-5, suffers from the same flaws as does its Sherman Act claims. The Rhode Island Antitrust Act mirrors the Sherman Act. See ERI Max Entm't v. Streisand, 690 A.2d 1351,

---

[3] Although the above analysis is sufficient to support a dismissal of the Section Two claim, the Court will also address PSW's reliance on United States v. Visa. That case held that MasterCard and Visa, both jointly and separately, have market power within the network services market. 344 F.3d at 239-40. In that case, however, there was no Section Two monopolization claim made, and the finding of market power was only made in connection with a Section One claim. In particular, it was found that the parallel exclusivity rules resulted in an unreasonable restraint of trade in the general purpose card market. The fact that the market power finding was made in connection with the Section One claim is significant since monopoly power under Section Two requires something greater than market power under Section One. See Kodak, 504 U.S. at 481. Thus, United States v. Visa does not support PSW's monopoly claim.

1353 n.1 (R.I. 1997); Stop & Shop, 239 F. Supp. 2d at 186-187 ("[t]he provisions of the Rhode Island Antitrust Act mirror those of §§1-2 of the Sherman Act...and are construed in the same manner as the federal statutes.") Because the Court has recommended the dismissal of PSW's Sherman Act claims, I also recommend that the analogous state law claims be dismissed.

### IV.   Count 4 – First Amendment / Bivens

In Count 4 of the FAC, PSW alleges that Defendants violated its rights under the First Amendment to the United States Constitution.  Plaintiff brings this claim pursuant to the Supreme Court's decision in Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971). The crux of PSW's claim is that Defendants violated PSW's First Amendment rights by reviewing and screening the content of PSW's adult website clients and that Defendants acted due to coercion and/or encouragement by "unknown" federal officials.  FAC ¶¶ 168, 184.

In Bivens, the Supreme Court held that a federal officer acting under color of federal law can be liable for damages for violating the constitutional rights of another. See Bivens, 403 U.S. at 397. Subsequently, the Supreme Court described Bivens as a "limited holding," which it has "consistently refused to extend...to any new context or new category of defendants" for the last twenty-five years. Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66-68 (2001).   Specifically, the Supreme Court subsequently held that Bivens does not confer a right of action against "private entities acting under color of federal law." Id; see also Sarro v. Cornell Corr., Inc., 248 F. Supp. 2d 52 (D.R.I. 2003); Stoutt v. Banco Popular de P.R., 320 F.3d 26 (1st Cir. 2003); and Meuse v. Pane, 322 F. Supp. 2d 36 (D. Mass. 2004).  In this case, PSW has claimed that Defendants, all of which are private entities, violated Bivens.  Although there is an assertion that the Defendants acted at the behest of some

-22-

"unknown" federal officials, PSW concedes that it has no support or further evidence regarding these claims.

Even assuming, *arguendo*, that a private entity could be sued under <u>Bivens</u>, PSW has failed to allege facts establishing a nexus between the federal actor and the challenged action. PSW merely states "on information and belief" that Defendants violated its First Amendment rights due to coercion and/or encouragement by "unknown" federal officials. FAC ¶¶ 168, 184. Such conclusory and vague allegations cannot withstand a motion to dismiss. <u>See</u> <u>Gerena v. P.R. Legal Servs., Inc.,</u> 697 F.2d at 450; <u>Contemporary Mission, Inc. v. U.S. Postal Servs.,</u> 648 F.2d 97, 106-107 (1981); and <u>Ostrer v. Aronwald,</u> 567 F.2d 551, 553 (1977). Because PSW has not alleged sufficiently that some identifiable federal official was involved in any claimed screening, I recommend that the <u>Bivens</u> count be dismissed.

### V.   Counts 5 and 6 – Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing

Counts 5 and 6 of the FAC are claims for breach of contract and breach of the covenant of good faith and fair dealing. These claims relate to the parties' actions under the Merchant Agreement. Consistent with its other claims, these two counts are broadly asserted against all four Defendants. Although MasterCard and Visa are not signatories to the Merchant Agreement, PSW claims they were a party to the Merchant Agreement, or were "at least in privity of contract with PSW relative thereto." FAC ¶ 173.

The Merchant Agreement states that it shall be governed and construed under New York law. The essential elements of an action for breach of contract under New York law are (1) formation of a contract between the parties, (2) plaintiff's performance, (3) defendant's failure to perform, and

-23-

(4) resulting damages to plaintiff. <u>Guity v. Martinez</u>, 03 Civ. 6266 (LAP), 2004 WL 1145832, at *5 (S.D.N.Y. 2004). In the FAC, PSW satisfies all elements of this <u>prima facie</u> test as to FFB/FDMS. First, it identifies the Merchant Agreement as the contract formed between the parties. Second, PSW claims it performed under the conditions of the contract, but that FFB/FDMS failed to perform. Finally, PSW sets forth various claimed damages. On the basis of these allegations, PSW has stated a claim for breach of contract against FFB/FDMS.

The Court notes that PSW sets forth twelve particular ways in which it alleges the Merchant Agreement was breached. <u>See</u> FAC ¶ 175. Although some of the allegations go to the reasonableness or fairness of the contract, rather than breach (such as assessment of "commercially unreasonable" fines and "permitting fraud"), others state specific breach allegations (such as "wrongfully terminating" the Merchant Agreement and improperly directing PSW to "terminate processing" of a non-adult account). The Court does not comment on PSW's ultimate success on the merits of each of the allegations. However, applying the Fed. R. Civ. P. 12(b)(6) standard of review, the breach allegations set forth by Plaintiff are sufficient at this stage to allow PSW to pursue its breach of contract claim as to FFB and FDMS; thus, I recommend that FFB and FDMS' Motion to Dismiss the breach of contract claim be denied.

The next issue is whether PSW states a <u>prima facie</u> breach of contract claim against Visa and MasterCard, entities which are not signatories to the applicable contract. PSW alleges that Visa and MasterCard are liable for breach of contract, claiming a principal/agent relationship exists between FFB/FDMS and Visa and MasterCard, FAC ¶ 32, by which the Visa and MasterCard are "in privity" with PSW under the contract. Again, although this Court has serious doubts as to the ultimate merits of this claim, there appears to be some legal support for this position under New York law.

-24-

New York law holds that a non-signatory to a contract can be named as a defendant in a breach of contract action only if the party has "assumed or been assigned" the contract. See Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp. 209, 215-16 (S.D.N.Y. 1997) (citations omitted); see also Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc., 156 A.D.2d 550, 551, 549 N.Y.S.2d 57, 58 (2d Dep't 1989)) (noting that it is "well settled that a [plaintiff in a breach of contract action] 'may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in privity.'") (citation omitted).

An allegation that a principal-agent relationship exists is sufficient to establish "the requisite privity for [a] cause of action to survive the motion to dismiss." See Huntington Pennysaver, Inc. v. Tire Supply Corp. of Long Island, 298 N.Y.S.2d 824 (Dist. Ct. Suffolk County 1969) (holding principal liable for the authorized contracts made by his agents with a third party) (citing Restatement, 2d, Agency, § 146). This is true even if the principal was undisclosed. See Industrial Mfr., Inc. v. Bangor Mills, Inc., 283 A.D. 113, 121, 126 N.Y.S.2d 508 (1st Dept.1953) ("plaintiff...has the right to hold the principal liable when finally disclosed") (citing Restatement, 2d, Agency, § 186). Since Plaintiff has sufficiently pled a principal-agent relationship between FFB/FDMS and MasterCard and Visa, the Court cannot dismiss the breach of contract claims against Visa or MasterCard applying Fed. R. Civ. P. 12(b)(6). Though they were not signatories to the Merchant Agreement, PSW sufficiently alleges that Visa and MasterCard were in privity of contract with it and thus PSW has stated a claim under New York law. Thus, I recommend that Visa and MasterCard's Motions to Dismiss the breach of contract claim be denied.

Next, the Court considers Plaintiff's allegation that Defendants breached the Covenant of Good Faith and Fair Dealing. The covenant is implied in all contracts under New York law. See

Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291-92 (1995). The Court determines whether the covenant has been breached by examining the "intent and reasonable expectations" of the parties entering into the contract "as long as those expectations are consistent with the express terms of the contract." Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2nd Cir.1989); see also Dalton, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289. The "purpose of the implied covenant of good faith is to further an agreement by protecting a promisee against 'breach of the reasonable expectations and inferences otherwise derived from the agreement.'"ARI and Co., Inc. v. Regent Int'l Corp., 273 F. Supp. 2d 518, 521-522 (S.D.N.Y. 2003) citing TVT Records and TVT Music, Inc. v. Island Def Jam Music Group, 244 F. Supp. 2d 263, 278 (S.D.N.Y. 2003). The covenant is "not distinct" from the underlying contract. Alter v. Bogoricin, No. 97 Civ. 0662, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997); see also Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 91 (1983).

Because the covenant does not exist apart from the underlying contract, there is no "separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." ARI and Co., 273 F. Supp. 2d at 521-522 citing Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2nd Cir. 2002); see also Butvin v. DoubleClick Inc., No. 99 Civ. 4727, 2001 WL 228121, at *8 (S.D.N.Y. Mar. 7, 2001). Therefore, under New York law, a claim for breach of the covenant will be dismissed as "redundant where the conduct allegedly violating the implied covenant is also the predicate for breach...of an express provision of the underlying contract." TVT, 244 F. Supp. 2d at 277; see also Alter, 1997 WL 691332 at *7 ("[E]very court faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing has dismissed the latter claim as

duplicative"). In ARI and Co., the Court noted that "a breach of the implied covenant of good faith claim can survive a motion to dismiss 'only if it is based on allegations different than those underlying the accompanying breach of contract claim.'" 273 F. Supp. 2d at 522 (citation omitted). That court also noted that, "where the relief sought by the plaintiff in claiming a breach of the implied covenant of good faith is 'intrinsically tied to the damages allegedly resulting from the breach of contract,' there is no separate and distinct wrong that would give rise to an independent claim." Id. (internal citation omitted).

Applying these rules to this case, the Court must determine if the allegations related to the claim for breach of the covenant of good faith and fair dealing are intrinsically tied to the claims made for breach of contract. After review, the Court has determined that each of the claims alleged in Count 6 (breach of covenant of good faith and fair dealing) is tied to the damages claimed in Count 5 for breach of contract. The first two alleged ways in which Defendants breached the covenant relate expressly to the termination of the Agreement. FAC ¶ 176(a) and (b). The next four alleged breaches of the covenant relate to the excessive chargeback programs, registration programs, fines and the reserve account. Id. ¶ 176(c), (d), (e) and (f). The final claim is that the covenant was breached as a result of a First Amendment violation. Id. ¶ 176(g). As previously noted, PSW has failed to properly state a claim for a First Amendment violation. Each of the other claims are independently pursued in the breach of contract claim, and therefore none of them form a separate basis for a claim for breach of the covenant. For these reasons, I conclude that under New York law, there is not a separate, cognizable cause of action for a breach of the implied covenant of good faith and fair dealing, and I therefore recommend that Defendants' Motions to Dismiss this claim be granted.

### VI.    Counts 7, 8 and 9 – Tortious Interference Claims

Counts 7, 8 and 9 are claims alleging tortious interference with contractual relations.  In Count 7, PSW claims that Defendants tortiously interfered with its contracts with its website clients.  Count 8, which is stated in the alternative, alleges that MasterCard and Visa, if determined not to be party to the Merchant Agreement, tortiously interfered with that Agreement.  Finally, Count 9 claims all Defendants "wrongfully interfered with Plaintiff's prospective economic advantage as it relates to a reasonable business expectancy of acquiring and continuing contracts with website clients and/or otherwise continuing to derive...."

### 1.    Count 7

Rhode Island broadly defines the tort of tortious interference.  The test requires the plaintiff to demonstrate "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor (sic) of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Mortgage Guar. & Title Co. v. Commonwealth Mortgage Co., 730 F. Supp. 469, 471-472 (D.R.I. 1990) citing Mesolella v. City of Providence, 508 A.2d 661, 669 (R.I. 1986).  The same test is applied to both claims of existing interference and prospective interference.

In Count 7, PSW alleges that all Defendants tortiously interfered with PSW's contracts with its website clients. Because of the broad definition of this tort, and accepting PSW's assertions as true pursuant to Fed. R. Civ. P. 12(b)(6), PSW has sufficiently pled a claim of tortious interference with contractual relations.  PSW has broadly alleged the existence of its contracts with its clients, that the Defendants were aware of those contracts, that they intentionally interfered and that their interference caused harm to Plaintiff, which suffered damages.  Although PSW's claims may not

-28-

ultimately survive summary judgment, the only issue at this stage is whether they have alleged all of the elements of the claim. For these reasons, I recommend that the Defendants' Motions to Dismiss Count 7 be denied.

### 2.   Count 8

Under Count 8, PSW alleges that if MasterCard and Visa are not ultimately deemed to be in privity of contract with PSW under the Merchant Agreement, that in the alternative, PSW asserts that they tortiously interfered with the Merchant Agreement. The Court applies the same test and standard of review outlined above. If MasterCard and Visa are ultimately deemed to not be in privity of contract with PSW under the Merchant Agreement, PSW may have a claim for tortious interference. At this early stage, the Court cannot conclusively determine that a viable claim fails to exist under Count 8. However, this claim should be dismissed in the event that the Court ultimately determines that MasterCard and Visa are in privity with PSW as to the Merchant Agreement. Therefore, the Court also recommends that Defendants' Motions to Dismiss Count 8 be denied at this stage.

### 3.   Count 9

Count 9 alleges that Defendants have harmed PSW's business, and some expectancy of prospective clients. The allegations are not entirely clear. In the FAC, for example, PSW has not sufficiently identified the prospective "economic advantage" with which it alleges that Defendants interfered. Rather, PSW states in a conclusory fashion that the "economic advantage...relates to a reasonable business expectancy of acquiring and continuing contracts with website clients and/or otherwise continuing to derive business advantages from the operation of its business." FAC ¶ 189. These claims are insufficient to state a claim for interference with prospective business. See Solar

Travel Corp. v. Nachtomi, 2001 WL 641151 *10 (S.D.N.Y. 2001) (conclusory allegations of "lost business from its customers" and other "lost prospective business" did not sufficiently identify third parties or plaintiff's dealings to state a tortious interference claim). See also Ed Peters Jewelry Co. v. C&J Jewelry Co., 51 F. Supp. 2d 81, 102 (D.R.I. 1999). ("Plaintiff needs more than a hope at some prospective contract to state such a claim."); Moran v. Norrell Health Care, Inc., No. PC 89-4262, 1993 WL 853860, at *3 (R.I. Super. Sept. 15, 1993); New England Multi-Unit Hous. Laundry Ass'n v. Rhode Island Hous. & Mortgage. Fin. Corp., 893 F.Supp. 1180, 1193 (D.R.I. 1995) (same). Accordingly, I also recommend that the tortious interference claim under Count 9 be dismissed.

## VII.    Counts 10 and 11 – Conversion / Embezzlement

Both Counts 10 and 11 relate to PSW's claim that Defendants misappropriated PSW's "funds." Whether PSW wants to call it conversion or embezzlement, either allegation is simply a disguised breach of contract claim.

Turning first to the conversion claim, Rhode Island does recognize a claim for conversion of money. In the present case, however, the test is not satisfied. In order to prove a claim for conversion of money, the plaintiff must demonstrate, "the defendant is under [an] obligation to deliver specific money to the plaintiff." DeChristofaro v. Machala, 685 A.2d 258, 263 (R.I. 1996) (emphasis added); see also Traffix Inc v. Herold, 269 F. Supp. 2d 223, 225 (S.D.N.Y. 2003) (no conversion claim when money is placed in a reserve account and subsequently withheld from plaintiff.) In the present case, there are absolutely no allegations that Defendants failed to deliver "specific" money to PSW. Moreover, at oral argument on the issue, Plaintiff's counsel conceded, "I think it is an embezzlement rather than a conversion." This Court will not search for a cause of action, where none is apparent, and the party concedes that it does not believe the claim exists.

-30-

Accordingly, I recommend that Defendants' Motions to Dismiss be granted and that the claim for conversion be dismissed.

Turning next to the embezzlement claim, the Court is again struck by several inconsistencies in the factual allegations contained in the FAC. The Court's review starts with the general embezzlement allegation in Count 11, that "Defendants...appropriated and converted to their own use Plaintiff's funds in the reserve account..." Id. ¶ 191. Presuming this to be true is contradictory to earlier allegations the Court is also required to credit as true. Earlier in the FAC, in support of its breach of contract claims, PSW makes several allegations related to the reserve account including a claim that the Merchant Agreement was breached by "failing or refusing to release to PSW or otherwise account for the [balance] in PSW's reserve account...." See FAC ¶¶ 175(h), (i) and (k). (emphasis added). Similarly, PSW alleges that at the time of the filing of the Complaint, "approximately $1.6 million was being held in PSW's reserve account" and that Defendants had not "authorized the release of these funds" nor had they "otherwise accounted to PSW." Id. ¶ 153 (emphasis added). PSW cannot have it both ways. Their detailed allegations do not allege that any money has been removed from the reserve account, until they make the conclusory allegation in Count 11 that the funds have been appropriated and converted. Construing the FAC in its entirety, Plaintiff does not sufficiently pled an embezzlement claim against Defendants. Accordingly, I recommend that Defendants' Motions to Dismiss the embezzlement claim be granted and that such claim be dismissed.

-31-

**Conclusion**

For the reasons discussed, I recommend that Defendants' Motions to Dismiss Counts 1, 2,

3, 4, 6, 9, 10 and 11 be GRANTED and that these counts be dismissed as to all Defendants.   I

recommend that Defendants' Motions to Dismiss Counts 5, 7 and 8 be DENIED as to all Defendants.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk

of the Court within ten (10) days of its receipt.  See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure

to file specific objections in a timely manner constitutes waiver of the right to review by the District

Court and the right to appeal the District Court's decision.  See United States v. Valencia-Copete,

792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir.

1980).

The recommendation is
hereby accepted.

Ernest C. Torres
Chief, US District Judge

Date: 2/23/06

LINCOLN D. ALMOND
United States Magistrate Judge
February 3, 2006

-32-